UNITED STATES of America
v.
Raymond MOORE, Appellant.
No. 71–1252.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 10, 1971.

Decided May 14, 1973.

Certiorari Denied Oct. 23, 1973.

See 94 S.Ct. 298

**1140**

Patricia Wald, Washington, D. C. (appointed by this court), for appellant.

Roger M. Adelman, Asst. U. S. Atty. with whom Thomas A. Flannery, U. S. Atty. at the time the brief was filed, and John A. Terry, Philip L. Cohan and Richard L. Cys, Asst. U. S. Attys. were on the brief, for appellee. Henry F. Greene, Robert C. Crimmins, Oscar Altshuler and John D. Aldock, Asst. U. S. Attys., also entered appearances for appellee.

George P. Lamb, Jr., Washington, D. C., filed a brief on behalf of the Washington Area Council on Alcoholism and Drug Abuse as *amicus curiae*.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting en banc.

PER CURIAM:

Circuit Judge Wilkey, with whom Circuit Judges MacKinnon and Robb join, filed an opinion voting to affirm all convictions and the sentences in the District Court. Circuit Judge Leventhal, with whom Circuit Judge McGowan concurs, filed an opinion voting to affirm all convictions and to remand to the District Court for further consideration of NARA disposition on resentencing. Circuit Judge MacKinnon concurred in Part IV of Circuit Judge Leventhal's opinion, and Chief Judge Bazelon in Part V thereof. Circuit Judges MacKinnon and Robb filed separate opinions voting to affirm all convictions and the sentences in the District Court.

Circuit Judge Wright, with whom Chief Judge Bazelon and Circuit Judges Tamm and Robinson join, filed a dissenting opinion voting to remand for a new trial in which the jury would be permitted to decide whether the defendant as a result of his repeated use of narcotics lacked substantial capacity to conform his conduct to the requirements of the law. Chief Judge Bazelon filed a dissenting opinion, stating he would extend the possibility of this defense of lack of capacity to crimes other than narcotics possession.

■ There being a majority of five judges of the court voting to affirm all convictions, but there being no majority in favor of any specific disposition, Circuit Judges MacKinnon, Robb and Wilkey, without intimating any dissatisfaction with the sentences originally imposed by the District Judge, vote to join Circuit Judges McGowan and Leventhal in affirming defendant Moore's conviction on all counts, vacating the sentences

imposed, and remanding to the District Court for resentencing.

So ordered.

WILKEY, Circuit Judge, with whom Circuit Judges MacKINNON and ROBB join.

This is an appeal from a conviction under two federal statutes for possession of heroin. Appellant contends that his conviction was improper because he is a heroin addict with an overpowering need to use heroin and should not, therefore, be held responsible for being in possession of the drug. After careful consideration, we must reject appellant's contention and affirm the conviction by the trial court.

I. *The Undisputed Evidence and the District Court's actions*

During January 1970 the Metropolitan Police began an investigation into a heroin trafficking operation allegedly being conducted in a Northwest Washington hotel. Through an informant, investigating officers learned that two men, identified simply as "Crip Green" and "Jumbo," were selling the drugs from two rooms in the hotel; acting under police supervision, the informant made heroin purchases from both of the suspects.

Based upon this information, search warrants for the two hotel rooms were obtained and executed on 29 January 1970. After knocking and announcing their identity and purpose, and receiving no reply, the officers forced their way into the room. The scene that greeted the officers was accurately described in appellant's own brief as follows:

> The room was about 10–12 feet in depth. Against the far wall was a bed, the head of the bed being to the left and the foot to the right. Two chairs were positioned at the side of the bed, *facing it,* and *about one foot away.* Sherman W. Beverly was seated on the left-hand chair, and Raymond Moore was seated on the right-hand chair. Both were still seated, and simply twisted around in their chairs to look at the door, when Officer Daly entered.

> . . . In front of Mr. Beverly's chair, about one inch from the edge of the bed, was a white-framed mirror on which there was a quantity of white powder (later found to be 1,854.5 milligrams of a mixture containing 4–7% heroin). [Footnote omitted.] To the right of the mirror, in front of Appellant's chair, was a flat square cardboard record album cover, on which there was also a quantity of white powder (later determined to be 1,824 milligrams of a mixture containing 4–7% heroin). Between these two "cutting boards" lay 93 new gelatin capsules and 81 used gelatin capsules (as determined by the fact that there was a small but detectable amount of white powder containing heroin in the capsules). To the left of the mirror lay 67 capsules filled with a white powder (later found to be a total of 3,650 milligrams containing 4–7% heroin). Toward the far edge of the bed there was a woman's stocking stretched over a wire coat hanger (called a cutting screen). Next to the cutting screen was an unopened package containing about 10 hypodermic syringes and needles. Lying on the album, in front of Mr. Moore's chair, was an ace of hearts cut in half (often called a cutting card). Near the pillow were a set of keys that were found to fit the door of room 15. Under the pillow was a 38-caliber Smith & Wesson pistol.

It is obvious that these implements were intended for use in mixing undiluted heroin with lactose and/or quinine to reduce it to a street concentration of about 5–10%, cutting into the quantity normally injected, and capping it in a form in which it can be sold and carried.

After Appellant and Beverly were arrested, they were searched. A plastic vial containing 50 capsules of a white powder (later found to be a total of 2,274.9 milligrams of a mixture

containing 4–7% heroin) was found in Appellant's right front trouser pocket. Nothing was found on Beverly.[1]

Upon this evidence a four-count indictment was returned charging appellant with violations of the Harrison Narcotics Act, 26 U.S.C. § 4704(a) (1964), and the Jones-Miller Act, 21 U.S.C. § 174 (1964).[2] Advancing his argument that he was a hopelessly dependent addict and could not, therefore, be held responsible for possession of heroin, appellant sought to have the indictment dismissed under the authority of this court's opinion in Watson v. United States.[3]

At the hearing on this motion appellant stated and the Government stipulated that appellant was indeed a heroin addict. Appellant further testified that he was not a heroin pusher, had never engaged in drug trafficking, and had simply come to the hotel room where he was arrested in order to purchase the illicit drug.

Relying on our opinion in *Watson*, appellant argued that he was a mere nontrafficking addict and that the indictment should be dismissed for any one of three reasons. First, appellant argued that it is unconstitutional to hold a nontrafficking addict guilty of simple possession of heroin. This position rests on an amplification and extrapolation of the Supreme Court's interpretation of the Eighth Amendment advanced in the admittedly confused and divergent opinions in Robinson v. California[4] and Powell v. Texas.[5] The second ground, an extension of the common law principle that there cannot be the requisite *free will* if the illegal act is performed because of overpowering compulsion, asserts that a narcotics addict is excused from any criminal penalties for the illegal acts of purchase, possession, and use of narcotics to satisfy his personal addictive needs. The third is appellant's construction and interpretation of the series of four congressional acts, which not once since 1909, neither in black let-

1. Appellant's Brief, pp. 24–26.

2. 26 U.S.C. § 4704(a):

"It shall be unlawful for any person to purchase, sell, dispense, or distribute narcotic drugs except in the original stamped package or from the original stamped package; and the absence of appropriate taxpaid stamps from narcotic drugs shall be prima facie evidence of a violation of this subsection by the person in whose possession the same may be found."

The Harrison Narcotics Act has since been repealed by the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. 91–513, Title III, § 1101 (b)(3)(A), 84 Stat. 1292 (Oct. 27, 1970). 21 U.S.C. § 174:

"Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any such acts in violation of the laws of the United States,

shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,-000. For a second or subsequent offense (as determined under section 7237(c) of the Internal Revenue Code of 1954), the offender shall be imprisoned not less than ten or more than forty years and, in addition, may be fined not more than $20,000.

"Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."

The Jones-Miller Act has since been repealed by the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. 91–513, Title III, § 1101(a)(2), 84 Stat. 1291 (Oct. 27, 1970).

3. 141 U.S.App.D.C. 335, 439 F.2d 442 (1970) (*en banc*).

4. 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

5. 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968).

ter statute nor in committee report, have specifically exempted the non-trafficking addict from criminal penalties for purchase, possession, and use.

The Government responded by arguing first that there was no constitutional, common law, or statutory rationale for permitting a non-trafficking addict a defense to a charge of possession of heroin. Secondly, it contended that in any event Moore was not a non-trafficking addict but was in fact engaged in pushing the drug and, even if there were a defense available to mere addicts, such a defense should not be permitted here.

Following a hearing, the trial court denied appellant's motion to dismiss. The trial judge, however, reserved his judgment on whether evidence of addiction could be introduced to the jury by the defense.

At trial the principal prosecution witness was the arresting officer who testified to the facts described above. In addition he testified that he had no personal knowledge that appellant was engaged in drug trafficking, that no tests had been conducted to determine if appellant's fingerprints were on the paraphernalia in the room, that no tests were conducted to determine if heroin powder was present on appellant's hands, and that he had not checked the hotel register and had no way of knowing whether appellant was in any way connected with the room in which he was arrested. On cross-examination the officer admitted that some addicts' habits require 50 to 100 capsules per day, and that having that many capsules in his pockets would not necessarily be inconsistent with appellant being a mere non-trafficking addict. Finally, the officer agreed on cross-examination that in his opinion appellant Moore was a heroin addict.

During the Government's presentation, the court heard out of the presence of the jury the testimony of Dr. Kaufman, an expert on drug addiction. Dr. Kaufman testified that appellant was an addict of long standing, that appellant's addiction had the characteristics of a disease, and that as a consequence appellant was helpless to control his compulsion to obtain and use heroin.

At the conclusion of this testimony, the trial court ruled that Dr. Kaufman would not be permitted to testify before the jury, apparently on the ground that addiction can never be a defense to a charge of possession of heroin. After the Government rested its case, the court denied a motion by appellant for a judgment of acquittal. Appellant then renewed his motion to dismiss the indictment on the basis of *Watson*. This motion to dismiss was rejected this time because the court felt that there was sufficient evidence of trafficking to permit the case to go to the jury. The court also indicated that it would now permit Dr. Kaufman to testify; this permission was, however, withdrawn the following day.

After this ruling the defense decided not to introduce any further evidence. Before resting, however, for purposes of completing the trial record, the defense offered to introduce the testimony of Mr. McKinley Gore of the District of Columbia Narcotics Treatment Administration. This testimony would have been to the effect that some addicts have habits that require more than 50 capsules per day and that such addicts may have more than 50 capsules in their possession at one time. Mr. Gore also would have testified, if permitted, that appellant was currently enrolled in a methadone therapy program, that in Mr. Gore's opinion appellant's chances for rehabilitation were good, and that Moore was beginning to solve the root problem of his addiction and would soon no longer need heroin.

Following this proffer, the court declined to instruct the jury that a non-trafficking addict could not be convicted under the statutes charged. Moore was found guilty on all four counts of the indictment. Acting upon appellant's motion immediately after the verdict was announced, the court committed appel-

lant to the Federal Correctional Institute at Danbury, Connecticut, for determination of his suitability for treatment under Title II of the Narcotics Addict Rehabilitation Act of 1966, 18 U.S.C. § 4251 et seq. (1970). Subsequently, the NARA staff reported that appellant was an addict, both physically and psychologically dependent on heroin, but was not suitable for treatment. Thus on 14 June 1971 the court sentenced appellant to concurrent terms of two to six years for the violations of 26 U.S.C. § 4704(a) and six years for the violations of 21 U.S.C. § 174. Appellant now seeks reversal of this conviction.

We believe it is clear from the evidence that Moore was not a mere non-trafficking addict but was in fact engaged in the drug trade.[6] Yet even if we were to assume that appellant was a simple addict and nothing more, we believe that his conviction must be sustained.

## II. *Appellant's Common Law Defense*

Let us see how far the logical basis of appellant's argument would inexorably take us. Bear in mind that this logical extension of the argument appellant makes here was foreseen by Justice Black and others of the Supreme Court in *Robinson* and *Powell*, as discussed *infra*, which may account for the limits written into those decisions, limits which appellant would have this court take upon itself to expand.

### A.

According to appellant this case has one central issue:

> Is the proffered evidence of Appellant's long and intensive dependence on (addiction to) injected heroin, resulting in substantial impairment of his behavior controls and a loss of self-control over the use of heroin, relevant to his criminal responsibility for unlawful possession. . . .[7]

---

6. Judge Wright in his opinion states that "it was clear that a trafficking operation was in progress, but the question remained whether Moore was the buyer or the seller." Judge Wright's opinion at 1212. The answer is indeed there was a trafficking operation, and *both* men, Beverly and Moore, were engaged in it.

The picture to us is clear. There are undeniable indicia that the narcotics on the bed were part of a trafficking enterprise, and that in turn Moore was part of the enterprise. First, both chairs were each about one foot from the edge of the bed, facing the bed, which had its long side against the wall. The chairs were not in the position of the two men, Beverly and Moore, engaging in a dialogue, but rather faced the bed, on which both could be inferred to be working. Second, the arrangement of the items on the bed indicated clearly that two persons were working there. There was a mirror on which were piled 1,854.5 milligrams of mixed heroin, and to the right of the mirror, in front of appellant's chair, there was a cardboard record album cover on which there were 1,824 milligrams of mixed heroin. Third, to the left of the mirror in front of Beverly were 67 capsules filled with the heroin mixture. These corresponded roughly with the 50 filled capsules in Moore's pocket. (Beverly had no capsules in his pocket;

Moore had none on his side of the bed.) Last, and most significant—particularly significant because nowhere in 108 pages of Judge Wright's opinion is this conclusive fact mentioned—there was one playing card in the entire room. That playing card had been torn in half, in order to provide a working tool for two men, not one.

For the benefit of the uninitiated, the mirror and the record album cover have smooth surfaces on which the heroin was placed to be put in the capsules. This cannot be conveniently done by fingers alone; the beveled edge of a playing card is an efficient encapsuling tool. Since there was only the Ace of Hearts, it had to be torn in half to provide the working tool for both Beverly and appellant Moore.

If this court were to hold on these undisputed facts that there was not even sufficient evidence to put the question to the jury that appellant Moore was a trafficking addict, it is crystal clear how the standard would be applied by the trial courts. The practical effect would be that any addict would go free of any punishment, or indeed rehabilitative treatment following a conviction, because there would be no conviction, no matter how blatant had been his trafficking.

7. Appellant's Brief, p. 8.

In other words, is appellant's addiction a defense to the crimes, involving only possession, with which he is charged? Arguing that he has lost the power of self-control with regard to his addiction, appellant maintains that by applying "the broad principles of common law criminal responsibility" we must decide that he is entitled to dismissal of the indictment or a jury trial on this issue. The gist of appellant's argument here is that "the common law has long held that the capacity to control behavior is a prerequisite for criminal responsibility." [8]

It is inescapable that the logic of appellant's argument, if valid, would carry over to all other illegal acts of any type whose purpose was to obtain narcotics for his own use, a fact which is admitted by Judge Wright in his opinion [9] Appellant attempts to justify only the acts of possession and purchase of narcotics, both illegal, and both prohibited because if successfully prohibited they would eliminate drug addiction. The justification is on the basis that the addict has lost the power of control over his choice of acts. Appellant argues that the same rationale, justifying a tolerance of these two illegal acts by this court, or a strained construction of the statute that Congress really did not intend to prohibit such acts, or that it is constitutionally impermissible to prohibit such acts, would not carry over to other actions for the same purpose of obtaining narcotics for his own use.

In the case of any addict there are two factors that go to make up the "self-control" (or absence thereof) which governs his activities, and which determines whether or not he will perform certain acts, such as crimes, to obtain drugs. One factor is the physical craving to have the drug. The other is what might be called the addict's "character," or his moral standards. In any case where the addict's moral standards are overcome by his physical craving for the drug, he may be said to lose "self-control," and it is at this point, and not until this point, that an addict will commit acts that violate his moral standards. For our purposes here, we may think of such acts as crimes to obtain drugs.

The legally determinative matter under appellant's theory must be the sum or result of the two factors. Putting it in mathematical terms, if the addict's craving is 4 on a scale of 10, and his strength of character is only 3, he will have a resulting loss of self-control and commit some illegal act to acquire drugs, perhaps only an illegal purchase and possession. For a different example, let us assume a medically induced addict, whose craving is 6, but whose strength of character is 8; with him there will be no resulting loss of self-control, and presumably no illegal acts of any kind. A third example, an addict with a craving of 8, and a strength of character of 3, may result in a loss of self-control to a degree that the addict robs a bank at gunpoint to obtain money to buy drugs.

In all these examples the legally important factor is the resulting loss of self-control. Drug addiction of varying degrees may or may not result in loss of self-control, depending on the strength of character opposed to the drug craving. Under appellant's theory, adopted by the dissenters, only if there is a resulting loss of self-control can there be an absence of *free will* which, under the extension of the common law theory, would provide a valid defense to the addict. If there is a demonstrable absence of free will (loss of self-control), the il-

8. *Id.*, at 52.

9. "Perhaps the most troublesome question arising out of recognition of the addiction defense is whether it should be limited only to those acts—such as mere possession for use—which are inherent in the disease itself. It can hardly be doubted that, in at least some instances, an addict may in fact be 'compelled' to engage in other types of criminal activity in order to obtain sufficient funds to purchase his necessary supply of narcotics. In such cases, common law principles of criminal responsibility would clearly be applicable." Opinion of Judge Wright, at p. 1255.

legal acts of possession and acquisition cannot be charged to the user of the drugs.

*But if it is absence of free will which excuses the mere possessor-acquirer, the more desperate bank robber for drug money has an even more demonstrable lack of free will and derived from precisely the same factors as appellant argues should excuse the mere possessor.*

In oral argument appellant maintained that there are different kinds of addicts, that is, some who are able to confine their law violation to possession and acquisition for their own use and some who will commit crimes other than possession or acquisition to feed their habits; and that it is only the latter whom we should punish for their addiction. This position of appellant is, unfortunately, logically untenable, if one accepts appellant's own rationale that we must not punish addicts for possession because of the compulsion under which they act to acquire the drugs.

By definition we have assumed crimes of two classes—first, simple possession and acquisition, or second, greater crimes such as robbery—both motivated by the compulsive need to obtain drugs resulting in loss of self-control. If we punish the second, we can do so only because we find *free will*. If *free will* can exist for the second, it likewise must exist for the first class. If, like appellant, one takes the position that any addict who commits crimes (*i.e.* robbery) to feed his habit may be punished, one is making a judgment that this addict possesses *free will*, that he is somehow guilty in a way that the addict who does not commit such crimes to feed his habit (other than the crimes of acquisition and possession) is not. In other words, it follows necessarily that the quality that makes this addict commit such crimes to obtain the drugs is not the compulsion of addiction and the loss of "self-control," but is something apart from his addiction—but if we are dealing with a motivating factor other than

drugs, this is another case, it is not the example called for by appellant's rationale. What the analysis just made demonstrates, even in the case of the addict-robber, is that his crime is caused by the same compulsion, his loss of self-control, due to his addiction.

Although attempted by appellant here, there can be no successful differentiation between the source of the drive, the compulsion and resulting loss of control which, appellant argues, vitiates legal accountability, hence the same compulsion would necessarily serve as the basis of the defense for each of the posited illegal acts. It is only a matter of degree. In fact, it seems clear that the addict who restrains himself from committing any other crimes except acquisition and possession, assuming he obtains his funds by lawful means, has demonstrated a greater degree of self-control than the addict who in desperation robs a bank to buy at retail. If the addict can restrain himself from committing any other illegal act except purchase and possession, then he is demonstrating a degree of self-control greater than that of the one who robs a pharmacy or a bank, and thus his defense of loss of control and accountability is even less valid than that of the addict who robs the pharmacy or the bank.

### B.

From the dissenting opinions it is not clear whether they ignore the logical inconsistency of this position, or whether the dissenters vaguely recognize the inconsistency and arbitrarily draw a line beyond which, to crimes other than acquisition and possession by a proven addict, the defense of lack of *free will* may not be deployed. Certainly Justice Marshall, writing for four members of the Court in *Powell*, declared that the limitation proposed by Justice Fortas regarding the defense of chronic alcoholism was merely "limitation by fiat."[10] And so it would be here.

10. 392 U.S., at 534, 88 S.Ct 2145.

The obvious danger is that this defense *will be* extended to all other crimes—bank robberies, street muggings, burglaries—which can be shown to be the product of the same drug-craving compulsion. Not only would the extension of the defense be on the same logical basis as the defense urged here, and as made indubitably certain in Judge Bazelon's separate opinion, but the words of Judge Wright indicate that the door would be open to another possible extension of the newly created defense not hitherto envisaged:

> While these comments in *Powell* were offered simply as dicta, they do indicate the position of the Court. Consequently [we limit] the availability of the addiction defense to only those acts which, like *mere purchase*, receipt or possession of narcotics for personal use, are inseparable from the disease itself and, at the same time, *inflict no direct harm upon other members of society*.[11]

We find cold comfort in Judge Wright's words.

If "mere purchase" *by* the addict is protected, what about "mere sale" *to* the same addict? Could not the sale of narcotics to a poor drug-crazed addict, driven by the compulsion of his unsatisfied needs, be defended as a humane act "inflict[ing] no direct harm upon other members of society"? Why would the supplying of narcotics by an illicit trafficker to a certified addict be any less humane, or inflict any more harm on other members of society, than the supplying of narcotics to the same addict by a licensed member of the medical profession?[12]

### C.

1. All of this points up the wisdom of Justice Black's observations in *Powell,* where he reached the conclusion that questions of "voluntariness" or "compulsion" should not be "controlling on the question [of] whether a specific instance of human behavior should be immune from punishment as a constitutional matter"; his arguments also show how the so-called "common-law defense" of compulsion may be unwisely applied here:

> When we say that appellant's [act] is caused not by "his own" volition but rather by some other force, we are clearly thinking of a force that is nevertheless "his" except in some special sense. [Footnote omitted.] The accused undoubtedly commits the proscribed act and the only question is whether the act can be attributed to a part of "his" personality that should not be regarded as criminally responsible. Almost all of the traditional purposes of the criminal law can be significantly served by punishing the person who in fact committed the proscribed act, without regard to whether his action was "compelled" by some elusive "irresponsible" aspect of his personality. As I have already indicated, punishment of such a defendant can clearly be justified in terms of deterrence, isolation, and treatment. On the other hand, medical decisions concerning the use of a term such as "disease" or "volition," based as they are on the clinical problems of diagnosis and treatment, bear no necessary correspondence to the legal decision whether the overall objectives of the criminal law can be furthered by imposing punishment.[13]

Just as Justice Black turned away from the proposed constitutional rule, we spurn the proposed "common law" rule, not only because the recently created statutory scheme of dealing with narcotics addicts stands a reasonable chance of reaching the objectives of "deterrence, isolation, and treatment," but also because the particular nature of the

11. Opinion of Judge Wright, at 1257–1258 (emphasis supplied).

12. This recalls the satirical song of Tom Lehrer entitled "The Old Dope Peddler," who was "doing well by doing good."

13. 392 U.S., at 540–541, 88 S.Ct., at 2158.

problem of the heroin traffic makes certain policies necessary that should not be weakened by the creation of this defense. There is no compelling policy requiring us to intervene here.[14]

2. Furthermore, if such a judgment weighing and balancing conflicting public interests and policies is to be made, it should be made by Congress, which, as we explore more fully *infra,* has by its activity in this area demonstrated both that it possesses more adequate facilities to deal with the problems of narcotic addiction, and that we in the judiciary are somewhat circumscribed in our activity in this area.[15]

III. *Appellant's Defense and the Eighth Amendment*

To evaluate the proposed defense in light of the Eighth Amendment we review the case law, in particular, Robinson v. California (1962) [16] and Powell v. Texas (1968).[17] This review demonstrates that the case law simply does not support the position advanced by appellant.

A.

In *Robinson* the Supreme Court was asked to determine the constitutionality of a state statute which, among other provisions, punished a person who was "addicted to the use of narcotics." [18] The appellant in *Robinson* had been convicted of addiction, principally on evidence of "marks and . . . discoloration [which] were the result of the injection of hypodermic needles into the tissue into the vein that was not sterile [sic]." [19]

While the Court observed that there was a wide range of activities available to states in dealing with the problem presented by narcotics,[20] the Court decided that this California statute was not within that range:

This statute, therefore, is not one which punishes a person for the use of narcotics, for their purchase, sale or possession, or for antisocial or disorderly behavior resulting from their administration. It is not a law which even purports to provide or require medical treatment. Rather, we deal with a statute which makes the "status" of narcotic addiction a criminal offense, for which the offender may be prosecuted "at any time before he reforms." California has said that a person can be continuously guilty of this offense, whether or not he has ever used or possessed any narcotics within the State, and whether or not he has been guilty of any antisocial behavior there.[21]

The Court concluded that just as it would be impermissible to punish a person because he was afflicted with mental disease, leprosy, or· venereal disease, so would it be impermissible to punish for his affliction one suffering from the illness of narcotic addiction, since

[I]n the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.[22]

Thus the Court held that "a state law which imprisons a person thus afflicted [by addiction to narcotics] as a crimi-

---

14. *See* Part IV, *infra.*

15. *Ibid.* And see Judge Leventhal's exhaustive treatment of this point in his separate opinion.

16. 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758.

17. 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed. 2d 1254.

18. California Health and Safety Code § 11721. The statute also prohibited the use of narcotics, and included a prohibition against being under their influence. Exceptions were provided for those who were administered narcotics under the direction of a person licensed to do so by the state.

19. 370 U.S., at 662. 82 S.Ct., at 1418.

20. *Id.*, at 664–665, 82 S.Ct. 1417.

21. *Id.*, at 666, 82 S.Ct., at 1420.

22. *Ibid.*

nal, even though he has never touched any narcotic drug within the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment.[23]

There are two important possible holdings which were *not* made in *Robinson*, but which are urged by appellant here, ostensibly on the basis of *Robinson*. The points not decided in *Robinson* as appellant argues here are:

1. The language of the Court quoted immediately above presumably left it open for a state to punish the activities such as possession and use or "irregular behavior" connected with narcotics addiction, although the addiction standing alone may not be punished.

2. It is also important that the majority's opinion did not base the Eighth and Fourteenth Amendment rationale on the unconstitutionality of punishment for any "compulsion" or loss of "self-control" involved in narcotics addiction. Indeed, if anything it appears that the appellant in *Robinson* had *not* lost his self-control with respect to giving in to his craving for the drug. As Justice Clark put it in his dissent, which would have upheld the California statutory scheme, "It is no answer to suggest that we are dealing with an involuntary status and thus penal sanctions will be ineffective and unfair. The section at issue applies only to persons who use narcotics often or even daily but not to the point of losing self-control."[24] Furthermore, the trial judge in *Robinson*, in his instructions to the jury, did not have his definition turn on any compulsion or loss of self-control:

The word "addicted" means, strongly disposed to some taste or practice or habituated, especially to drugs. In order to inquire as to whether a person is addicted to the use of narcotics is in effect an inquiry as to his habit in that regard. Does he use them habitually. To use them often or daily is, according to the ordinary acceptance of those words, to use them habitually.[25]

Standing alone, then, *Robinson* is no authority for the proposition that the Eighth Amendment prevents punishment of an addict for acts he is "compelled" to do by his addiction, since *Robinson* recognizes no compulsion in addiction. *Robinson* simply illustrates repugnance at the prospect of punishing one for his status as an addict.

In the case analysis it is important to keep the concept of loss of self-control separate from the definition of addiction. This is the approach taken in *Robinson*, so for the Supreme Court, at least, the judicial definition of addiction stops short of a loss of self-control, though it may recognize some compelling aspects of the craving for the drug. This distinction is illustrated in some of Mr. Justice Harlan's remarks made in his concurrence in *Robinson*:

[I]n this case the trial court's instructions permitted the jury to find the appellant guilty on no more proof than that he was present in California while he was addicted to narcotics. *Since addiction alone cannot reasonably be thought to amount to more than a compelling propensity to use narcotics, the effect of this instruction was to authorize criminal punishment for a bare desire to commit a criminal act.*[26]

In other words, addiction is the physical craving to have the drug, a craving

---

23. *Id.*, at 667, 82 S.Ct., at 1420. It should be noted that the opinion of the Court, written by Justice Stewart, was apparently joined in by Justices Warren, Black, and Brennan, who wrote no opinions, and in the points discussed here was joined in by Justice Harlan, who wrote a concurring opinion of his own, and to a certain extent by Justice Douglas, who also concurred, but for somewhat more involved reasons. There were but two dissenters, Justices Clark and White, while Justice Frankfurter did not participate.

24. 370 U.S., at 684, 82 S.Ct., at 1429.

25. *Id.*, at 680, 82 S.Ct., at 1427, quoted in Justice Clark's dissent.

26. *Id.*, at 679, 82 S.Ct., at 1426 (emphasis supplied).

which can arise from a number of different causes, not all of them voluntary or even self-induced.[27] As Justice Harlan's remarks make clear, however, it is the craving which may not be punished under the Eighth Amendment, and not the acts which give in to that craving. Furthermore, while addiction may be a "compelling propensity to use narcotics," it is not necessarily an irresistible urge to have them.[28] The failure in many minds to keep the concept of addiction separate from irresistible compulsion, or loss of self-control, has resulted in much confusion, as will be explored below.

### B.

The Eighth Amendment defense for chronic alcoholics advanced by some members of the Court in Powell v. Texas, that is, the interpretation that *Robinson* held that it was not criminal to give in to the irresistible compulsions of a "disease," weaves in and out of the *Powell* opinions, but there is definitely no Supreme Court holding to this effect.

1. Justice Marshall, writing for four members of the Court,[29] distinguished public drunkenness from *Robinson*, since the acts amounting to this kind of public behavior were much more than the "mere status" for which punishment was prohibited in *Robinson*.[30] Justice Marshall rejected the notion of the four dissenters [31] that *Robinson* stood for "the 'simple' but 'subtle' principle that '[c]riminal penalties may not be inflicted upon a person for being in a condition he is powerless to change.' " [32] Justice Marshall noted that in the view of the dissenters appellant's public intoxication was " 'occasioned by a compulsion symptomatic of the disease' of chronic alcoholism, and thus apparently, his behavior lacked the critical element of *mens rea*." Justice Marshall, in disassociating himself and his three brother Justices from this view, noted that *Robinson* did *not* deal with the question "whether certain conduct cannot constitutionally be punished because it is, in some sense 'involuntary' or 'occasioned by a compulsion.' " [33] He concluded simply that "criminal penalties may be inflicted only if the accused has committed some act, has engaged in some behavior, which society has an interest in preventing, or perhaps in historical common law terms, has committed some *actus reus*." [34]

2. Appellant's position seems to be that if a defendant is compelled to use narcotics due to a serious physical craving (addiction), but can acquire the narcotics with money obtained by legal means (such as relying on the labor of other members of his family), the court can find no *free will* on the part of the defendant, since he acts as a result of compulsion, not from choice. Indeed, so the argument goes, since the money used to buy drugs is procured through perfectly legal means, there is really no guilt involved, merely disease. Thus appellant argues that the *acts* resulting from addiction to narcotics must be treated in the manner that addiction to alcohol was considered in *Powell*.

Where the asserted analogy with *Powell* breaks down, however, is, first, that

---

27. *See, e. g.*, the dissenting opinion of Mr. Justice Douglas in *Robinson*, 370 U.S. at 670, 82 S.Ct. 1417, where he discusses, *inter alia*, addiction among newborn infants.

28. *See, e. g.*, Phillipson, Drug Dependence —Opiate Type, and Criminal Responsibility (1971), a paper presented at the 33rd annual meeting of the Committee on Problems of Drug Dependence of the National Academy of Sciences—National Academy of Engineering Division of Medical Sciences, 16–17 February 1971 in Toronto, Canada (reproduced as Appendix C of the Government's Brief, at 117).

29. Justices Black, Harlan, and Chief Justice Warren concurred.

30. 392 U.S., at 532, 88 S.Ct. 2145.

31. Justices Fortas, Douglas, Brennan, and Stewart.

32. 392 U.S., at 533, 88 S.Ct., at 2154, quoting 392 U.S., at 567, 88 S.Ct., at 2171.

33. 392 U.S., at 533, 88 S.Ct., at 2155.

34. *Ibid.*

the acts in *Powell* were held to be punishable, as Justice White's separate opinion for the majority makes clear. Second, here the acquisition and possession of the addictive substance by Moore are *illegal* activities, whereas in *Powell* the "addict" induced his addictive state through *legal* means. Powell's violation was in actions taken later, which to four members of the Court were punishable without question, and which to Justice White were punishable so long as the acts had not been proved to be the product of an established irresistible compulsion. In *Moore,* however, the acquisition and possession of the addictive substance (narcotics) are themselves illegal, whether considered as initial acts *causing* addiction or acts *resulting* from addiction.

While we always start with where we are, or the present condition of the addict in this case, we cannot ignore how the defendant became an addict. The dissenters here dwell on established principles:

> Thus criminal responsibility is assessed only when through "free will" a man elects to do evil, and if he is not a free agent, or is unable to choose or to act voluntarily, or to avoid the conduct which constitutes the crime, he is outside the postulate of the law of punishment.[35]

Moore could never put the needle in his arm the first and many succeeding times without an exercise of will.[36] His *illegal* acquisition and possession are thus the direct product of a *freely willed illegal act.*

According to the appellant's thesis, an addict only has a choice as to the manner in which he obtains the funds (or the drugs) to support his habit; this neglects the choice that each addict makes *at the start* as to whether or not he is going to take narcotics and run the risk of becoming addicted to them. Although the narcotics user may soon through continued use acquire a compulsion to have the drug, and thus be said to have lost his self-control (insofar as he must take the drug regularly) due to a "disease," it is a disease which he has induced himself through a violation of the law. In contrast to the alcoholic Powell, the drug addict Moore has contracted a disease which virtually always [37] commences with an illegal act.

3. As a final point with regard to *Powell,* we find the same concern we discussed under II, *supra,* voiced by Justice Black: "The rule of constitutional law urged upon us by appellant would have a revolutionary impact on the criminal law, and any possible limits proposed for the rule would be wholly illusory." [38] We are wary of the multitude of acts which are now crimes and which might have to be excused if appellant's defense were accepted, since

> If the original boundaries of *Robinson* are to be discarded, any new limits too would soon fall by the wayside and

---

35. Opinion of Judge Wright, at 1241.

36. *See* note 28 *supra.* and accompanying text. It is not necessary for us to adopt judicially the view of this authority, because in the present state of the development of medical knowledge it would be imprudent to do so. It is sufficient for the purposes of this case to say that the appellant's argument, espoused by Judge Wright here, that narcotic addiction is an irresistible compulsion to take the drugs, is clearly *not* the law of the land by virtue of the Supreme Court's holding in *Robinson.*

37. There are, of course, a very small number of individuals who may have the disease by virtue of an illegal act committed by another, such as a child addicted to narcotics because of maternal addiction, and a few addicts whose disease is a result of a medical prescription. See Judge Wright's opinion, at p. 1243, note 196. The comments with regard to "free will" made here would not, of course, be completely applicable to this small number of individuals. On the other hand, their number is apparently so small that their existence cannot be the primary consideration of a judicial decision in this area, and we do not read Judge Wright to rely heavily on the existence of these few unfortunate individuals to support the position he takes today.

38. 392 U.S., at 544, 88 S.Ct., at 2160.

the Court would be forced to hold the States powerless to punish any conduct that could be shown to result from a "compulsion," in the complex, psychological meaning of that term.[39]

### C.

Passing on from *Robinson* and *Powell*, we come to the case on which much of the present appeal is based, Watson v. United States (1970).[40] In *Watson* the appellant, a heroin addict, was convicted for violations of 21 U.S.C. § 174, and 26 U.S.C. § 4704(a), the Jones-Miller and Harrison Acts, which respectively forbid fraudulent importation and the purchase, sale, dispensation, or distribution of narcotic drugs not in the appropriately taxpaid stamped package. For all practical purposes, because of the particular evidentiary provisions of the two Acts, proof of mere possession of the narcotic is enough to convict under either, and so the crime is often spoken of as one for "possession" of narcotic drugs. This was really the crime for which appellant Watson was convicted, and although in appellant Moore's case there are powerful elements of trafficking (discussed under I, *supra*), he contends that he was guilty of the crime of possession, and of possession for his own use. Among the other arguments made in *Watson*, as here by appellant, was the proposition that after *Robinson* it is constitutionally impermissible to punish a narcotics addict for possession of narcotics which he has only for his own use.

While discussing this defense, this court in *Watson* believed that the record was not adequate properly to support such a defense, and the case was decided on another ground, *i. e.*, that the two-prior-felony disqualifying provision of Title II of the Narcotic Addict Rehabilitation Act of 1966 unconstitutionally barred Watson from possible beneficial treatment under that Act.[41] Judge McGowan's discussion in the court's opinion to the effect that "if Robinson's deployment of the Eighth Amendment as a barrier to California's making addiction a crime means anything, it must also mean in all logic that (1) Congress did not intend to expose the non-trafficking addict-possessor to criminal punishment, or (2) its effort to do so is as unavailing constitutionally as that of the California legislature"[42] is therefore dicta. These dicta have been very persuasive, particularly in light of the explicit framework which Judge McGowan set forth for the raising of the defense,[43] and it has occasionally been successfully used in the trial courts of the District.[44] The case at bar, however, is the first time that we have been in the position to change these dicta into a holding, and to rule conclusively that *Robinson* represents a constitutional bar to conviction of a non-trafficking addict-possessor.

39. *Ibid. See also* Part II, *supra.*

40. 141 U.S.App.D.C. 335, 439 F.2d 442 (en banc).

41. The court noted that to bar a non-trafficking addict such as appellant Watson because of two prior felony convictions, which might in fact be no more than two convictions for possession, was "curiously at odds with the Congressional preoccupation, underlying the Narcotic Addict Rehabilitation Act, with the distinction between traffickers and non-traffickers, and the reiterated purpose that 'strict punishment . . . be meted out where required to the hardened criminal, while justice . . . be tempered with judgment and fairness in those cases where it is to the best interest of society and the individual that such a course be followed.'" 141 U.S.App.D.C. at 349, 439 F.2d, at 456, citing H.R.Rep.No.1486, 89th Cong., 2d Sess., p. 9, and Senate Report No. 1667, 89th Cong., 2d Sess., p. 17, U.S.Code Cong. & Admin.News 1966, p. 4245.

42. 141 U.S.App.D.C., at 345, 439 F.2d, at 452.

43. *See*, 141 U.S.App.D.C., at 335, 439 F.2d, at 442.

44. *See* United States v. Ashton, 317 F. Supp. 860 (D.D.C.1970) ; United States v. Lindsey, D.D.C.Crim. No. 2277-70; United States v. Allen, D.C.Super.Ct. Nos. 41333-70 and 21031-70 (10 February 1971) ; and United States v. Bowser, D.C. Super.Ct. No. 45504-70 (10 February 1971).

As made amply clear earlier, we believe *Robinson* supports no such determination. Any widening of the Eighth Amendment rationale should come from the Supreme Court,[45] hence we are not prepared to hold that appellant, if he were a mere addict-possessor would have an Eighth Amendment defense. Despite all their labors through the divergent opinions in *Robinson* and *Powell,* the dissenters here are able to derive nothing more certain than that we should interpret the federal narcotic statutes in such a way as to "avoid serious doubts of their constitutionality."[46] Although we would phrase the issue differently, we are in accord with Judge McGowan's desire that the Supreme Court "be effectively entreated to explain, more fully than it has done so far, how it is that California may not, consistently with the Federal Constitution, prosecute a person for being an addict, but the United States can criminally prosecute an addict for possession of narcotics for his personal use."[47] Given the demonstrated divergence and inconclusiveness of the Supreme Court's views, it is not incumbent upon us to force this explanation by widening the Eighth Amendment defense, but rather to leave it where the Supreme Court has left it until it chooses, perhaps by this appellant's prompting, to make such a holding.

Our hesitancy to rush in where the High Court has feared to tread is reinforced by this court's opinions in *Watson* itself, which show that it is not inconsistent to excuse the addict in *Robinson* on Eighth Amendment grounds, but to deny such relief to the addict-possessor in *Watson* and *Moore.* As Judge McGowan observed, and as Judge Bazelon concluded in his opinion for the three-judge panel which preceded *en banc* determination in *Watson,* the majority in *Powell* "unmistakably recoiled from opening up new avenues of escape from criminal accountability by reason of the compulsions of such things as alcoholism and, presumably, drug addiction—*conditions from which it is still widely assumed, rightly or wrongly, that the victim retains some capacity to liberate himself.*"[48] Thus it would appear that according to the Supreme Court, "rightly or wrongly," an addict is not under an "irresistible compulsion" to possess narcotics, but retains some ability to extricate himself from his addiction by ceasing to take the drugs. Thus it would certainly not be "cruel and unusual punishment" to convict him for possessing the narcotics, since the decision to possess is one that he makes at least in part of his own volition, especially at the beginning of his habit.

On the other hand, once a person has taken a certain amount of narcotics his body develops a craving for more (this, of course, is "addiction" as Justice Harlan defined it),[49] a physical craving which he cannot prevent, and for which, the Supreme Court has said in *Robinson,* he may not be punished. Taking into account this view of addiction, which view seems to us to be the one taken by the Supreme Court in *Robinson,* it is not inconsistent to say that an addict may not be punished for his craving (his "addiction") but may be punished when he makes the decision not to subject himself to the admittedly painful process of withdrawal, gives in to his craving and commits acts in violation of law and which continue his addiction.

Far from being "cruel and unusual punishment," the rationale of punishment for such acts has been set forth in *Robinson* and *Powell,* especially in the opinions of Justices Black, Harlan, and

---

45. Castle v. United States, 120 U.S.App. D.C. 398, 401, 347 F.2d 492, 495 (1964), cert. denied, 381 U.S. 929, 85 S.Ct. 1568, 14 L.Ed.2d 687 (1965).

46. Opinion of Judge Wright, at 1240.

47. 141 U.S.App.D.C., at 347, 439 F.2d, at 454.

48. 141 U.S.App.D.C., at 346, 439 F.2d, at 451 (emphasis added).

49. See Part III.AA., *supra.*

Marshall.[50] There is no Eighth Amendment defense for the addict-possessor.

IV. *Congressional Intent to Punish Addict-Possessors*

A.

Aside from the logical fallacies in appellant's argument outlined above, the line which he asks this court to draw concerning the *mens rea* involved in drug addiction may not be drawn by this court for other, perhaps more important, reasons of policy and power. The choice that appellant would have us make is the reverse of the choice made by early English judges in carving out an exception to the common law defense of duress; they declined to apply it to the crime of murder.[51] The policy judgment made by these common law judges was that, because of the great value which the common law placed on human life, one should risk one's own life rather than take that of an innocent.

The problem with our making the choice that appellant urges is that, unlike common law judges who were perhaps the major legal policy-making body before the rise of the parliamentary system as we know it today, this court is not the appropriate body to make such a policy judgment. Congress is now the best forum with resources adequate to determine the implications of such a policy, to evaluate the social, scientific, and psychological premises underlying such a policy, to make the appropriate rules, and to establish the necessary mechanisms (including the funding) to carry them out.

B.

We can best approach this problem of the role of Congress and the courts here by now considering the possible defense mentioned but not recognized by Judge McGowan in *Watson*,[52] urged by appellant here, and accepted by Judge Wright in his opinion.[53] It is argued that Congress never intended for the provisions of federal statutes making it a crime to possess narcotics to apply to addicts who possess narcotics for their own use. We cannot subscribe to this argument. Never, in many different narcotics control acts and their amendments, dating back to 1909, did Congress say this. What justification would this court have for writing it into law now? Only a clear constitutional mandate could call for such action on our part. For this court to find such would demonstrate a perception the Supreme Court has not achieved. As is obvious from Judge Wright's dissent, if there is one thing certain, it is that the constitutional question is far from clear.

Furthermore, the two latest congressional pronouncements are squarely contrary to the statutory interpretation appellant urges here. As Judge Reilly of the District of Columbia Court of Appeals noted in Wheeler v. United States (1971),[54] Congress made it clear that in enacting the District's "Rehabilitation of Users of Narcotics" statute [55] it did not mean to exclude from criminal punishment persons addicted to the use of narcotics, at least in the District of Columbia. Congress said in the preamble to that Act:

The Congress intends that Federal criminal laws shall be enforced

50. *Ibid.*

51. IV W. Blackstone, Commentaries 29 (1854).

52. 141 U.S.App.D.C., at 345, 439 F.2d, at 452.

53. At p. 1250, Part IV.C.

54. 276 A.2d 722 (1971). In the recent case of Franklin v. United States, No. 5960 (D.C.Ct.App., 27 Feb. 1973) a panel

of the District of Columbia Court of Appeals held in a split decision, that addiction should be permitted as a defense to simple heroin possession. That decision was vacated and set for *en banc* consideration by an order rendered simultaneously with the decision. The significance of the *Franklin* decision is, therefore, unclear.

55. D.C.Code § 24–601 et seq. (1967 edition).

against drug users as well as other persons, and sections 24–601 to 24–611 shall not be used to substitute treatment for punishment in cases of crime committed by drug users.[56]

If Congress had intended that addicts in the District of Columbia should not be prosecuted for the crime of possession, Congress would have qualified § 24–601 to that effect. Congress had the problem of drug users (addicts), their punishment and treatment, squarely before it, and declined to make any distinction as to what acts constituted a crime by an addict or non-addict. This conclusion is virtually inescapable, as Congress defined "drug user" (as that term is employed in the preamble just quoted) to include *"any .person, including a person under eighteen years of age, . . . who uses any habit-forming narcotic drugs so as to endanger the public morals, health, safety, or welfare, or who is so far addicted to the use of such habit-forming drugs as to have lost the power of self-control with reference to his addiction."* [57]

Appellant argues for rejection of this interpretation of the "Rehabilitation of Users of Narcotics" statute, on the theory that to accept it would be to assume "that Congress enacted a complex statutory scheme for treatment of narcotic addicts which it never intended to be utilized," since under this interpretation addicts could be punished for possession, and possession being a "criminal act" under § 24–601, all addicts thus would have to be punished criminally, and not be treated under the rehabilitation statute.

With all respect, we submit that such a reading of the statute, which leads to its rejection of an intent to punish addict-possessors, is simply incorrect. We read the provision that says the statute shall not be used "to substitute treatment for punishment in cases

of crime committed by drug users" as meaning that, when the Government is able successfully to prosecute *any* drug user for a criminal offense under any federal statute, it may do so. The Rehabilitation Act is *NOT* the *only* statute applying to drug users; if the Government has the evidence, it may invoke any applicable criminal statute. As Judge Wright in his dissent points out, drug use among addicts and others in some areas has reached epidemic proportions, and the difficulty of amassing evidence and securing convictions for possession and other crimes committed by drug users is in many instances insurmountable. For many of these drug users the rehabilitation statute presents a feasible and humane method of treatment which the Government may pursue through the securing of evidence of such persons' addiction,[58] and this may be particularly appropriate where, for any of a multitude of reasons, criminal prosecution under other federal statutes is not called for. On the other hand, Congress made it clear that this procedure shall not be used in the case of some persons, explicitly those "charged with a criminal offense, whether by indictment, information or otherwise, or . . . under sentence for a criminal offense, whether [they are] serving the sentence, or [are] on probation or parole, or [have] been released on bond pending appeal." [59]

We do not view this rehabilitation statute as evincing intent not to punish addict-possessors, but merely as one more attempt by the Congress to reach an accommodation between its avowed twin aims of eliminating the traffic in harmful narcotics and rehabilitating those damaged by that traffic.[60]

While it is true that other statutes, most notably the Narcotic Addict Rehabilitation Act of 1966, evince a legislative purpose that after addicts are pros-

---

56. D.C.Code § 24–601, quoted in *Wheeler, supra*, 276 A.2d, at 725.

57. D.C.Code § 24–602 (1967 edition) (emphasis supplied).

58. D.C.Code § 24–603(a).

59. D.C.Code § 24–603(b).

60. *See* Part IV.D., *infra*.

ecuted they should be treated medically whenever possible rather than placed in prison, it remains true that D.C.Code § 24–601 et seq. may not be used to substitute treatment for punishment, and we must assume that the congressional intent spelled out in that civil commitment statute to enforce the federal criminal laws against drug users (*i. e.*, to prosecute them) remains, unless it is subsequently repudiated by Congress.

Far from overruling this manifestation of congressional intent, just as it has done in the past, Congress has continued to enact legislation under the terms of which addicts and all others can be and are being prosecuted for narcotics possession and trafficking.[61]

The fact that not one of the numerous congressional enactments makes exception for addicts, and that many of them were passed when there were cases of conviction of narcotics addicts for narcotic offenses on the books, may be taken to indicate that Congress intends for addicts to be prosecuted like anyone else. *See* Sutherland, Statutory Construction §§ 4510, 5101, 5103–5105, 5107, 5109 (3d ed. 1943). It is argued that it is equally likely that Congress desired to remain neutral in this issue.[62] In light of the strong sentiment of many members of Congress against all drug users, of which Congress was most justly aware[63] we refuse to impute such motives to Congress.

 Thus while Congress has not explicitly provided that addiction shall *not* be an affirmative defense to a charge of possessing illicit narcotics, the congres-

sional intent to prosecute drug users expressed in D.C.Code § 24–601, buttressed by Congress' legislative activity both before and after that expression of legislative intent, demonstrates that *Congress has preempted this court's authority to create a common law defense.* It is hornbook law that when the legislature has spoken, what might have been the common law is altered, and judges (including this court) may not change the law back because they would have favored a different policy, unless there is a constitutional mandate, which, of course, would operate irrespective of judicial preferences.

 Furthermore, although this is of limited help in determining what the law was when appellant was arrested, the latest narcotics legislation, the Comprehensive Drug Abuse Prevention and Control Act of 1970 (passed 27 October 1970),[64] contains two highly significant provisions relevant to congressional intent and policy in the area of narcotics control. First, the statute has penal provisions making it "unlawful for any person" to commit the proscribed acts; second, § 844 in particular makes it unlawful "for *any person* knowingly or intentionally *to possess* a controlled substance unless such substance was obtained directly, or pursuant to a valid prescription or order from a practitioner . . . ."[65] The Comprehensive Drug Abuse Prevention and Control Act provides a much lighter penalty for simple possession (and for the first time explicitly makes simple possession an offense), but this by no means suggests

---

61. Congress has been enacting such legislation beginning in 1909, and continuing to the present. *See, e. g.*, Narcotics Importation Act, 35 Stat. 614 (1909), as amended, 21 U.S.C. 3174 (1964), repealed Pub.L. No. 91–513, § 1101(a)(2) (27 October 1970) ; Harrison Narcotic Act of 1914, 38 Stat. 785, as amended, 26 U.S.C. §§ 4701–4706, repealed, Pub. L. No. 91–513, § 1101(b)(3)(A) (27 October 1970) ; Uniform Narcotic Drug Act, 33 D.C.Code §§ 401–425; Controlled Substances Act, 21 U.S.C. §§ 801–904 (1970). (The "Controlled Sub-

stances Act" is one title of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. No. 91–513 (27 October 1970).

62. At 1254–1256.

63. *See, e. g.*, The remarks of Commissioner Harry J. Anslinger of the Federal Bureau of Narcotics, S.Rep.No.2033, 84th Cong. 2d Sess., at 7–8 (1956).

64. Pub.L. No. 91–513, see note 61, *supra*.

65. Emphasis supplied.

that possession by an addict did not give rise to an offense before the statute. On the contrary, we find the conclusion inescapable that Congress rejected the notion of excusing addicts from guilt for possession, and instead decided to reduce the penalties for simple possessions across the board. Now to create the defense appellant seeks in the face of the explicit prohibition against possession by *any person* in 21 U.S.C. § 844 would be directly contrary to the expressed will of Congress.

### C.

In his brief appellant makes much of the apparent analogy between the statutory scheme dealing with the rehabilitation of alcoholics analyzed in Easter v. District of Columbia,[66] which resulted in this court's allowing alcoholics a´ defense for public drunkenness, and the statutory scheme in the District for dealing with drug addiction. Judge Wright's opinion also relies on the analogy to *Easter.* The implication, of course, is that we should use the same reasoning to find a defense for the addict-possessor.[67]

Even if we were persuaded by the analogy, and we are not, we would certainly not grant appellant's defense on the theory that this will pressure Congress into providing the facilities for treatment of the many addicts who could then *only* be civilly committed. Aside from impropriety, this tactic was resoundingly unsuccessful in the *Easter* case, and we have no reason to believe it would fare better here. Immediately after *Easter,* it appeared that the facilities were simply not forthcoming and the average chronic alcoholic was worse off than he was pre-*Easter,* as demonstrated

by a noticeable decline in the health and well-being of the District's chronic alcoholics.[68]

### D.

But apart from any aversion to pressuring Congress in this manner, there are significant and difficult differences between the problems of chronic alcoholism and narcotics addiction. In dealing with the problem of alcoholism we have what is, after all, a single aim—the rehabilitation of alcoholics.[69] With narcotics addiction, however, we must take account of at least two aims, the first being (like alcoholism) the rehabilitation of addicts, but the second (quite different) being the complete elimination of the addictive substance. The existence of these two policies is particularly troubling where their implementation may be contradictory. For instance, while the policy of rehabilitation might well be served by giving addicts a defense to possession for their own use, and instead providing mandatory hospital treatment, the possible penalties for possession help the police by providing them a means to use their prosecutorial discretion to enlist addict-informers to aid in ferreting out the wholesale sources of the drug traffic, and the threat of possible punishment persuades some addicts to undertake rehabilitation under such schemes as the Narcotics Addict Rehabilitation Act, which they might otherwise choose not to undergo.

Faced with the need to reconcile these two aims, of eliminating the drug traffic and the rehabilitation of addicts, and under great pressure from advocates pushing for one or the other aim, Congress has reached a reasonable accommodation through such means as the Narcotics Addict Rehabilitation Act of 1966

---

66. 124 U.S.App.D.C. 33, 361 F.2d 50 (1966). See also Judge Wright's discussion at pages 1248–1249 of his opinion.

67. Brief for Appellant, at 65–72.

68. Report of the President's Commission on Crime in the District of Columbia, 486–491 (1966).

69. There is, of course, the twin aim of preventing those who have not yet become alcoholics from doing so, but this is not the task for lawyers and judges.

and the Controlled Substances Act of 1970. Judge Wright's dissent asserts: "But punishment of addict possessors is neither a reasonable nor a necessary means to achieve this goal." [70] If the issue is thus placed on pragmatic grounds, whose judgment is entitled to prevail, that of Congress or of this court? [71]

Aside from the fact that this construction of the law is neither constitutionally compelled nor reflects the intent of Congress in the legislation on the books, if we recognize that the use of narcotics is an evil—and it is, opium *is* a killer [72]—then the adoption of a policy of interpretation which removes criminal penalties and sanctions from the mass use of opiates is just as misguided as the individual's use of opiates for his own particular problems.

One startling fact, and probable consequence, of accepting the line of reasoning advanced by appellant lies buried in Judge Wright's dissent on page 1227. In describing three categories of narcotics addicts, Judge Wright states:

> The second category is comprised of those addicts who are employed in the medical and paramedical professions. *The rate of addiction among these professions appears to be almost 30 times greater than that of the general population,* but since these individuals have ready access to drugs such as morphine and demerol, they frequent-

ly escape the need to pay the exorbitant prices for their supplies that lead other addicts to crime.

This has been a well-known fact for many years, that easy access through legal channels, as can be had by doctors, nurses, pharmacists, hospital orderlies, etc., leads inevitably to a tremendous rate of narcotics addiction. These are not a class of people who can be termed culturally or economically deprived in any way. They do not have associations with criminals nor with the lower economic and social classes. Yet the mere fact of easy access to the drugs has created an addiction rate 30 times that of the general population. Viewed pragmatically, the cited language offers a powerful argument in favor of never removing the criminal penalties for possession of drugs, an argument for never legitimatizing possession.

We have seen civilizations which reached the carpet slipper stage, and slowly drowsed away beside the fading fires of genius. Ours may be the first civilization to speed the process by the deliberate injection of drugs into our culture; without waiting for the natural sleep of old age, we hasten to evade our feared crushing burdens by permitting those who crave it to slip into an opium haze.

Congress has not ceased to attempt to fashion new ways to deal with these problems of narcotics addiction; [73]

---

70. Opinion of Judge Wright, at 1245.

71. The flat prohibition against possession bears a direct logical relationship to both objectives. Making all possession illegal is both to protect the addict against himself and the public against the drug traffic (whether conducted by addicts or nonaddicts).
Congress' flat prohibition against possession, if obeyed or enforced, would amount to an infallible cure for drug addiction. In a simplistic comparison; to lose weight, don't eat; to avoid drug addiction, never possess narcotics. It may be objected, of course, that the prohibition is difficult of enforcement, but such difficulty of enforcement does not give this court a ground either to abrogate or to qualify an act of Congress. What exceptions to the flat prohibition

against possession that do exist have been specifically provided for by Congress, such as certain exceptions having to do with prescriptions by medical authorities. Thus our conclusion that Congress has preempted this area, and that the courts cannot widen the list of exceptions, as we have been asked to do in this case.

72. *See, e. g.*, Robinson v. California, 370 U.S. 660, 672, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (Douglas, J., concurring).

73. It appears that in the fall of 1971 there were 42 bills dealing with various aspects of the problems of narcotics addiction in Congress. Brief for the Government, at 90. The Bills of the House were H.R. Nos. 131 and 2220, 272, 273, 999, 4417, 5714, 8436, 8389, 8621, 8861, 8875, 8880, 8881, 8902, 8944, 8985, 8986,

hence, on the shaky foundations—constitutional, precedential, interpretative—advanced by appellant, it would be unthinkable to write our own new law that might undercut some of these congressional efforts.[74] We are supported in our conclusion by Judge Leventhal's eloquent and exhaustive analysis of Congress' intent in passing the various enactments discussed above and the consequent need for judicial restraint.

Our reluctance to make new law is not, as Judge Wright appears to suggest, "to shut our eyes in ignorance and allow injustice to persist in blind imitation of the past."[75] Our course of action is simply to leave the innovations in this area to a body more capable of making decisions on them than are we. The extremely difficult and complex questions involved in the problems of rehabilitation of addicts and elimination of the illicit drug traffic are best solved by the kind of extended debate and investigation possible in the legislature. Judicial modesty and restraint may not make the headlines, but they have their place.

### V. Conclusion

▉ The writer and Judges MacKinnon and Robb, concurring in this opinion, would simply affirm both appellant Moore's convictions and the sentences he received. However, this view does not command a majority of the court. Judges McGowan and Leventhal would likewise affirm Moore's convictions, but would remand for the District Court to give further consideration of NARA disposition.

8989, 9057, 9059, 9060, 9095, 9124, 9137, 9184, 9186, 9207, 9210, 9213, 9215, 9216, 9254, 9265, 9323, 9372, and 10453. The Senate Bills were S. Nos. 1174, 1189, 1836, 2124, and 2108.

74. Judge Wright appears to place much reliance on a sentence that appears in a Congressional Report, H.Rep.No.1444, 91st Cong., 2d Sess., pt. 1, at 9 (1970), U.S.Code Cong. & Admin.News 1970, p. 4566, which states that the question of whether or not narcotics addicts " 'can be held criminally responsible can only be decided in the courts, case by case.' " At 1255. We are not as impressed as

Therefore, there being a majority of five judges voting to affirm all convictions, but there being no initial majority for either of the three proposed methods of acting on this appeal, the writer and Judges MacKinnon and Robb acquiesce in the method of affirming Moore's convictions on all counts, vacating the sentences imposed, and remanding to the District Court for resentencing. In so doing, we intimate no dissatisfaction with the sentences originally imposed by the District Judge nor do we suggest his ultimate disposition of Moore's case.

LEVENTHAL, Circuit Judge; with whom McGOWAN, Circuit Judge, concurs.

This is an appeal from convictions under 21 U.S.C. § 174, 26 U.S.C. § 4704(a), following a police raid on, and arrest of appellant Moore in, a hotel room being used for a heroin capping operation. The verdict was permitted to rest on evidence that Moore was in possession of heroin. Appellant's contention is that he was improperly precluded from proffering as a defense that he was a heroin addict, without the power of self-control with respect to the drug.

The case was put en banc to consider matters not resolved in our en banc opinion in Albert Watson v. United States, 141 U.S.App.D.C. 335, 439 F.2d 442 (1970). After consideration of pertinent principles of common law jurisprudence, constitutional doctrine, and statutory provisions, including the 1970 law passed by Congress subsequent to

Judge Wright appears to be with this statement as authority for the action that Judge Wright urges may very well stifle, rather than encourage, the "case by case" analysis that is called for in the House Report. Secondly, just how representative are the sentiments expressed in the House Report of general congressional feeling is by no means certain. Lastly, the report does nothing to contradict our judgment that at this point in time the congressional enactments have struck a reasonable balance with which we should not interfere.

75. At 1255.

*Watson,* permitting and implementing a disposition of narcotic addicts through probation conditioned on treatment, we conclude the judgment of conviction should be affirmed and the case remanded, in the interest of justice, *see* 28 U. S.C. § 2106, for further consideration of a disposition under the Narcotic Addict Rehabilitation Act (NARA).

In *Watson* we started to ponder difficulties posed to us by the iron rigidity of inexorable sentences for narcotic addicts chargeable only with possession or purchase for personal use. But in *Watson* we did not finalize an approach in terms of validity of conviction, in view of the record as presented, and we focused on dispositional alternatives— NARA.

In the present case, we have an outright attack on conviction, forcefully presented. The question is presented as a form of mens rea defense that negatives criminal responsibility, and would require society to proceed only by way of civil proceedings. If we had been faced with the rigidity that prevailed in the 1950's, with minimum prison sentences without respite, we might well have joined in an opinion that recognized the defense, either on common law grounds or constitutional considerations or some combination of these.

While our opinion parallels that written by Judge Wilkey in some ways, the differences in approach are not insignificant. Our opinion reflects a process— of reexamination of an approach previously, if tentatively, indicated in *Watson*—in which the doctrinal factors have not been as cogent as our examination of, and increasing awareness of the limitations in, the technical knowledge concerning crucial aspects of the narcotic addiction problem. This is a thicket, not impenetrable we hope, but one that requires tough and slow going, and something different from a sharp scythe of judicial doctrine to cut brush. The proposed broad psychological drug dependence defense would not only require an extension of conventional judicial doctrine, as we point out, but an extension

that is inappropriate in view of the problems of verifiability rooted in the inadequacies of our knowledge. Our conclusion, that at the present juncture justice neither compels nor warrants that kind of extension of judicial doctrine, is based in critical degree on our detailed study of the successive steps taken by the Congress in recent years, its heeding of expert voices focusing on its past mistakes, and its provision for research and continued reexamination. In that context, we think the ultimate problems of law and policy should be addressed by the Congress without judicial intrusion at this time.

Our conclusion that the addiction defense should not be recognized, even for drug possession offenses, at the present juncture, does not mean that we think this defense, is contrary to sound policy, but rather that the issues are such that the ultimate consideration of the problems of law and policy require the attention of the legislature. While a court cannot abdicate its judicial function of assessing the validity of what the Congress has done and intended, the court must also take into account the uncertain state of present knowledge, and the salutary deference to Congressional latitude in finding a way to cope with the problems of heroin addiction and addiction-related crimes.

Since it is not necessary to recognize a narcotic addiction (or dependence) defense to secure just dispositions in the future, given the provisions of the 1970 law, we see no compelling reason to inject the defense into convictions governed by the prior law. In a way this is a corollary—by way of converse—to the Supreme Court's modern doctrine of retroactivity, or should one say prospectivity. Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). The fact that judicial decisions contemplate changes for the future is good sense, for the mistakes of the past are left to the past and the administrative burden of this correction is not permitted to lay a dead hand on adaptation to modern perceptions and needs. Con-

versely, when judicial intervention is not necessary to assure justice for the future, sound judgment cautions against any approach of judicial overhaul.

In the large, this approach permits the courts to focus on each individual's condition in terms of disposition, rather than guilt of the substantive offense. This approach has many strengths. It has particular strengths for the future in view of the probation possibilities under the 1970 legislation.

There is an awkward junction point for defendants like appellant whose offenses, under prior legislation, were reached by sentences imposed prior to May 1, 1971. Serious questions of fairness are raised by the unavailability of either an addiction defense or the range of dispositions made possible by the 1970 Act. To some extent a court must be satisfied if it sees a trend in improvement of justice. As to the particular case, we think the appropriate disposition is to remand the case for further consideration of the possibility of disposition of appellant within the structure of NARA.

The path we have found was not clearly marked. We have done much soul searching, with reexamination of assumptions. Ideally, we should have preferred to write an opinion half as long and twice as crisp. But this was a case where the picture emerged as in a mosaic, after the numerous tiles were sorted and laid out. We present our views with full appreciation of the strengths of the differing views presented by our colleagues.

## I. FACTS OF OFFENSE, AND DISTRICT COURT DISPOSITION

### Prosecution Evidence

An informant advised the police of heroin sales being made in the Warren Hotel by "Crip Green" (room 15) and "Jumbo" (room 17), and made buys on January 25 and 26, 1970, under police supervision. Warrants were obtained, and executed on January 29. When Officer Daly entered room 15 at about 7:00 p. m., he found appellant Moore and another man in circumstances permitting an inference by police and jury of appellant's possession of narcotics on a bed.[1] The evidence would also, we think, have justified a finding that appellant was a participant in the capping operation, as the prosecution contended, but this was denied by appellant and the case was not put to the jury on that basis. Moore and his companion were arrested and searched; 50 capsules of mixed heroin were found in Moore's trouser pockets. Moore was charged on two counts—under the Jones-Miller Act of 1909, 21 U.S.C. § 174 (unlawfully imported substance) and under the Harrison Act, originally enacted in 1914, 26 U.S.C. § 4704(a) (package not tax-stamped)—as to the heroin on the bed, and two additional counts on the drugs in his pockets.

### Theory of Defense

The theory of the defense, referred to as his *Watson* defense, is that guilt cannot be established by proof of possession by a non-trafficking addict, that this would be inconsistent with (a) Congres-

---

1. Room 15 is 10–12 feet in depth. Against the wall opposite the door was a bed which was being used as a workbench. Two chairs were drawn up to the bed; one was occupied by Sherman W. Beverly, the other by Raymond Moore. Neither of the two men was holding anything in his hands. On the bed in front of the men was a mirror and a record album cover on each of which was a heap of white powder containing heroin. Also on the bed were a large number of empty gelatin capsules, 67 capsules containing mixed heroin, an unopened package of hypodermic needles,

a makeshift sieve (or "cutting screen") fashioned of a lady's stocking stretched over a wire coat hanger, a key to the room, and a pistol.

This case does not involve the issue, sometimes encountered, of the adequacy of proof to establish defendant's possession, *see* United States v. Holland, 144 U.S. App.D.C. 225, 445 F.2d 701 (1971); *cf.* C. H. Whitebread and R. Stevens, Constructive Possession in Narcotics Cases: To Have and Have Not, 58 Va.L.Rev. 751 (1972).

sional intention, and (b) constitutional principles, particularly as developed in Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). The trial court rejected this so-called *Watson* defense, first by denying defendant's motion to dismiss the indictment, and later by excluding evidence and denying requested instructions.

Defense counsel proffered, through the testimony of Dr. Harold Kaufman, a psychiatrist on the staff of St. Elizabeths Hospital, heard by the court out of the presence of the jury, that appellant had a compulsion to inject heroin and therefore to possess heroin illegally, that appellant suffered from drug addiction, and that this was not a mental disease but a "disorder." Dr. Kaufman's proffered testimony is amplified below (see fn. 11 and text thereto). It suffices, for present purposes, that defendant was not claiming that he was under the pharmacological duress of "withdrawal" at the time of the offense.[2] The claim rather focused on his psychological compulsion to inject heroin.

The court ruled there was no defense of non-responsibility on ground of narcotic addiction, except as part of a defense of insanity. The insanity defense was negatived by Dr. Kaufman's own testimony, and the proffer of his testimony was rejected. Defense counsel decided not to introduce further evidence.

Before resting, defense counsel referred the court to appellant's pre-trial testimony, that he was a non-trafficking addict who came to the room to buy narcotics to supplement the supply in his pocket, and made a proffer of testimony of McKinley Gore, a former addict and a counselor of drug addicts with the District of Columbia Narcotics Treatment Administration (NTA), that some addicts do use more than 50 capsules daily, and have 50 or more capsules in their possession, and that appellant had been enrolled in the NTA methadone program since December 9, 1970, and his chances for rehabilitation were good.[3]

The court gave standard instructions on narcotic offenses, and a charge covering constructive possession. He charged: "It is not a crime to be a narcotics addict, nor is the use of narcotics, standing alone, a crime." The court declined an instruction on appellant's *Watson* theory, and also apparently, appellant's requests for a "mens rea" instruction and an instruction defining addiction.

*Sentencing*

On February 24, 1971, the jury found Moore guilty on all counts. On February 26 the court entered an order committing defendant for examination pursuant to Title II of the Narcotic Addict Rehabilitation Act of 1966 (NARA), 18 U.S.C. § 4252. A notice of appeal was filed March 8, 1971.[4] On April 13, 1971,

---

2. As was sought to be claimed at one point by Albert Watson, *see* Watson v. United States, *supra*, 141 U.S.App.D.C. at 344, note 8, 439 F.2d at 451, note 8.

3. Proffer (Tr. 290–91):
 "Mr. Gore would testify that Mr. Moore has been on methadone consistently since (Dec. 9); that he is engaged in a considerable amount of counselling programs, that Raymond Moore's chances for rehabilitation from drugs were very good; that he has seen considerable growth in Mr. Moore during the time of his association with the treatment programs, and that he believes Mr. Moore is beginning to get at the root of his addiction problem. * * * He would testify that it is almost the

universal situation that narcotic addicts during stages of their rehabilitation will on occasion continue to use or attempt to use, narcotics, and that this is a normal part of the rehabilitation process. He would further testify that Mr. Moore's level of methadone intake has been increased and that at the present time, or shortly, it will be such as to make unnecessary Mr. Moore's further resorting to the taking of any narcotics."

4. The notice of appeal form calls for an entry on "Concise statement of judgment or order, giving date, and any sentence." Defense counsel inserted: "Found guilty on two counts of violating 26 U.S.C. § 4704(a) and two counts of violating 21 U.S.C. § 174; committed for examination

the NARA staff at Danbury Federal Correctional Institution reported to the District Court that Moore "was an addict, both physically and psychologically dependent on heroin" but was not likely to be rehabilitated by treatment.[5]

At the sentencing proceeding, held June 14, 1971 after the brief on appeal had been filed in this court by the appellate counsel appointed May 4, defense trial counsel submitted that Danbury's conclusion did not mean appellant is an unwilling patient or one who does not want a cure, but reflected the fact that Danbury uses a complete abstinence program and not the methadone method of treatment, with which Mr. Moore had been cooperating. When the trial judge sought confirmation from appellant concerning his criminal record, defense trial counsel conceded he had a long criminal record but submitted that it was "the record of a man forced by his addiction to commit these various offenses."[6]

The court sentenced appellant to concurrent terms of 6 years, and 2–6 years.[7]

## II. CONTENTIONS FOR REVERSAL

### A. *By Counsel for Appellant*

Counsel representing appellant in this court are signally well-informed[8] and have made an effective presentation, as follows: .

1. Appellant is an addict—as appears from his own testimony that he was using an average of $60 per day of heroin[9] at the time of the offense; Officer Daly's testimony that appellant was an addict; a 1969 NARA report to a judge of the then D.C. Court of General Sessions; and the April 13, 1971 NARA report of the trial judge. It was proffered that Dr. Kaufman would testify that appellant suffers, not from a mental illness, but from a mental disorder of a special character called "drug addiction," that he is subject to "drug dependence of morphine type" as defined by the World Health Organization,[10] and

---

under Title II, Narcotic Addict Rehabilitation Act, 18 U.S.C. § 4251 et seq."

On the docket sheet maintained by the Clerk of the District Court appears the notation: "Mar. 8, 1971. Notice of appeal from order committing deft for exam under NARA."

5. Govt.Br. 2. The NARA report said: " . . . Mr. Moore has shown no motivation whatever in wanting to help himself with his narcotics problem. * * In addition, he would be extremely detrimental to the other individuals in the program who are attempting to deal with their narcotics problem."

6. Moore quit school in 1946, aged 16, after completing 8 grades. That summer he began shooting heroin. Since then his life has consisted of a procession of scrapes with the law, embracing some 15 convictions, including two felonies, housebreaking and robbery. Between mid-1946 to January 1970, 23 and one-half years, Moore spent some 13 years in jail or prison. Moore always returned to the use of narcotics within a few weeks after each release. He concedes that he supported his habit over the years by shoplifting, pimping, gambling, robbery and bootlegging.

7. As to co-defendant Beverly, who had pleaded guilty, under 26 U.S.C. § 4704(a), on a motion invoking the discretion of the court under McCoy v. United States. 124 U.S.App.D.C. 177, 363 F.2d 306 (1966), on June 23, 1971, the District Court suspended imposition of sentence and placed Beverly on probation for two years.

8. The brief was prepared expeditiously by Peter Barton Hutt, Esq., counsel originally appointed by this court. The argument was presented, on short notice, by Patricia M. Wald, Esq., appointed by this court as co-counsel, Mr. Hutt having entered on Government service. Mrs. Wald and Mr. Hutt were the co-chairmen of the Ford Foundation's Drug Abuse Survey Project. The Project Report to the Ford Foundation was published under the title, "Dealing with Drug Abuse" (Praeger 1972).

9. Higher than the $45 average daily cost reported by addicts in the D.C. NTA's program. Staff of Senate Committee on the District of Columbia, 91st Cong., 2d Sess., Study on Drug Abuse in the Washington Area 15 (Comm.Print 1970).

10. World Health Organization Expert Committee on Addiction-Producing Drugs, Thirteenth Report, WHO Tech.Rep.

that appellant was an "old addict," *i. e.,* one who continuously had not only a physiological craving but also a psychological compulsion to inject heroin.[11]

2. Basic common law principles of criminal responsibility and capacity entitle a defendant to show that he is "so far addicted to use of habit-forming narcotic drugs as to have lost the power of self-control with reference to his addiction" thus rendering his drug-related actions "involuntary."

3. Neither the statutes charged in the indictment, nor the Controlled Substances Act of 1970 preclude application of these basic principles.

4. If the statutes do preclude such application, then the Eighth Amendment —which embodies the same core principles or morality—bars appellant's conviction, under Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758, rehearing denied, 371 U.S. 905, 83 S.Ct. 202, 9 L.Ed.2d 166 (1962), and Powell v. Texas, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254, rehearing denied, 393 U.S. 898, 89 S.Ct. 65, 21 L.Ed.2d 185 (1968).

5. Appellant concludes (Br. 102):

. . . [T]he compulsive acts inherent in a disease condition are no more blameworthy than having the disease itself. It is as barbarous to punish

the one as the other. * * * While it is cruel and unusual to *punish* an addict for the acts inherent in his addiction, it certainly could not be argued that adequate and appropriate rehabilitative treatment, including withdrawal from heroin, is anything but humane and the preferred approach. In short, Appellant does not urge that an addict has a constitutional or any other legal right to purchase and possess heroin for injection.

### B. *By Amicus Curiae*

A reflective brief filed, with leave of court, on behalf of the Washington Area Council on Alcoholism and Drug Abuse (WACADA), supports the jurisprudential argument of appellant's counsel, and further submits:

Our law enforcement forces are not equipped to deal with criminal behavior on the scale generated by the thousands of addicts, 17,000 officially estimated to reside in the District, who are daily (a) violating the narcotics laws and (b) engaged in other criminal activity to support the narcotics habit. The assignment of principal responsibility for dealing with drug addiction to the criminal justice system, instead of institutions better suited to deal with addiction, has produced a failure that has been expensive and intolerable to the community.[12]

---

Series No. 273 at 9, 13 (1964). That definition lists the characters of the disease as follows:

(1) an overpowering desire or need to continue taking the drug and to obtain it by any means; the need can be satisfied by the drug taken initially or by another with morphine-like properties;
(2) a tendency to increase the dose owing to the development of tolerance;
(3) a psychic dependence on the effects of the drug related to a subjective and individual appreciation of those effects; and
(4) a physical dependence on the effects of the drug requiring its presence for maintenance of homeostasis and resulting in a definite, characteristic, and self-limited abstinence syndrome when the drug is withdrawn.

11. In particular, the doctor said, appellant evidenced a behavior pattern characterized

by continued use of narcotics by one who, though no longer physically addicted, has a continuing obsession to inject drugs. The doctor saw in appellant all the WHO characteristics, but basically he found a compulsion to seek and obtain drugs which had been ruling his behavior for years (Tr. 199–204). In general, the doctor testified, such a "psychic addict" begins by taking drugs for physical reasons, *i. e.,* to attain a "high" and later to ward off withdrawal symptoms; but after a period of five or ten years, the need to take drugs acquires an autonomous characteristic and renders the addict "involuntary to resist" the compulsion to inject drugs (Tr. 202–203). In the doctor's opinion, appellant, being such an addict, would be "compelled" to obtain drugs in some manner (Tr. 203–206).

12. The amicus brief states that while some violent criminals use heroin, character-

The judicial system is clogged and distorted. A 1971 study, conducted by an official of the D.C. Bail Agency, indicates that of all defendants charged with crime in the District of Columbia, approximately 50% have an indication of narcotics use, and of these 40% were charged solely with narcotics offenses, primarily possession. Even the select group released on personal recognizance show a recidivism rate for addicts, of 24%, almost twice the rate for all other offenders. However, addicts released on condition of treatment at D.C.'s NTA had a recidivism rate less than half that of other addicts.

The WACADA Council agrees that the criminal justice system should hold addicts who commit non-drug crimes, though with "treatment rather than simple incarceration," but submits it should not reach mere possessors of drugs, and thus burden public facilities without any benefit in deterrent or rehabilitative effect. A defense of lack of power to control his drug behavior would permit treatment under, e. g., the 1953 D.C. Hospital Treatment Act, 24 D.C.Code § 601 et seq. (1967), by institutions developed and designed to deal with drug addiction.

The Council sees a paradox, but no inconsistency, in its position that addicts should not be held criminally responsible for actions necessary to satisfy addiction, while rehabilitation centers are trying to make addicts bear more responsibility for their welfare and behavior to others, including crimes and drug

behavior. While the Council would prefer a simple statutory exemption, in the situation as it exists "the result we seek must come about within the context of the common law principles of 'responsibility.' So be it. We dislike the means, but we are convinced that the present situation is desperate, and the consequence of its continuation unacceptable. We therefore urge the Court to hold that Raymond Moore and others similarly situated may present the defense of their addiction * * * [as] the necessary first step[13] in the process of making the criminal justice system the instrumentality for identifying addicts so that they may be properly treated. . . . [T]he consequence of not confessing to the criminal law's inability to control drug addiction is that the criminal process becomes part of the problem, rather than part of the solution." (Brief at 23–24).

## III. THIS CASE SHOULD BE DECIDED IN THE CONTEXT OF EVOLUTION OF CONGRESSIONAL LEGISLATION PREMISED BROADLY ON MAXIMUM USE OF REHABILITATION OF NARCOTIC ADDICTS.

### A. The Focusing of Our Inquiry on the 1970 Law

The Jones-Miller Act and Harrison Act did not prohibit possession of narcotics as such, but under the provisions frequently referred to as "possession" offenses, proof of possession sufficed to

istically the heroin user is passive and typically engages in low-grade criminality —property theft, and minor vice (numbers running, gambling, pimping)— Moore's pattern being typical.

The addicts' lack of energy and need for steady supply cast them perfectly for their role of small dealer, with 5 to 10 steady retail customers. Rarely does a non-addict deal in drugs at this retail level. It is virtually unheard of for an addict to become involved in the drug trade at a higher level, where sustained and organized effort are necessary.

Widespread addiction has an especially deleterious influence on the young, par-

ticularly those searching for role models and an accepting group to which they can adhere. Dr. Robert Dupont, administrator of the D.C. Narcotics Treatment Agency (NTA) estimates that in the Model Cities area, 24% of young men between 15 and 19, and 36% of young men between 20 and 24 are heroin addicts. A study of 5,892 addicts in NTA programs in August 1971 shows 33% below the ages of 21, and 68% under 26.

13. It is a first step since the addict will not "avoid the criminal process entirely. But it will bring the judicial system into phase with reality."

sustain conviction of importation, or of purchase in a non-stamped package.[14]

These laws were repealed by the Controlled Substances Act of 1970, P.L. 91–513. That act wrought three significant changes. First, it expressly prohibited simple possession of narcotic drugs as controlled substances, see § 404(a), 21 U.S.C. § 844. Second, it made that offense a misdemeanor, sharply reducing penalties that might be applied to persons on mere evidence of possession. Most important, Congress repealed the provision, included in the Price Daniel Act of 1956 (note 18, infra) that had precluded probations or suspended sentences as to most convictions under the Jones-Miller and Harrison Acts, see 26 U.S.C. § 7237(d). Probation is now prohibited only in case of a "continuing criminal enterprise." 21 U.S.C. § 848.

Appellant's counsel submit that his contentions rest on broad principles which require the same disposition on the merits as to prosecutions under both the earlier laws and the 1970 law. Counsel have urged us, in effect, to consider the conviction as if it were under the 1970 law. They make no argument based on the particular provisions or earlier history of the prior statutes. We think it appropriate to broadly consider applicable principles and Congressional intention in the light of the 1970 law. In short, the validity of appellant's conviction will be appraised as equivalent in all material respect to one entered under the 1970 law for knowing possession.

We are aware that this is somewhat unusual, particularly since the Supreme Court has recently held, in Bradley v. United States,[15] that the 1970 law's provision permitting the use of probation henceforth was accompanied by another provision precluding its use for offenses committed prior to the effective date of the 1970 law. However, on focusing on the defense in issue, we have come to the conclusion that while there are occasional legislative and judicial statements that might have been seized on as indications that the earlier laws were not intended to be applicable to persons possessing or purchasing heroin for their own use, these were essentially insubstantial wisps—which would, incidentally, have also excluded mere users who had not lost "control." As to the lack-of-control issue, we conclude that even in the 1970 law, with its more moderate approach, Congress did not intend to provide for the kind of drug dependence defense appellants have urged. The developments of the 1970 law round out the picture, assuring us that the injection of a drug dependence defense as to prosecutions under either the prior laws, as they fade from view, or the 1970 law, would be an impermissible judicial interjection. We develop in subsequent parts of this opinion the reasons why we do not believe that the courts should develop such a defense as an extension of the general jurisprudence that provides the setting for criminal prosecutions. As to the issue of Congressional contemplation, the fact that we glean its contours in large measure from an examination of current developments in narcotics legislation broadly considered, is, we think, a sound approach for ascertaining legislative intent.[16]

B. *The Increasing Severity of the Legislation of the 1950's*

Understanding of pertinent Congressional intent will be aided by first recalling the Federal narcotics legislation of the 1950's, laws that have been characterized as the turning of the screw.

The mandatory minimum, no probation, no-parole provisions of the Federal laws were not in the original Jones-Miller and Harrison Acts. These features

---

14. Watson v. United States, *supra*, 141 U.S.App.D.C. at 344–345, 439 F.2d at 451–452.

15. Bradley v. United States, 410 U.S. 605, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973).

16. *See* Karl N. Llewellyn, The Common Law Tradition 529 (1960); 2 J. Sutherland, Statutes and Statutory Construction § 4506 (3rd ed. 1943).

were installed by amendment in 1951 and 1956, in reaction to the rising tide of drug abuse.

The Boggs Act of 1951, P.L. 82–255, 65 Stat. 767, placed a two-year minimum sentence on convictions under the Jones-Miller and Harrison laws. The Senate Report deemed prevailing sentences unequal to the task of stemming drug abuse.[17] "It would appear . . . that the punishment which has been afforded narcotic law violators has not been an effective deterrent."[18]

The Price Daniel Act of 1956, P.L. 84–728, 70 Stat. 567, raised the minimum penalty for a violation of the Jones-Miller law to five years, and in addition, introduced the no-probation provision codified at 26 U.S.C. § 7237(d).[19] The House Report stated: "Drug addiction is not a disease."[20] It evidenced considerable optimism that increasing penalties would cope with the drug problem. It claimed the 1951 penalties had reduced narcotic traffic,[21] that illicit traffic continues in "problem areas where leniency with respect to sentencing of convicted traffickers is an established pattern in the courts."[22] It recommended increasing severity in sentences as justified by "the factual evidence proving the deterring value of severe penalties for narcotic and marihuana law violations."[23]

C. *The Reassessment of the 1960's*

The 1960's witnessed a continuing reassessment of approach, and an increasing realization and acceptance that the Government could not satisfactorily cope with the narcotic drug abuse problem by concentrating on law enforcement activities and a theory of deterrence, that there was need for removal of mandatory terms and reestablishment of probation and parole authority, for recognition of addiction as beset by disease aspects that could respond in some measure to treatment, and for multiple paths of research and experiment in keeping with the diverse aspects of the problems.

1. *White House Conference on Narcotic and Drug Abuse (1962): The Emergence of Civil Commitment; Probation and Parole*

The watershed was the first White House Conference on Narcotic and Drug Abuse, convened on September 27, 1962. The working paper of the Conference, the Report of an Ad Hoc Panel on Drug Abuse, identified drug abuse as a indication of an underlying character disorder, manifesting an inadequate personality unable to cope with the stresses of

---

17. S.Rep. No. 1051, 82d Cong., 1st Sess. 3 (1951).

18. *Id.* The Commissioner of Narcotics was quoted, on the basis of information presented during hearings, on the inadequacy of average (18-month) sentences for drug violators: "Short sentences do not deter. * * * There should be a minimum sentence of 5 years without probation or parole, I think it would just about dry up the traffic." *Id.* The Committee was told that drug abuse was not a serious problem in those sections of the country where the judges had a reputation for imposing long sentences.

19. This prohibited probation, or suspension of sentence, upon conviction of (i) violation of the Jones-Miller Act, (ii) violation of 26 U.S.C. §§ 4705(a), 4742(a); (iii) second, or subsequent, offenses punishable under 26 U.S.C. § 7237(a),

which included violations of 26 U.S.C. § 4704 (Harrison Act).

20. H.R.Rep. No. 2388, 84th Cong., 2d Sess. 8 (1956), U.S.Code Cong. & Admin. News 1956, p. 3281.

21. *Id.* at 8, U.S.Code Cong. & Admin.News 1956, p. 3281. "The year 1952 was the peak year in the post-World War II period for arrests for narcotic law violations. In 1953 [and in 1954, narcotic law arrests] dropped. . . . Your committee was advised that the principal cause of the decline in narcotic traffic as evidenced by the reduced number of arrests was the severe penalties provided for by the enactment of the [1951 amendments.]"

22. *Id.* at 10, U.S.Code Cong. & Admin. News 1956, p. 3283.

23. *Id.* at 11, U.S.Code Cong. & Admin. News 1956, p. 3284.

normal life. It recognized that we do not understand the origins of the disorders of the various types of addicts, or how to cure them, but posited that even an individual whose abuse has been terminated must be provided with support and supervision or he could not survive any stress without relapse.[24]

The Conference was particularly advised of the legislative developments in California and New York. After ten years of increasing prison terms, the California legislature realized this might seem a panacea to the public mind but could not effectively cope with the problem. After study, it passed legislation establishing rehabilitation centers, available on certification by a court after conviction of an addict, with provision for controlled supervision after institutional treatment.[25]

The New York law, not yet in force, went further, permitting criminal proceedings to be stayed, with provision for committal to a facility subject to medical supervision, release to out-patient probationary supervision, and abatement of the legal proceedings on successful completion of the program.[26]

A significant voice at the Conference was that of Senator Thomas J. Dodd, Chairman of the Senate Subcommittee on Juvenile Delinquency, who opposed the rigid imprisonment features of the 1956 law, as of illusory value in deterrence and damaging in impact. Without leniency for "the professional criminals at the vortex of narcotic racketeering" there must be reform of the "excessively primitive and inhumane treatment now meted out to those who are essentially the victims of the narcotic racket." He recommended:

> The problem of drug addiction is essentially a medical problem, a psychiatric problem. It cannot be solved by merciless prison sentences. I believe that the law should be amended to repeal mandatory minimum penalties and to restore the possibility of probation and parole for rehabilitated narcotic offenders.

Senator Dodd stated that the responses to his Committee's inquiries showed that these views were supported by a majority of Federal Judges, probation officers, prison wardens and United States attorneys.[27]

---

24. Proceedings, White House Conference on Narcotic and Drug Abuse 293–4 (hereinafter "Proceedings") (1962).

25. *Id.* at 244 ff. (Analysis of State Senator Edwin J. Regan, California Legislature).

26. *Id.* at 184 ff. (Analysis of Richard H. Kuh).

27. *Id.* at 228 ff. Senator Dodd gave these data:

| | Against minimum sentences | Against prohibition of probation and parole |
| --- | --- | --- |
| Prison wardens .... | 92% | 97% |
| District judges .... | 73% | 86% |
| Probation officers .. | 83% | 86% |
| U. S. Attorneys ... | 50% | 55% |

His explanation follows:

Why? I will give you representative answers.

From James V. Bennett, Director of the Federal Bureau of Prisons:

"Prisons, both State and Federal, in the years immediately ahead will be faced inevitably with the problems of narcotic offenders, addict and nonaddict alike, who are weighted down by the hopelessness and the bitter futility of sentences which seemingly stretch into infinity. * * *"

From U. S. District Judge James M. Carter:

"Several years ago at a ninth circuit conference there was a unanimous vote against mandatory sentences. The mandatory sentence can work extreme injustice. * * *"

From Oliver Gasch, then U. S. attorney for the District of Columbia:

"I am opposed to the philosophy of mandatory minima. Even in narcotic cases some discretion should be allocated to the judge. The answer to the elimination of drug traffic is an ideal difficult of realization. I would recommend long "conditional" sentences with close supervision by parole authorities."

From Eugene F. Dupuy, Chief U. S. Probation Officer, New Orleans, Louisiana:

"Existing laws emphasize the punitive aspects in dealing with the illegal drug traffic. Presumably, the reason for this approach is that strict penalties are expected to serve as a deterrent and

## 2. Recommendation of President's Advisory Commission (1963)

Executive Order 11076, signed January 15, 1963, 28 Fed.Reg. 477, created the President's Advisory Commission on Narcotic and Drug Abuse, to submit recommendations based on an evaluation of the White House Conference. The Commission, chaired by our distinguished and revered late colleague, Judge E. Barrett Prettyman, rendered its report on November 1, 1963.[28]

### Basic philosophy

The "Basic Philosophy" section of the Prettyman Commission report was reprinted in full in the 1970 House Committee Report, which stated that the 1970 law, added to previous measures, effectuated in whole or in part virtually all pertinent recommendations made by the Presidential Commissions in 1963 (Prettyman Commission) and in 1967 (so-called Katzenbach Commission).[29] This is how the Prettyman Commission stated its Basic Philosophy: [30]

> The abuse of drugs has aroused two extreme attitudes—the punitive and the permissive.
>
> Some people are concerned primarily with the effects of drug abuse on the community. * * * Because most serious drug abusers return to drugs if left to themselves, these people would shut down the drug abuser away from society for as long as possible.
>
> In contrast to this attitude, others hold that serious drug abuse is usually symptomatic of a mental disturbance and that the drug abuser is a sick person. They attribute his crimes to an inner compulsion for which he should not be held responsible under our code of criminal justice. They feel that the drug abuser must be treated for his sickness rather than punished. Some feel his disease is incurable and that he should be maintained on the drug.
>
> This Commission does not accept either of these extreme attitudes, but it subscribes to certain aspects of each. * * * The drug abuser who steals or who sells drugs to finance his habit is guilty of a crime. Like any other citizen, he should face the consequences. Whether he can be held criminally responsible can only be decided in the courts, case by case. The Commission cannot assert a general rule that every confirmed drug abuser is so impelled by his habit that he is not accountable for his acts under criminal law.
>
> If the abuser is to be penalized, he should not be penalized in the spirit of retribution. The modern concept of criminology should apply—that penalties fit offenders as well as offenses.
>
> Penalties should be designed to permit the offender's rehabilitation wherever possible. Although society must often be protected from the offender for a time, penalties in specific cases should recognize the need for reformation.
>
> The deterrent effect of long sentences is vigorously debated. Some

---

to eliminate or greatly reduce the problem. Were this premise valid, mandatory minimum sentences for all crimes would be the solution. I believe that all persons who have worked with offenders know that such an approach is doomed to failure. . . . [The] person with mental or emotional problems who needs support will seek that support, irrespective of social or legal consequences."

28. Final Report, The President's Advisory Commission on Narcotic and Drug Abuse (1963) (hereinafter 1963 Report).

29. H.R.Rep.No.91–1444, 91st Cong., 2d Sess. 8–10, 16 et seq. (1970), 3 U.S.C.C. A.N. 4566, 4574–75, 4582 (1970). The Katzenbach Commission Report is in The President's Commission on Law Enforcement and the Administration of Justice, Task Force Report: Narcotics and Drug Abuse (1967) (hereinafter Task Force).

30. 1963 Report, *supra* note 28, at 2–4.

evidence indicates that the threat of long sentences may deter non-using traffickers, but it does not necessarily deter the drug abuser. Deterrence is essentially an appeal to a normal sense of reason which the drug abuser has lost. The persistence of narcotic abuse, despite severe penalties for the possession of narcotics, is persuasive evidence that the abuser will risk a long sentence for his drug.

The general philosophy of this Commission can be stated in three parts:

(1) The illegal traffic in drugs should be attacked with the full power of the federal government. * * *

(2) The individual abuser should be rehabilitated. * * *

(3) Drug users who violate the law by small purchases or sales should be made to recognize what society demands of them. In these instances, penalties should be applied according to the principles of our present code of justice. When the penalties involve imprisonment, however, the rehabilitation of the individual, rather than retributive punishment, should be the major objective.

*Specific recommendations*

Specifically the Prettyman Commission recommendations included the following:

(a) *As to probation and parole:*

That mandatory minimum sentences, and prohibition of probation, suspended sentences, and parole, be modified so that the sentencing judge have full discretion in the sentencing of those whose offense is possession of narcotics without intent to sell (and for all marihuana offenses).[31]

(b) *As to civil commitment:*

After discussion of the New York and California programs, the Commission recommended "that a federal civil commitment statute be enacted to provide an alternative method of handling the federally convicted offender who is a narcotic or marijuana user." [32]

*3. Civil Commitment: Narcotic Addict Rehabilitation Act of 1966 (NARA)*

The Prettyman Commission proposals as to civil commitment emerged, with some modification, in the Narcotic Addict Rehabilitation Act of 1966 (NARA). NARA was intended to provide a rehabilitative approach, rather than a purely penal one.[33] NARA was

---

31. 1963 Report, *supra* note 28, at 39–42. It also recommended that possession of small quantities of narcotics with intent to sell be subject to imprisonment—but without a mandatory minimum—and to parole, but not probation.

32. *Id.* at 71, with specific recommendations including: Discretionary authority if the judge, with exception for certain cases, acting upon expert advice, determines that the defendant's offense is related to his abuse of drugs "and that there are reasonable grounds for belief that the defendant can be rehabilitated by treatment." The judge would suspend sentence, and commit to the care of the Attorney General, for at least a period of six months, with possibility of return of defendant to the community as a parolee, under close supervision by a federal probation officer, and provision for inpatient services in the community wherever possible. For the event of successful completion of the program, there was a proposal for discharge and court expunge-

ment of conviction. Otherwise there was provision for resumption of proceedings and imposition of sentence.

33. S.Rep.No.1667, 89th Cong., 2d Sess. 13 (1966), U.S.Code Cong. & Admin.News 1966, p. 4245. This report was based on the testimony in the 1964 hearings that followed the Prettyman Commission Report. The Senate Committee stated:

S.2191 [the proposed legislation], . . . represents a fundamental and innovative reorientation toward the problem of drug addiction and the handling of drug addicts. In brief, that Bill is based upon the simple and historically unassailable fact that narcotic addiction cannot be cured merely by prosecution and imprisoning addicts; hence, narcotic addicts, even those who have committed criminal offenses, should not be treated as common criminals in the spirit of retribution. Instead, S. 2191 takes the more realistic approach of seeking to utilize flexible tools of medicine and psychiatry, re-education

congruent with the 1953 D.C. law's philosophy, 24 D.C.Code § 601 et seq. (1967), that addicts were sick people, who need a helping hand, and which permitted a court order for confinement of a "drug user." [34] However, the D.C. Act was made expressly inapplicable to "any person . . . charged with a criminal offense," 24 D.C.Code § 603(b). NARA went further and provided for civil commitment even of persons charged with crimes, in the case of crimes deemed related to drug abuse (with certain exceptions).

*NARA commitment provisions*

The NARA provisions for civil commitment of narcotic addicts may be summarized as follows:

*Title I*—pretrial commitment for treatment, in lieu of prosecution, of addicts charged with Federal crime. 28 U.S.C. § 2901 ff.

*Title II*—commitment for treatment of addicts convicted of Federal crime. 18 U.S.C. § 4251 ff.

*Title III*—commitment for treatment of persons not charged with any Federal crime, on a petition by the addict or a related individual. 42 U.S.C. § 3411 ff.

Eligibility under Titles I and II was subject to statutory exclusions, *e.g.*, any person charged with a crime of violence.[35] A person charged with selling a narcotic drug is excluded from Title I, but not from Title II, if the sale was to enable him to obtain a narcotic drug which he required for his personal use.

Civil commitment requires a determination by the court that the narcotic addict is likely to be rehabilitated by treatment. Under Title I he is committed to the custody of the Surgeon General for treatment up to 36 months—in an institution, or on additional release in the community. If he successfully completes the treatment program, the criminal charge is dismissed, otherwise, the prosecution may be resumed. Under Title II, the convicted person is committed to the custody of the Attorney General who provides for his treatment, with provision for conditional release under supervision in the community, after six months commitment in a treatment institution.

D. *Restoration of Rehabilitative Discretion of Sentencing Judge: The Controlled Substances Act of 1970*

The other pertinent recommendation of the Prettyman Commission (1963) and Katzenbach Commission (1967) for restoration of discretionary authority in the sentencing judge (probation, including suspension of sentence; no mandatory minimum) and parole, was accomplished by the Controlled Substances Act of 1970. This was enacted as Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, P.L. 91–513, 84 Stat. 1236.[36] This Prettyman

and job training, family and neighborhood supervision in an effort to cure the addict and return him to society physically and emotionally prepared to resist the temptations to return to drug abuse and crime. This approach—primarily rehabilitative rather than penal—was firmly supported by every witness who testified before the Subcommittee.

34. 24 D.C.Code § 608 (1967). The term "drug user" was defined, 24 D.C.Code § 602(a), to mean any person "who uses any habit-forming drug so as to endanger the public morals, health, safety, or welfare, or who is so far addicted to the use of such habit-forming narcotic drugs as to have lost the power of self control with

reference to his addiction." The Act provided for commitment to a hospital—"confined there for rehabilitation"—until the drug user is (1) cured, or (2) has received maximum benefits. 24 D.C.Code § 609(a).

35. This was held valid in United States v. Fersner, 151 U.S.App.D.C. 20, 465 F.2d 605 (1972). Other exclusions were held invalid in Watson v. United States, *supra*; and United States v. Hamilton, 149 U.S.App.D.C. 295, 462 F.2d 1190 (1972).

36. The comprehensive act accomplished a redefinition of drug control mechanisms, with reclassification of dangerous substances, and also provided for broadening

Commission recommendation (text at note 31 *supra*) was reiterated in 1967 by the President's Commission on Law Enforcement and Administration of Justice,[37] which stated:

> *The Commission recommends*: State and Federal drug laws should give a large enough measure of discretion to the courts and correctional authorities to enable them to deal flexibly with violators, taking account of the nature and seriousness of the offense, the prior record of the offender and other relevant circumstances.

The President's 1969 message, while recommending expansion of rehabilitation and research measures in recognition of an obligation of society to help the "genuinely sick people" dependent on drugs, stated that their sickness helps to explain, but not to excuse, the crimes they commit.[38] However, the Administration made clear that its concern for such sick people, while not extending to exculpation, did embrace provision for treatment while on probation or parole.

Attorney General Mitchell, outlining the Administration's proposal at the hearings, emphasized the need for tailoring of disposition "to the requirements of the violation or the narcotics addict," both in length of detention, and in possibility of rehabilitation and treatment "while on probation or parole." [39]

This approach was reflected in the 1969 report submitted by Senator Dodd in behalf of the Senate Judiciary Committee and was in line with Senator Dodd's presentation to the 1962 White House Conference. The Report [40] stated:

> It had also become apparent that the severity of penalties including the length of sentences does not affect the extent of drug abuse and other drug-related violations. The basic consideration here was that the increasingly longer sentences that had been legis-

---

the scope of research, education, and rehabilitation programs. Title I, "Rehabilitation Programs Relating to Drug Abuse," includes provisions for appropriation authorizations, an expanded role for HEW, broader treatment programs in Public Health Service hospitals and more scope for treatment of persons with "drug dependence problems" in treatment facilities established under the Community Mental Health Centers Act, 42 U.S.C. § 2688(a).

37. The Challenge of Crime in a Free Society 223 (1967).

38. *See* "Control of Narcotics and Dangerous Drugs," President's Message to Congress, July 14, 1969, H.Doc.No.91–138, 91st Cong., 1st Sess., reprinted at 115 Cong.Rec. 19327–28 (1969). Part VIII states:

Considering the risks involved, including those of arrest and prosecution, the casual experimenter with drugs of any kind, must be considered at the very least, rash and foolish. But the psychologically dependent regular users and the physically addicted are generally sick people. While this sickness cannot excuse the crimes they commit, it does help to explain them. Society has an obligation both to itself and to these people to help them break the chains of their dependency.

39. *See* Hearings on Narcotics Legislation, before the Subcommittee to Investigate Juvenile Delinquency of the Senate Judiciary Committee, 91st Cong., 1st Sess. 216 (1969) (hereinafter 1969 Senate Hearings).

I personally believe in sentences which are reasonably calculated to be deterrents to crime and which also will give judges sufficient flexibility to tailor the sentences to the requirements of the drug violator or the narcotics addict.

Prison is not the only logical alternative. In some cases, it may be advisable to use Federal rehabilitation programs, halfway houses and private medical treatment while on probation or parole. Perhaps the most promising alternative is to approach the narcotics violator in relation to his function; the professional trafficker who should be given as severe a sentence as possible; the casual and intermittent user who is perhaps only experimenting out of curiosity; or the mentally or physically ill addict, who without additional help, cannot break a confirmed habit.

*See also*, the July 15, 1969 letter of the Department of Justice submitting the Administration bill. *Id.* at 909.

40. S.Rep.No.91–613, 91st Cong., 1st Sess. (1969).

lated in the past had not shown the expected overall reduction in drug law violations.

\* \* \* \* \* \*

The main thrust of the change in the penalty provisions is to eliminate all mandatory minimum sentences for drug law violations except for a special class of professional criminals. The field of penology has maintained the position that mandatory sentences hamper the process of rehabilitation of offenders. It has equally been maintained that such penalties infringe on the judicial function by not allowing the judge to use his discretion in individual cases.

The House Interstate and Foreign Commerce Committee, H.R. Rep. No. 91–1444, 91st Cong., 2d Sess. 19, U.S. Code Cong. & Admin. News 1970, p. 4585 (1970), expressly implementing the Presidential Commission's recommendations for sentencing flexibility "to provide a greater incentive for rehabilitation," stated in its report:

*Action.* As discussed earlier in this report elimination of almost all mandatory minimum sentences, as well as elimination of the prohibition against probation and parole of narcotic offenders, is accomplished by this bill.

Furthermore, and significantly, the House Committee specifically voiced approval of probation on condition of treatment:

The Committee is confident that judges, in administering the provisions of this section, will recognize that many defendants coming before them will be in need of medical treatment and that judges will require that these persons undergo some form of prescribed treatment as a condition of their probation (at 49, U.S.Code Cong. & Admin. News 1970, p. 4617).

*Statutory provisions*

The Controlled Substances Act of 1970 collects in one place prohibition and penalty provisions previously scattered; simplifies determination of what conduct is forbidden; and standardizes penalty provisions in a pattern whereby penalties bear some rational and continuous relationship to forbidden acts. Offenses involving drugs which carry (1) a high potential for abuse; (2) no recognized medical purposes and (3) danger of addiction or worse consequences, are treated as more serious than offenses involving less-dangerous, more-useful drugs. The misdemeanor of simple possession of controlled drugs (for one's personal use) was made subject to a maximum penalty of one year and $5,000 fine. An additional year and $5,000 fine was permitted for second and subsequent offenses.[41]

No mandatory minimum terms were provided by the 1970 law, with a single

---

41. 21 U.S.C. § 844 (1970). The House Report on the 1970 Act, *supra* at 11, U.S.Code Cong. & Admin.News 1970, p. 4577, states: "The bill also provides that illegal possession of controlled drugs by an individual for his own use is a misdemeanor, with a sentence up to [one] year imprisonment and a fine of not more than $5,000 or both."

*Cf.* § 411 of the Act, 21 U.S.C. § 851: "Proceedings to establish prior convictions—Information filed by United States Attorney." This section provides that a person convicted of an offense by reason of prior conviction shall be sentenced to increased punishment, unless before trial, or before entry of a plea of guilty, the U. S. Attorney files an information with the court stating that previous convictions would be relied upon. Subsection (a)(2) provides that an information may not be filed under this section if the increased punishment may be imposed for a term in excess of three years, unless the defendant was indicted. This section also provides that if an issue is raised as to the prior conviction, the issue shall be decided by a court without a jury.

The intention is, apparently, that simple possession is a misdemeanor, and that the increase in punishment from one to two years is not considered an element of any crime (not triable to a jury) or to require an indictment.

exception [42] not here material. The court's restored authority to use probation was enhanced by a provision that on the first offense of simple possession, if the offender has complied with the conditions of probation (not exceeding one year in duration), the court shall discharge the person and dismiss the proceedings, without entering any court adjudication of guilt on the verdict or plea of guilty. If the offender is below 21 when the offense occurs, he may obtain a court order expunging from all official records all recordation relating to his arrest, indictment, trial and finding of guilt. 21 U.S.C. § 844.

*Dispositional options under probation— including treatment*

The conception that narcotic addiction is a disease which explains, while it does not excuse, the conduct of defendants, is carried out by the approval, implied in the restoration of probation authority, and expressly voiced by the House Committee, contemplating probation orders conditioned on treatment.

Statutory authority to provide probation on conditions is set forth in the provisions of the Federal Probation Act, codified at 18 U.S.C. § 3651. The suspension of imposition or execution of sentence is authorized when the court is "satisfied that the ends of justice and the best interest of the public as well as the defendant will be served thereby . . . ." When sentence is suspended, the convicted person is placed on probation "for such period and upon such terms and conditions as the court deems best."

The power to impose conditions is a broad one, governed by the standard of reasonableness, which permits insulating the individual from the conditions that led him into trouble. Whaley v. United States, 324 F.2d 356 (9th Cir. 1963). "[T]he Probation Statute is a humanitarian piece of legislation and should, accordingly, be liberally interpreted by the courts." Mann v. United States, 218 F.2d 936, 940 (4th Cir. 1955). An intelligent compassion was the aim of Congress as appears from the legislative history reviewed in United States v. Murray, 275 U.S. 347, 355, 48 S.Ct. 146, 72 L.Ed. 309 (1928).

By an amendment to 18 U.S.C. § 3651, Pub.L. No. 91–492, 84 Stat. 1090, passed a few days before the comprehensive 1970 law, the court was given authority to require narcotic addicts to reside at or participate in treatment centers when the Attorney General certifies that adequate facilities, personnel and programs are available. By another amendment to 18 U.S.C. § 3651, passed May 11, 1972, Pub.L. No. 92–293, 86 Stat. 136, Congress authorized a court to require a person who is an addict under the NARA definition,[43] 18 U.S.C. § 4251(a), "to participate in the community supervision programs" established by the Attorney General under Title II of NARA [44] as a condition of probation . . . for all or part of the period of probation." This makes the community-based programs authorized for persons under NARA, available, under probation, for addict-offenders arguably ineligible for NARA treatment, but in like need of supportive adjustment.[45]

---

42. A mandatory minimum is provided, by § 408, 21 U.S.C. § 848 (1970), as to a "continuing criminal enterprise."

43. Or "a drug dependent person within the meaning of section 2(q) of the Public Health Service Act."

44. 18 U.S.C. § 4255.

45. S.Rep.No.92–675, 92d Cong., 2d Sess. 4 (1972):
 At present there are approximately 200 Federal prison inmates involved in the institutional phase of the program.

The role of the Bureau of Prisons in rehabilitation of non-NARA addicts was carefully discussed when the Subcommittee on National Penitentiaries held oversight hearings in March 1971. The committee now anticipates that some of the inmates presently in the program may become eligible for release before the end of the current fiscal year. The Bureau of Prisons has estimated that the first will become eligible for release in February 1972.

An institutional program, however, cannot fully prepare these individuals

IV. AT PRESENT STAGE OF LE-
GAL DEVELOPMENTS, APPRO-
PRIATE JUDICIAL ROLE LIES
IN UPHOLDING THE GENERAL
VALIDITY OF UNLAWFUL POS-
SESSION VERDICTS FOR HER-
OIN ADDICTS, TAKING INTO
ACCOUNT THE AVAILABILITY
OF PROBATION AND TREAT-
MENT, LEGISLATIVE INTENT,
JUDICIAL DOCTRINE OF RE-
SPONSIBILITY, CONSTITUTION-
AL FACTORS, AND MEDICAL
AND CLINICAL DATA

■ Taking into consideration the discernible contemplation of Congress, pertinent doctrines of responsibility, constitutional factors, and medical and clinical data, in the context of the resto-ration of probation flexibility, we conclude that the judicial role, at this juncture, lies in upholding the general validity of unlawful possession verdicts for heroin addicts.

A. *Overall View of Congressional Intent*

There was widespread construction of the Harrison and Jones-Miller Acts, as permitting prosecutions based on evidence of possession of narcotic drugs by an addict for his own use. This is an entirely different matter from the disputes as to the way the Harrison Act was construed to preclude medical prescription of narcotics outside an institution.[46]

The "simple possession" prohibition in the 1970 law,[47] which follows the pattern

for the pressures of job, home, family, and associates they will face when they complete their sentences of imprisonment or are released on parole. Aftercare counseling, both individually and in groups, is essential to improving the offenders' chances of following a drug-free and crime free lifestyle when they are on the street. In addition, periodic urine surveillance is necessary to determine that they are remaining free of drugs. The proposed legislation authorizes both community treatment and urine surveillance as necessary adjuncts to the supervision already provided by the U.S. probation officers.

The proposed legislation would also authorize community-based treatment for offenders who for one reason or another have not taken part in an institutional program. For example, probationers or parolees who experiment with drugs while under community supervision may receive treatment even though the seriousness of their infraction does not warrant revocation and imprisonment. The committee finds that the purpose here is parallel to that legislation passed in 1970 permitting parolees and probationers to be referred to community treatment centers (84 Stat. 1090). This would give the probation officers who supervise probationers and parolees treatment resources they can rely on when an offender begins to show signs of difficulty. It gives the officer treatment alternatives other than immediate incarceration.

46. *See, e. g.*, King, The Narcotics Bureau and the Harrison Act: Jailing the Heal-ers and the Sick, 62 Yale L.J. 736, 739 ff. (1953). Despite pre-passage assurances in the Journal of the American Medical Association, that the purpose of the law was to ban sales of opiates without a physician's interposition, after the Harrison Act became effective the Treasury Department began setting, and steadily broadening, restrictions on the authority of physicians. Regulations forbade the prescribing for opiates except in hospital, and such prescription came to be declared unethical by the AMA in 1924, after years of debate. By 1923, some 40 maintenance clinics, opened mainly by cities from about 1918, were closed.

As for the Supreme Court opinions on medical treatment, *see* A. Lindesmith, The Addict and the Law 5 (1965). Early decisions precluded doctors from prescribing drugs to cater to the appetite or satisfy the craving of the addict, rather than the attempted cure of the habit. Webb v. United States, 249 U.S. 96, 39 S.Ct. 217, 63 L.Ed. 497 (1919); United States v. Jim Fuey Moy, 254 U.S. 189, 41 S.Ct. 98, 65 L.Ed. 214 (1920). However, in Linder v. United States, 268 U.S. 5, 18, 45 S.Ct. 446, 449, 69 L.Ed. 819 (1925), the Court upheld moderate dosages, to avoid withdrawal symptoms, and said "They [addicts] are diseased and proper subjects for such (medical) treatment. . . . What constitutes *bona fide* medical practice must be determined upon consideration of the evidence and attending circumstances."

47. The Controlled Substances Act provides in § 404(a), 21 U.S.C. § 844

of the widespread Uniform Narcotic Drug Act[48] removes a marginal gap in the prior Federal legislation—*e. g.*, for persons who received narcotics by gift, perhaps from a pusher.[49] So far as appellant's contention of a defense of incapacity or drug dependence is concerned,[50] the 1970 law marks no shift in Congressional intent, but rather a continuance of absence of any Congressional contemplation of such a defense.

The 1967 Task Force Report, Narcotics and Drug Abuse, note 30 *supra*, rendered to the President's Crime Commission, exemplifies the widespread understanding that an addict's constant need for drugs was no defense to a charge, under State or Federal law, of possession of or purchase of narcotic drugs. This is the same Report that supported sentencing flexibility for the addict offender (text at note 36 *supra*). But it did not contemplate a defense on the merits. The Report states (at p. 10):

*Drug Offenses*

Addiction itself is not a crime. It never has been under Federal law, and a State law making it one was struck down as unconstitutional by the 1962 decision of the Supreme Court in Robinson v. California. It does not follow, however, that a state of addiction can be maintained without running afoul of the criminal law. On the contrary, the involvement of an addict with the police is almost inevitable. By definition, an addict has a constant need for drugs, which obviously must be purchased and possessed before they can be consumed. *Purchase and possession*, with certain exceptions not relevant in the case of an addict, are *criminal offenses under both Federal and State law.* So is sale, to which many addicts turn to provide financial support for their habits. (Emphasis added).

The pertinent state rulings support the view that drug dependence did not establish a defense. In rejecting the claim, based on Robinson v. California, that the uniform possession prohibition was inapplicable to a narcotic addict because his possession only reflected his disease of addiction, the Illinois court held that knowing "possession" signifies a "voluntary act" and not a mere "status" or "condition." [51]

The same analysis appears in other state rulings, *e. g.*, Nutter v. State, 8 Md.App. 635, 262 A.2d 80 (1970), stating that the victims of unlawful drug traffic "are also criminals, not by reason of being addicts, . . . but, because, notwithstanding their addiction, they

(1970): "It shall be unlawful for any person knowingly or intentionally to possess a controlled substance" unless the substance was obtained from a medical practitioner in the course of his professional practice, or as otherwise authorized by the 1970 law.

**48.** It provides: "Sec. 2. Acts Prohibited. It shall be unlawful for any person to manufacture, possess, have under his control, sell, prescribe, administer, dispense, or compound any narcotic drug, except as authorized in this Act." The Uniform Act was approved by the American Bar Association in 1932 and passed prior to 1970 by 49 jurisdictions. W. Eldridge, Narcotics and the Law 35, 45, and Appendices A and B (1962).

**49.** United States v. Harling, 150 U.S.App. D.C. 87, 463 F.2d 923, 928 (1972).

**50.** See Br. 93: "Appellant therefore relies solely upon the common law princi-

ples enunciated above, which serve to qualify all criminal statutes, and not upon any specific Congressional intent derived from legislative history." While *Watson* reserved the question whether research into their legislative history would show that the earlier statutes were not intended to apply when the evidence showed only an addict's possession for his own use, counsel have disclaimed such a presentation and for present purposes appellant's conviction can be treated like one under the 1970 law for knowing possession of heroin.

**51.** *See* People v. Nettles, 34 Ill.2d 52, 213 N.E.2d 536 (1966), cert. denied, 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967); People v. Luckey, 90 Ill.App.2d 325, 234 N.E.2d 26 (1967). For subsequent cases reiterating *Nettles, see* People v. Jones, 43 Ill.2d 113, 251 N.E.2d 195 (1969); People v. Jackson, 116 Ill.App. 2d 304, 253 N.E.2d 527 (1969).

are responsible for certain of their acts, even though stemming from their addiction, which are crimes, as for example, possession and control of a narcotic drug." 262 A.2d at 86–87.

The modern practice in drafting penal legislation is to specify defenses when intended.[52] Congress would have inserted an affirmative provision in the 1970 law, if it had contemplated a drug dependence defense. Exactly such an affirmative defense provision was proposed in § 1824 of the Study Draft of a new Federal Criminal Code, released for comment, in June 1970, by the National Commission on Reform of Federal Criminal Laws.[53]

Although that Commission's Staff on balance—after candidly discussing pertinent problems, which we shall note later—favored this defense, they (a) proposed it for adoption by the legislature, and (b) drafted it as an affirmative defense.[54]

The hearings preceding the Controlled Substances Act of 1970 contain a submission by Professor Michael Rosenthal, identified as the staff consultant on Drug Laws to the National Commission on Reform of the Criminal Laws, speaking in his individual capacity. He proposed that simple possession, even of heroin, be at most a misdemeanor (except for organized criminal activity) and not a felony, subject to high (maximum) imprisonments, as proposed by the Administration; his view became a feature of the law as eventually enacted. He made other suggestions that were not accepted by Congress—that possession not be made a Federal crime; alternatively that it be subject to diminished punishment, or acquittal, if "a defendant proved beyond a preponderance of evidence that he possessed only for personal use." [55] A recommendation for a drug dependence defense was made by an authoritative medical voice,[56] on the

---

52. *See* Wechsler, The Challenge of a Model Penal Code, 65 Harv.L.Rev. 1097 (1952).

53. The Study Draft proposed:
 § 1824. Possession Offenses; Defense of Dependence.
 (1) Offense. A person is guilty of an offense if . . . he knowingly possesses a usable quantity of a dangerous or abusable drug. . . .
 (2) Defense. It is an affirmative defense to a prosecution under this section that the drug was possessed for personal use by a defendant who was so dependent on the drug that he lacked substantial capacity to refrain from use.

54. The dependence defense provision was dropped from § 1824 when the National Commission submitted its Final Report on January 7, 1971. *See* Hearings on Reform of the Federal Criminal Laws, Before the Subcommittee on Criminal Laws and Procedures of the Senate Judiciary Committee, 92d Cong., 1st Sess. pt. 1, 129 ff. (1971) (hereinafter 1971 Senate Hearings). *See* p. 407 for § 1824 in the Final Report.

55. 1969 Senate Hearings, note 39 *supra*, at 1050–1055.
 He said it was "questionable whether there is a substantial federal interest in reaching users" (at 1054) outside federal enclaves, but conceded that it is cer-

tainly arguable that most Schedule I and II drugs have a potential for harm great enough to warrant—for deterrent purposes—misdemeanor treatment for simple possession violations. He particularly criticized the philosophy of use of a possession offense as a means of reaching those users who, in the judgment of police or prosecutors, have not cooperated with the authorities in identifying sources.

56. Id. at 315, 321–322, testimony of Dr. Henry Brill, Chairman, Committee on Alcoholism and Drug Dependence of the American Medical Association's Council on Mental Health:
 In regard to handling of offenders, drug dependence, as distinguished from drug abuse, should be regarded as an illness. Drug dependent persons should be treated as patients rather than criminals. We are particularly concerned over the possible ramifications of S. 2637 with respect to those persons who unlawfully possess drugs in schedules III and IV for their own personal use. Mere possession for personal use of depressant and stimulant drugs having a legitimate medical usage should not constitute an offense. Here again, the degree of social hazard, and the reasons for having the drug should be taken into account.

ground that it should be regarded as an illness; this was particularly urged for the amphetamines and barbiturates, which have a legitimate medical use. Congress did not enact any of these suggestions.

We do not think it can fairly be said that Congress contemplated a drug dependence defense to a Federal charge based on possession that had not been accepted by the State courts.

### B. Interlock of Legislative Intent of Possession Statute and Judicial Doctrines of Criminal Responsibility

A statute prohibiting "possession" is not to be taken in a sense "which works manifest injustice or infringes constitutional safeguards," and so even if the words "intentionally or knowingly" had not been inserted in the 1970 law prohibiting possession of heroin and other controlled substances the court would have inferred a legislative intent to avoid criminality for "a possession which is not conscious and willing." Baender v. Barnett, 255 U.S. 224, 225, 41 S.Ct. 271, 65 L.Ed. 597 (1921).

The broad question raised by this case is whether or when possession of heroin by an addict, though conscious and intentional, lacks elements indispensable to criminality under fundamentals of our system of justice. Appellant contends that his conduct is excusable for lack of ability to control offending behavior, that his "long and intensive dependence on injected heroin stands on the same footing" as "a person forced under threat of death to inject heroin." (Brief at 4). We may fairly assume that a statute contemplates the defense of threat of death, as basic jurisprudence, even though not expressly noted. However, psychic dependence, and a claim of psychic incapacity, did not establish a defense under settled judicial doctrine that Congress may reasonably be said to have contemplated.

### Untenability of impaired control concept as universal and absolute defense negativing criminal responsibility

Appellant's key defense concepts are impairment of behavioral control and loss of self-control. These have been considered by this court most fully in discussion of the insanity defense, and the philosophy of those opinions is invoked, although appellant disclaims the insanity defense as such. In our 1962 en banc McDonald [57] opinion we required as an essential ingredient of the insanity defense evidence that the crime was the product of a "mental disease or defect"—defined as an "abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls." In our 1972 en banc opinion in Brawner,[58] we adopted the test of the ALI's Model Penal Code and required, for exculpation from responsibility for criminal conduct on ground of insanity, evidence from the defendant that as a result of "mental disease or defect," as defined in McDonald, he lacked at the time of his conduct "substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law."

Appellant's presentation rests, in essence, on the premise that the "mental disease or defect" requirement of McDonald and Brawner is superfluous. He discerns a broad principle that excuses from criminal responsibility when conduct results from a condition that impairs behavior control. Appellant's submission was made prior to Brawner but presumably would be modified so that the statement (Brief at 80) that it is not contended that appellant's controls were totally destroyed would be refined with a claim that there was a lack of substantial capacity to conform conduct to the law prohibiting possession. The broad assertion is that in general the mens rea element of criminal responsi-

57. McDonald v. United States, 114 U.S. App.D.C. 120, 124, 312 F.2d 847, 851 (en banc, 1962).

58. United States v. Brawner, 153 U.S.App. D.C. 1, 471 F.2d 969 (en banc, 1972).

bility requires freedom of will, which is negatived by an impairment of behavioral control and loss of self-control.

If drug dependence really negatived mens rea, it would be a defense not only to the offense of possession or purchase of prohibited drugs but to other actions taken under the compulsion of the need to obtain the drug. If there is an impairment and lack of capacity to alter conduct, there is no way in which the line can be drawn in mens rea terms so as to exclude the very large percentage of addicts [59] who must support their habit by engaging in retail sales, or, indeed, committing other crimes in order to satisfy their compulsion for drugs.

Under common law doctrine the courts did recognize defenses as applicable to some but not all offenses. Thus, the defense of duress was not applicable to murder, and originally not applicable to any capital crime. But these are not defenses of lack of the "free will" or mens rea that is an ethical and moral requisite of criminality, but are affirmative defenses of justification and excuse that are based on policy assessment of the needs and limits of social control, a policy appraisal that has been resolved by the legislature for the heroin offenses.

Appellant's surface logic loses luster with analysis. It does not follow that because one condition (mental disease) yields an exculpatory defense if it results in impairment of and lack of behavioral controls the same result follows when some other condition impairs behavior controls.

The criminal law expresses the requirements of personal and official discipline needed to protect society. By long tradition of the penal law, an actor's behavior is "involuntary" and there is no criminal responsibility, when he is overwhelmed by force, as when his arm is physically moved by someone else.[60] By long tradition, too, the criminal law reaches only acts that are not only voluntary but also accompanied by a mental element, a "mens rea" (Law latin for guilty mind). Although some modern statutes impose strict liability, statutes defining criminal offenses are generally construed to require a mens rea, what Justice Jackson aptly referred to as the "requisite but elusive mental element" of crime. Morissette v. United States, 342 U.S. 246, 252, 72 S.Ct. 240, 96 L.Ed. 288 (1952). However, this mental state may be supplied by proof of knowledge, or even by an objective standard of negligence not dependent on subjective knowledge of the actor.[61] The elements that our basic jurisprudence requires for criminal responsibility—a voluntary act, and a mental state—are plainly fulfilled by an offense of knowing possession of a prohibited article.[62]

The legal conception of criminal capacity cannot be limited to those of unusual endowment or even average pow-

59. Concededly there are "many addicts" engaged in retail sales. Task Force, *supra* note 30, at 10. Estimates put their number in a range of 40 to 70% of Federal and D.C. narcotics offenders. Report of the President's Commission on Crime in the District of Columbia 579, 995 n. 120 (1966) (hereinafter 1966 D.C. Report). Kolb, Drug Addiction: A Medical Problem 173 note * (1962) (hereinafter Kolb) recommending laws that vest in physicians the responsibility of treatment of addicts, and control over narcotics dispensation, states: "Most peddlers today are opiate addicts who sell small amounts of narcotics primarily to support their own habit. These peddlers should be treated in law as addicts."

60. ALI Model Penal Code § 2.01(1) (Proposed Official Draft 1962); see Comment (Tent.Draft No. 4 1955), at 122, Tent.Draft No. 10 (1960), at 6.

61. ALI Model Penal Code § 2.02 (Proposed Official Draft 1962) on requirements of culpability, requires that action be done "purposely" and "knowingly," "recklessly" or "negligently," and refines these terms.

62. *See* ALI Model Penal Code §§ 2.01, 2.02 (Proposed Official Draft 1962). Section 2.01(4) states that the requirement of a "voluntary act" embraces possession as an act, "if the possessor knowingly procured or received the thing possessed or was aware of his control thereof for a sufficient period to have been able to terminate his possession."

ers. A few may be recognized as so far from normal as to be entirely beyond the reach of criminal justice, but in general the criminal law is a means of social control that must be potentially capable of reaching the vast bulk of the population. Criminal responsibility is a concept that not only extends to the bulk of those below the median line of responsibility,[63] but specifically extends to those who have a realistic problem of substantial impairment and lack of capacity due, say, to weakness of intellect that establishes susceptibility to suggestion; or to a loss of control of the mind as a result of passion, whether the passion is of an amorous nature or the result of hate, prejudice or vengeance; or to a depravity that blocks out conscience as an influence on conduct.[64]

The criminal law cannot "vary legal norms with the individual's capacity to meet the standards they prescribe, absent a disability that is both gross and verifiable, such as the mental disease or defect that may establish irresponsibility. The most that it is feasible to do with lesser disabilities is to accord them proper weight in sentencing."[65]

Only in limited areas have the courts recognized a defense to criminal responsibility, on the basis that a described condition establishes a psychic incapacity negativing free will in the broader sense. These are areas where the courts have been able to respond to a deep call on elemental justice, and to discern a demarcation of doctrine that keeps the defense within verifiable bounds that do not tear the fabric of the criminal law as an instrument of social control.

*Duress*

These principles of social control are illuminated by the doctrines defining the defense of duress.[66] While the defense of duress is available to one compelled against his will to perpetrate a crime, with the exception of homicide, the defense is "subject to certain important restrictions and limitations, but in general is a modifying circumstance rather than a limitation of criminal capacity."[67]

The defense of duress does not betoken a broad principle of lack of self-control as a defense to criminal responsibility. While the ALI has accepted the less strict view, voiced in some cases, of lesser threats than those embraced in the original doctrine requiring apprehension of death or great bodily harm,[68] there is a continuing limitation of the defense to one who shows coercion by the use of, or a threat to use, unlawful force against his person.[69]

The limited defense of duress is thus inapplicable to a purely internal psychic incapacity. Indeed, it is also excluded if the actor recklessly or consciously placed himself in a situation where it was probable he would be subjected to external duress, a limitation considered ap-

---

63. Perkins, Criminal Law 878 (2d ed. 1969) (hereinafter Perkins).

64. *Id.* at 878–79. *Compare* United States v. Levy, 326 F.Supp. 1285 (D.Conn. 1971).

65. ALI Model Penal Code § 2.09, Comment (Tent.Draft No. 10, 1960), at 6.

66. The defense is sometimes called "compulsion," *see* Perkins, note 63 *supra*, at 95. Technically, the term "coercion" is reserved for influence over a married woman by her husband, *id.* at 909.

67. *Id.* at 909.

68. ALI Model Penal Code §·2.09 (Proposed Official Draft, 1962). The ALI would expand the traditional common law state-

ment by accepting a threat of force against the person of another and by stating the extent of the threat of force as one "which a person of reasonable firmness in his situation would have been unable to resist."

69. Perkins, note 63 *supra*, at 954; ALI Model Penal Code § 2.09 (Tent. Draft No. 10, 1960), at 4; Annot., Coercion, compulsion or duress as defense to criminal prosecution, 40 A.L.R.2d 908 (1955); Iva Ikuko Toguri D'Aquino v. United States, 192 F.2d 338, 357 (9th Cir. 1951), cert. denied, 343 U.S. 935, 72 S.Ct. 772, 96 L.Ed. 1343 (1952); *cf.* Gillars v. United States, 87 U.S.App.D.C. 16, 28, 182 F.2d 962, 974 (1950).

propriate "in view of the exceptional nature of the defense." [70]

*Necessity defense*

There is a common law defense of necessity—sometimes called "duress of circumstances"—available for conditions not involving an external threat of force. Supported by Biblical citation,[71] this legal doctrine is more discussed than litigated, and it provides a justification that is limited to the person who commits an offense in order to avoid a greater evil.[72]

The few cases on the doctrine tend to involve violations undertaken for the greater good (or lesser evil) of safety—as in the case of the master held not to violate an embargo law when he takes port in a storm for the safety of vessel and those on board.[73] The doctrine of necessity does not support appellant's case; on the contrary, its limitation to avoidance of a "greater evil," illustrates that in common law doctrines the courts have proceeded in support of policy choices by staking out limited manageable defenses, not an all-embracing theory of psychic incapacity.

*Crucial differences between mental disease defense and proposed drug dependence defenses*

Our past decisions have considered the "no control" defenses of drug addicts in the context of the insanity defense. This is in accord with the approach of other circuits, e. g., United States v. Freeman, 357 F.2d 606 (2d Cir. 1966). Appellant disclaims any direct reliance on the insanity defense.[74] He agrees with our rulings that heroin dependence may have probative value, along with other evidence of mental disease,[75] but is not by itself evidence of "mental disease or defect" sufficient to raise the insanity issue,[76] unless so protracted and extensive as to result in unusual deterioration of controls.

Our opinion in *Brawner* declined to accept the suggestion that it "announce" a standard exculpating anyone whose capacity for control is insubstantial, for whatever cause or reason, and said, disclaiming an "all-embracing unified field theory," that we would discern the appropriate rule "as the cases arise in regard to other conditions".[77]

In our view, the rule for drug addiction should not be modeled on the rule for mental disease because of crucial distinctions between conditions. The subject of mental disease, though subject to some indeterminacy, and difficulty of diagnosis when extended to volitional impairment as well as cognitive incapacity,[78] has long been the subject of systematic study, and in that framework it is considered manageable to ask

**70.** ALI Model Penal Code § 2.09 (Proposed Official Draft, 1962) ; and *see* Comment (Tent. Draft No. 10, 1960), at 8.

**71.** Jonah, C. 1, v. 5 (jettison cargo to save lives).

**72.** Perkins, note 63 *supra*, at 956 ff ; ALI Model Penal Code § 3.02 (Proposed Official Draft, 1962) ; Comment (Tent. Draft No. 8, 1958), at 5.

**73.** The William Gray, 29 Fed.Cas. No. 17,694, p. 1300 (C.C.N.Y.1810).

**74.** *See* appellant's Brief at 48 (appellant exhibited no mental disease or defect, and directed counsel not to present insanity defense).

**75.** Gaskins v. United States, 133 U.S.App. D.C. 288, 290, 410 F.2d 987, 989 (1967) ; Green v. United States, 127 U.S.App.D.C. 272, 383 F.2d 199 (1967), cert. denied,

390 U.S. 961, 88 S.Ct. 1061, 19 L.Ed.2d 1158 (1968).

**76.** *See* United States v. Collins, 139 U.S. App.D.C. 392, 433 F.2d 550 (1970) ; Heard v. United States, 121 U.S.App. D.C. 37, 38, 348 F.2d 43, 44 (1964). One study found only 2% of the patients coming to the Federal narcotics hospitals for treatment suffered from mental disease in the form of psychosis, Maurer & Vogel, Narcotics and Drug Addiction 171 (1962).

**77.** 153 U.S.App.D.C. at 27, 471 F.2d at 995.

**78.** *See e. g.*, Consultant's Report on Criminal Responsibility-Mental Illness, (prepared by D. Robinson), I Working Papers of the National Commission on Reform of Federal Criminal Laws 229, 239 (1970) (hereinafter Working Papers.)

psychiatrists to address the distinction, all-important and crucial to the law, between incapacity and indisposition,[79] between those who can't and those who won't, between the impulse irresistible and the impulse not resisted.[80] These are matters as to which the court has accepted the analysis of medicine, medical conditions and symptoms, and on the premise that they can be considered on a verifiable basis, and with reasonable dispatch, the courts have recognized a defense even in conditions not as obvious and verifiable as those covered in the older and limited test of capacity to know right from wrong.

As to the subject of drug dependence and psychic incapacity to refrain from narcotics, even the 1970 Study Draft of the Staff of the National Commission on Reform of Federal Criminal Laws, which favors on balance a drug dependence defense to the crime of possession, for incapacity to refrain from use,[81] candidly recognizes the problems involved. One is "the paradox of jail for the least dangerous possessors (non-addict experimenters and the like) while addicts go free." [82] More important, for present purposes, is the Staff's caution first, that even physical symptoms might "be successfully feigned," [83] and,

---

79. ALI Model Penal Code, Comment (Tent. Draft No. 4, 1955), at 157–158.

80. The inquiry asks for an opinion as to the individual's capacity, but the underlying predicate is that the expert will support his opinion by testimony that the described mental disease has a general result of disablement of capacity. *Cf.* Professor L. B. Schwartz, Staff Report, Statement, The Proposed Federal Penal Code: Accomplishments and Issues, 1971 Senate Hearings, note 54 *supra*, at 106, 109:

> The Criterion for barring criminal prosecution for an act done while the actor barring criminal prosecution for an act done while the actor was 'insane' should be whether the defendant suffered from a mental illness of a sort which generally deprives persons suffering from such illness of substantial power to conform with the law in question. This standard does not require a determination, usually impossible to make reliably, that the particular individual lacked power of self-control at the critical moment. I would put the burden of proof on the defendant to show that the authorities had wrongly brought him into the criminal court rather than the civil commitment process.

While the ALI test, adopted in our en banc opinion in *Brawner*, retains the standard of individual capacity (or lack thereof), proof of the existence, or lack, of substantial individual capacity, is made out by analyzing the consequences generally attendant on the kind of mental illness involved, and also taking into account any particular features of the individual's condition that show that he exemplifies the general pattern, or perhaps that his

case marks a standard exception to the general pattern.

81. Report on Drug Offenses (prepared by Professor Louis B. Schwartz, Staff Director, and Professor Michael P. Rosenthal), II Working Papers of the National Commission on Reform of Federal Criminal Laws 1059, 1061–1062 (1970).

82. *Id.* at 1062.

83. *See*, Note on Dependence as a Defense to Unlawful Possession (from Consultant's Report of Prof. Rosenthal), in II Working Papers 1132, 1137:

> Dr. Warren P. Jurgensen, Deputy Chief of the National Institute of Mental Health Clinical Research Center at Fort Worth, Texas, explained to the writer that an experienced opiate user may present to the medical examiner a false but convincing verbal picture of very severe addiction and be able to feign some symptoms of withdrawal. The success of these efforts, he stated, is likely to be at least in part dependent on the experience of the medical personnel who examine a person raising the defense, and unfortunately, the number of medical and psychiatric personnel who have extensive experience with drug-dependent persons is not great.

The Staff Report offers in offset that the motivation to feign the defense is negatived by the Staff's provision for civil proceedings as a result of which the addict could be committed for approximately 3 years. *Id.* at 1138–1139. But a broad philosophy of treatment may encompass methadone maintenance programs, without any confinement. Or it may and likely should provide a program for confinement in an institution that is relatively short in time, followed by community supervision.

more broadly, that there is considerable difficulty of verification of the claim of a drug user that he is unable to refrain from use. The Staff Report states:

Perhaps the most significant problem with respect to the proposed defense is that substantial incapacity to refrain from use of dangerous or abusable drugs is not easy to verify. Difficulty of verification, while related to the possibility of feigning the defense, is a broader problem.

According to Dr. Jurgensen such a defense for opiate use would present several problems. A judgment that the defendant lacked substantial capacity to refrain from use of opiates at the time of his possession is a more difficult judgment than a judgment whether the defendant who has assaulted or killed another lacked substantial capacity to conform his conduct to the requirements of the law, because why a person used an opiate at a particular time is not as easily explained by his life history and personality dynamics as why he assaulted or killed another person. Even a person with great clinical experience with addicts could only make an intelligent guess as to the extent that the capacity to refrain from use was impaired at the time of the use or possession in question; persons with less experience could not guess as accurately.[84]

For clinical purposes, the guesswork inherent in "clinical intuition" may be tolerated as part of the experimental approach to whether a disease exists, in what degree, and which mode of treatment should be tried first. But different criteria apply to determination of criminal responsibility. The Staff concludes that while there are "basic arguments for exempting from punishment for his use the dependent drug user who lacks substantial capacity to refrain

from drug use," there are significant difficulties, and there is need for further inquiry:

In order to exempt such a person from liability it is also necessary that his condition not be unduly difficult to verify or define, and that this is so is not entirely clear. Hence, the value of the defense may be illuminated by additional opinions from the National Institute of Mental Health.[85]

The difficulty of the verification problem of lack of capacity to refrain from use is sharpened on taking into account that the issue comprehends the addict's failure to participate in treatment programs. This raises problems of the addict's personal knowledge, disposition, motivation, as well as extent of community programs, that may usefully be assessed by someone considering what program to try now or next, but would irretrievably tangle a trial.

The feature that narcotic addiction is not a stable condition undercuts any approach patterned on the mental disease, where there is a reasonable projection that subsequent analysis of particular incidents over time may delineate an ascertainable condition. It is unrealistic to expect the addict himself to supply accurate information on the nature and extent of addiction at the time of the offense, particularly as to "psychic dependence."

The difficulty is sharpened by the appreciable number of narcotic "addicts" who do abandon their habits permanently, and much larger number who reflect their capacity to refrain by ceasing use for varying periods of time. The reasons are not clear but the phenomenon is indisputable. It is noted in the Staff Report, and reported by specialists voicing different approaches to addiction problems.[86]

---

84. *Id.* at 1137–1138.

85. *Id.* at 1133.

86. *See, e. g.,* (1) G. E. Vaillant, Natural History of Drug Addiction, 2 Seminars in

Psychiatry 486, 489, 491 (1970). ("Although heroin addiction usually persists for more than a decade, virtually every addict spends some of that time abstinent.") (general trend *"for 2 percent of*

There is need for reasonable verifiability as a condition to opening a defense to criminal responsibility. The criminal law cannot gear its standards to the individual's capacity "absent a disability that is both gross and verifiable, such as the mental disease or defect that may establish irresponsibility." [87]

That criminal defenses from somatic conditions must hinge on a verifiable predicate has been noted by criminal law specialists most ready to reexamine old dogmas [88] and was pointed out in *Brawner* as a requisite for exculpation.[89] Not dissimilar considerations undergird the maxim, ignorance of the law is no excuse, which contradicts salient principles underlying mens rea, yet rejects the defense claim in the interest of society. "The plea would be universally made, and would lead to interminable questions incapable of solution." [90] The needs of society require overriding the subjective good faith of the individual as a legal defense, remitting his position to mitigation of punishment and executive clemency.[91]

Reliability and validity of a legal defense require that it can be tested by criteria external to the actions which it is invoked to excuse.[92] And so the Model Penal Code's caveat paragraph rejects

---

addicts at risk to become permanently abstinent each year") ;

(2) Burnham, *Heroin Traps 33% on Addict Block*, New York Times, 1968. According to one study "about one-third of those living on the block with a history of narcotics addiction have quit taking heroin, generally without the help of any government program."

(3) Kolb, *supra* note 59, at 76:
Of 210 addicts studied—"20 percent of the entire number, at some time during their addiction careers, had voluntarily abstained from the drug and had succeeded in breaking the habit without assistance from physicians, hospitals or prisons."

(4) Dr. Jordan Scher notes that many junkies who lose their "highs" use occasional abstinence, including voluntary hospitalization, in order to reduce tolerance and thus heighten later capacity for euphoria. "Little wonder then that the addict sprints gleefully to a supplier on his release." He speculates that some addicts may in time become unable to gain "a rejuvenated euphoria" through such abstinence and "may lose the euphorigenic capacity altogether" and then withdraw permanently. He also posits that "needle fiends," involved in pricking without euphoria, may be engaged in "ritualistic and compulsion maneuvers intended to recover the capacity of euphoria." J. Scher, Patterns and Profiles of Addiction and Drug Abuse, 15 Archives of General Psychiatry (1966), reprinted in 1969 Senate Hearings, *supra* note 39, at 1060 ff.

(5) Compare Zinberg and Robertson, Drugs and the Public 115 (1972) (hereinafter Zinberg and Robertson) who say that the decline from one million narcotic addicts in 1919 to 100,000 in 1928 means that substantial numbers "deserted the use of their drugs."

87. *See* fn. 65 and text thereto.

88. *See, e. g.*, G. Williams, Criminal Law: The General Part § 289, at 888 (2d ed. 1961): courts "peremptorily require medical evidence before considering a defense of automatism" thought it is possible that hysterical fugues, epileptic seizures and the like may occur without supporting medical indications. The "possibility of miscarriages of justice must be accepted in order to make the law workable."

89. 153 U.S.App.D.C. at 27, 471 F.2d at 995, referring to "other conditions—somnambulism or other automatism; blackouts due, *e. g.*, to overdose of insulin; drug addiction. Whether these somatic conditions should be governed by a rule comparable to that herein set forth for mental disease would require, at a minimum, a judicial determination, which takes medical opinion into account, finding convincing evidence of an ascertainable condition characterized by 'a broad consensus that free will does not exist.' "

The *Brawner* list of somatic conditions to be considered would presumably also include *e. g.*, "pathological intoxication" or a "grossly abnormal reaction to alcohol," with violence resulting from small amounts, due to hypoglycemia. *See* ALI Model Penal Code § 2.01, Comment (Tent.Draft No. 9, 1959), at 11.

90. People v. O'Brien, 96 Cal. 171, 176, 31 P. 45, 47 (1892).

91. Perkins, note 63 *supra*, at 924–25.

92. B. Wootton, Social Science and Social Pathology 233 (1959).

an insanity defense based on an abnormality manifested only by repeated criminal or otherwise anti-social conduct. This approach was followed in *Brawner*.[93] The defense of drug dependence to a charge of drug use cannot clear the hurdle of circularity.

Problems of verifiability interrelate with dangers of widespread assertion. This is particularly significant since it is proposed that the defense be made available not only to persons who satisfy the World Health Organization definition of addiction, which requires a physical dependence, note 10 *supra*, and who make a claim of action under the compulsion of withdrawal stress, but also to persons who claim mere "psychic" dependence. Such a defense of drug dependence would seem likely for most persons having possession or making purchases of narcotic drugs, in contrast with mental disease, which cannot be established for more than a small percentage of the cases affected. A defense put forward nominally for the addict without capacity to refrain would naturally extend to all habitual drug users, given the realities of the administration of justice, limited time and resources available for prosecution and trial, and the extreme difficulty of any effort to draw distinctions between addicts.

The difficulty of verifiability of "loss of control" was side-stepped by Congress in its civil commitment statutes, which apply to one who is either "so far addicted . . . as to have lost the power of self control with reference to his addiction" *or* "who uses any habit-forming drug so as to endanger the public morals, health, safety, or welfare". This compound concept was used in the 1953 definition of "drug user," *see* 24 D.C.Code § 602(a) and the 1966 definition of "addict" in Titles I, II and III of NARA, 28 U.S.C. § 2901(a), 18 U.S.C. § 4251(a), 42 U.S.C. § 3411(a) (1970).

Furthermore, Title I of the Comprehensive Drug Abuse Prevention and Control Act of 1970 contains, in § 2, a provision for Surgeon General custody not only of an "addict" but also of a "drug dependent person," 42 U.S.C. § 201 (1970), defined as:

> a person who is using a controlled substance . . . and who is in a state of psychic or physical dependence, or both, arising from the use of that substance on a continuous basis. Drug dependence is characterized by behavioral and other responses which include a strong compulsion to take the substance on a continuous basis in order to experience its psychic effects or to avoid the discomfort caused by its absence.

The 1970 law establishes the Surgeon General's authority to treat drug dependent persons on voluntary petition, transfer of a prisoner, or in accordance with a Federal court probation order specifying treatment as a condition of probation. 42 U.S.C. §§ 257–259 (1970).

Such provision for treatment for drug dependent persons (under "strong compulsion") on probation reinforces the lack of contemplation that the same condition was covered through some implied osmosis as a criminal defense.

### C. *The Need for Judicial Restraint in a Context of Balanced Legislative Commitment to the Narcotic Addiction Problem*

*Restraint as part of judicial policy role*

Our analysis has revealed that there is no broad common law principle of exculpation on ground of lack of control, but rather a series of particular defenses staked out in manageable areas, with the

---

93. *See* ALI Model Penal Code § 4.01 (Proposed Official Draft, 1962), at 66. *Brawner*, 153 U.S.App.D.C. at 26, 471 F.2d at 994, provides for application of the "caveat" by the court, with room to deviate for the special case of "expert testimony, supported by a showing of the concordance of a responsible segment of professional opinion, that the particular characteristics of [certain past criminal actions] constitute convincing evidence of an underlying mental disease that substantially impairs behavioral controls."

call for justice to the individual confined to ascertainable and verifiable conditions, and limited by the interest of society in control of conduct.

Unless compelled by constitutional considerations, an injection by the courts of a new criminal "drug dependence" defense, on a subject of extraordinary difficulty, would be singularly inappropriate, at the present juncture.

We are now rounding out a decade when the turn-of-the-screw approach of the 1950's has been succeeded by a wide-ranging and flexible attention to the problem by the legislature. The Drug Abuse Office and Treatment Act of 1972 [94] marks continuing recognition that law enforcement must be integrated with education, prevention, treatment and rehabilitation programs, reflecting "a strong consensus that prevention and treatment and law enforcement are in fact interrelated and can have enhancing as well as counter-productive effects on one another." [95]

Congress has seen the need for flexibility, experiment, coordination of programs, devotion of resources. All the experts are in agreement concerning the extraordinary complexity of the problems, the changes over the years in patterns of addiction, the diversity in kind of narcotic addicts, reasons for addiction and possible motivations and methods for diversion and rehabilitation, and above all the limitations on our knowledge, and the need for research.

*Court cannot extirpate criminal process as lacking a role in treatment of addicts*

We are not to be taken as encouraging prosecution of drug addicts on the basis of mere possession. But the present state of learning and public opinion does not allow us to foreclose recourse to the criminal process as part of the overall approach of government to this tangled problem, or to anticipate legislative consideration of the pro's and con's of a drug dependence defense to possession.

When Senator Dodd called in 1962 for recognition that "drug addiction is essentially a medical problem, a psychiatric problem" his proposal was to restore probation and parole. With probation, the criminal process may provide, in the words of Judge Belson, "a potent and beneficial intervention in the life of the addict . . . . Persons on probation from offenses such as charged here [possession of heroin and narcotic paraphernalia, D.C.Code § 33–402, 22–3601] are frequently required to participate in drug abuse programs; and their participation may, in the case of some individuals, be strongly encouraged by the direct threat of a jail term which would ensue if they should fail to make reasonable efforts to cooperate with the program." [96] Whether addicts respond to such governmental intervention presumably depends upon their particular personalities and disorders and their attitudes toward authority.

Certainly it cannot be said that the technical evidence eliminates any possible role for detention and compulsion. The Report of the Ad Hoc Panel on Drug Abuse, the working paper of the 1962 White House Conference, indicates that underlying personality inadequacy persists even after drug abuse is terminated, and unless the individual is provided with support manifests itself as soon as he encounters stress.[97] "When, however, firm supervision of the discharged addict is available, particularly under civil or criminal parole arrangement, an encouraging number are able to stay off drugs and maintain themselves by honest employment for an appreciable period of time. These programs depend upon the substitution of external control, exercised jointly by

---

94. P.L. 92–255, 86 Stat. 65 (1972).

95. S.Rep.No.92–486, 92nd Cong., 1st Sess. 5 (1971).

96. United States v. Chester Williams, D. C. Superior Court, No. 28001–70, Memo- randum Order, March 4, 1971, set forth as Appendix B to Government's Brief, digested in 99 Washington Law Reporter 541 (1971).

97. Proceedings, *supra* note 24, at 294.

correctional officers, medical personnel, and social workers, for the inner control which appears to be lacking in the addict personality." [98]

Reference may also be made to the literature since 1966 on studies, supported by a research award of the National Institute of Mental Health, of two long-term follow-ups of patients, one group from Kentucky, one group from New York, who were admitted to the United States Public Health Hospital at Lexington. The study by Dr. G. E. Vaillant, of Harvard Medical School, has been identified as a "break-through." [99] The study finds relative ineffectiveness securing abstinence from either voluntary treatment along the medical model, or punishment alone, but finds that "external coercion of some kind appears a critical variable in facilitating abstinence" and produces significantly greater success rates when punishment is combined with a follow-up parole providing close and prolonged community supervision,[100] and a work program to help achieve independence, in a backdrop of social prohibition and legal sanction against narcotic drug abuse.

The study posits that the urban addict typically lacked integrated supervision in childhood and in effect seeks control, and that the parole supervision meets the addict's need for a powerful incentive to work, as a substitute for the satisfaction of addiction, and an unescapable nonparental ally to back up his impulse control, and to care when he is honest and independent.[101]

98. *Id.* at 297.

99. *See* Zinberg and Robertson, *supra* note 86, at 47–48: "His [Vaillant's] work constitutes a break-through because it is a longitudinal study following up addicts after twenty-five years. Most of the reports about addicts from so-called experts have been impressionistic, and consist largely of generalizations from hard cases."

Dr. Vaillant's articles from this study include those cited in notes 86, 101, 105 and also e. g., A 12 Year Follow-Up of New York Addicts III, Some Social and Psychiatric Characteristics, 15 Archives of General Psychiatry 599 (1966).

100. *See* G. E. Vaillant, *supra* note 86, at 494:

Rather, the principal reason for abstinence among O'Donnell's subjects was the fact that in rural Kentucky narcotics gradually became unavailable. Illegal sources and medical sources alike dried up. For the New York sample, where availability remained unthreatened, the most effective motivation for abstinence was that narcotics were illegal; the most potent treatment was compulsory supervision. Thus, if the addict is followed over time, external coercion of some kind appears a critical variable in facilitating abstinence. This is in contrast to the views both of sociologists like Lindesmith and Chein and the medical profession at large, who, encountering the problem of addiction at one point in time, conclude—quite correctly—that punishment per se is no deterrent.

*Id.* at 497: "The medical model, the casework model of mobilizing family resources and the legal model of punishment are unambiguous failures in the treatment of addiction. Nor can one hope to help the addict by taking away what little he already has—at least not without providing something in return. There appear to be three treatment methods that effectively raise the anual 2 per cent recovery rate and lower the 2 per cent annual death rate that seem to be the fate of the heroin addict. These three treatments are parole, methadone-maintenance and Synanon-like therapeutic communities. All but parole have too short a history to be encompassed by this review. Over the short term all dramatically appear to facilitate short term abstinence; the success of all three is predictable from the natural history of addiction. All depend upon a backdrop of social prohibition and of legal sanction against narcotic drug abuse. All depend upon close and prolonged supervision, but supervision in the community. Only methadone-maintenance programs fail to require the addict to work as well as prohibiting his use of drugs. All provide some substitute for narcotics. The relative efficacy of these three treatments await scientific comparison. Hopefully the major centers now working with addicts will conduct such studies and recognize that 1 or 2 years of follow-up will be inadequate to evaluate which one is superior."

101. G. E. Vaillant, A Twelve-year Follow-Up of New York Narcotic Addicts

It is not our province to assess the value of a system of probation reinforced by jail sanctions. That there is some evidence to support its vitality, at least for some addicts, establishes that prohibition on legal grounds is not warranted as the necessary product of the consensus of medical opinion. If it is, indeed, one of three main approaches that have value—along with methadone-maintenance, and therapeutic communities—and there is need for experiment and study, judicial interdiction is not warranted.

There has been increasing recourse to —and experience and data developing about—treatment programs with the substitute and blocking drugs, e. g., methadone (itself an "opiate") and cyclozocine (an "antagonist").[102] At present, maintenance programs are being stressed [103]—though not exclusively.[104] Attention must also be focused on effective community supervision and follow-up, to secure supporting life styles, including e. g., work performance conditions, that motivate for both treatment and abstinence.

There are expert voices describing compulsory supervision in the form of probation and parole as an important and effective weapon in society's arsenal against narcotic addiction.[105] And students of the problem most hostile to compulsion, even through civil commitment, acknowledge that such supervision has a substantial effect in inducing abstinence.[106] The approach of compulsory supervision through probation cannot rightly be excluded.

*Significance of conviction prior to probation supervision or detention*

The knowledge available concerning narcotic addiction is not such as to impel the courts to intervene, on grounds of justice, to require that probationary supervision be met by a civil determination and civil compulsory commitment, and to forbid its being preceded by a "conviction", or accompanied by a threat of prison in case of violation.

1. When the 1963 Prettyman Commission recommended a federal civil commitment statute to "provide an alternative method of handling the federally *convicted* offender,"[107] it selected the model of conviction first (Califormia plan), as preferable to deferral of prose-

---

I, The Relation of Treatment to Outcome, 122 Am.J.Psychiatry 727, 735 (1966). The described experience may be influenced by the circumstance that in New York many parole officers are trained as social workers, the system is significantly influenced by psychiatry, and the officers maintain considerable personal contact and encourage parolees to seek psychiatric treatment. Such reinforcements should be available with probation and parole officers generally, provided funds and training are devoted to society's needs.

102. An informed voice reports: "Neither has produced personality deterioration as had been fearfully predicted, and both may continue to prove useful, each in its own way, in aiding the rehabilitation of opiate-dependent people." Dr. John C. Kramer, Hearings before the Select Committee on Crime, "Narcotics Research, Rehabilitation and Treatment" p. 667 (June 4, 1971), as quoted in H.R.Rep.No.92–678, 92d Cong., 1st

Sess. 16 (1971), which calls for enlargement for research for a more effective heroin addiction control agent.

103. *Id.* "It appears that maintenance on either treatment may be prolonged though ultimate discontinuation of medication may be possible."

104. In the District of Columbia, the official Narcotics Treatment Agency supervises a large scale maintenance program. But it also supports methadone for transition, and motivation of the addict to abstinence.

105. G. E. Vaillant and R. W. Rasor, The Role of Compulsory Supervision in the Treatment of Addiction, 30 Fed.Probation 53, 59 (1966).

106. J. C. Kramer, R. A. Bass, J. E. Berecochea, Civil Commitment for Addicts: The California Program, 125 Am.J. Psychiatry 816, 823 (1968).

107. 1963 Report, *supra* note 28, at 71.

cution (New York plan), in avoiding serious problems of trial if needed.[108] While NARA as enacted provided for both alternatives, Congress required that certain addicts—engaged in sales solely to secure narcotics for their personal use—be committed only under Title II after conviction. And the problem identified by the Prettyman Commission has contributed to the actual experience of under-utilization of Title I of NARA, with prosecutors preferring the Title II approach lest controls be undermined.[109]

Given the present state of available knowledge, and given the need for compulsion to reenforce cooperation in rehabilitation treatment, a court cannot gainsay the permissibility of a policy choice by the legislature that there be a conviction before a treatment is ordered. This establishes, at a minimum, a clear signal to the addict of prompt and effec-

tive detention in the event of non-cooperation, whether on a sentence already passed, or by the celerity with which a sentence previously deferred may be imposed, following a hearing by the court, without the delay and other problems attendant on trial before a jury of the underlying offense.

A recent report notes that the D.C. Narcotics Treatment Agency's program of Outpatient Abstinence, recorded a low performance rate, with only 15% remaining in it for six months, whereas the same NTA programs showed significantly better results when used for abstinence patients referred to NTA by the Department of Corrections. The analysis comments: "Programs connected with the criminal-justice system usually have the spur of return to jail if the patient fails, of course."[110] What more need be said?

---

108. *Id.*

A serious problem is raised by the provision in the New York law that an addict offender who has been civilly committed in lieu of being prosecuted, and who proves unresponsive to or uncooperative in treatment, may be returned to the court for prosecution of the original charge. If he is returned to the court after a considerable lapse of time, much of the evidence on his behalf may have dissipated, and there is no assurance that he will receive as fair a trial as he would have if the charge had been promptly prosecuted. Although under the New York plan, the addict must consent to this procedure circumstances may arise in which it could be contended that the addict, for various reasons, did not effectively waive his constitutional rights. It would be best to avoid these problems by proceeding immediately to have guilt or innocence judicially determined at the outset, as under the California law.

109. *See* Report to the Congress by the Comptroller General "Limited Use of Federal Programs to Commit Narcotic Addicts for Treatment and Rehabilitation," (No. B-16403(2), Sept. 20, 1971) (hereinafter GAO Report). During the first three years of the program only 179 addicts were committed under Title I, compared with 900 per annum estimate before the Act was passed. Appendix II to the Report, at 39, contains a

Department of Justice letter to GAO, June 16, 1970:

[There] may be many reasons why the United States Attorney may not want to utilize Title I. For example, if he believes that the individual is not likely to benefit from the program, any efforts to get the individual into the program may be futile; additionally, since the pending charge is held in abeyance conditional on the individual successfully completing the program, the situation may frequently arise when the individual does not successfully complete the program, but because of the passage of time, the United States Attorney is unable to try the individual on the underlying criminal charge.

In 1969, 48 addicts were processed under Title I. Inquiries of the 21 federal districts with indexes of major narcotic addiction, revealed 14 showing no use or only one use of Title I. Yet 20 cases were reported by the United States Attorney in the District of Columbia—partly because of non-violence offenses (forgeries and theft) that elsewhere are tried in State courts, but also because the United States Attorney and Federal judges in that District Court were more willing to offer a chance of rehabilitation. *Id.* at 13.

110. J. V. DeLong, Treatment and Rehabilitation, in Dealing With Drug Abuse 198 (Staff Paper No. 3, Drug Abuse Survey Project of Ford Foundation, 1972).

2. Furthermore, community supervision rests, to a considerable extent, in the hands of the police. The legislature might reasonably conclude that, in our society as it stands, the police are more likely to be vigilant in requiring compliance with a parole officer who is exacting payment of a "debt to society" owed by a convicted man, than with a doctor or social worker,[111] and, further, that more genuine help to the addict will be obtained through supervision from probation and parole officers, because they are likely to be more "hard-nosed" and demanding, requiring employment, without accepting the evasions and objections, of unsuitability or discomfort, that may be persuasively presented to treatment aides by a person avowedly only "sick." [112]

3. The foregoing only says there may be a place for probation after conviction. It does not deny the considerable value of pre-trial diversion,[113] or of other legislative models that avoid conviction,[114]

or permit expungement of conviction following successful treatment.[115] Such expungement would help avoid any possibility that the social stigma attached to ex-convicts might impede the rehabilitation of drug addicts when they return to the community.[116] A similar result can be accomplished for age-eligible misdemeanants by disposition under the Federal Youth Corrections Act,[117] which provides for probation as well as treatment in confinement, and which has a provision for expungement of conviction.[118]

Section 404 of the 1970 law, 21 U.S.C. § 844 (1970), goes further and provides for expungement as to the misdemeanor of possession, without any "adjudication" of guilt, notwithstanding a verdict or plea of guilty, in the case of a first narcotics offense by a person under 21 who complies with the conditions of a probation order.

4. There are difficult problems relating to responsibility and stigma. The

---

111. G. E. Vaillant and R. W. Rasor, *supra* note 105, at 56.

112. *Ibid*: "[The] parole officer, often with a degree in social work, works to help and not to punish. However, unlike the doctor, the parole officer can often find his 'patient' a job; unlike the social worker he can demand that his 'client' keep the job . . . ."

*Compare* Zinberg and Robertson *supra* note 86, at note 43, describing a play that the inhabitants of *Daytop* Village on Staten Island, a residential treatment center for hard-core addiction, have produced and acted in order to educate the public. "Early in the play an addict has a screaming, writhing withdrawal syndrome in jail. Later, after admission to Daytop, he starts the same process. The others in his group tell him to come off it, hand him a broom, and indicate that he works or leaves. Clearly, he is still uncomfortable; but the contrast between what he experiences at Daytop and what he experienced in jail is a key point in the play."

113. An article by William L. Claiborne in The Washington Post for May 1, 1972, reports on the testimony the previous day of Dr. Robert L. DuPont, administrator of the NTA to a House Judiciary subcommittee, that a heroin user charged with

crime be diverted to treatment agencies "at the earliest possible point." Committee members asked whether he favored a pre-indictment probation program similar to one operated in Philadelphia. "I would definitely support that."

The American Bar Association's Special Committee favors a program under which eligible addicts would plead guilty to a charge and then, after six months of successful treatment, be allowed to withdraw their guilty plea. Four months later, if the addict remained in treatment, his case would be dismissed by the court. For the operating procedures prescribed by the D.C. Superior Court, see fn. 130.

114. *E. g.*, Title I of NARA.

115. *E. g.*, Title II of NARA.

116. D. P. Ausubel, The Case for Compulsory Closed Ward Treatment of Narcotics Addicts, 31 F.R.D. 58, 59 (2d Cir. Jud. Conf.1961).

117. 18 U.S.C. § 5010 (1970). This was held applicable to misdemeanors, in Harvin v. United States, 144 U.S.App.D.C. 199, 445 F.2d 675 (en banc, 1971).

118. 18 U.S.C. § 5021 (1970). This was cited as an analog in the Prettyman Commission recommendation, *see* 1963 Report, *supra* note 28, at 72.

issue of responsibility requires consideration not merely in terms of the abstraction of blameworthiness, but also from the standpoint of furtherance of rehabilitation. The Government's brief presents, in an appendix, a technical paper [119] which reports on a questionnaire put to recovered addicts, that 76% of them agreed that motivation for cure would be removed if it was ruled that heroin addicts were not responsible for their actions at material times, and 69% further said they were always responsible for their actions at material times. Appellant takes issues with the writer's methodology and conclusions. We cannot, on appeal, resolve such matters so as to override a legislative contemplation of conviction.

The role of responsibility is noted in the WACADA amicus brief, that rehabilitation depends on an acknowledgment of responsibility by the addict. Deeming it an unfortunate paradox that it must negative responsibility in order to obtain non-punitive treatment—and nowhere does amicus address itself to suspension under probation—amicus says that "conviction" of crime is contra-indicated because it is what sociologists call a "degradation" ceremony. Its use in the criminal process is said to intensify the personality configuration of the long-term heroin addict (which involves significant qualities of dependency, irresponsibility, insecurity and low self-esteem) and in effect reinforce the dynamic of addiction.

The amicus brief is forthright in recognizing the need for "responsibility," and the problem it presents to a plea denying responsibility. Its "degradation ceremony" contention is interesting, but we are not cited to any evidence or study. The references we have cited seem to undercut any assumption that probation techniques that have proved successful are impaired by the existence of a prior conviction or even short confinement.[120]

Most significant is the dilemma that the "degradation" problem, to the extent that it exists, would seem most applicable to the relatively young, whereas the testimony relied on by appellant's counsel to support the defense of psychic incapacity highlights the special problems of the "old" addict. One may be at least skeptical whether confirmed addicts—beset with self-hate, often depressed and perhaps even suicidal—will be affected by a possession conviction as an even marginal increment of despair. That they are more likely to be attentive to the realities of controls than such nuances, appears from the reactions of addicts to the California compulsory civil commitment program:[121] Those convicted of a felony narcotics violation (about 75%) feel they are better off in a civil commitment program—with lesser potential detention time; those committed after a misdemeanor conviction would rather be in prison, with less detention time.

It may be that the invocation of the criminal process has the plus value of telling the addict: "You are responsible for what you have done and are doing." There is a dignity in holding him responsible. And it may be ego-building, too, to offer a treatment as a choice (on probation) rather than a compulsory mandate of commitment. That it is likely to be preferred to prison does not negative the ego mechanism of choice.

Finally, there is serious question whether stigma is avoidable. Justice

119. R. Phillipson, Drug Dependence—Opiate Type, and Criminal Responsibility, presented at 33rd Annual Meeting, Committee on Problems of Drug Dependence, National Research Council, National Academy of Sciences (Feb. 1971). Dr. Phillipson is identified as associate director for operations, Division of Narcotic Addiction and Drug Abuse, National Institute of Mental Health.

120. *See* notes 99–101 *supra*, and text thereto.

121. J. C. Kramer, The State Versus the Addict: Uncivil Commitment, 50 Bost. U.L.Rev. 1, 12–13 (1970). Dr. Kramer was formerly the research director of the California civil commitment program.

Black and Harlan concluded that compulsory commitment would "carry with it a social stigma little different in practice from that associated with" the label of a "crime." [122] And it is notable that the 1970 Congressional scheme constituting the crime of possession as a misdemeanor avoids the collateral consequence that the offender will suffer the loss of voting rights. [123]

*Deterrence*

Finally, we cannot entirely overlook the feature of deterrence. Narcotic addiction is not as prevalent today as in 1900. [124] A noted advocate of humane treatment for addicts recognizes (a) that "Federal and State laws have been exceedingly effective in preventing the addiction of normal cases, and the coercive features of narcotics laws have forced the cure of the more hopeful of the curable cases"; and (b) that a "well-defined fear of the law" is one reason why addicts try a cure. [125] Deterrence of addicts may be most effective for those who can best visualize options—like doctors and para-medical personnel who become medical addicts—but it is not limited to them. It would not be unreasonable to consider that a drug dependence defense

would operate to undercut any prohibition of possession, and that this must be balanced against the evidence that a deterrent effect is wrought by the possibility of arrest followed by penalty.

The deterrent consideration is not undone by noting the addicts who were not deterred, for they must be weighed against the invisible experimenters or dabblers, who were deterred from starting or continuing. It is not decisive that the criminal law did not deter addicts in the first instance, when it could not offset the contagion of the peer-group—and most studies place the beginning of heavy use between the ages of 17 and 19, addicts often testifying that they got started through the offer, and the contagious enthusiasm, of a friend who tried it and liked it. [126] The fact that use was not deterred when the criminal law was abstract and remote, at least in comparison with peer-group pressures, does not mean it will not be deterred when the criminal law is made concrete with arrests, even the arrests of others. The deterrence is intensified when the criminal sanction is made concrete with a sentence that is suspended only on condition of treatment.

122. Powell v. Texas, *supra*, 392 U.S. at 539, 88 S.Ct. at 2157.

123. Voting disqualification in the District of Columbia only follows upon conviction of a felony, and after a 1971 amendment even felons may vote upon meeting certain conditions after completion of their sentence or when probation is granted. (1 D.C.Code § 1–1102(7), Supp. V 1972).

124. Even the "high" estimate of 200,000 addicts currently is criticized as lacking solid foundation, *see* Task Force, *supra*, note 29, at 2, whereas for the year 1900, the figure of 250,000 is a "conservative estimate," and one that covers a higher percentage of the relevant population— "at least 1%." *See* Marihuana: A Signal of Misunderstanding, First Report of the National Commission on Marihuana and Drug Abuse 12 (1972) (hereinafter Nat. Comm. Report)

*Cf.* Zinberg and Robertson, *supra* note 86, at 115: "Kolb and DuMez cite the estimate of the special narcotics committee of 1919, which was one million addicts in the United States. Using the

FBN (Federal Bureau of Narcotics) figure for 1928 of 100,000 addicts, it would mean that 900,000 addicts deserted the use of their drugs within ten years."

125. *See* Kolb, *supra* note 59, at 71, 76. The same conclusion is reported by others, e. g., G. E. Vaillant, *supra* note 99. *See also* Wilson, Moore & Wheat, The Problem of Heroin, 29 Public Interest 3, 20 (1972) (hereinafter Wilson, et al.) citing, *inter alia*, Robert Schasre's study of Mexican-American heroin users who had stopped shooting heroin. Above half did so involuntarily (lost source of supply); the others "did so in response to some social or institutional pressure; in a third of these cases, that pressure was having been arrested or having a friend who was arrested on a narcotics charge."

126. Wilson, et. al., *supra* note 125, at 9–11. "Though not every person who tries it will like it, and not every person who likes it will become addicted to it, a substantial fraction (perhaps a quarter) of first users become regular and heavy users." (at 9).

In view of the phenomenon of remission and self-abstinence, we must take into account that the prospect of criminal punishment may help an individual decide that now is the time to remove himself from involvement with narcotics, and to undertake serious rehabilitative efforts.

The deterrent aspects of prohibition of possession are noted even by those favoring a medical model, but admit that the law reducing possession to a misdemeanor has the redeeming aspects of precluding extremely severe prison sentences for non-traffickers, making it likely that many will be deemed appropriate for probation rather than detention, while still discouraging those who are deterred by criminal sanctions from experimenting into a habit, and even encouraging some addicts to give up the habit.[127]

*Need for judicial role of probation supervision, and doctrinal restraint, pending on-going legislative reappraisal of narcotic addiction problems*

Our approach is consonant with the March 1972 report of the American Bar Association Special Committee on Crime Prevention and Control.[128]

The Committee lamented the under-utilization of programs for pre-trial diversion of drug dependent defendants, and recommended that procedures be developed within the criminal justice system so that addicts, accused or convicted of possession of narcotics or of street crimes for support of their habit, would be diverted from the criminal justice system and be referred to treatment.

The subject of pre-trial diversion is one of enormous importance in the administration of justice, both in avoiding needless clogging of the courts for the cases that really identify a social and medical problem rather than a legal problem, and for the more effective protection of society through rehabilitation of the individuals involved in those cases. However, pre-trial diversion is not a sound justification for a broad dependence defense to possession charges, which may not only involve the courts in trial tangles, but would be most applicable to the older addicts, rather than the younger ones most appropriate for diversion. Pretrial diversion is a matter that requires exercise of prosecutorial discretion,[129] and it may fairly be contemplated that such discretion will be exercised for non-trafficking addicts who, the Government says, are not the real target of the criminal laws.

The Committee's conclusion that narcotics addiction should be transferred out of the courts "to non-judicial entities, such as detoxification centers, narcotics treatment centers and social service agencies" (at 100) is a broad legislative proposal. It projects for the future a limited role for the criminal justice system.

Meanwhile, however, the Report comments with approval (at 42) that the 1970 act "contains some substantial and long-awaited reforms," including provision for "offenders on probation subject to conditions of medical treatment."

The efforts of the American Bar Association's Committee, conjoined with

---

127. Zinberg and Robertson, *supra* note 86, at 251.

128. New Perspectives on Urban Crime (1972) (hereinafter Perspectives).

129. While pretrial diversion has been under-utilized in the past, even under NARA's Title I, *see* note 109 *supra*, the United States Attorney for the District of Columbia has in some cases agreed "to drop the prosecution if the addict consents to a civil commitment" under the 1953 D.C. law, 1966 D.C. Report, *supra* note 59, at 571. The Report noted that

civil commitments under this law had been few in number—the maximum was 35 in 1964—and featured by a high recidivism rate, estimated at 90%, due to limited staffing, meager after-care rehabilitation series and virtually non-existent out-patient facilities. *Id.* at 571–72.

As to latitude of discretion given by Congress to prosecutor to permit invocation of NARA, see Watson v. United States, 133 U.S.App.D.C. 87, 408 F.2d 1290 (1969).

negotiations with the United States Attorney and court officials, have led to a pre-trial diversion program in the Superior Court of the District of Columbia for first offenders charged with certain non-violent misdemeanors.[130] The courts rightly encourage and sponsor such programs. However, the courts will soundly be governed by a judicial restraint that keeps in phase with the pace of legislative advances. Injection of a judicial doctrine of psychological dependence of heroin addicts would be heavy-handed and counter-productive at least in the present state of knowledge, and the reality of critical problems of reliability. Judicial efforts at this time are more soundly oriented to improvement of disposition within the contours of the system of criminal justice rather than to outright negation of criminal responsibility for addicts. This is a time when many programs have begun and need assessment. The legislature and executive contemplate an integrated approach, wherein law enforcement aspects would be coordinated with prevention, rehabilitation, research and other programs. The literature suggests that the criminal justice system may have a useful role in this integrated approach, in reinforcing treatment by those charged with the possession misdemeanor, and put under pre-trial diversion, and by those convicted of possession and put under probation supervision. This court is in no position at this time to reject or imperil that potential. Sound judgment calls for the courts to reinforce the legislature's rehabilitation efforts, using the probation flexibility, but to avoid at this juncture injection of new doctrine in an area still in evolution, with ongoing reappraisal of the narcotic addict problem under way by the legislature, and indeed all concerned.

\*　　\*　　\*　　\*　　\*　　\*

On March 22, 1973—after this opinion and the others were in page proof—the National Commission on Marihuana and Drug Abuse released its Second Report: "Drug Use in America: Problem in Perspective." It concludes (at 273):

> The Commission recommends that the unauthorized possession of any controlled substance except marihuana for personal use remain a prohibited act. The Commission further recommends that as a matter of statutory or enforcement policy, assertion of control over the consumer should not be tied to concepts of criminal accountability but rather to concepts of

---

130. The American Bar Association's Special Committee on Crime Prevention and Control and the United States Attorney for the District of Columbia had discussions from September 1971 through July 1972, resulting in procedures for a Narcotics Pre-trial Diversion Project sponsored by the Superior Court, with some modifications following a meeting August 7, 1972, with pertinent officials, including representatives of the NTA and D.C. Bail Agency, and the U. S. Attorney. These Operating Procedures provide: First offenders charged with certain non-violent misdemeanors (possession of narcotics paraphernalia, violation of the Dangerous Drugs Act or Uniform Narcotics Act, petit larceny, unlawful entry), will be eligible for participation, if the United States Attorney and Project Director concur. The conditions of diversion include: entry of a guilty plea to the charge; continuance of sentencing during the diversion program (10 months); remaining in the treatment program for a 10-month period. The document is signed by both defendant and the United States Attorney. After the individual has remained successfully in treatment for 6 months he may withdraw his guilty plea, and after 10 months his case is nolle prosequied. If he fails to meet the standards for treatment, the U. S. Attorney may terminate his participation in the diversion program, and the defendant will be scheduled for sentencing. The diversion program is to offer methadone maintenance, methadone detoxification and abstinence programs, with emphasis on intensive counseling. The defendant who graduates after 10 months will be encouraged to transfer to another NTA facility for treatment as a voluntary community patient.

Implementation of this Diversion Project has been partially funded by the Law Enforcement Assistance Administration, and awaits additional Government funding.

assistance appropriate in the individual case. The primary purpose of enforcement of the possession laws *should be the detection and selection* of those persons who would benefit by treatment or prevention services.

Specifically as to the role of the legal system and the issue of drug-dependent persons, the Commission concludes as follows (at 274):

> For those drug-dependent persons who are apprehended for consumption-related offenses, including possession, one of the following dispositions is in our view constitutionally required and should be mandatory:
>
> (a) diversion to a treatment program or
>
> (b) diversion to a treatment program after conviction but before entry of judgment by the court.
>
> Failure by an individual to comply with the conditions of treatment would result in his return to the court for prosecution or sentencing. In that event, he should be subject to punishment by up to one year imprisonment, a fine of up to $500 or both.

At this time and in this space it is not feasible to review the Commission's discussion in depth, much less to integrate it into the analysis in this opinion. It suffices to observe generally that the Commission's commentary is in large part, if not entirely, congruent with the analysis in this opinion. An index of that congruence is the Commission's observation (at 275):

> The Commission has proposed retention of the possession offense because of its symbolic importance, its practical though limited deterrent value, its legitimate role as a mechanism for channelling drug dependent persons into treatment and for identifying others whose drug use may be symptomatic of serious emotional distress.

We cannot know the ultimate fate of this or any other of the Commission's recommendations. But this Second Report, which covers drugs like heroin and cocaine, is part of the direction of ongoing reconsideration by the legislature, here by an expert commission established by statute, which is a key assumption of our opinion.

### D. *Constitutional Considerations*

In Robinson v. California, *supra*, the Supreme Court held that a California statute making mere addiction a crime inflicted "cruel and unusual punishment" in violation of the Eighth and Fourteenth Amendments. The Court said, however, that "A state might impose criminal sanctions, for example, against the unauthorized manufacture, prescription, sale, *purchase*, or *possession* of narcotics within its borders. . . ."[131] The Court emphasized, at 665–666, 82 S.Ct. 1417, that, in the case before it, the jury had been instructed that they could convict even though the defendant had never used narcotics within the State, and overturned the sentence as one based on an addict's *status* standing alone, for the reason that this would be tantamount to punishing a disease, and indeed "an illness which may be contracted innocently or involuntarily," 370 U.S. at 667, 82 S.Ct. at 1420, and stated:

> We hold that a state law which imprisons a person thus afflicted as a criminal, even though he has never touched any narcotic drug within the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment. * * * Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold.

---

131. 370 U.S. at 664, 82 S.Ct. at 1419 (emphasis added).

As Justice Harlan pointed out, 370 U.S. at 678–679, 82 S.Ct. at 1427, the jury could have convicted solely on proof that defendant was present in California while he was addicted to narcotics, which would authorize criminal punishment for a propensity, and in effect a "bare desire to commit a criminal act."

In Powell v. Texas, *supra,* the Court upheld a statute making public drunkenness a crime. Mr. Justice Marshall announced the judgment, in an opinion concurred in by Chief Justice Warren and Justices Black and Harlan. He stated that the court could not assert categorically that the use of the criminal process as a means of dealing with public aspects of problem drinking lacked rationality. He referred to the uncertainty as to the nature, cause, identity and treatment of the disease of alcoholism. Faced with the reality that there is no known effective method of treatment, and in any event in view of the enormous requirements of facilities and manpower for the implementation of a rehabilitation program "it is difficult to say in the present context that the criminal process is utterly lacking in social value." 392 U.S. at 530, 88 S.Ct. at 2153. Moreover, the possibility of deterrence significance cannot be nullified.

As to the Eighth Amendment, the Court distinguished *Robinson* on the ground that there was no punishment of Powell for a mere status, but for the actus reus—being in public while drunk on a particular occasion. The Court was unable to conclude from the record and "the current state of medical knowledge, that chronic alcoholics . . . suffer from such an irresistible compulsion to drink and to get drunk in public that they are utterly unable to control their performance of either or both of these acts . . . ." at 535, 88 S.Ct. at 2155. And the Court declined to articulate a general constitutional doctrine of

mens rea, or to define "some sort of insanity test in constitutional terms . . . . and freeze the developing productive dialogue between law and psychiatry into a rigid constitutional mold. It is simply not yet the time to write into the Constitution formulas cast in terms whose meaning, let alone relevance, is not yet clear either to doctors or to lawyers." at 536, 88 S.Ct. at 2156.

If this had been the opinion of a majority, no shred of a constitutional problem would confront us. The criminal law recognizes that a knowing possession is an act, *see* text at note 62 *supra.* The medical authorities are uncertain as to the causes of narcotic addiction, and even hypotheses as to the propensity to addition are confronted by the ever-changing nature of the addict population. Most importantly, there is no generally accepted cure. The ABA Committee Report, note 128 *supra,* places main hope on management programs through use of narcotics—methadone-maintenance as a replacement addiction—to cabin the anti-social consequences of heroin addiction. But the Report recognizes (at 57) that methadone maintenance might be effective in the range of 25–50% of addicts, and that "far smaller percentages" can be reached by the other treatment programs discussed—abstinence and detoxification, including civil commitment programs with counseling and psychiatric input; therapeutic communities (Synanon); and antagonists.[132]

---

132. Another analysis released in early 1972 reaches like conclusions: slight success for the main cure programs. *See* J. V. DeLong, *supra* note 110, at 198: "[T]hese programs [detoxification centers; therapeutic communities; outpatient abstinence] help a few people a great deal and more people to some degree, but the failure rates are very high". Methadone maintenance is analyzed as a "helpful treatment modality, but just how helpful is not yet known." *Id.* at 246. The author considers that the Government estimates that 25–33% of addicts will be helped by methadone is

on the low side, at 233. The author faces the problems that loom when and as methadone maintenance moves from small to mass programs, at 230. He is concerned that an open methadone choice may encourage people to run the risk of addiction that they now avoid because of the unattractiveness of the life-style of a heroin addict, at 233. Methadone maintenance is beneficial in that *crime is reduced and employment* increased by "forcing him [the heroin addict] to switch to being a methadone addict." at 222.

The overall context of the constitutional problem must also take into account (a) the acceptance of a penal sanction to enforce compulsory civil commitment for narcotic addicts, notwithstanding that at present success rates are at best modest; and (b) the material already developed concerning the possible value of the penal sanction —when used with probation conditioned on treatment. In this setting, with probation-with-treatment available to the sentencing authority, Justice Marshall's opinion supports a penal sanction for knowing possession of narcotics by addicts.

We turn to the opinion of Justice White, the fifth member of the *Powell* court. We have particularly pondered his statement that *Robinson's* incapacity to punish addiction (a disease) necessarily means an incapacity to punish an addict for possession or use of the narcotics, which is the same as punishing for addiction "under a different name." See 392 U.S. at 548, 88 S.Ct. 2145. In *Watson*, this court reflected, without resolution, on the implication of that position.

As already noted, *Robinson* said expressly that the state could punish purchase or possession of a narcotic drug. The Court was doubtless aware that just such a possession provision is part of the Uniform Narcotic Drug Act in effect in most states.[133] Justices Warren and Black subscribed not only to *Robinson* but also to the opinion affirming Powell's conviction as based on an actus reus.

Justice White's statement must be read in the framework not only of his votes to uphold the convictions of both Robinson and Powell, but of his statement that punishment for an offense can be related to the exercise of will at some previous time—at least if the willed acts were not "remote in time."[134] This indicates that punishment for the offense of possession may be justified constitutionally, notwithstanding a claim of present lack of control capacity, by reference to some not-too-remote choice of the addict to eschew rehabilitation treatment available. This is significantly different from the standard approach of e. g., the insanity defense, as exemplified by the ALI rule, which focuses on lack of capacity at the time of the offense, to control the conduct.

Also revealing of Justice White's approach is his concluding passage, 392 U.S. at 553–554, 88 S.Ct. 2145, that a defense is not established by the mere existence of compulsion "to some degree," where the defendant has not made a showing that he was "unable" to avoid the condition made criminal.[135] There is a plain implication that defendant would have the burden of proof.

---

133. Justice Douglas, who joined in the *Robinson* opinion, added a concurrence which noted, 370 U.S. at 660, 82 S.Ct. 1417, that the Uniform Act does not punish addiction.

134. Justice White said, 392 U.S. at 550–551 note 2, 88 S.Ct. at 2163:

By precluding criminal conviction for such a "status" [narcotic addiction] the Court [in Robinson] was dealing with a condition brought about by acts remote in time from the application of the criminal sanctions contemplated, a condition which was relatively permanent in duration, and a condition of great magnitude and significance in terms of human behavior and values. * * * If it were necessary to distinguish between "acts" and "conditions" for purposes of the Eighth Amendment, I would adhere to the concept of "condition" implicit in the opinion in *Robinson*. . . . The proper subject of inquiry is whether volitional acts brought about the "condition" and whether those acts are sufficiently proximate to the "condition" for it to be permissible to impose penal sanctions on the "condition."

135. Justice White upheld the conviction of Powell, even assuming he "established that he could not have resisted becoming drunk on December 19, 1966." ". . . Powell showed nothing more than that he was to some degree compelled to drink and that he was drunk at the time of his arrest. He made no showing that he was unable to stay off the streets on the night in question." 392 U.S. at 553–554, 88 S.Ct. at 2164, 2165.

Taking Justice White's opinion and votes as a whole, we conclude that his approach does not undercut Justice Marshall's opinion on the constitutional permissibility of holding even narcotic addicts for the intentional action of possession, without recognition of a new defense of psychological dependence that poses difficult problems of verifiability and widespread use. To the extent that those contending for a dependence defense are ready to accept convictions under state statutes, without provision for such a defense, their submission plainly lacks constitutional requirement, even though it may be permeated with constitutional discussion.

Constitutional doctrine is concerned with general fairness. The pertinent context combines (a) increasing availability of treatment choices in the community, including "treatment" probation, and (b) awareness of the problems attendant on a drug dependence defense if required (difficulty of verification of psychic incapacity as distinguished from unwillingness to undertake available treatment, difficulty of identifying differences in types of addicts, difficulty of limiting the defense to the few rather than the many, etc.). In this combined context, constitutional fairness does not mean a compulsion to probe the addict's alleged compulsion and determine, e. g., precisely when and on what basis he made a choice for use when not dependent, or ignored the community's program (in the District of Columbia, not only voluntary commitment, but also the NTA's multi-modality programs, including methadone maintenance).

### E. Current Resolution of Problems Noted in Watson, and Further As-

sessment of Pertinent Doctrines of Responsibility and Constitutional Protection

We are aware that in *Watson* it was indicated that the criminal process might be inapplicable to acts as integrally related to the status of addiction as possession, and that the issue of this defense on the merits might be presented through motions before and during the trial.[136]

These references to the merits were at most tentative, and were intermeshed with non-constitutional questions, that the pertinent legislative history of the earlier statutes might show that Congress never intended to reach "the non-trafficking addict possessor"[137] or "non-trafficking possessors for personal use."[138] Even as to addicts, it is significant that the opinion, which sustained a conviction, focused on the availability of NARA treatment after conviction, as a primary consideration, albeit not a final solvent of the claims on the merits. In a significant passage, the *Watson* opinion stated that the sentence was being vacated and remanded—

with directions that he [appellant] be regarded on resentencing as eligible for non-criminal disposition under the Narcotic Addict Rehabilitation Act. *Amicus* itself has represented to us . . . that this action on our part "would in large measure" obviate appellant's problem.[139]

*Watson* did not take into account—indeed the court was not advised of—the prospect that subsequent 1970 legislation would make possession a misdemeanor and would permit conviction to be followed by treatment even without NARA

---

136. We are aware, too, that conscientious district judges have sought to grapple reflectively with the implications of that approach. *E. g.,* United States v. Lindsey, 324 F.Supp. 55 (D.D.C., 1971) (Gasch, J.) ; United States v. Ashton, 317 F.Supp. 860 (D.D.C.1970) (Gesell, J.).

137. 141 U.S.App.D.C. at 345, 439 F.2d at 452.

138. 141 U.S.App.D.C. at 347, 439 F.2d at 454.

139. 141 U.S.App.D.C. at 347, 439 F.2d at 454. *See* also Bailey v. United States, 386 F.2d 1, 4 (5th Cir. 1967), cert. denied, 392 U.S. 946, 88 S.Ct. 2300, 20 L.Ed. 2d 1408 (1968), cited in note 15 of *Watson*, as indicating that NARA's provisions required caution in any extension of the principle of *Robinson*.

commitment, through provision for treatment as a condition of probation.

The thought has been put that we should enlarge on common law defenses to reach psychic incapacity from drug addiction. In *Brawner* we considered a diametrically oriented proposal, that the insanity defense be abolished, with medical overview reserved for disposition not guilt. We noted that this proposal had not only appeared in the journals but been endorsed in comments of reflective judges. We concluded that this turn-about from settled common law doctrines based on mens rea and free will was not for judicial fiat but for the kind of legislative reexamination that could be accomplished by devotion of resources.

Similarly, we think it should be for the legislature to focus on whether to expand the theory of the insanity defense so as to add a defense of psychic incapacity from drug addiction. The difficulties of verifying incapacity are significantly greater than those posed by the insanity defense. And the identification of the defense of drug dependence with concepts of mens rea and free will is undercut by its proposed limitation to simple offenses of possession and use. That this is fiat does not necessarily mean it is unsound policy. However, this is the kind of choice of policies in tension that is appropriately for the legislature, at least when, as here, the legislature is engaged in continuing reappraisal of narcotic addiction, has supported an integrated approach with large funds for research and rehabilitation, and has, significantly, restored pro-bation and permitted conditions of treatment.

The flexibility of probation, and suspended sentence, may serve (a) to reinforce the addict's motivation for rehabilitation, and (b) to protect society, by ensuring against any hiatus between the termination of the criminal process and the institution of civil equivalents. The term "equivalents" is used advisedly; any widespread recourse to compulsory civil commitment must take account of voices increasingly concerned with the threat to liberty portended by actual confinement.[140] The problems are underscored by civil commitment statutes, like the D.C. law, that provide no maximum detention, such as inheres in a sentence, and authorize detention for the duration of "treatment." Nor can the problems of compulsory commitment, aptly termed a hybrid detention,[141] be finessed in the name of "treatment"; the penal sanction for evading commitment, or elopement, extends in all likelihood, to a failure to cooperate.[142] Moreover, in a field pervaded with doubt, about all that is certain is that it is not yet known, for many if not most addicts, whether, how, or to what extent, successful treatment may be achieved. A whole-hearted commitment to civil commitment must be tempered with awareness that even now this is sometimes "uncivil commitment" and that overhead hovers the anxiety of detention unadorned by meaningful treatment.[143]

The uncertain state of knowledge in this field, and need for flexibility, are underscored by the "unanticipated findings" of a survey in the "ghetto" Bedford-Stuyvesant community.[144] The sur-

140. Kramer, *supra* note 121; Aronowitz, Civil Commitment of Narcotic Addicts, 67 Colum.L.Rev. 405 (1967).

141. H. Packer, The Limits of the Criminal Sanction 256–7, 333 et seq. (1968).

142. *Cf.* In re Cruz, 62 Cal.2d 307, 42 Cal. Rptr. 220, 398 P.2d 412 (en banc, 1965); P. J. Belton, Civil Commitment of Narcotics Addicts in California: A Case History of Statutory Construction, 19 Hastings L.J. 603, 648 (1968).

143. "He [the addict] may, of course, be confined for treatment or for the protection of society." Justice Douglas, concurring, Robinson v. California, *supra*, 370 U.S. at 676, 82 S.Ct. at 1425.

144. Study by Addiction Research and Treatment Corporation Evaluation Team, in association with the Columbia University School of Social Work, the Vera Institute of Justice, and the Harvard Law School Center for Criminal Justice, as reported in 2 LEAA Newsletter 2 (No. 8,

vey found that a *lower* heroin use in their families was reported by respondents with grade school education (one-half the use of those with high school or college education); by respondents with blue collar occupations or incomes below $6,000 annually (significant difference with those employed in white collar occupations or income above $6,000 annually); by respondents from broken homes (slightly less than those in intact families); and by respondents in households headed by females (slightly less than those headed by males). These surprising findings on the profile of the addict caution against any court extension and intrusion into on-going appraisals, based on assumptions that may be undercut by studies and developments. As to the less surprising finding of this LEAA-financed study, that the highest drop-out rate from the methodone maintenance program was among the younger members, this reinforces the need for the availability of strong sanctions that can overcome the inducements of the drug, and motivate users to accept responsibility and the strains of changing a life style.

It is argued that civil commitment provides the protection that society needs in the case of an individual unable to control his possession and use of narcotic drugs. This raises serious questions whether commitment juries will be ready to find such lack of self-control as to warrant involuntary confinement of those not charged with crime; whether our society can realistically be expected to implement a civil statute with the same priorities as a violation of probation, in *e. g.*, unrelenting enforcement of an employment requirement; whether there is a feasible way to handle the person whose extreme hostility means that his inclusion in a treatment program limits capacity for treatment of other addicts.[145] Apart from such questions there remains the problem of slippage, the inescapable problem of the narcotic user who resists confinement in jail on the ground that it has not been proved beyond a reasonable doubt that he had substantial capacity to conform his past conduct to the law's prohibition of possession, and then resists possible confinement in a hospital by arguing to the jury that it has not been sufficiently proved by the Government that he has "lost the power of self control with reference to his addiction."[146] Since the presence, or lack of control capacity is difficult of verification as of any one time, and is subject to change, this problem of slippage is not inconsiderable.

On the other side of the coin, so far as criminal sanctions are concerned, Congress has recognized the mistakes of the past in over-domination of medical solutions by law-enforcement officials, and has provided for HEW prescription of approved medical techniques.[147] Methadone maintenance has been given increasing recognition, and Congress has expressly permitted methadone treatment under Titles I and II of NARA, in appropriate cases.[148] Experts caution

1972) (The study was financed by LEAA).

145. *See generally*, Hearings on Treatment and Rehabilitation of Narcotics Addicts, Before Subcommittee No. 4 of the House Judiciary Committee, 92d Cong., 1st Sess. 155 (1971) (Testimony of Dr. Jerome H. Jaffe, Special Consultant to the President for Narcotics and Dangerous Drugs).

146. 24 D.C.Code § 602(a) (1967). While theoretically civil commitment could be premised on a showing that the person used a drug "so as to endanger the public morals, health, safety, or welfare," it is difficult to see how this could be invoked when the addict by hypothesis, has not been engaged in trafficking or any conventional crime.

147. H.Rep.No.91–1444, *supra* note 29, at 14–15.

148. Public Law 92–420, 86 Stat. 677 (Sept. 16, 1972). In reporting this bill, backed by the administration, the Senate Committee noted that the President's 1967 Crime Commission had found it could not, on fragmentary research then available, reach a judgment as to suitability of methadone maintenance for treatment or as a public health approach. The Committee continued: "Subsequent events, however, have established that in appropriate cases methadone is a useful

that methadone maintenance has both ultimate limits in the number of addicts who will respond, and intermediate limitations on the rate of transition from experimental to mass programs.

It has been duly noted that there were no criminal sanctions in the 19th century notwithstanding a relatively larger user population of narcotic addicts—soldier addicts; medical addicts; and significantly "drug store addicts," predominantly female, white and middle class, and not confined to a particular geographical region or the cities—and that criminal legislation ensued only with the advent of the "pleasure" or "street" use of narcotic drugs by ethnic minorities in the nation's cities.[149] There are reflective voices who say that the criminal sanctions approach of the more recent past, and prohibition of out-patient medical prescription of narcotics, have combined to provide an impetus to crime that besets the society with dangers worse than the evil, and that the curse of the drug abuse requires riddance from past dogmas and research in, and then acceptance of, a system of medical-

ly supervised narcotic maintenance.[150] This is a matter for policy-making that may not be mandated by the courts.

There will be on-going legislative appraisal. The 1970 law provided, § 601, 21 U.S.C. § 801 note, for a non-partisan Commission on Marihuana and Drug Abuse, with members appointed by the President (9) and Congress (4), to conduct a comprehensive study and make recommendations. The Commission's First Report, in March 1972, recommended that the Federal law be revised so as to remove criminal prohibitions against "private" possession of marijuana for personal use.[151] The Commission disclaimed any absolutist philosophy, and explicitly recognized that so-called "private" conduct may be prohibited in furtherance of public health and welfare, but focused on the utility of the legal system, and the need for use of criminal law, in modifying noxious behavior, particularly when the behavior is invisible, private or consensual, and whether primary emphasis must not be put on other agencies of social control.[152]

tool in the work of rehabilitating heroin addicts." S.Rep.No.92–1071, 92d Cong., 2d Sess. 3 (1972), U.S.Code Cong. & Admin.News 1972, p. 3189.

Public Law No. 92–420, amended Title II of NARA, 18 U.S.C. § 4251 (1970), to redefine treatment, as including services "designed to protect the public and benefit the addict" not only "by eliminating his dependence on addicting drugs," but also "by controlling his dependence on addicting drugs."

149. Nat.Comm.Report, *supra* note 124, at 12–13.

150. *E. g.,* Perspectives, *supra* note 128; R. King, The Drug Hangup (1972); Zinberg and Robertson, *supra* note 86.

151. *See* Nat.Comm. Report, *supra* note 124, at 152. It also recommended removal of criminal offense for distribution in private of small amounts for insignificant remuneration.

152. *Id.* at 24, ff. *See also,* the report of the comparable Canadian Commission, chaired by Dean Le Dain, Interim Report of the Commission of Inquiry into the Non-Medical Use of Drugs 505 et seq. (1970). This rejects John Stuart Mill's view (On Liberty) that society may not

rightly restrict the liberty of an individual (other than a child) for his own good. The Commission subscribes to the moderate view expressed by Professor H. L. A. Hart in Law, Liberty and Morality, that the wane of laissez faire requires modification of Mill's thesis, and permits society to restrict the availability of harmful substances, even though the individuals would consent to the resulting harm. While it rejects Lord Devlin's extreme thesis (The Enforcement of Morals) that society may prohibit any conduct that is deemed "immoral," it finds merit in his "moderate thesis" that "Society is entitled by reason of its laws to protect itself from dangers, whether from within or without."

*See also* Wilson, et al., *supra* note 125, at 26:

Even John Stuart Mill, whose defense of personal liberty is virtually absolute, argued against allowing a man to sell himself into slavery, 'for by selling himself as a slave, he abdicates his liberty; he foregoes any future use of it beyond that simple act.' * * * We think it clear that for a sufficiently large number of persons, heroin is so destructive of the human personality that it should not be made generally available.

The Commission's rejection for marijuana of the contention that a possession offense is needed to reach traffickers,[153] does not necessarily extend to heroin, marked by differences in consequences to user, type of user population and quantum of "sales." Its Second Report, in 1973, recommended criminal sanctions for possession of heroin. *See* text *supra*, at 1194–1195.

The Administration's 1969–1970 presentation sought a Federal offense prohibiting mere possession of controlled drugs as a means of reaching large-scale traffickers,[154] and disclaimed any intent to prosecute mere addicts possessing for personal use, with reliance instead on rehabilitation and civil commitment for abusers and addicts.[155] Congress agreed to make simple possession a crime, but declined the request for high penalties and felony classification.

As to possession of narcotics by addicts for personal use, we take note of the limited impact projected by Congress for the present law—with Congressional contemplation that the Government would withhold criminal prosecution of mere addicts, and that they would be subject to pretrial diversion and the court's broad probation authority. This, together with the provision of an executive-legislative commission for ongoing reappraisal, establish a climate conducive to a judicial restraint that would avoid a constitutional hobbling of legislative flexibility and development.

In *Watson*, the 1968 opinion of a panel of this court found Eighth Amendment infirmity in the excessiveness of statutory requirement imposing a minimum ten-year term on an addict, without hope of probation or parole, and without regard to the offender's dire need for treatment.[156] When the case was reargued en banc in 1969 and decided in July 1970, the court reversed by invalidating arbitrary limitation of the

153. Nat.Comm. Report, *supra* note 124, at 143 ff.

154. Hearings on Controlled Dangerous Substances, Narcotics and Drug Control Laws Before Committee on Ways and Means, 91st Cong., 2d Sess. 201 (1970) (hereinafter 1970 House Hearings). Attorney General Mitchell testified that a possession offense was needed in view of recent Supreme Court opinions on inferences available from mere proof of possession. He said: "While possession offenses are not the major thrust of Federal law enforcement, they are a necessary concomitant to drug conspiracy cases against large-scale traffickers."

155. *See, e. g.*, 1969 Senate Hearings, *supra* note 39, at 233, testimony of Mr. John Ingersoll, Director of the Bureau of Narcotics and Dangerous Drugs:

With regard to the crime of possession for one's own use, I feel, from a Federal point of view, that this should not be the major Federal law enforcement effort. The rationale for mere possession offenses within the framework of the Federal penalty structure is for the purpose of indicating a lack of acceptance for indiscriminate and non-medical use of these drugs and to provide a handhold against the criminal who cannot be arrested for more serious crimes because of his insulation from the street traffic. For the Federal enforcement point of view, some sort of possession provision is considered necessary and must be included. However, the person arrested for simple possession will many times be the narcotic addict or the casual abuser of drugs. In both cases rehabilitation is possible, and, for the casual abuser, probable.

*See also*, Testimony of Mr. Ingersoll, in Hearings on Drug Abuse Control Amendments—1970, Before the Subcommittee on Public Health and Welfare of the House Committee on Interstate and Foreign Commerce, 91st Cong., 2d Sess. 127 (1970):

Our philosophy is one which attempts to distinguish between the abuser and the trafficker.

We feel that the abuser is the victim of the trafficker who is the criminal in this case. Therefore, we feel our efforts are properly focused against the criminal elements.

Meanwhile, we would hope that our expertise and our efforts, our research and rehabilitative techniques, would develop to the point where the abuser or the victim can be deterred, prevented from becoming victimized on the one hand or be rehabilitated in the event that he does become an abuser.

156. 141 U.S.App.D.C. at 357, 439 F.2d at 464, et seq.

benefits of Title II of NARA, thus assuring the trial court would have discretion to provide for treatment of the convicted offender.

We have not shelved the concerns underling *Watson*. Our position is, rather, that the legislature has increasingly addressed itself to like concerns, and has not only permitted for addicts, but made clear its interest in, probation on condition of medical treatment.

Congress fairly contemplated that the trial court in a possession case, involving claim at sentencing that the defendant was a dependent, would consider information concerning the nature of the defendant's drug dependence, before passing sentence, and the possibilities of control under treatment.[157]

At this juncture, we do not think judicial interposition of a drug dependence defense would mark a sound intrusion into the on-going legislative development of the law.

## V. REMAND FOR FURTHER CONSIDERATION OF DISPOSITION

Our conclusion that this case should be remanded for further consideration by the District Court of disposition arises in part from its unusual procedural posture. Under the circumstances of this case, we exercise our jurisdiction of the appeal from the conviction—accompanied as it was by a judgment placing appellant under confinement, for a Title II NARA consideration to guide disposition after sentencing, but remand to permit further consideration of NARA disposition if requested by appellant.[158] Our settled jurisprudence calls on us to apply 28 U.S.C. § 2106 so as to order a remand following a sentence when there is a possibility that there was a failure to give NARA dispositions full consideration.[159] The present

157. *See* Leach v. United States, 115 U.S. App.D.C. 351, 320 F.2d 670 (1963), on remand 218 F.Supp. 271 (D.C.1963), cause remanded 118 U.S.App.D.C. 197, 334 F.2d 945 (1964).

158. As to our jurisdiction of the appeal from the conviction-plus-commitment, *compare* Korematsu v. United States, 319 U.S. 432, 63 S.Ct. 1124, 87 L.Ed. 1497 (1943) (appeal from order of probation).

Subsequent to the appeal to this court the defendant besought the District Court for a NARA disposition, which was rejected. We cannot know for certain whether the appellant would continue to request a NARA disposition but think that in the interest of justice our judgment should not foreclose consideration of such a request.

A defendant who voluntarily extends his commitment time to gain NARA benefits would seem no worse off, in any significant respect, than one who voluntarily applies for civil commitment under Title III of NARA, and becomes subject to the possibility of 42 months treatment without possibility of voluntary withdrawal, 42 U.S.C. § 3413.

The defendant could properly limit his request to an order under Title II of NARA given operative effect, nunc pro tunc, as of the date of the sentence. Indeed, a NARA disposition might have to provide such a credit, in any event, but we need not pursue the matter.

The total benefits of a NARA disposition may warrant the defendant in requesting it, even assuming that NARA disposition—which may permit discharge after 6 months, 18 U.S.C. § 4254—entails the possibility of longer confinement than the sentence already ordered. Such a request would waive any possible claim of prejudice from possible increase in sentence. *Compare* Tatum v. United States, 114 U.S.App.D.C. 49, 50, 310 F.2d 854, 855 (1962) (possibility of increase in detention time, under Youth Corrections Act, outweighed by benefit of ability to earn an expungement order). The non-punitive setting of NARA may be deemed by defendant to outweigh punitive confinement for a shorter period. Carter v. United States, 113 U.S.App.D.C. 123, 306 F.2d 283 (1962), cited with approval in Harvin v. United States, 144 U.S.App. D.C. 199, 203, 445 F.2d 675, 679 (en banc, 1971). Defendant may consider that NARA disposition even at this time may yield overall benefit (a) in preparing him for a future life free of crime, and (b) would help avoid the danger that he might, if not cured of his addiction, be subject to involuntary civil commitment, as a dangerous drug dependent person under the District law, beginning *subsequent* to the service of his sentence.

159. United States v. Gaines, 140 U.S.App. D.C. 402, 406, 436 F.2d 150, 154 (1970) ("this court is unable to determine

case is considered appropriate for such a remand order, since prior to the disposition order, by the trial judge, this court appointed counsel to argue the appeal, and he diligently filed his brief on the merits and sought the en banc consideration which we ordered. Counsel for both appellant and the Government have thus focused on conviction vel non, and yet a simple order of affirmance might preclude any further judicial consideration of the NARA issue.

In such consideration on remand, the District Court would be free to take into account all pertinent material. The material available to this court indicates that the failure of the defendant to profit from a prior experience at Danbury is not conclusive. NARA itself makes clear that a prior failure on a Title I commitment does not preclude a Title II commitment.[160] And the fact that a person is found not likely to be rehabilitated under a Danbury program does not negative a successful adjustment through a methadone-maintenance program of the kind administered by D.C.'s Narcotic Treatment Administration. The HEW Department, and the National Institute of Mental Health, have thus far limited NARA's rehabilitation programs, notwithstanding some variations in approach,[161] to "addicts with a high

motivation for treatment." [162] While Congress contemplated in 1966 that NARA civil commitment (Titles I and III) would be limited to "selected narcotic addicts" the legislative history also underscores the need for "flexible approaches," embodying on-going medical knowledge, and it would seem that Title II dispositions could be governed by the broad objective of NARA voiced by the Committee as follows:

[T]he bill provides alternatives which provide a needed flexibility in the law. The practical effect of the implementation of the law provided for in the bill, is that strict punishment can be meted out where required to the hardened criminal, while justice can be tempered with judgment and fairness in those cases where it is to the best interest of society and the individual that such a course be followed.[163]

There is widespread conviction that many addicts who cannot be initially motivated for the rehabilitation programs now used by the Surgeon General can be successfully rescued from criminality, and oriented toward work performance and relatively normal life as a "socially useful citizen, happy in himself and in society," through a methadone-maintenance program coupled with effective counseling.[164] Indeed this view

whether the trial court considered the appellant to be eligible" under NARA); United States v. Collins, 139 U.S.App. D.C. 392, 399, 433 F.2d 550, 557 (1970) ("remanding for resentencing," so that possibility of a commitment under Title II of NARA can be considered free of the confusion introduced "by appellant's ambivalence") ; United States v. Williams, 407 F.2d 940, 944 (4th Cir. 1969) (NARA "was not sufficiently called to his attention [of the trial judge] to make him aware of his discretion").

160. See H.R.Rep. No. 1486, 89th Cong., 2d Sess. 13 (1966), U.S.Code Cong. & Admin.News 1966, p. 4254:
This committee notes that the court will also be able to consider those individuals who for one reason or another did not complete the civil commitment program. The provisions contained in title II provide for sentencing to commitment for treatment, a procedure which may be

described as a problem-centered device which will actually provide supervision and control for a much longer period of time than a short-term commitment.

161. The Government's NARA programs differ from place to place. In addition to Danbury, there are Government facilities at Lexington, Kentucky, Fort Worth, Texas and Terminal Island, California. At Lexington alone, there are five different therapeutic communities, each using a different approach. National Institute Mental Health, Lexington, HEW Pub.No. (HSM) 71–9071 (1971).

162. GAO Report, *supra*, note 109, at 35–36.

163. H.R.Rep.No.1486, 89th Cong., 2d Sess. 9 (1966), U.S.Code Cong. & Admin.News 1966, p. 4250.

164. Perspectives, *supra* note 128, at 54.

seems to have been taken in the NARA Staff Evaluation Report in September 1969 to a trial judge in the then Court of General Session, that "Raymond Moore is an addict who is not likely to be rehabilitated through a treatment program in this Institution at this time. . . . He might possibly be considered a suitable prospect for a Methadone Program, but it also appears that he is in need of hospital care."

The proffered testimony of Mr. Gore of NTA, that appellant's chances for rehabilitation are good, while properly excluded at trial, would of course be considered on a disposition remand. While the picture is not completely clear, there is reason to believe that appellant would at least be able to proffer (appellant's brief, at 37) that it was not until after the January 1970 offense for which appellant was convicted that methadone maintenance programs became available to appellant, due to the efforts of the Narcotic Treatment Agency. In February 1970 appellant tried the methadone program available at the Blackman's Development Center, but this consisted of low detoxification doses and was no help to him. Although appellant Moore's previous request for help for his addiction while in the judicial system was unavailing, this apparently changed in September 1970 when he was referred, by his probation officer, to the Narcotics Treatment Administration, with its substantial methadone doses.

We contemplate a remand pursuant to which the District Court will arrange for a current assessment by the Surgeon General concerning Title II possibilities, one that takes into account possible changes in that official's administration of Title II and also the possible changes wrought in appellant by his more successful experience in the D.C's Narcotic Treatment Agency. Even assuming the Danbury program would not be suitable for appellant in the first instance, the remand could explore the suitability of programs at other facilities—which are either operated by the Public Health Services or to which that Service has access, including the access to the community treatment centers—opened up by recent legislation.[165] *See* United States v. Miller, 155 U.S.App.D.C. 110, 476 F. 2d 555 (1973). The remand to explore NARA possibilities could also consider whether under Title II, after conditional release is granted, 18 U.S.C. § 4254, the individual can receive methadone in a community treatment center providing aftercare, and if so whether methadone is now being used in NARA confinement, or at least used as a transitional means of adjusting to a more rigorous NARA program.

Our view that the interest of justice calls for thorough-going review of NARA possibilities is a corollary of the approach reflected in this opinion, that the courts should refrain from questioning convictions when Congress has authorized an on-going liberalization of post-conviction alternatives. That premise calls for more than lip-service or mechanical consideration of the reality of these alternatives.

We conclude that the appropriate disposition is an affirmance of the conviction, and a remand for further consideration of post-conviction alternatives, for disposition.[166]

The remand could also consider whether remanding the defendant to the kind

165. We think the Surgeon General could give consideration whether a basis exists for arranging commitment at community treatment centers which would satisfy the requirements of the Title II NARA confinement. The recent amendment of Title II to include methadone maintenance treatment is discussed in note 148 *supra*.

166. The bulk of this opinion was in proof long prior to the issuance by the District of Columbia Court of Appeals of its order of February 27, 1973, vacating the panel opinions in Franklin v. United States, No. 5960, and ordering a *sua sponte en banc* hearing, and prior to the President's message of March 14, 1973, Cong. Rec.H. 1731 (daily ed., March 14, 1973). We have thought it best not to indulge in the inherently speculative analysis of how our opinion might be affected by any permutation of results from the legislative proposal or prospective *en banc* ruling.

of custody of the Attorney General that is provided by Title II of NARA could be blended with the kind of Attorney General custody that has been developed in connection with work-release programs, and with remittance to community residential centers, which offer guidance to persons with narcotic addiction problems.[167]

MacKINNON, Circuit Judge:

My decision is to concur in Judge Wilkey's opinion and affirm the conviction and the sentence. Failing that, I vote to affirm the conviction and remand for reconsideration of the sentence. I also concur in Judge Leventhal's discussion in Part IV with respect to criminal responsibility and impaired control as a possible defense to crime.

I

Despite all the writing about non-trafficking addicts, the evidence introduced against appellant Moore is sufficient to support a conclusion that, at the very least, Moore was aiding and abetting the trafficking in narcotics when he was arrested. Hence, he is guilty as a principal[1] and must be considered a trafficker.

Moore was arrested on January 29, 1971 in Room 17 of the Warren Hotel. Previously the police had learned from an informer that certain persons were selling heroin in Rooms 15 and 17 and this information had been corroborated by actual purchases of heroin from persons (other than Moore) in both rooms several days before Moore's arrest. Acting on this information the police obtained a warrant to search both rooms

and in execution thereof discovered Moore *with his coat off* seated on a chair facing a bed about one foot away on which was laid out all the paraphernalia and loose mixed heroin for a heroin capping operation.[2] A vial containing 55 capsules full of mixed heroin was also found in Moore's pants pocket. Moore was thus arrested and before he was taken away he went to the closet in Room 17 and *put on his overcoat.* It was a permissible conclusion that his presence in the room was more than casual or temporary and that he was actually aiding the trafficking in heroin. There is thus no basis for any discussion about a non-trafficking addict. And, since Moore after full examination was found to be ineligible for treatment under the Narcotic Addict Rehabilitation Act, I would affirm the conviction and the sentence. Failing that, as stated above, I concur in the remand to *consider* resentencing.

II

Judge Wright's opinion fails to recognize that the use of narcotics by addicts is the great vice. It is the use of illegal drugs by addicts that makes other crimes possible. Possession of narcotics by the addict is at the root of the evil. And while addicts are objects of pity, that does not justify a judicial reordering of our control procedures so as to protect such persons in the regular procurement of unlimited quantities of illegal narcotics to satisfy their individual desires for euphoria. If a change is to be made in the handling of narcotics it must come from Congress.

167. The foregoing is not to be confused with community residential centers simpliciter, which apparently was provided by the 1970 law for pre-release or parole situations, but rather for an adaptation of custody under Title II of NARA. We further note that the Bureau of Prisons has in mind the possibility of use of these centers for short commitments. U. S. Department of Justice Bureau of the Prisons, The Residential Center: Corrections in the Community, 2, 15 (not dated).

For work release programs, we note that "full minimum custody is a prerequisite in all cases," U. S. Department of Justice, Bureau of Prisons, "Questions and Answers About Work Release" (mimeograph).

1. 18 U.S.C. § 2(a) (1970).

2. 174 empty capsules, 67 capsules full of mixed heroin, large quantities of loose mixed heroin, and other heroin paraphernalia.

## III

I would not recognize the mental condition resulting from narcotic addiction as a defense to crime except in full conformance with the rule announced in United States v. Brawner, 153 U.S.App. D.C. 1, 471 F.2d 969 (en banc, 1972), *i. e.*, he may not be convicted

> if, at the time of the criminal conduct, the defendant, as a result of mental disease or defect, either lacked substantial capacity to conform his conduct to the requirements of the law, or lacked substantial capacity to appreciate the wrongfulness of his conduct.

153 U.S.App.D.C. at 40, 471 F.2d at 1008. Thus, he would have to prove "mental disease or defect" and a lack of "substantial capacity to conform" and I would not consider that any person "lacked substantial capacity to conform his conduct to the requirements of law" unless his "conduct . . . would not be inhibited even by a 'policeman at the elbow' of the offender." [3] The essence of appellant's claim is that if an accused person

> lacks substantial capacity to conform his conduct to the requirements of the law [he] may not be held criminally responsible for mere possession of drugs for his own use. (Judge Wright's opinion, p. 1209)

What Judge Wright is arguing for is a defense that would eliminate any requirement of a "mental disease or defect." Such defense would be the substantial equivalent of allowing a defense of insanity without proof of insanity. The test he proposes would not even measure up to the requirements of the irresistible impulse theory, of which it has been said:

> "The medico-legal theory of irresistible impulse is advocated only by laymen and by psychiatrists who are scientifically not sufficiently oriented.

It lends an air of scientific literalness and accuracy to a purely legal definition without any foundation in the facts of life or science." [30]

Irresistible impulse as a defense to a charge of crime has been rejected in England,[31] in Canada,[32] and in a majority of our jurisdictions. In 1955 the American Law Institute found it had been added to the right-wrong test in fourteen states, the federal jurisdiction and the army plus one state having a delusional-impulse test.[33]

[30]. Wertham, The Show of Violence 13–14 (1949). And see Hall, In Defense of the McNaghten Rules, 42 A.B.A.J. 917, 918–9 (1956).

[31]. Regina v. Barton, 3 Cox C.C. 275 (1848); Rex v. Kopsch, 19 Cr.App. R. 50 (1925); Rex v. Flavelle, 19 Cr.App.R. 141 (1926). It was proposed to be accepted in England in the bill of 1878, but rejected in the Draft Code of 1879. It was recommended by the Atkin Committee in 1923, supported by the British Medical Association but was blocked by influential opposition. The Royal Commission on Capital Punishment in 1953 recommended that the M'Naghten rules be abrogated "and the jury left to decide simply whether the accused ought to be held irresponsible for insanity." Williams, Criminal Law § 99 (1953). And see § 163 of the second edition (1961).

[32]. Can.Crim.Code § 16 (1953–54).

[33]. Model Penal Code 161 (tent. dr. 4, 1955). The states are Alabama, Arkansas, Colorado, Connecticut, Delaware, Indiana, Kentucky, Massachusetts, Michigan, New Mexico, Utah, Vermont, Virginia and Wyoming. Georgia has a delusional-impulse test.

R. Perkins, Criminal Law 873 (2d ed. 1969).

In Misenheimer v. United States, 106 U.S.App.D.C. 220, 271 F.2d 486 (1959), Judge Washington pointed out that, even under *Durham*,[4] a defense of irresistible impulse in the District of Columbia had to be "due to a mental disorder." To-

3. *See* United States v. Kunak, 17 CMR 346, 357–58 (1954).

4. Durham v. United States, 94 U.S.App. D.C. 228, 214 F.2d 862 (1954). Judge Washington was one of the participating judges in *Durham*.

day, in this jurisdiction, it is *Brawner, supra,* that sets forth the requirements for such defenses and I see no need to depart from the standards there laid down. The adoption of the defense recommended by Judge Wright's opinion, to my mind, "would destroy social order as well as personal safety." [5]

To paraphrase Perkins' summary of court decisions on the irresistible impulse theory to Judge Wright's "lack of substantial capacity to conform" proposal:

> The difficulty would be great, if not insuperable, of establishing by satisfactory proof whether substantial capacity to conform his conduct was or was not lacking. "It will be a sad day for this state when lack of substantial capacity to conform one's conduct shall dictate a 'rule of action' to our courts." "The vagueness and uncertainty of the inquiry which would be opened may well cause courts to pause before assenting to it. Lack of substantial capacity to conform his conduct is too incapable of a practical solution, to afford a safe basis for legal adjudication. It may serve as a metaphysical or psychological problem, to interest and amuse the speculative philosopher, but it must be discarded by the jurist and the lawgiver in the practical affairs of life."

*See* R. Perkins, *supra,* at 872 (footnotes omitted).

In my view the most impractical aspect of the "lack of substantial capacity to conform their conduct" test is that in applying such test it would be practically impossible to separate those who *lacked* substantial capacity to conform their conduct to the law from those who possessed such capacity but who merely

*refused* to conform their conduct. Under the "addiction defense," the repeated and successive *refusal* to conform one's conduct would be tantamount to proof that he was *unable* to conform. It would thus be the cause of great mischief besides favoring gross users of narcotics over those less addicted.

ROBB, Circuit Judge (concurring):

I concur in Judge Wilkey's opinion and add a few words.

The doctrine espoused by the minority would license an addict to commit any criminal act—including the sale of drugs —that he considers necessary to support and maintain his habit. In my opinion neither the Constitution nor any statute requires that result, and I decline to bring it about by judicial legislation.

WRIGHT, Circuit Judge, with whom BAZELON, Chief Judge, and TAMM and ROBINSON, Circuit Judges, join, dissenting:

In Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), the Supreme Court recognized that narcotic addiction, like mental illness, leprosy and venereal disease, is an illness and not a crime. The Court therefore held that a California statute making the "status" of addiction a criminal offense inflicted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. Some eight years later, in Watson v. United States, 141 U.S.App.D.C. 335, 439 F.2d 442 (1970) (*en banc*), this court noted that as a practical matter an addict's purchase, receipt, possession and use of narcotics are acts inseparable from the disease itself. As a result we suggested, without deciding,[1] that "if *Robinson's*

---

5. Commonwealth v. Mosler, 4 Pa. 264, 6 Pa.L.J. 90 (1846.)

1. Although the court suggested that a defense of addition might be available to the non-trafficking addict possessor, it concluded that since the record in the trial court had not been developed with these theories in mind, "definitive rulings with respect to them cannot meaningfully be made on such a record, and are more properly to be left to the orderly processes of adversary litigation beginning at the trial court level, and with fact-finding sufficiently close in point of time to the events in question as to assure its integrity." Watson v. United States, 141 U.S.App.D.C. 335, 347, 439 F.2d 442,

deployment of the Eighth Amendment as a barrier to California's making addiction a crime means anything, it must also mean in all logic that (1) Congress either did not intend to expose the non-trafficking addict possessor to criminal punishment, or (2) its effort to do so is as unavailing constitutionally as that of the California legislature." 141 U.S. App.D.C. at 345, 439 F.2d at 452.

Today this court rejects the *Watson* rationale and holds that a non-trafficking addict is a criminal because he possesses drugs to satisfy his addiction. In my judgment stigmatization of such persons as criminals, rather than treatment of them for their disease, raises serious questions of constitutionality, is contrary to established common law notions of criminal responsibility, and is not mandated by Congress' intent in adopting the relevant legislation. Moreover, this insensitive approach to drug addiction is tragically counter-productive. Twenty years of rigid criminal enforcement of drug laws against addicts has brought this country, not only a dramatic increase in organized crime, but a harvest of street crime unknown in our history. *See* ABA Special Committee on Crime Prevention and Control, New Perspectives on Urban Crime (1972). Yet the court presses on, still hoping that some day, somehow, the criminal sanction will bring relief. With due respect, I suggest that the law can do better. I suggest that the development of the common law of *mens rea* has reached the point where it should embrace a new principle: a drug addict who, by reason of his use of drugs, lacks substantial capacity to conform his conduct to the requirements of the law may not be held criminally responsible for mere posses-

---

454 (1970) (*en banc*). The record in the instant case was made by both parties with *Watson* fully in mind, and therefore presents an appropriate vehicle for "definitive rulings" on the questions broached in *Watson*.

The court here, instead of following the *Watson* suggestion, adopts the disposition indicated in Part V of Judge Leventhal's concurrence, which reads:

"* * * Under the circumstances of this case, we exercise our jurisdiction of the appeal from the conviction—accompanied as it was by a judgment placing appellant under confinement, for a Title II NARA consideration to guide disposition after sentencing, but remand to permit further consideration of NARA disposition if requested by appellant. Our settled jurisprudence calls on us to apply 28 U.S.C. § 2106 so as to order a remand following a sentence when there is a possibility that there was a failure to give NARA dispositions full consideration. * * *"

(Footnotes omitted.) The commitment under NARA is provided in 18 U.S.C. § 4253(a) (1970), which states: "Such commitment shall be for an indeterminate period of time not to exceed ten years, but in no event shall it exceed the maximum sentence that could otherwise have been imposed." *See* Baughman v. United States, 8 Cir., 450 F.2d 1217 (1971), cert. denied, 406 U.S. 923, 92 S.Ct. 1791, 32 L.Ed.2d 123 (1972), affirming D.

Minn., 286 F.Supp. 269 (1968); United States v. Watkins, D.D.C., 330 F.Supp. 792 (1971); 44 F.R.D. 220 (Form F) (1968); Barkin, Legal Problems in Sentencing, 54 F.R.D. 289, 295–296 (1968); H.Rep.No.1486, 89th Cong., 2d Sess., at 12 (1966). Moore has already served almost half of his 6-year sentence. Consequently, the commitment "for an indeterminate period of time not to exceed ten years" would increase the sentence he is now serving and is, therefore, illegal. *See* Tatum v. United States, 114 U.S. App.D.C. 49, 50, 310 F.2d 854, 855 (1962) (*per curiam*), and cases there cited. Even if this legal obstacle could be overcome on a waiver theory, Moore's is an unlikely test case to extend the application of NARA. Moore has 2 years and 2 months left to serve on his sentence (counting good time). The chances of his agreeing to accept a 10-year NARA sentence in lieu of his 2 years and 2 months are remote. Also remote is the possibility that on reconsideration the District Court will place Moore in the NARA program. The NARA report received by the judge at the time of sentencing on Moore's suitability for NARA was negative, and Moore has not in any way sought to raise the propriety of his rejection from NARA as an issue on this appeal. Under all the circumstances recited here, any serious attempt to expand NARA applicability should await a more appropriate and a more promising vehicle.

sion of drugs for his own use. The trial judge refused appellant's request to give the jury an instruction based on this principle. I would, therefore, reverse this conviction and remand the case for a new trial.

## I. STATEMENT OF THE CASE

During the week prior to January 29, 1970, Officers Daly and Larman of the Metropolitan Police Narcotics Squad conducted an investigation into narcotics trafficking in the Warren Hotel, located at 1024 10th Street, N.W. Officer Daly learned from an informant that a man known as Crip Green was selling heroin in Room 15 of the hotel, and that another man, identified only as "Jumbo," was selling heroin in Room 17. On January 25, the same informant, under the supervision of Daly and Larman, purchased heroin in capsules from Crip Green in Room 15, and the following day a similar purchase was made from "Jumbo" in Room 17. Narcotics search warrants were thereafter obtained for Rooms 15 and 17 of the hotel. (M. Tr. 62–66, 69–71.) [2] These warrants were executed at about 7:05 P.M. on January 29. Officer Daly knocked on the door to Room 15 and announced his identity and purpose. There was no response, and after waiting about 15 or 20 seconds he forced open the door with his foot. (M. Tr. 49–50; Tr. 12, 36–37).

Upon entering, he observed that the room was quite small—about 10 to 12 feet in depth. (Tr. 252.) Directly across from the door was a bed, with its long side against the far wall. Appellant Moore and one Sherman Beverly were seated in chairs, each about one foot from the edge of the bed. Neither man had anything in his hands. On the bed, in front of Beverly, was a mirror on which there was a pile of white powder consisting of 1,854.5 milligrams of mixed heroin.[3] To the right of the mirror, in front of appellant's chair, there was a cardboard record album cover on which there was a similar quantity of mixed heroin. Between the mirror and the album cover, there were 93 new and 81 used empty gelatin capsules, and to the left of the mirror lay 67 capsules filled with mixed heroin. A woman's stocking stretched over a wire coat hanger and an unopened package containing about ten hypodermic syringes and needles were located toward the far edge of the bed. The key to Room 15 and a pistol were found near the pillow. Both men were placed under arrest and searched. A vial containing 50 capsules of mixed heroin was discovered in appellant's pants pocket. (M. Tr. 50–54; Tr. 37–42, 68, 136–141.) Based on the seizure of the loose and capsuled heroin found on the bed and the 50 capsules discovered in appellant's pocket a four-count indictment [4] was returned on

2. The various transcripts of the proceedings in the District Court are referenced as follows: "M. Tr. ———" represents the transcript of the hearing on appellant's pretrial motions on October 21, 1970, and "Tr. ———" signifies the transcript of the continuation of these pretrial proceedings on February 18, 19 and 22, 1971, and the trial itself, conducted on February 22, 23 and 24, 1971.

A narcotics search warrant for a third room in the hotel, Room 9, was obtained at about the same time by Officer Caron of the Narcotics Squad, who had been conducting an investigation independent of that of Daly and Larman. (M. Tr. 72–73, Tr. 15–16.)

3. The chemist merely tested for the presence of heroin, and not for the exact quantity present. He estimated, however, that the powdered mixture contained 4 to 7% heroin. (Tr. 180–182.)

4. The first count charged that both appellant and Sherman Beverly had purchased, dispensed and distributed the loose and capsuled heroin found on the bed in violation of 26 U.S.C. § 4704(a). The second count alleged that they had received, concealed and facilitated concealment of this same heroin in violation of 21 U.S.C. § 174. Before trial, Beverly pleaded guilty to Count 1 of the indictment and the second count was thereafter dismissed as to him. Only appellant was charged in the remaining two counts. Under the third count, he was charged with having purchased, dispensed and distributed the heroin contained in the 50 capsules found in his pocket in violation of 26 U.S.C. § 4704(a). The fourth count

April 13, 1970, charging appellant with violations of the Harrison Narcotics Act, 26 U.S.C. § 4704(a) (1964),[5] and the Jones-Miller Act, 21 U.S.C. § 174 (1964).[6]

The litigation before trial focused primarily [7] on appellant's motion to dismiss the indictment under the authority of this court's decision in Watson v. United States, *supra*. Testifying on this motion, appellant Moore explained that he had been using heroin on a regular basis since 1946. He stated, and the Government stipulated,[8] that at the time of his arrest he was addicted to heroin. Indeed, in the weeks immediately preceding January 29, 1970, his addiction ranged from 50 to 70 capsules a day, usually at a price of a dollar per capsule. Moore did not live at the Warren Hotel, but lived with his wife about three blocks away. He testified further that he had never put heroin into capsules himself, and that the sole reason he was in Room 15 on the night in question was to purchase the 50 capsules found in his

---

alleged that he received, concealed and facilitated concealment of the heroin in his pocket in violation of 21 U.S.C. § 174.

5. 26 U.S.C. § 4704(a) :
 "It shall be unlawful for any person to purchase, sell, dispense, or distribute narcotic drugs except in the original stamped package or from the original stamped package; and the absence of appropriate taxpaid stamps from narcotic drugs shall be prim[a] facie evidence of a violation of this subsection by the person in whose possession the same may be found."
 The Harrison Narcotics Act has since been repealed by the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801 *et seq.* (1970).

6. 21 U.S.C. § 174 :
 "Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000. For a second or subsequent offense (as determined under section 7237(c) of the Internal Revenue Code of 1954), the offender shall be imprisoned not less than ten or more than forty years and, in addition, may be fined not more than $20,000.
 "Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."
 The Jones-Miller Act has since been repealed by the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801 *et seq.* (1970).

7. Appellant moved also to suppress the evidence obtained at the Warren Hotel, alleging insufficient probable cause for, and insufficient particularity and improper execution of, the search warrant pursuant to which he was arrested. The court denied this motion without elaboration of its reasons (Tr. 81), and appellant has elected not to pursue this issue on appeal. In addition, appellant asked the trial court to commit him for treatment under Title I of the Narcotic Addict Rehabilitation Act of 1966, 28 U.S.C. §§ 2901–2906 (1970). Appellant argued that his two prior felony convictions should not disqualify him, since this court in *Watson* had declared unconstitutional a similar exclusionary rule under Title II of NARA. The court denied appellant's request (Tr. 89), and this ruling is not assigned as error. Finally, appellant does not dispute the adverse rulings on his motions for production of the grand jury minutes and for disclosure of the identity of the informant who led Officers Daly and Larman to the Warren Hotel. (M. Tr. 3–4; Tr. 89–91.)

8. There is some confusion as to precisely what the Government intended when it stipulated that Moore was an addict. At the hearing on Oct. 21, 1970, Government counsel clearly stipulated, without qualification, to the element of addiction. (M. Tr. 15.) On Feb. 22, 1971, however, the Government backtracked, stating, "We are willing to stipulate addiction insofar as addiction represents the taking of a quantity of narcotics over a period of years." (Tr. 122.) *See* Brief for Appellee at 6–7 n. 12.

pocket for his own use. He had come to the room about 10 or 15 minutes before the police arrived, and was admitted by a man known only as "J. B.," who sold him the 50 capsules for $30. He intended to use them at home that night and the next morning before going to work. After completing the transaction, "J. B." left the room and asked Moore to wait until he returned. After being placed under arrest, Moore told the police, as Officer Daly testified, "If you wait a while, the big man is coming." The officers, however, apparently declined the invitation. (M. Tr. 27–44, 59; Tr. 73–76.)

Relying upon this court's decision in *Watson*, appellant argued that he was simply a non-trafficking addict possessor and that the court should therefore dismiss the indictment either on the ground that the statutes under which he was charged did not apply to him or, if they did apply, that such application would inflict cruel and unusual punishment in violation of the Eighth Amendment. The Government's response was twofold. First, the prosecution argued that this court's discussion of the addiction defense in *Watson* was mere dicta and not binding upon the trial judge. Second, it contended that in any event Moore was not a non-trafficking addict. Most of the Government's evidence was devoted to this point.

Officer Daly, after qualifying as an expert in the conduct of narcotic addicts and traffickers, explained that the purpose of the materials found on the bed, including the mirror, the record album cover, the stocking stretched over the wire coat hanger, the "loose" heroin, and the empty gelatin capsules, was to prepare the heroin for sale through the process known as cutting and capping. (M. Tr. 45–49, 51–53.) It was clear that a trafficking operation was in progress, but the question remained whether Moore was the buyer or the seller. On this point, Daly was less helpful. When questioned by counsel for appellant, Daly admitted that he had no knowledge of Moore as a trafficker

prior to the arrest. The informant had never mentioned appellant's name as a seller in the Warren Hotel, and the officer did not see him at the hotel on previous nights during the course of the investigation. Moreover, counsel for the Government stipulated that, although Moore had been an addict for some 25 years, the Metropolitan Police Department had no knowledge of him as a trafficker. (M. Tr. 71; Tr. 9, 49–50, 53.)

There was also a question as to whether Moore intended to sell, rather than use, the 50 capsules found in his pocket. Officer Daly testified that since most addicts are "street wise," they normally carry only a small number of capsules at any one time in order to avoid a felony charge (rather than a misdemeanor) if arrested and to avoid being robbed by other addicts. Although Daly had never encountered an addict possessing drugs for his own use who carried more than 15 capsules, he admitted that some non-selling addicts might do so. Moreover, counsel for the Government stipulated that some addicts have habits in excess of 50 capsules per day and that some will buy an entire day's supply at one time and carry this supply with them immediately after the purchase. (M. Tr. 54–56; Tr. 49, 52, 54, 57–59.)

At the conclusion of this testimony, the court denied appellant's motion to dismiss. The basis of this ruling was unclear, however, for the court refused to specify whether it accepted the Government's position that despite *Watson* a defense of "addiction" is never available or, on the other hand, whether such defense does exist but that the evidence of trafficking in this case was such that appellant could not be found, at least as a matter of law, to be a non-trafficking addict possessor. (Tr. 83–84, 110–111.) Thus when the trial opened the court still had not ruled on whether evidence of addiction could be introduced by the defense. It deferred its decision on this question until it could hear the testimony of Dr. Harold Kaufman, a psychiatric witness for the defense, out of the presence of the jury prior to the start of the

Government's case. Since Dr. Kaufman was not available at this time, however, the court decided to proceed with the trial. (Tr. 121, 123–125.)

As at the pretrial proceedings, Officer Daly was the principal prosecution witness.[9] In large part, Daly merely reiterated what he had said earlier when testifying on the motion to dismiss. Thus he again described the events of the night in question and explained that the paraphernalia found on the bed ordinarily is used to cut and cap heroin for sale. (Tr. 135–145.) With regard to appellant Moore's relationship to the heroin on the bed, Officer Daly testified that both Moore and Beverly had put on coats before leaving the room, but he was not certain whether they had taken them from the closet (Tr. 141, 234); that the informant had not mentioned appellant as a trafficker in the Warren Hotel (Tr. 157–158); that he had no prior knowledge of Moore as a trafficker (Tr. 153); that when he entered the room appellant had nothing in his hands (Tr. 233); that no tests were run to determine whether there were traces of heroin powder on appellant's hands (Tr. 233); that no tests were run to determine whether appellant's fingerprints were on the paraphernalia found on the bed (Tr. 152); and finally, that he had not checked the hotel register and, indeed, had "no idea" whether Moore was in any way connected with Room 15 (Tr. 151, 224–225).

Officer Daley testified further that since most addicts are "street wise" they rarely carry more than 20 capsules at one time. On cross-examination, however, Daly admitted that some addicts he was "aware of" had habits of 50 to 100 capsules per day, and that it was possible for such addicts to carry a full day's supply. Moreover, the defense also elicited Officer Daly's opinion that appellant was addicted to heroin—at least insofar as he was a repeated user of the drug. (Tr. 146–148, 166–169, 235–236.)

During the course of the Government's presentation, the court heard the testimony of Dr. Kaufman out of the presence of the jury.[10] The doctor indicated that he had examined appellant on several occasions for periods ranging from ten minutes to two or three hours in duration. He had also examined Moore's St. Elizabeths file, the police report in this case, and other materials relating to appellant's background. (Tr. 194–195.) On the basis of this information, Dr. Kaufman concluded that appellant clearly was an addict within the meaning of the World Health Organization definition of addiction.[11] Indeed, Moore's addiction was a classic illustration of the five basic components of the disease: (1) an overwhelming desire to use the drug; (2) chronic return to such use; (3) physiological dependence as evidenced by the withdrawal syndrome; (4) psychological dependence; and (5) the phenomenon of tolerance. (Tr. 199–201.)

Dr. Kaufman explained that appellant had been an addict for over 25 years. (Tr. 196.) No matter what reason Moore may have had originally to begin taking drugs, as "he progressed in his addiction his controls deteriorated * * * and he felt helpless in the face of his drug addiction." (Tr. 197.) Gradually, the need to take drugs "begins to have an autonomous characteristic and * * * becomes a disease entity in itself * * *." (Tr. 202.) As an "old" addict, he is not so much "after

9. There was also testimony by a chemist, who explained that the two piles of loose heroin on the bed contained 1,824 milligrams and 1,854.5 milligrams, respectively; the 67 capsules contained 3,650 milligrams; and the 50 capsules in appellant's pocket contained a total of 2,274.9 milligrams of mixed heroin. See note 3 supra. Officer Larman also testified as to the events of the night in question. His testimony was consistent with that of Officer Daly. (Tr. 248–250.)

10. Dr. Kaufman's eminent qualifications were stipulated by the prosecution. (Tr. 190–194).

11. See text at note 131 infra.

the kick but the experience of taking drugs has become so much of the ingrained part of his life that he is completely bound up in getting, seeking out drugs, hustling to get them, and having no other reason for living. He is disgusted with himself and feels he is a failure * * *." (Tr. 197–198.) For appellant Moore, "there is only one solution to all problems, that is, a drug solution." (Tr. 203.) As a result, Moore "is helpless to exert any voluntary control over this compulsion * * *." (Tr. 197.) He "would be forced to obtain drugs and since the drugs have to be someplace * * * he would have to be there, he would be compelled to be because of the nature of his illness." (Tr. 203.)

At the conclusion of this testimony, the court ruled that Dr. Kaufman would not be permitted to testify before the jury, apparently on the ground that addiction can never constitute a defense.[12] (Tr. 206–214.) Later, after the Government had resumed its case and then rested, the court denied appellant's motion for judgment of acquittal. (Tr. 253.) Appellant then renewed his motion to dismiss the indictment on the basis of *Watson*. This time, the court denied the motion simply because there was sufficient evidence of trafficking "to go to the jury," and added that it had reconsidered its earlier ruling and would now permit Dr. Kaufman to testify. (Tr. 267–269.) When the trial resumed the following day, however, the court reverted to its earlier position, ruling once again that Dr. Kaufman's testimony was inadmissible and that the defense of addiction was unavailable. (Tr. 287.)

Thus, with the case in this posture, the defense decided not to introduce any further evidence. Before resting, however, counsel for the defense, in order to complete the record, proffered the testimony of Mr. McKinley Gore of the District of Columbia Narcotics Treatment Administration.[13] The proffer, pursuant to the court's invitation, was to the effect that some addicts have habits in excess of 50 capsules per day and that such addicts may have more than 50 capsules in their possession at one time. Mr. Gore would also have testified that appellant Moore had been enrolled in the NTA methadone program since December 9, 1970, and that he had consistently been on methadone since that time. His chances for rehabilitation were good, and Moore was beginning to get at the root of his addiction problem. He had been increasing his methadone intake, and in the near future would no longer need heroin at all. (Tr. 289–291.)

Following this proffer, the court refused to instruct the jury that a non-trafficking addict could not be convicted under the statutes under which appellant was charged. (Tr. 287, 292–294.) Moore was then found guilty on all four counts of the indictment. Acting upon a motion made by appellant immediately after the verdict was announced, the court committed him to the Federal Correctional Institution at Danbury, Connecticut, for determination of his suitability for treatment under Title II of the Narcotics Addict Rehabilitation Act of 1966, 18 U.S.C. § 4251 *et seq.* (1970). On April 13, 1971, the NARA staff reported that appellant was an addict, both physically and psychologically dependent on heroin, but was not a suitable candidate for treatment. Thus on June 14, 1971, the court sentenced appellant to concurrent terms of two to six years for the violations of 26 U.S.C. § 4704(a) and six years for the violations of 21 U.S.C. § 174.

---

12. The court suggested, however, that it would permit Dr. Kaufman to testify on the issue of insanity. (Tr. 206–214, 218.) The defense rejected this alternative, since Dr. Kaufman felt that appellant's addiction did not constitute a mental disease or defect. (Tr. 206).

13. In addition, counsel for appellant referred the court to the prior testimony of appellant Moore on the motion to dismiss. (Tr. 288.)

## II. HISTORICAL PERSPECTIVE

The contemporary problem of drug abuse is both complex and far-reaching, touching upon our fundamental conceptions of public health, commerce and morality. Yet the origins of the problem are quite ancient, for since prehistoric times man has engaged his energies in a relentless search for new drugs to make life more pleasurable and, at the same time, to alleviate the discomforts which inevitably accompany human existence.[14] Throughout this quest, the use of drugs has been associated with a diversity of medical, religious, literary, criminal and cultural patterns and has, in recent times, often reflected the technical and scientific advances in medicine and pharmacology.[15] Thus our current problem is but a reflection of all that has gone before, and it can be understood clearly only when placed in historical perspective.

Although the precise origin of the use of opium is forever lost to the past, we now know that the people of lower Mesopotamia, in the ancient kingdom of Sumeria, discovered the somniferous characteristics of the poppy plant (Papaver Somniferum) as early as 7000 B.C.[16] The Sumerians cultivated the plant in order to extract a juice which they called "gil"—meaning "joy" or "rejoicing"[17]—and which was used primarily for religious purposes.[18] The medicinal properties of "gil"—or "opium" as it later came to be known—were recognized in Persia and Egypt about 1550 B.C. and spread thereafter throughout the Greek and Roman world.[19] The writings of Homer and Virgil refer frequently to the "sleep-bringing poppy," and other sources indicate that Hippocrates recommended the use of opium in the treatment of numerous diseases.[20]

The first incidence of widespread opiate abuse occurred in India when Brahmin priests forbade consumption of alcohol and the citizenry, rather than fight the ban, switched to opium smoking as an alternative.[21] China received its initial exposure to opium from Arab traders in the tenth century A.D.[22] The therapeutic virtues of the drug were soon recognized by Chinese doctors, and it was used medicinally for centuries before the practice of recreational opium smoking made its appearance in the 16th century.[23] Due largely to the efforts of European commercial interests,[24] the

14. *See, e. g.*, D. Maurer & V. Vogel, Narcotics and Narcotics Addiction 4 (3d ed. 1967) ; Chapman, Drug Addiction : The General Problem, 20 Fed.Prob. 39, 40 (Sept. 1956).

15. *See, e. g.*, Ball, Two Patterns of Narcotic Drug Addiction in the United States, 56 J.Crim.L., C. & P.S. 203 (1965).

16. *See, e. g.*, B. Dai, Opium Addiction in Chicago 27–28 (1970) ; D. Maurer & V. Vogel, *supra* note 14, at 5 ; Bell, Drug Addiction, 1971 Drug Abuse L.Rev. 1 ; Eddy, The History of the Development of Narcotics, 22 Law & Contemp.Prob. 3 (1957).

17. *See, e. g.*, A. Lindesmith, Addiction and Opiates 207–208 (1968) ; T. Brown, The Enigma of Drug Addiction 6 (1961).

18. *See, e. g.*, D. Maurer & V. Vogel, *supra* note 14, at 4 ; Bell, *supra* note 16, at 1.

19. *See, e. g.*, T. Brown, *supra* note 17, at 6 ; A. Lindesmith, *supra* note 17, at 208 ; B. Dai, *supra* note 16, at 27–33.

20. *See, e. g.*, C. Terry & M. Pellens, The Opium Problem 53–59 (1928) ; Chapman, *supra* note 14, at 40.

21. *See, e. g.*, T. Brown, *supra* note 17, at 6 ; H.Rep. No. 91–1808, 91st Cong., 2d Sess., 3 (1970).

22. *See, e. g.*, A. Lindesmith, *supra* note 17, at 208 ; W. Eldridge, Narcotics and the Law 3 (1962) ; Chapman, *supra* note 14, at 40 ; H.Rep. No. 91–1808, 91st Cong., 2d Sess., 3 (1970).

23. *See, e. g.*, A. Lindesmith, The Addict and the Law 189 (1965) (hereinafter cited as The Addict and the Law).

24. The Portuguese took over the lucrative opium trade from the Arab and Indian merchants, but were themselves displaced by the Dutch and, later, the British. *See, e. g.*, The Addict and the Law, *supra* note 23, at 194 ; W. Eldridge, *supra* note 22, at 3 ; Chapman, *supra* note 14, at 40.

level of opium smoking in China swelled rapidly to crisis proportions, and in 1729 the Emperor issued an edict forbidding all traffic in opium.[25] It is interesting to note that, although this edict decreed death by strangulation for all retailers of the drug, non-trafficking users were exempt from punishment. Throughout the 18th and 19th centuries China sought desperately to close its ports to the opium trade, but the British East India Company, which by then had obtained a virtual monopoly, refused to cooperate. This conflict led eventually to the Opium Wars of 1839–42 and 1856, when the trade was finally legalized.[26]

Opium was used enthusiastically by the medical profession in the American colonies throughout the 18th century.[27] Then, in the first decade of the 19th century, the curiosity of William Sertürner, a German chemist, brought about the separation and recognition of the first of the opiate alkaloids.[28] Sertürner aptly named the agent morphine, after Morpheus, the god of dreams.[29] Although the new drug was considerably more potent than crude opium, physicians were at first somewhat reluctant to adopt its use.[30] During the 1820's, however, a rapidly increasing number of persons turned to morphine for its non-medical characteristics.[31]

At the same time, the publication of Thomas DeQuincy's *Confessions of an English Opium Eater* in 1821 had a far-reaching effect in stimulating its readers—primarily respectable persons of the American upper class—to experiment with opiates. Most of DeQuincy's disciples consumed the drug orally, generally in liquid form known as "Laudanum" (tincture of opium), or sometimes as gum or powder.[32] Although opiate indulgence gradually became more common during this era, it did not yet present a problem of serious proportions.

The turning point, however, came with the invention of the hypodermic syringe in the 1840's. This discovery, which facilitated intravenous administration of drugs so as to achieve a heightened effect, gave added impetus to both medical and non-medical uses of morphine.[33] As a result, the Civil War, with its wholesale carnage and poor medical facilities on the field of battle, caused the first large-scale morphine addiction problem in the United States. The Army's reliance on morphine as a pain-killer became so widespread that morphine addiction during this period came to be known as the "Soldier's Disease."[34] Indeed, one of the more unfortunate consequences of the war was

25. *See, e. g.,* The Addict and the Law, *supra* note 23, at 194; Blum, Mind-Altering Drugs and Dangerous Behavior: Narcotics, in The President's Commission on Law Enforcement and the Administration of Justice, Task Force Report: Narcotics and Drug Abuse 40, 41 (1967) (hereinafter cited as Task Force).

26. *See, e. g.,* W. Eldridge, *supra* note 22, at 3; The Addict and the Law, *supra* note 23, at 194; H.Rep. No. 91–1808, 91st Cong., 2d Sess., 4 (1970).

27. *See, e. g.,* D. Maurer & V. Vogel, *supra* note 14, at 5; Chapman, *supra* note 14, at 40.

28. *See, e. g.,* The Addict and the Law, *supra* note 23, at XI; Eddy, *supra* note 16, at 3–4; Bucaro & Cazalas, Methadone: Treatment and Control of Narcotic Addiction, 44 Tulane L.Rev. 14, 16 (1969).

29. *See, e. g.,* Lang, The President's Crime Commission Task Force Report on Narcotics and Drug Abuse: A Critique of the Apologia, 1971 Drug Abuse L. Rev. 449, 453.

30. *See, e. g.,* Eddy, *supra* note 16, at 4.

31. *See, e. g.,* A. Lindesmith, *supra* note 17, at 209; B. Dai, *supra* note 16, at 34.

32. *See, e. g.,* A. Lindesmith, *supra* note 17, at 209; B. Dai, *supra* note 16, at 35; T. Brown, *supra* note 17, at 6–7.

33. *See, e. g.,* W. Eldridge, *supra* note 22, at 4; B. Dai, *supra* note 16, at 35; Chapman, *supra* note 14, at 40; Ball, *supra* note 15, at 203; Bucaro & Cazalas, *supra* note 28, at 16.

34. *See, e. g.,* D. Maurer & V. Vogel, *supra* note 14, at 6; W. Eldridge, *supra* note 22, at 5; Lang, *supra* note 29, at 453; King, Narcotic Drug Laws and Enforcement Policies, 22 Law & Contemp.Prob. 113 (1957).

the creation of a large class of ex-soldier addicts, and estimates of addiction in the postwar years ran as high as four per cent of the population.[35]

As the effects of this morphine epidemic gradually began to subside, a new element was injected into the American drug scene by the large numbers of Chinese immigrants who entered this country to work on the great canal and railroad projects of the mid-19th century.[36] The practice of opium smoking, which previously had been unknown to Americans, soon became somewhat of a vogue among the demimonde of San Francisco and spread rapidly thereafter throughout the nation.[37] Initially, this practice was limited primarily to the upper strata of society and, unlike the opium eaters and morphine addicts who generally were viewed as victims of an unfortunate vice, opium smokers typically were considered rather "sporting characters."[38] Gradually, however, the practice filtered down to the underworld, and the considerable notoriety which attached to this development caused the first stirrings of what was eventually to become a pivotal shift in public attitudes toward addiction. For the first time, a link was perceived between drug abuse and criminality.[39]

The next major development began in 1898 when Dresser, a German scientist, devised a method to modify morphine into a new alkaloid derivative of opium —diacetylmorphine, commonly referred to as heroin.[40] Initially, the basic characteristics of this new drug were completely misunderstood. Since heroin appeared to relieve the symptoms of morphine withdrawal, it was hailed as a cure for morphine addiction, and heroin was rapidly substituted for morphine in cough medicines and tonics. Many writers extolled the pain-killing qualities of the drug while assuring readers that it was free of addiction liability.[41] The naive myth that heroin could cure morphine addiction exploded soon after 1900, when it was finally realized that heroin itself possessed an even greater addiction potential than morphine.[42] But despite the urgent, if somewhat belated, warnings of the medical profession, heroin had gained a foothold and was here to stay.

Perhaps the most unfortunate chapter in the early history of American drug abuse involved the vicious practices of the patent medicine business of the late 19th and early 20th centuries. These general curatives, which often contained a potent concentration of some narcotic, were sold without restraint over the counters of pharmacies and were used indiscriminately to treat everything from simple headache to angina pectoris.[43] Through such wonder-work-

35. *See, e. g.,* M. Nyswander, The Drug Addict As a Patient 2 (1956).

36. *See, e. g.,* W. Eldridge, *supra* note 22, at 4; C. Terry & M. Pellens, *supra* note 20, at 72; A. Lindesmith, *supra* note 17, at 214; H.Rep. No. 91–1808, 91st Cong., 2d Sess., 5 (1970).

37. *See, e. g.,* W. Eldridge, *supra* note 22, at 4; C. Terry & M. Pellens, *supra* note 20, at 72; Ball, *supra* note 15, at 203.

38. *See, e. g.,* A. Lindesmith, *supra* note 17, at 312; *see generally* H. Kane, The Opium Smoker in America and China (1882).

39. *See, e. g.,* W. Eldridge, *supra* note 22, at 9–10; A. Lindesmith, *supra* note 17, at 213.

40. *See, e. g.,* The Addict and the Law, *supra* note 23, at XI; Bucaro & Cazalas, *supra* note 28, at 16; Ball, *supra* note 15, at 203; Chapel & Taylor, Drugs for Kicks, 1971 Drug Abuse L.Rev. 31, 52; Lang, *supra* note 29, at 453.

41. *See, e. g.,* M. Nyswander, *supra* note 35, at 2; C. Terry & M. Pellens, *supra* note 20, at 77–78; Eddy, *supra* note 16, at 4; Bucaro & Cazalas, *supra* note 28, at 16.

42. *See, e. g.,* W. Eldridge, *supra* note 22, at 6–7; H.Rep.No.91–1808, 91st Cong., 2d Sess., 5 (1970).

43. *See, e. g.,* M. Nyswander, *supra* note 35, at 2; Chapman, *supra* note 14, at 41; Clausen, Social and Psychological Factors in Narcotics Addiction, 22 Law & Contemp.Prob. 34, 39 (1957); Lang, *supra* note 29, at 453.

ing medicants as Mrs. Winslow's Soothing Syrup, Dr. Cole's Catarrh Cure and Perkins' Diarrhea Mixture, opium, morphine, codeine and cocaine were spooned regularly into children as well as adults. And although these potions usually relieved the symptoms for which they were taken, they also caused physical dependence in the user.[44] As the public grew concerned over their "drug habits," the patent medicine manufacturers readily responded with more nostrums offered as cures for addiction. Yet most of these "cures" were in reality preparations containing a different opiate, so that the user merely substituted one drug for another, with the result that his addiction frequently was intensified.[45]

With the confluence of these separate, yet clearly related, facets of the narcotics problem, the incidence of addiction reached crisis proportions by the early years of the 20th century.[46] Estimates as to the number of addicts ranged as high as two million,[47] although more reliable authorities placed the figure at somewhere between 100,000 and 200,000.[48] It is important to note, however, that the problem as it then existed was quite different from that facing our nation today.[49] With only limited exceptions,[50] these drugs were cheap, legal, and readily available to anyone desirous of their use,[51] and the "pusher" of pre-World War I society more often than not was the local pharmacist, grocer or confectioner.[52]

Moreover, addiction was not confined to any particular social class; it affected most segments of society to some extent, although the disease was most

44. *See, e. g.*, A. Lindesmith, *supra* note 17, at 210; M. Nyswander, *supra* note 35, at 2; W. Eldridge, *supra* note 22, at 5.

45. *See, e. g.*, W. Eldridge, *supra* note 22, at 5; Eddy, *supra* note 16, at 3.

46. In urging adoption of what eventually was to become the Harrison Act of 1914, the authors of the House Report noted that "[w]e are an opium-consuming nation to-day." H.Rep.No.23, 63rd Cong., 1st Sess., 2 (1913); *accord,* S.Rep.No. 258, 63rd Cong., 2d Sess., 4 (1914).

47. *See, e. g.*, W. Eldridge, *supra* note 22, at 7 n. 7; Hynson, Report of the Committee on Acquirement of the Drug Habit, 74 A.J.Pharm. 547 (Nov.1902).

48. *See, e. g.*, Lang, *supra* note 29, at 453; Bucaro & Cazalas, *supra* note 28, at 17; Finestone, Narcotics and Criminality, 22 Law & Contemp.Prob. 69, 79 (1957); Note, The Narcotics Problem: Outlook for Reform, 12 Buffalo L.Rev. 605, 606 (1963); H.Rep.No.91–1808, 91st Cong., 2d Sess., 5 (1970).

49. For a discussion of the problem as it exists today, *see* text and notes at notes 105–128 *infra*.

50. The only narcotic drug regulated by the federal government in the 19th century was opium in a form suitable for smoking. In 1866, the drug was subjected to a prohibitively high duty, making it virtually impossible to obtain the drug for smoking purposes through legal importation. *See* C. Terry & M. Pellens,

*supra* note 20, at 536–539; King, *supra* note 34, at 116. Domestic manufacture of the drug was taxed after 1890, Act of Oct. 1, 1890, c. 1244, §§ 36, 38, 26 Stat. 620, 621 (repealed 1970); and its importation was prohibited entirely by the Jones-Miller Act of 1909, Act of Feb. 9, 1909, c. 100, § 2, 35 Stat. 614 (repealed 1970).

In the Food and Drugs Act of 1906, Act of June 30, 1906, c. 3915, §§ 1–11, 34 Stat. 768–772 (repealed 1938), Congress attempted to regulate the sale of adulterated or misbranded foods or drugs, including the patent medicines discussed earlier. State regulation in this era was minimal, and that which did exist was largely ineffective. *See* H.Rep.No.23, 63rd Cong., 1st Sess., 1, 3 (1913); S. Rep.No.258, 63rd Cong., 2d Sess., 3, 4 (1914).

51. *See, e. g.*, A. Lindesmith, *supra* note 17, at 210; King, *supra* note 34, at 116; Ploscowe, Some Basic Problems in Drug Addiction and Suggestions for Research, in Joint Committee of the American Bar Association and the American Medical Association on Narcotic Drugs, Drug Addiction: Crime or Disease? 15, 69 (1961) (hereinafter cited as Joint Committee); H.Rep.No.23, 63rd Cong., 1st Sess., 2 (1913); S.Rep.No.258, 63rd Cong., 2d Sess., 3 (1914).

52. *See, e. g.*, D. Maurer & V. Vogel, *supra* note 14, at 7; A. Lindesmith, *supra* note 17, at 210; King, *supra* note 34, at 113.

prominent among middle-aged southern whites and members of the upper class.[53] The drug addict of that era generally had little or no involvement with criminal activity, and frequently was able to lead his life in a normal fashion.[54] Those addicts who wished to avail themselves of medical care could apply to any member of the medical profession for treatment, including gradual withdrawal or even a "permanent comfort" regime.[55] Although the habit certainly was not approved, neither was it regarded as criminal. Typically, addiction was viewed as an illness or personal misfortune—much as alcoholism is today.[56]

As the ranks of the addicted continued to swell, however, the public gradually grew alarmed and the need for effective federal regulations to eliminate the indiscriminate sale and distribution of these drugs became apparent. Against this backdrop, the United States participated in the Hague Opium Convention of 1912 for the purpose of establishing international controls on production, sale and use of opium and coca products.[57] To fulfill our obligations under this agreement, the Harrison Narcotics Act was adopted in 1914.[58] Although formulated as a revenue measure,[59] the Act was intended to bring domestic traffic in narcotics into the open under a federally sponsored licensing system so that the sloppy dispensing practices of the day could be checked. Thus, with certain exceptions, it was made unlawful for any person to produce, import, manufacture, compound, deal in, dispense, sell, distribute or give away any derivative of opium or cocaine unless he had registered, paid the required taxes, and maintained careful records of his transactions. Although possession was not itself made criminal, it was to be treated as *prima facie* evidence of the proscribed acts. In neither the language of the statute nor its legislative history is there any indication that Congress intended specifically to punish addicts who possessed the drug solely for personal use.[60] Indeed, such an intent would have been quite surprising given the general regulatory nature of the Act and the prevailing mores of the time. Thus when the Supreme Court first had occasion to interpret the "possession" provisions in Unit-

53. *See, e. g.*, Lang, *supra* note 29, at 454; Note, *supra* note 48, at 607; H.Rep.No. 23, 63rd Cong., 1st Sess., 2 (1913); S. Rep.No.258, 63rd Cong., 2d Sess., 4 (1914). It is noteworthy that approximately 60% of all addicts at that time were women. *See, e. g.*, A. Lindesmith, *supra* note 17, at 210; Lang, *supra* note 29, at 453.

54. *See, e. g.*, M. Nyswander, *supra* note 35, at 4. *See also* note 157 *infra*.

55. *See, e. g.*, King, *supra* note 34, at 116; Note, *supra* note 48, at 606; Ploscowe, *supra* note 51, at 69.

56. *See, e. g.*, American Bar Association Special Committee on Crime Prevention and Control, New Perspectives on Urban Crime 34 (1972) (hereinafter cited as Special Committee); D. Maurer & V. Vogel, *supra* note 14, at 7; M. Nyswander, *supra* note 35, at 4; A. Lindesmith, *supra* note 17, at 211; King, *supra* note 34, at 116.

57. "Suppression of the Abuse of Opium and Other Drugs Convention and Final Protocol Between the United States and Other Powers," Jan. 23, 1912 and July 9, 1913, 38 Stat. 1912 (1912).

58. Act of Dec. 17, 1914, c. 1, § 1, 38 Stat. 785 (repealed 1970). The constitutionality of the Act was upheld in United States v. Doremus, 249 U.S. 86, 39 S.Ct. 214, 63 L.Ed. 493 (1919).

59. Unlike the Jones-Miller Act of 1909, which was founded on the Commerce Clause, the Harrison Act was enacted as a taxing measure because of fears that the statute would be deemed unconstitutional if premised on the commerce power. *See, e. g.*, Watson v. United States, *supra* note 1, 141 U.S.App. D.C. at 345 n. 9, 439 F.2d at 452 n. 9.

60. *See, e. g.*, H.Rep.No.23, 63rd Cong., 1st Sess. (1913); S.Rep.No.258, 63rd Cong., 2d Sess. (1914); H.Rep.No.1196, 63rd Cong., 2d Sess. (1914). *Cf.* A. Lindesmith, *supra* note 17, at 217; King, *supra* note 34, at 118; King, The Narcotics Bureau and the Harrison Act: Jailing the Healers and the Sick, 62 Yale L.J. 736, 737 (1953) (hereinafter cited as Jailing the Healers and the Sick).

ed States v. Jin Fuey Moy, 241 U.S. 394, 36 S.Ct. 658, 60 L.Ed. 1061 (1916), it held that mere possession of a small amount of narcotics for personal use did not trigger the statutory presumption of illegality.

In the years immediately following passage of the Act, however, the main concern was not whether addicts could be punished for possession but, rather, whether the statute in any way affected the right of physicians to prescribe and administer narcotic drugs in order to treat their addict patients. As previously noted,[61] prior to 1914 addiction was viewed primarily as a medical problem, and addicts could and often did receive help from members of that profession.[62] Based on the legislative history of the statute, there was no reason to suspect that Congress intended to alter this situation.[63] Indeed, the Act specifically provided that "[n]othing contained in this section shall apply: (a) to the dispensing or distribution of any of the aforesaid drugs to a patient by a physician * * * in the course of his professional practice only."[64] Other portions of the statute qualified this exemption, however, by requiring that the treatment be in the "legitimate practice of his profession"[65] and in "good faith."[66]

Although the Act did not define these terms with precision, most doctors reasonably believed they could continue to prescribe these drugs to addicts in order to effect gradual withdrawal or simply to sustain them in their condition.[67] Thus as the thousands of addicts who previously had obtained their supplies from local grocers and pharmacists suddenly found these sources extinguished, they turned in desperation to the medical profession for help. The profession responded willingly, and by 1919 most addicts were under the direct care and supervision of physicians.[68] At the same time, free morphine clinics were opened in more than 40 cities in an effort to treat and control the disease.[69] And although some of these clinics apparently were subject to abuse, the medical profession generally had taken the first meaningful steps toward controlling the problem of addiction.[70]

Unfortunately, however, this situation was short-lived. Due largely to the efforts of the Federal Bureau of Narcotics, within a decade after passage of the Act the medical profession had been driven permanently from the treatment of addicts. This result was achieved primarily through a series of court decisions interpreting the terms "legitimate practice" and "good faith" as used in

---

61. See text at note 55 supra.

62. See, e. g., M. Nyswander, supra note 35, at 4; D. Maurer & V. Vogel, supra note 14, at 7; Ploscowe, supra note 51, at 69; Jailing the Healers and the Sick, supra note 60, at 737; King, supra note 34, at 116; Note, supra note 48, at 606.

63. See, e. g., H.Rep.No.23, 63rd Cong., 1st Sess. (1913); S.Rep.No.258, 63rd Cong., 2d Sess. (1914); H.Rep.No.1196, 63rd Cong., 2d Sess. (1914); The Addict and the Law, supra note 23, at 3–4; A. Lindesmith, supra note 17, at 217; King, supra note 34, at 118; Jailing the Healers and the Sick, supra note 60, at 737.

64. 38 Stat. 786 (1914).

65. 38 Stat. 789 (1914).

66. 38 Stat. 789 (1914).

67. See, e. g., M. Nyswander, supra note 35, at 4; Jailing the Healers and the Sick, supra note 60, at 739; Cantor, The Criminal Law and the Narcotics Problem, 51 J.Crim.L., C. & P.S. 512 (1961); Note, supra note 48, at 608.

68. Although the figure may be somewhat inflated, it was reported that as of 1919 approximately 240,000 addicts were being treated for their addiction by physicians. See, e. g., C. Terry & M. Pellens, supra note 20, at 31; King, supra note 34, at 118 n. 44.

69. See, e. g., The Addict and the Law, supra note 23, at 136; M. Nyswander, supra note 35, at 6–8; C. Terry & M. Pellens, supra note 20, at 90–91; H.Rep. No.91–1808, 91st Cong., 2d Sess., 7 (1970).

70. For an excellent discussion of these clinics, see The Addict and the Law, supra note 23, at 135–161.

the Act. In the first of these cases, Webb v. United States, 249 U.S. 96, 39 S.Ct. 217, 63 L.Ed. 497 (1919), the Supreme Court held that the medical exemption was unavailable to a doctor who had sold drugs and prescriptions indiscriminately to addicts with no view toward treatment. A similar result was reached in Jin Fuey Moy v. United States, 254 U.S. 189, 41 S.Ct. 98, 65 L. Ed. 214 (1920), in which the Court upheld the conviction of a doctor who had issued prescriptions for morphine "to persons not his patients and not previously known to him * * * for the mere purposes * * * of enabling such persons to continue the use of the drug, or to sell it to others * * *." *Id.* at 193, 41 S.Ct. at 100. Neither of these decisions was particularly surprising, however, since it was clear in both that the defendants had acted neither in "good faith" nor in the "legitimate practice of [their] profession."

The clincher, however, came some two years later in United States v. Behrman, 258 U.S. 280, 42 S.Ct. 303, 66 L.Ed. 619 (1922). Dr. Behrman, like Webb and Jin Fuey Moy before him, had flagrantly abused his rights as a physician by indiscriminate prescription of large quantities of morphine. But in Dr. Behrman's case, the indictment was drawn so as to exclude the statutory elements of "good faith" and "legitimate practice." Over a prophetic dissent by Mr. Justice Holmes, joined by Mr. Justices Brandeis and McReynolds, the Court affirmed the conviction, apparently construing the statute as proscribing *per se* administration of drugs to an addict, regardless of the doctor's purpose or intent.

The inevitable followed. Armed with the broad language of *Behrman,* agents of the Bureau of Narcotics launched what has aptly been termed a "reign of terror" against the medical profession's treatment of addiction.[71] Even those doctors who prescribed these drugs in good faith as part of their therapeutic treatment of the disease were subjected to prosecution, and the clinics which had opened so hopefully only a few years before were abruptly shut down.[72] Within the short span of three years the medical profession was "bullied into submission" and was forced to extricate itself almost entirely from the treatment of addicts.[73]

One of the doctors prosecuted during this era, however, Dr. Charles O. Linder, refused to be bullied. Unlike the defendants in the prior Supreme Court cases, Dr. Linder had dispensed only four tablets of drugs to a single addict. The addict, an informer, had come to his office in a state of partial withdrawal, and he provided her with the tablets to be used at her discretion. Since the drugs were prescribed solely to relieve withdrawal distress and to maintain the addict's customary usage, without any thought of rehabilitation, Linder was convicted on the authority of *Behrman* even though he had acted in good faith and according to legitimate professional standards.

When the case reached the Supreme Court in 1925, however, the conviction was emphatically reversed. In a unanimous opinion, the basis for the Court's decision was made resoundingly clear:

"* * * [The Act] says nothing of 'addicts' and does not undertake to prescribe methods for their medical

71. *See, e. g.,* M. Hentoff, A Doctor Among the Addicts 33 (1968); Bucaro & Cazalas, *supra* note 28, at 21; King, *supra* note 34, at 122; Note, *supra* note 48, at 608. *See also* Simmons v. United States, 6 Cir., 300 F. 321 (1924); Hobart v. United States, 6 Cir., 299 F. 784 (1924); Manning v. United States, 8 Cir., 287 F. 800 (1923).

72. *See, e. g.,* D. Maurer & V. Vogel, *supra* note 14, at 7; The Addict and the Law,

*supra* note 23, at 138; M. Nyswander, *supra* note 35, at 6–8; C. Terry & M. Pellens, *supra* note 20, at 90–91; Jailing the Healers and the Sick, *supra* note 60, at 744–745.

73. *See, e. g.,* The Addict and the Law, *supra* note 23, at 7; M. Nyswander, *supra* note 35, at 6; Jailing the Healers and the Sick, *supra* note 60, at 744–745; King, *supra* note 34, at 122; Bucaro & Cazalas, *supra* note 28, at 21.

treatment. They are diseased and proper subjects for such treatment, and we cannot possibly conclude that a physician acted improperly or unwisely or for other than medical purposes solely because he had dispensed to one of them, in the ordinary course and in good faith, four small tablets of morphine or cocaine for relief of conditions incident to addiction. * * * "

Linder v. United States, 268 U.S. 5, 18, 45 S.Ct. 446, 449, 69 L.Ed. 819 (1925). The holdings of *Webb* and *Jin Fuey Moy* were limited specifically to those situations in which the defendant acted in bad faith,[74] and *Behrman* was explained as

"relat[ing] to definitely alleged facts * * *. The enormous quantity of drugs ordered, considered in connection with the recipient's character, without explanation, seemed enough to show prohibited sales and to exclude the idea of *bona fide* professional action in the ordinary course. The opinion cannot be accepted as authority for holding that a physician, who acts *bona fide* and according to fair medical standards, may never give an addict moderate amounts of drugs for self-administration in order to relieve conditions incident to addiction. Enforcement of the tax demands no such drastic rule, and if the act had such scope it would certainly encounter grave constitutional difficulties." [75]

Following *Linder*, one might reasonably have expected a sudden and enthusiastic resurgence of medical interest in addiction. Unfortunately, such was not the case. Soon after *Behrman* a large-scale propaganda campaign was initiated, from which we derive many of our present misconceptions of the addict and his affliction. Although addicts had traditionally been viewed as victims of an unfortunate illness, this campaign sought, quite successfully, to attach the stigma of criminality to addiction. The addict was portrayed as a moral degenerate, and the myth of the "dope-crazed sex fiend" was perpetrated.[76] Grossly inflated estimates of the number of addicts were circulated,[77] and as the public's alarm over the "dope menace" swept the nation, medical approaches to the problem of addiction fell gradually into disfavor.

Moreover, although *Linder* had established beyond question the right of physicians to administer narcotics to their addict patients, the concepts of "good faith" and "legitimate practice" are by necessity subject to varying interpretations, and given their pre-*Linder* experiences with the Bureau of Narcotics, most doctors feared to tread so slippery a path. Indeed, the Bureau itself contributed heavily to this uncertainty, for not only was its response to *Linder* wholly negative, but its regulations were directly contrary to that decision. For example, one of its long-standing regulations declares:

"An order purporting to be a prescription issued to an addict or habitual user of narcotics, not in the course of professional treatment but for the purpose of providing the user with narcotics sufficient to keep him comfortable by maintaining his customary use, is not a prescription within the meaning and intent of [the Act], and the person filling such a [sic] order,

---

74. 268 U.S. at 19–21, 45 S.Ct. 446.

75. *Id.* at 22, 45 S.Ct. at 450. *See also* Boyd v. United States, 271 U.S. 104, 46 S.Ct. 442, 70 L.Ed. 857 (1926) ; Strader v. United States, 10 Cir., 72 F.2d 589 (1934) ; Bush v. United States, 5 Cir., 16 F.2d 709 (1927) ; United States v. Anthony, S.D.Cal., 15 F.Supp. 553 (1936).

76. *See, e. g.*, Jailing the Healers and the Sick, *supra* note 60, at 738; King, *supra*

note 34, at 123–124; *see also* C. Terry & M. Pellens, *supra* note 20, at 548.

77. In 1923, for example, the Bureau of Narcotics estimated that there were some *one million* addicts in the United States. *See* U. S. Treasury Dept., The Traffic in Habit Forming Narcotic Drugs (1923). When the Bureau began to report its enforcement achievements, however, the estimate was suddenly reduced to 100,000. *See* Jailing the Healers and the Sick, *supra* note 60, at 738 n. 11.

as well as the person issuing it, shall be subject to [prosecution]." [78]

In 1963, the President's Advisory Commission on Narcotic and Drug Abuse criticized this regulation as not "in accord" with *Linder*, and concluded that, as a result, "[t]he practicing physician has * * * been confused as to when he may prescribe narcotic drugs for an addict. Out of a fear of prosecution many physicians refuse to use narcotics in the treatment of addicts. * * * In most instances they shun addicts as patients." [79] Similarly, the House Committee on Interstate and Foreign Commerce, in its report on the "Comprehensive Drug Abuse Prevention and Control Act of 1970," declared that because of this regulation "[t]here are relatively few practicing physicians in the United States today who treat narcotic addicts because of uncertainty as to the extent to which they may prescribe narcotic drugs for addict patients." [80] To remedy this situation, the Act specifically directs the Secretary of Health, Education and Welfare to determine "the appropriate methods of professional practice in the medical treatment of * * * addiction * * *." [81] And although the Committee expressed concern about "having Federal officials determine the appropriate method of the practice of medicine,"

it noted that "for the last 50 years this is precisely what has happened, through criminal prosecution of physicians whose methods of prescribing drugs have not conformed to the opinions of Federal prosecutors * * *." [82] Thus, due largely to the misguided efforts of federal officials, the medical profession for more than half a century now has been forced to abdicate its role in the treatment of addiction.[83] And by depriving addicts of treatment on the one hand, while criminalizing their illness on the other, this nation adopted a policy toward addiction unique in all the world.[84] Equally dsturbing, moreover, is the manner in which this policy was formulated. As one scholar has capsuled the situation:

"The present program of handling the drug problem in the United States is, from the legal viewpoint, a remarkable one in that it was not established by legislative enactment or by court interpretation of such enactments. Public opinion and medical opinion had next to nothing to do with it. It is a program which, to all intents and purposes, was established by the decisions of administrative officials of the Treasury Department of the United States. After the crucial decisions had been made, public and medical support was sought and in large mea-

78. 26 C.F.R. § 151.392 (1971). This regulation was later repealed. *See* 36 Fed. Reg. 7778 (1971).

79. The President's Advisory Commission on Narcotic and Drug Abuse, Final Report 57 (1963) (hereinafter cited as Advisory Commission).

80. H.Rep.No.91–1444, 91st Cong., 2d Sess., pt. 1, at 14 (1970), U.S.Code Cong. & Admin.News 1970, p. 4580.

81. 42 U.S.C. § 257a (1970). *See* 36 Fed. Reg. 7778 (1971).

82. H.Rep.No.91–1444, 91st Cong., 2d Sess., pt. 1, at 14 (1970), U.S.Code Cong. & Admin.News 1970, p. 4581.

83. *See, e. g.,* authorities cited in notes 79 and 80 *supra* and Special Committee, *supra* note 56, at 35–36; Ploscowe, *supra* note 51, at 78; Bucaro & Cazalas, *supra*

note 28, at 24; Jailing the Healers and the Sick, *supra* note 60, at 744–745; Note, *supra* note 48, at 609.

84. *See, e. g.,* W. Eldridge, *supra* note 22, at 118: Jailing the Healers and the Sick, *supra* note 60, at 737; Note, Punishment of Narcotic Addicts for Possession: A Cruel But Usual Punishment, 56 Iowa L.Rev. 578, 581 (1971). For a discussion of the treatment of addiction in other nations, *see, e. g.,* The Addict and the Law, *supra* note 23, at 162–188; Special Committee, *supra* note 56, at 50–52; Lindesmith, The British System of Narcotics Control, 22 Law & Contemp. Prob. 138 (1957); King, An Appraisal of International, British and Selected European Narcotic Drug Laws, Regulations and Policies, in Joint Committee, *supra* note 51, at 121.

sure obtained for what was already an accomplished fact."[85]

Over the years the consequences of this policy have been disastrous for both the individual addict and society as a whole. With the closing of the narcotics clinics and the sudden elimination of medical assistance in the mid-1920's, thousands of addicts were left stranded without any legitimate source from which to obtain their supplies.[86] "Treatment" was ceded to the underworld, which eagerly accepted the invitation.[87] Within a few years, a multimillion dollar industry had developed, and the price of drugs skyrocketed.[88] For the first time, addicts were compelled to turn to crime as a means of obtaining funds to support their addiction.[89] Gradually, a vast criminal infrastructure was developed to distribute illicit narcotics primarily to the lower socio-economic classes in our cities, and drug addiction became almost exclusively a problem of the urban poor.[90]

During the 1920's and 1930's the incidence of addiction remained relatively stable, with a few periodic bursts breaking an otherwise gradual decline.[91] With the advent of World War II, however, the rate of addiction nosedived as young men were recruited into the armed services, international smuggling was disrupted, and illicit supplies became scarce. Most officials believed that the narcotics problem had dwindled to an almost irreducible minimum.[92]

Then came the postwar explosion in drug abuse, with its greatly increased involvement of young persons.[93] In an effort to check this trend, the penalties for violations of the narcotics laws were increased dramatically, and mandatory minimum sentences were introduced— two years for the first offense, five for the second, and ten for the third and subsequent offenses. In addition, suspension of sentence and probation were prohibited for all but first offenders.[94] The American Bar Association immedi-

85. The Addict and the Law, *supra* note 23, at 3.

86. *See, e. g.*, M. Nyswander, *supra* note 35, at 6–8, 10–11; A. Lindesmith, *supra* note 17, at 220; Note, *supra* note 48, at 609.

87. *See, e. g.*, A. Lindesmith, *supra* note 17, at 220; C. Terry & M. Pellens, *supra* note 20, at 91; Ball, *supra* note 15, at 204. In *Watson* this court observed that "[a]lthough the Harrison Act succeeded in its goal of regulating and containing lawfully imported drugs in lawful channels, it failed * * * 'to cope with the enormous flow of smuggled drugs that are distributed to addict-consumers without ever entering the regulated channels at all.'" 141 U.S.App.D.C. at 345 n. 9, 439 F.2d at 452 n. 9, quoting King, *supra* note 34, at 118.

88. *See, e. g.*, C. Terry & M. Pellens, *supra* note 20, at 91. Indeed, prices climbed as high as 10 to 50 times their pre-World War I level. A. Lindesmith, *supra* note 17, at 220.

89. *See, e. g.*, A. Lindesmith, *supra* note 17, at 221; C. Terry & M. Pellens, *supra* note 20, at 91. For a discussion of the problem of crime and addiction, *see* text and notes at notes 121–128 *infra*.

90. For a discussion of the socio-economic characteristics of addicts, *see* text and notes at notes 105–128 *infra*.

91. *See, e. g.*, The Addict and the Law, *supra* note 23, at VII; Lang, *supra* note 29, at 454; Chapman, *supra* note 14, at 42. It is worth noting that there were very few black addicts at this time. See M. Nyswander, *supra* note 35, at 88. Throughout this period, morphine was the most popular drug, although there was a brief upsurge in heroin use by young addicts in the early 1920's. *See, e. g.*, Chapman, *supra* note 14, at 42; Ball, *supra* note 15, at 206; Lang, *supra* note 29, at 454.

92. *See, e. g.*, A. Lindesmith, *supra* note 17, at 225–226; The Addict and the Law, *supra* note 23, at VIII. By 1948 it was estimated that there were as few as 50,000 addicts in the nation. *See* D. Maurer & V. Vogel, *supra* note 14, at 8.

93. *See, e. g.*, S.Rep.No.1051, 82nd Cong., 1st Sess., 2 (1951); H.Rep.No.635, 82nd Cong., 1st Sess., 2–3 (1951), U.S.Code Cong. & Admin.Service 1951, p. 2602; *see also* Task Force, *supra* note 25, at 11; Cantor, *supra* note 67, at 519.

94. 65 Stat. 767 (1951), 26 U.S.C. § 2557 (Supp.1952), 21 U.S.C. § 174 (Supp. 1952).

ately criticized these amendments and vigorously suggested that they be re-examined.[95] In 1956 Congress did indeed reexamine its earlier decision and, convinced that harsh penalties would prove effective,[96] increased them still further.[97] As we shall see, this belief eventually proved incorrect.

During the late 1950's a dissident movement began to gather strength and to raise fundamental questions concerning our attitudes toward the addict and his disease. Medical and psychiatric research continued to shed new light on what had previously been thought to be closed questions and, as was inevitable, the basic assumption that addiction is an evil from which the addict can extricate himself at will seemed suddenly to collapse in the face of enlarged experience and increased knowledge. As a result, in the period since 1960 we have seen a fundamental reorientation of our policies toward addiction.[98] The first important step in this direction was taken by the Supreme Court in the landmark case of Robinson v. California, *supra*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed. 2d 758, in which the Court, resurrecting *Linder* after 35 years, recognized once again that addiction is an illness and must be treated as such. Specifically, the Court held that a California statute

making the "status" of addiction a criminal offense inflicted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.

The effects of this dramatic reorientation were not limited solely to the judiciary. Faced with the growing awareness "that for too long the law had stressed punitive solutions and neglected medical and rehabilitative measures," [99] Congress enacted the Narcotic Addict Rehabilitation Act in 1966. Stated generally, the Act established a broad-based program of civil commitment for treatment of both "criminal" and "non-criminal" addicts.[100] Moreover, in the ensuing years an impressive series of statutes was adopted authorizing federal grants to public and nonprofit private agencies for the purpose of developing effective methods for institutional and community-based treatment of addiction.[101]

Then, in order "to collect the diverse drug control and enforcement laws under one piece of legislation," [102] Congress enacted the "Comprehensive Drug Abuse Prevention and Control Act of 1970." [103] This Act displaced virtually all pre-existing federal narcotics legislation—including the Harrison and Jones-Miller Acts. In addition, Congress repudiated the premises underlying the harsh penalty provisions adopted in the

95. *See, e. g.,* 80 A.B.A.Rep. 408 (1955); 76 A.B.A.Rep. 387, 411–412 (1951).

96. *See, e. g.,* H.Rep.No.2388, 84th Cong., 2d Sess., 8, 51 (1956), U.S.Code Cong. & Admin.News 1956, p. 3274.

97. 70 Stat. 568 (1956), 26 U.S.C. § 7237 (1958), 21 U.S.C. § 174 (1958).

98. *See, e. g.,* Task Force, *supra* note 25, at 1; H.Rep.No.1486, 89th Cong., 2d Sess., 10 (1966); S.Rep.No.1667, 89th Cong., 2d Sess., 13 (1966), U.S.Code Cong. & Admin.News 1966, p. 4245.

99. H.Rep.No.1486, 89th Cong., 2d Sess., 8 (1966), U.S.Code Cong. & Admin.News 1966, p. 4249.

100. Title I of the Act authorizes, with certain enumerated offenses excepted, civil commitment in lieu of prosecution, 28 U.S.C. § 2901 *et seq.* (1970); Title II provides, again with certain offenses excepted, for civil commitment after con-

viction in lieu of imprisonment, 18 U.S.C. § 4251 *et seq.* (1970); and Title III permits voluntary civil commitment of addicts not charged with any criminal offense, 42 U.S.C. § 3411 *et seq.* (1970). *See also* 42 U.S.C. § 260 (1970), providing for voluntary civil commitment of addicts to federal hospitals.

101. *See, e. g.,* 42 U.S.C. § 2688k(a) (1970) (funds for development of hospital and post-hospital care of addicts); 42 U.S.C. § 2688n–1(a) (1970) (funds for development of detoxification services, institutional services and community-based aftercare services); 42 U.S.C. § 2809 (1970) (to provide for development of community-based treatment of addicts).

102. S.Rep.No.91–613, 91st Cong., 1st Sess., 3 (1969).

103. 21 U.S.C. § 801 *et seq.* (1970).

1950's. Indeed, after nearly two decades of experience with those provisions, it had become abundantly clear that "the severity of penalties * * * does not affect the extent of drug abuse * * *." [104] As a result, a more just and humane sentencing structure was devised to replace the rigid policies of the past.

Thus a beginning has been made but, unfortunately, we still have a long way to go. Although it is virtually impossible to estimate with any reasonable degree of certitude the precise number of addicts in our society today,[105] it is clear that, due in part to the Vietnam war,[106] the rate of addiction has continued to rise.[107] Indeed, most reliable authorities place the number at somewhere between 200,000 and 300,000 nationally,[108] and at about 16,000 for the District of Columbia.[109] Moreover, the average age of addicts has declined steadily over the past decade, and a recent study of addicts in New York State reveals that almost one third are under the age of 21.[110] In the District, it is estimated that some 60 per cent of all addicts are less than 25 years of age, and that one of every six men between the ages of 20 and 24 is an addict.[111] Approximately 50 per cent of all addicts are black,[112] and more than 80 per cent are male.[113]

104. S.Rep.No.91–613, 91st Cong., 1st Sess., 2 (1969). *See also* Report of the President's Commission on Crime in the District of Columbia 572 (1967) (hereinafter cited as Report of the President's Commission).

105. Any estimate of the number of addicts at any particular time is necessarily precarious. It must depend upon the obvious fact that the methods of tabulation and documentation of statistics by the various agencies involved are not uniform. Moreover, since the traffic in most addictive drugs is illegal, addicts seek to avoid detection whenever possible. As a result, statistics compiled by the Federal Bureau of Narcotics as to the number of *known* and *reported* addicts generally are regarded as woeful underestimates. For a more complete discussion of the problem of drug statistics, *see, e. g.,* Mandel, Problems with Official Drug Statistics, 21 Stan.L.Rev. 991 (1969) ; *see also* Blum, *supra* note 25, at 44–45 ; H.Rep. No.91–1808, 91st Cong., 2d Sess., 8 (1970).

106. *See, e. g.,* Special Committee, *supra* note 56, at 30–31.

107. *See, e. g.,* H.Rep.No.91–1444, 91st Cong., 2d Sess., pt. 1, at 6 (1970) ; H. Rep.No.92–678, 92nd Cong., 1st Sess., 1 (1971) ; Hearings Before the House Select Committee on Crime, entitled "Crime in America—Heroin Importation, Distribution, Packaging and Paraphernalia", 91st Cong., 2d Sess., 1 (1970).

108. *See, e. g.,* Special Committee, *supra* note 56, at 28–29; Hearings Before Subcommittee No. 4 of the House Committee on the Judiciary, entitled "Treatment and Rehabilitation of Narcotic Addicts", 92nd Cong., 1st Sess., 105 (1971) (testimony of Congressman Rodino)

(250,000) ; H.Rep.No.91–1808, 91st Cong., 2d Sess., 8 (1970) (200,000) ; 116 Cong. Rec. 33649, 91st Cong., 2d Sess. (1970) (remarks of Congressman Podell) (270,000).

109. Estimates as to the number of addicts in the District vary widely, ranging from a low of 10,400, *see* Hearings Before the House Select Committee on Crime, entitled "Crime in America—The Heroin Paraphernalia Trade", 91st Cong., 2d Sess., 1 (1970), to a high of almost 60,000, *see* Report of the Professional Advisory Committee on Heroin Addiction in the District of Columbia, in Hearings Before Subcommittee No. 4 of the House Committee on the Judiciary, entitled "Treatment and Rehabilitation of Narcotic Addicts", 92nd Cong., 1st Sess., 422 (1971) (hereinafter cited as Professional Advisory Committee). The Advisory Committee itself adopts the more widely accepted estimate of 16,000. *Ibid.*

110. *See, e. g.,* Note, Heroin, Marijuana and Crime: A Socio-Legal Analysis, 45 St. John's L.Rev. 119, 121 (1970). As of Dec. 31, 1969, statistics compiled by the Bureau of Narcotics revealed that the average age for *known* and *reported* addicts was 30.7 years. *See* U. S. Dept. of Commerce, Bureau of the Census, Statistical Abstract of the United States, Table No. 116 (1971) (hereinafter cited as Statistical Abstract).

111. *See, e. g.,* Professional Advisory Committee, *supra* note 109, at 422.

112. *See, e. g.,* Statistical Abstract, *supra* note 110, Table No. 116; U. S. Treasury Dept., Traffic in Opium and Other Dangerous Drugs 49 (1967) ; Note, *supra* note 110, at 121.

113. *See, e. g.,* Statistical Abstract, *supra* note 110, Table No. 116; U. S. Treas-

The class of persons who become addicts is not homogenous, however, and for the sake of analysis it may be divided into three identifiable subgroups. The first such group consists of those individuals who became addicted during the course of medical treatment for some other illness. As previously noted, this was the primary cause of addiction at the time of the Civil War.[114] We have learned a great deal since that time, however, and although opiates are still used widely as painkillers, the incidence of medical addiction today is relatively low. Moreover, when such addiction does occur, it frequently is not "complete"—that is, the dependence may be physical only, without the more complex psychological components.[115]

The second category is comprised of those addicts who are employed in the medical and paramedical professions. The rate of addiction among these professions appears to be almost 30 times greater than that of the general population,[116] but since these individuals have ready access to drugs such as morphine and demerol, they frequently escape the need to pay the exorbitant prices for their supplies that lead other addicts to crime. As a result, many of these persons live relatively normal lives, and few are ever subjected to the indignities of a criminal prosecution.[117]

The third, and by far the largest, category consists of the "street addicts." Although street addiction no longer is confined solely to the ghetto, and has spread in recent years to suburban and even rural communities,[118] it remains primarily the plague of the inner cities where unequal education, unemployment, poor housing and high delinquency predominate.[119] Indeed, within the Model Cities area of the District of Columbia, it is estimated that more than a third of all men between the ages of 20 and 24, and almost a quarter of those between 15 and 19, are addicted to heroin.[120]

It is these hard core addicts who engage in the extensive criminal activity which has so alarmed the public. Unfortunately, however, the public's understanding of this problem is, in many respects, rife with confusion, uncertainty and misconception. For example, according to popular mythology the addict is perceived as a criminal aggressor driven to rape and violence by the evil

ury Dept., *supra* note 112, at 55; Professional Advisory Committee, *supra* note 109, at 422. This is a complete reversal from the pre-1914 period, when 60% of all addicts were women. *See* note 53 *supra*.

114. *See* text at notes 34–35 *supra*.

115. For an excellent discussion of medical addiction, *see* Blum, *supra* note 25, at 46–47. The physical and psychological aspects of addiction are explained in text at notes 129–159 *infra*.

116. *See, e. g.,* W. Eldridge, *supra* note 22, at 27; Ausubel, The Case for Compulsory Closed Ward Treatment of Narcotics Addicts, 31 F.R.D. 58, 64 (1961); Note, *supra* note 48, at 608.

117. *See, e. g.,* Blum, *supra* note 25, at 49.

118. *See, e. g.,* H.Rep.No.92–678, 92nd Cong., 1st Sess., 1 (1971); H.Rep.No.91–1808, 91st Cong., 2d Sess., 1 (1970).

119. *See, e. g.,* Task Force, *supra* note 25, at 2–3; Advisory Commission, *supra* note 79, at 4; Ball, *supra* note 15, at 208–209; Lang, *supra* note 29, at 454.

120. *See, e. g.,* Professional Advisory Committee, *supra* note 109, at 422. Heroin is far and away the most commonly used addicting drug today. *See, e. g.,* Task Force, *supra* note 25, at 2; American Medical Association Council on Mental Health, Report on Narcotic Addiction, in American Medical Association, Narcotic Addiction—Official Actions of the American Medical Association 11 (1963). Statistics compiled as to *known* and *reported* addicts reveal that approximately 96% use heroin. Morphine, codeine, demerol and dilaudid combined account for another 3%. *See, e. g.,* Statistical Abstract, *supra* note 110, Table No. 116. *See also* U. S. Treasury Dept., *supra* note 112, at Table No. 12.

effects of the drug itself.[121] Yet nothing could be farther from the truth, for in reality heroin produces a tranquil, lethargic state in the user, inhibiting aggressive and sexual activities.[122] As a result, "[c]rimes of violence are rarely, and sexual crimes almost never, committed by addicts." [123]

And although the public's concern over nonviolent addict criminality is by no means unfounded, important questions of causation remain unanswered. Many addicts, of course, engaged in criminal activity even prior to their addiction, and to some extent both post-addiction criminality and addiction itself may be viewed as independent manifestations of some other underlying antisocial tendencies.[124] But the social behav-

ior of the addict depends also upon the legal and social context in which it occurs, and with the realization that criminal behavior is neither a necessary nor even a logical consequence of the disease, we must face the undeniable fact that our criminalization of addiction has, in part, become a self-fulfilling prophecy.[125] Having been cut off from all legal sources of supply, many addicts resort to the black market, where prices are astronomical. Indeed, the cost to some addicts may exceed $150 per day, and the average addict requires almost $13,000 per year simply to purchase heroin sufficient to satisfy his addiction.[126] Needless to say, few street addicts can afford such prices without supplementing their income through criminal activity,[127] and the cost of such crime to

121. See, e. g., Ploscowe, supra note 51, at 46; Note, supra note 110, at 124.

122. See, e. g., The Addict and the Law, supra note 23, at XI; Task Force, supra note 25, at 2. It is important to note, however, that those observations are limited to depressant-type drugs such as the opiates. Other drugs, like cocaine, may stimulate the user to violent crime. See, e. g., Bowman, Narcotic Addiction and Criminal Responsibility Under Durham, 53 Geo.L.J. 1017, 1041 n. 107 (1965).

123. Joint Committee, supra note 51, at 165. Similarly, the President's Commission on Law Enforcement and Administration of Justice concluded that "[a]ssaultive or violent acts, contrary to popular belief, are the exception rather than the rule for the heroin addict, whose drug has a calming and depressant effect." Task Force, supra note 25, at 10. See also Report of the President's Commission on Crime in the District of Columbia (Appendix) 538 (1966), which reveals that in 3 categories of offenses— rape, other sex crimes, and gambling— there was no indication of addiction among a selected sample of offenders. Homicide, robbery and UUV offenders show less than 3% addiction. The remaining 5 categories were narcotics offenses (86% addiction), larceny/theft (16%), burglary (8%), fraud (7%), and assault (5%).

124. See, e. g., W. Eldridge, supra note 22, at 24–28; I. Chein, D. Gerard, R. Lee & E. Rosenfeld, the Road to H 15–16

(1964) (hereinafter cited as I. Chein et al.) ; Blum, supra note 25, at 55–57.

125. See, e. g., Special Committee, supra note 56, at 25; A. Lindesmith, supra note 17, at 43–44, 221; M. Nyswander, supra note 35, at 45; Jaffe, Drug Addiction and Drug Abuse, in L. Goodman & A. Gilman, The Pharmacological Basis of Therapeutics 276, 285–286 (4th ed. 1970) ; Frankel, Narcotic Addiction, Criminal Responsibility, and Civil Commitment, 1966 Utah L.Rev. 581, 584–585; Bowman, supra note 122, at 1040–1041.

126. The cost to the addict may range from $20 to more than $150 per day, depending upon the intensity of the addiction. The average habit is usually estimated at about $35 per day. See, e. g., H.Rep. No.91–1808, 91st Cong., 2d Sess., 9 (1970).

127. Moreover, the problem is aggravated still further by the fact that addicts must pay, not only the trafficker, but the "fence" as well. Stolen property may bring as little as 20% of the actual value when sold on the black market. See, e. g., Task Force, supra note 25, at 10; H.Rep.No.91–1808, 91st Cong., 2d Sess., 9 (1970) ; S.Rep.No.91–613, 91st Cong., 1st Sess., 3 (1969). As a result, addicts are responsible for a substantial proportion of all non-violent, property-related crime (e. g., shoplifting, theft, pickpocketing and fraud) committed in this nation today. See, e. g., Report of the President's Commission, supra note 104, at 564; Task Force, supra note 25, at 10.

society is staggering—amounting to literally billions of dollars each year.[128]

As noted at the outset of this section, our existing narcotics problem is largely a reflection of all that has gone before. Yet there is little in the past of which we can be proud, for our policies have branded these unfortunate individuals as the outcasts of society and forced them unnecessarily to lives of crime and degradation. In recent years, however, we have finally begun to recognize the injustice of these policies, and both Congress and the courts have moved dramatically to correct the situation. Substituting treatment for criminal stigmatization, as I suggest, will not eliminate all or even most of the remaining problems, but it does represent one step further toward what hopefully will become an age of enlightenment in our attitudes toward the addict and his disease.

### III. THE NATURE OF ADDICTION

The problem of heroin addiction [129] is, for most persons, possibly the most widely discussed yet least understood issue of our time. Indeed, popular notions of addiction are often shrouded in mystery and laden with half-truths, mis-

conceptions and, all too often, total ignorance. But addiction is no longer the mystery it once was, for we have learned a great deal in recent years concerning the nature and characteristics of the disease. And although many aspects of the problem remain obscure,[130] we now possess a sufficient body of information to appreciate the medical—and legal—significance of addiction.

The most widely accepted and authoritative definition of heroin addiction is that promulgated by the World Health Organization, which lists the characteristics of the disease as follows:

(1) an overpowering desire or need to continue taking the drug and to obtain it by any means; the need can be satisfied by the drug taken initially or by another with morphine-like properties;

(2) a tendency to increase the dose owing to the development of tolerance;

(3) a psychic dependence on the effects of the drug related to a subjective and individual appreciation of those effects; and

(4) a physical dependence on the effects of the drug requiring its presence for maintenance of homeostasis

128. *See, e. g.*, Special Committee, *supra* note 56, at 31; H.Rep.No.92–678, 92nd Cong., 1st Sess., 2 (1971); S.Rep.No. 91–613, 91st Cong., 1st Sess., 4 (1969).

129. Since heroin is used by more than 90% of all addicts, *see* note 120 *supra*, the discussion in this section will focus primarily on the etiological aspects of heroin addiction. It should be recognized, however, that heroin is by no means the only addicting drug. The drugs with the greatest addiction potential are, of course, the opiates and their synthetic equivalents. Narcotics of the opiate class include opium, morphine, heroin, dionon, dilaudid, metapon, codeine, eucodal, dicodide and apomorphine. Their synthetic equivalents are demerol, methadone, dromoran, phenazocine and leritine. These drugs are discussed in D. Maurer & V. Vogel, *supra* note 14, at 60–80. Certain sedatives, such as barbiturates and bromides, are also addicting, but many of the generalizations relating to heroin addiction do not hold true for these drugs.

*See, e. g.*, D. Maurer & V. Vogel, *supra* note 14, at 102–121; Task Force, *supra* note 25, at 4; Advisory Commission, *supra* note 79, at 1–2. Other narcotic substances, such as amphetamines, methedrine, marijuana, cocaine, benzedrine, LSD, peyote and psilocybin, do not appear to cause any physical addiction, although psychological dependence may develop. *See, e. g.*, D. Maurer & V. Vogel, *supra* note 14, at 131–157; Task Force, *supra* note 25, at 3; Advisory Commission, *supra* note 79, at 1–2. *See generally* 21 U.S.C. § 812 (1970).

130. The most important gaps in our knowledge relate to our lack of understanding of the precise etiology of heroin addiction. Since it is neither possible nor appropriate to enter into a discussion of the varied and complex theoretical issues which divide psychoanalysts, sociologists and pharmacologists on the question of causation, my analysis of the disease as set forth in this section will be cast in general terms upon which most experts agree.

and resulting in a definite, characteristic, and self-limited abstinence syndrome when the drug is withdrawn.[131] Development of such an addiction is, of course, a gradual process, and it is the purpose of this section to explore briefly the nature of this process and the effects of the disease upon the addict.

The psychological and sociological implications of the initial decision to experiment with addicting drugs are highly complex, involving such factors as the social climate, attitudes, values, stresses and gratifications ·current in the relevant subculture, the individual predilections of the potential user, and, of course, the availability of the drugs themselves. But once the basic inhibitions have been overcome, the typical motivations for drug use are, as for most vices, quite simple—in most cases the experimentation is due simply to curiosity, depression or group pressure.[132]

The effects of this initial exposure [133] may vary greatly depending upon the quality of the drug, the size of the dose, the manner of administration,[134] the setting, the mood, personality and expectations of the user, and many other variables ranging from the biochemical to the cultural.[135] Indeed, while some individuals may enjoy the experience, others suffer dysphoria, headache, dizziness and depression, and still others perceive no effects whatever.[136] As the user becomes accustomed to the drug, however, he generally learns to appreciate its effects, and the initial experimentation is typically followed by what has been termed the "honeymoon period." During this stage, the drug serves primarily a recreational function, and may be used at parties, on weekends, or when the user feels particularly depressed.[137]

Contrary to popular belief, not all persons who enter this stage will eventually become addicts. Indeed, most experts now agree that even repeated use of heroin will not necessarily or even usually result in addiction unless the user's personality is particularly susceptible to the psychological effects of the drug.[138]

131. World Health Organization Expert Committee on Addiction-Producing Drugs, *Thirteenth Report*, World Health Organization Technical Report Series No. 273, at 13 (1964). Congress has adopted a similar definition of addiction, stating that a "drug dependent person" is one "who is using a controlled substance * * * and who is in a state of psychic or physical dependence, or both, arising from the use of that substance on a continuous basis. Drug dependence is characterized by behavioral and other responses which include a strong compulsion to take the substance on a continuous basis in order to experience its psychic effects or to avoid the discomfort caused by its absence." 42 U.S.C. § 201(q) (1970). Other statutes define "addict" as "any individual who habitually uses any narcotic drug so as to endanger the public morals, health, safety, or welfare, or who is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his addiction." 21 U.S.C. § 802(1) (1970) ; *see also* 18 U.S.C. § 4251; 28 U.S.C. § 2901; 42 U.S.C. § 3411.

132. *See, e. g.,* I. Chein *et al., supra* note 124, at 149–157; Clausen, *supra* note 43, at 38–39.

133. Contrary to popular belief, the individual almost invariably receives his first dose from a friend or acquaintance, rather than from the proverbial "pusher." *See, e. g.,* W. Eldridge, *supra* note 22, at 29; Advisory Commission, *supra* note 79, at 4; Blum, *supra* note 25, at 52; Clausen, *supra* note 43, at 39.

134. Many beginners will inhale the drug initially, although some will inject it intravenously, take it orally, or inject it subcutaneously. *See, e. g.,* I. Chein *et al., supra* note 124, at 157; Jaffe, *supra* note 125, at 283.

135. *See, e. g.,* A. Lindesmith, *supra* note 17, at 24; Blum, *supra* note 25, at 54.

136. *See, e. g.,* D. Maurer & V. Vogel, *supra* note 14, at 81; I. Chein *et al., supra* note 124, at 157; A. Lindesmith, *supra* note 17, at 24; Blum, *supra* note 25, at 42.

137. *See, e. g.,* A. Lindesmith, *supra* note 17, at 25; I. Chein *et al., supra* note 124, at 159.

138. The phenomenon of "addiction-proneness" is widely discussed in the literature. *See, e. g.,* D. Maurer & V. Vogel, *supra* note 14, at 91; M. Nyswander, *supra* note 35, at 63; I. Chein *et al., supra* note 124, at 14; R. DeRopp, Drugs and the

Unlike the hallucinogens, heroin does not produce a positive euphoric "high" of intensified sensory input. Rather, the drug has a calming, depressant effect which dulls the general sensibilities and allays feelings of pain, insecurity or discomfort.[139] The heroin "high" is essentially escape-oriented, and a direct correlation exists between the pleasure one derives from the drug and the user's psychic need to avoid reality. Thus, although the psychologically stable individual may enjoy his experience with heroin, his satisfaction generally is not so great as to draw him irresistibly to excessive use. As a result, many such persons are able to administer heroin on an occasional basis without ever becoming addicted.[140]

The situation is quite different, however, for those users whose psychological makeup renders them particularly prone to addiction.[141] Although the precise nature of the disorders causing addiction proneness may vary,[142] its symptoms are readily identifiable, including such characteristics as an oversensitivity to rejection, an inability to enter into close associations with others, difficulty in sexual role identification, an inability to cope with reality, and a tendency to be overcome by a sense of inadequacy, futility and despair.[143] For the individual exhibiting all or some of these symptoms, the use of heroin may be seen as an attempt at personal adjustment. The drug fulfills a specific function in his psychological economy, and when experiencing its effect he finds that the previously intolerable frustrations and anxieties of his daily existence mysteriously evaporate.[144] Feelings of pain, hunger,

Mind 146 (1957); Ploscowe, *supra* note 51, at 51–59; Bowman, *supra* note 122, at 1036–1037; Blum, *supra* note 25, at 50; Bell, *supra* note 16, at 16; Chein & Rosenfeld, Juvenile Narcotics Use, 22 Law & Contemp.Prob. 52, 59–63 (1957).

139. *See, e. g.*, I. Chein *et al.*, *supra* note 124, at 229–241; A. Lindesmith, *supra* note 17, at 26–27; Task Force, *supra* note 25, at 2; Bell, *supra* note 16, at 15.

140. *See, e. g.*, A. Lindesmith, *supra* note 17, at 47; Chein & Rosenfeld, *supra* note 138, at 54; Chapman, *supra* note 14, at 43; Ploscowe, *supra* note 51, at 25; Bowman, *supra* note 122, at 1036.

141. *See* authorities cited in note 138 *supra*. Indeed, it has been estimated that as few as 3.8% of all addicts could be termed psychiatrically normal according to established medical criteria. *See, e. g.*, Winick, Narcotics Addiction and Its Treatment, 22 Law & Contemp.Prob. 9, 21 n. 45 (1957); Kolb & Offenfort, The Treatment of Drug Addicts at the Lexington Hospital, 31 So.Med.J. 914 (1938); Note *supra* note 48, at 606 n. 11.

142. According to one study, for example, the emotional disorders of adolescent opiate addicts fall into 4 major categories: (1) overt schizophrenia (19%); (2) incipient or "borderline" schizophrenia (25%); (3) delinquency dominated character disorders (44%); and (4) inadequate personality (12%). *See, e. g.*, Gerard & Kornetsky, A Social and Psychiatric Study of Adolescent Opiate Addicts, 28 Psychiatric Q. 113–125 (1954). *See also* Chapel & Taylor, *supra* note 40, at 55; Lowry, Hospital Treatment of the Narcotic Addict, 20 Fed.Prob. 42, 44–45 (Dec. 1956).

143. *See, e. g.*, I. Chein *et al.*, *supra* note 124, at 14, 193–226; M. Nyswander, *supra* note 35, at 63; Bell, *supra* note 16, at 19; Blum, *supra* note 25, at 51; Clausen, *supra* note 43, at 44; Chein & Rosenfeld, *supra* note 138, at 60; H.Rep.No. 91–1444, 91st Cong., 2d Sess., pt. 1, at 7–8 (1970). As one might suspect, the foremost breeding grounds for such psychoses are our center cities, where lives are scarred early by broken homes, discrimination, poor education, poverty, hopelessness and alienation. *See, e. g.*, Special Committee, *supra* note 56, at 33; I. Chein *et al.*, *supra* note 124, at 51–56; Blum, *supra* note 25, at 50; Clausen, *supra* note 43, at 37. The family background of the potential user plays a particularly crucial role in the development of these disorders. *See, e. g.*, I. Chein *et al.*, *supra* note 124, at 251–298; Bell, *supra* note 16, at 16; Clausen, *supra* note 43, at 37–38, 46; Chein & Rosenfeld, *supra* note 138, at 60–62. Of course, our urban slums are not the sole sources of these psychoses, and it is important to note that addicts who are members of the medical and paramedical professions exhibit similar symptoms. *See, e. g.*, Blum, *supra* note 25, at 49.

144. *See, e. g.*, A. Noyes & L. Kolb, Modern Clinical Psychiatry 566 (5th ed. 1961);

inadequacy and fear are extinguished, and he experiences a sense of aloofness and self-sufficiency which he is unable to attain in the real world. Indeed, he "has discovered something he may well have been searching for all his life." [145]

Thus during the "honeymoon period" of occasional use the addiction prone individual finds the psychic effects of the drug virtually irresistible and, spurred on by a false sense of security generated by the drug itself, he begins gradually to increase the frequency of his doses.[146] Due to the development of tolerance, however, he soon discovers that the same dose fails to produce the original euphoric effect, and he must continually increase the size of his dosage in order to achieve the desired "high." [147] Then, after a period of excessive use, physical dependence develops.[148] The user is "hooked"—he now needs the drug not only to alleviate his underlying psychological instability, but also to avoid the misery of withdrawal.

In the withdrawal syndrome, which usually begins to manifest itself within eight to ten hours of abstinence, the addict shows an almost schematic pattern of behavior which will vary in severity depending upon the individual and the length, strength and nature of his addiction. The following account,[149] based upon observation and experimentation with addicts under medical supervision, describes in detail the process of opiate withdrawal:

"As the time approaches for what would have been the addict's next administration of the drug, * * * he begins to move about in a rather aimless way, failing to remain in one position long. * * * With this restlessness, yawning soon appears, which becomes more and more violent. * * * He may then lie on the floor close to the radiator, trying to keep warm. Even here he is not contented, and he either resumes his pacing about, or again throws himself onto the bed wrapping himself under heavy blankets. At the same time he complains bitterly of suffering with cold and then hot flashes, but mostly chills. He breathes like a person who is cold, in short, jerky, powerful respirations. His skin shows the characteristic pilomotor activity well known * * *

I. Chein et al., supra note 124, at 14; Winick, supra note 141, at 20; Bowman, supra note 122, at 1036–1037; Wikler & Rasor, Psychiatric Aspects of Drug Addiction, 14 Am.J.Med. 566 (1953); Blum, supra note 25, at 50.

145. Bowman, supra note 122, at 1037.

146. See, e. g., A. Lindesmith, supra note 17, at 25; I. Chein et al., supra note 124, at 159.

147. See, e. g., D. Maurer & V. Vogel, supra note 14, at 33; M. Nyswander, supra note 35, at 50–52; Jaffe, supra note 125, at 285, 287; Bowman, supra note 122, at 1038; Winick, supra note 141, at 10.

148. The precise mechanisms by which physical dependence develops are presently unknown. For discussions of the various theories suggested, see, e. g., A. Noyes & L. Kolb, supra note 144, at 565; A. Lindesmith, supra note 17, at 33; Lowry, supra note 142, at 44; Jaffe, supra note 125, at 281–282; Wikler, Recent Progress in Research on the Neurophysiological Basis of Morphine Addiction, 105 Am.J. Psychiat. 329 (1948).

149. A. Light, E. Torrance, W. Karr, E. Fry & W. Wolff, Opium Addiction 10–11 (1929), as quoted in A. Lindesmith, supra note 17, at 29–30. See also A. Noyes & L. Kolb, supra note 144, at 568; R. DeRopp, supra note 138, at 152–154; D. Maurer & V. Vogel, supra note 14, at 95; Blum, supra note 25, at 54; Ploscowe, supra note 51, at 42–44; Cantor, supra note 67, at 523; Winick, supra note 141, at 10–11; Bowman, supra note 122, at 1039.

Abstinence from barbiturates produces its own severe withdrawal symptoms, including insomnia, anorexia, convulsions, temporary psychosis, and occasionally even death. See, e. g., A. Noyes & L. Kolb, supra note 144, at 572; D. Maurer & V. Vogel, supra note 14, at 124; Advisory Commission, supra note 79, at 53; Winick, supra note 141, at 11. Abstinence symptoms are not found in users of cocaine, marijuana, LSD, peyote, benzedrine, methedrine, amphetamines and psilocybin, since these drugs do not cause physical dependence. See note 129 supra.

as 'cold turkey.' * * * Coincident with this feeling of chilliness, he complains of being unable to breathe through his nose. Nasal secretion is excessive.

"Often at the end of this period the addict may become extremely drowsy and unable to keep his eyes open. If he falls asleep, which is often the case, he falls into a deep slumber well known as the 'yen' sleep. * * * The sleep may last for as long as eight or twelve hours. On awakening he is more restless than ever. Lacrimination, yawning, sneezing, and chilliness are extreme. A feeling of suffocation at the back of the throat is frequently mentioned. Usually at this stage, the addict complains of cramps, locating them most frequently in the abdomen * * *. Vomiting and diarrhea appear. He may vomit large quantities of bile-stained fluid. Perspiration is excessive. * * * Muscular twitchings are commonly present; they may occur anywhere, but are most violent in the lower extremities. * * * He refuses all food and water, and frequently sleep is unknown from this point. It is at this stage that he may one minute beg for a 'shot' and the next minute threaten physical violence. * * * He will beat his head against the wall, or throw himself violently on the floor. * * * Seminal emission in the male and orgasm in the female frequently occur."

The acute symptoms of withdrawal generally reach a peak between 48 and 72 hours after the last dose and subside gradually during the following week.[150] Distress may continue for weeks, however, and it may be months before physiological stability is achieved.[151] But as terrifying as the withdrawal experience may seem, it does not end the addiction, for the underlying psychological dependence of the addict remains uncured.[152] As a result, "[a]ddiction to heroin and to other opiates, once established, has the characteristics of a chronic relapsing disease." [153]

This psychological dependence, which derives initially from the basic personality disorders of the addict, develops through a process of conditioning. Each time the drug is injected, tension, pain and anxiety are reduced, and the memory of this experience beckons as a panacea for all the frustrations of daily living. Gradually, a complex set of conditioned responses is acquired, which tends to perpetuate continued use. When physical dependence emerges, the need to use the drug to avoid withdrawal further reinforces the addict's psychic reliance, and evenually he requires heroin to relieve all forms of tension, no matter how slight.[154] Indeed, the addict's psychological dependence on the drug is generally considered to be the most powerful aspect of the disease.[155]

150. *See, e. g.,* A. Noyes & L. Kolb, *supra* note 144, at 468; A. Lindesmith, *supra* note 17, at 30; Bowman, *supra* note 122, at 1039.

151. *See, e. g.,* Special Committee, *supra* note 56, at 47; Martin & Jasinski, Physiological Parameters of Morphine Dependence in Man—Tolerance, Early Abstinence, Protracted Abstinence, 7 J. Psychiat.Res. 9, 16 (1969); Blum, *supra* note 25, at 54; Note, *supra* note 84, at 580.

152. *See, e. g.,* W. Eldridge, *supra* note 22, at 2; Advisory Commission, *supra* note 79, at 55; Cantor, *supra* note 67, at 524; Winick, *supra* note 141, at 23–24.

153. American Medical Association and National Academy of Sciences—National Research Council, The Use of Narcotic Drugs in Medical Practice and the Medical Management of Narcotic Addicts, in Advisory Commission, *supra* note 79, at 83, 87; Vaillant, A Twelve-Year Follow-up of New York Narcotic Addicts: The Natural History of a Chronic Disease, 275 N.Eng.J.Med. 1282 (1966); Jaffe, *supra* note 125, at 277.

154. *See, e. g.,* Jaffe, *supra* note 125, at 278–279. *See also* authorities cited in note 155 *infra.*

155. *See, e. g.,* I. Chein *et al., supra* note 124, at 6; Bowman, *supra* note 122, at 1037; Eddy, Drug Dependence: Its Sig-

Thus with the confluence of these three factors—physical dependence, psychological dependence and tolerance—the addict is caught in the spiralling web of his addiction. Unable to face reality without the drug on the one hand, and requiring it to avoid the horrors of withdrawal on the other, he turns repeatedly to the drug to obtain relief. Yet with each additional dose, the withdrawal becomes more intense, the psychological dependence greater, the tolerance increased, and the ability to escape voluntarily less likely. Eventually, he loses all control, and "[s]truggle as he may, the curious and inexorable process overwhelms him. No outer moral compulsion can stay it; no authoritarian decree can cut it short. Punishment is meaningless, imprisonment futile, in halting the relentless course of the disease." [156]

The popular notion that an addict's inner life is serene and untroubled and that he lives in a carefree world of heroin-induced ecstasy is completely false. The confirmed addict is in fact a worried, troubled, harried individual. Misery, alienation and despair, rather than pleasure and ecstasy, are the key features of his existence. Since he cannot obtain his supply of drugs legally, his entire life becomes bound up in a ceaseless quest for heroin. He loses all desire for socially productive work,[157] food, sex, companionship, family ties and recreation,[158] and because of his poverty and his inability to obtain pure drugs, his life is scarred by constant pain, disease and, all too often, premature death.[159] Yet the misery of the addict

nificance and Characteristics, 32 Bull. WHO 721, 723 (1965); Vogel, Isbell & Chapman, Present Status of Narcotics Addiction, 138 A.M.A.J., 1019, 1020 (1948); Winick, *supra* note 141, at 23.

156. M. Nyswander, *supra* note 35, at 1; *see, e. g.,* Cantor, *supra* note 67, at 523; Frankel, *supra* note 125, at 587; Winick, *supra* note 141, at 9, 24.

157. Although addiction may cause a loss of vitality which can impair the addict's ability to work productively, *see, e. g.,* I. Chein et al., *supra* note 124, at 166; Winick, *supra* note 141, at 14; most addicts can perform in a work capacity in a relatively normal fashion if the drug is readily available to them. *See, e. g.,* Special Committee, *supra* note 56, at 48; A. Lindesmith, *supra* note 17, at 39–40; M. Nyswander, *supra* note 35, at 45; Blum, *supra* note 25, at 49, 54; Ploscowe, *supra* note 51, at 46–48.

158. *See, e. g.,* I. Chein et al., *supra* note 124, at 163; A. Lindesmith, *supra* note 17, at 40–44, 57; A. Noyes & L. Kolb, *supra* note 144, at 566–567; Bowman, *supra* note 122, at 1038–1040; Ausubel, *supra* note 116, at 66; Winick, *supra* note 141, at 141.

159. Contrary to popular belief, even prolonged heroin use does not cause permanent organic damage. Thus the illnesses most frequently associated with addiction, such as severe tooth decay, malnutrition and hepatitis, are due to the addict's preoccupation with drugs, the impurity of the drugs he purchases on the black market, and his poverty, rather than to addiction itself. *See, e. g.,* W. Eldridge, *supra* note 22, at 16–18; The Addict and the Law, *supra* note 23, at X; A. Lindesmith, *supra* note 17, at 39–40; A. Noyes & L. Kolb, *supra* note 144, at 567; Task Force, *supra* note 25, at 2; Ploscowe, *supra* note 51, at 47–49.

In New York City, narcotic addiction is the greatest single cause of death of persons between the ages of 15 and 35. In 1970, there were approximately 1,825 narcotic-related deaths nationally, and 84 in the District of Columbia. *See, e. g.,* Special Committee, *supra* note 56, at 31–32; Hearings Before Subcommittee No. 4 of the House Committee on the Judiciary, Entitled "Treatment and Rehabilitation of Narcotic Addicts", 92nd Cong., 1st Sess., 110 (1971) (testimony of Congressman Rodino, June 23, 1971); H. Rep.No.91–1808, 91st Cong., 2d Sess., 8 (1970); Hearings Before the House Select Committee on Crime, entitled "Crime in America—Heroin Importation, Distribution, Packaging and Paraphernalia", 91st Cong., 2d Sess., 184 (1970) (testimony of Dr. Milton Helpern, June 27, 1970). Most overdoses are due to the impurity of the drug injected. On the black market, the substance purchased may range in purity from about 1% to 30%, although 7% is normal. The remainder usually consists of natural impurities and adulterants such as lactose, dextrose, quinine and mannitol. Thus the user never knows what dosage he is actu-

is not his alone, for as members of a common society we all share in the responsibility for the conditions which have helped to make him what he is. Indeed, no matter how low he sinks, he cannot lose his right to justice; and the lower he sinks, the greater is his claim to our concern.

## IV. CRIMINAL RESPONSIBILITY AND ADDICTION

Recognizing the implications of the historical and medical considerations discussed above, appellant Moore contends that the federal narcotics statutes cannot be construed as exposing non-trafficking addict possessors to criminal punishment. Indeed, prosecution and conviction of such persons, appellant argues, would raise serious questions of constitutionality, is contrary to established common law notions of criminal responsibility, and is not mandated by Congress' intent in adopting the relevant legislation. For reasons given below, I find these arguments compelling.

### A

The Eighth Amendment's prohibition against cruel and unusual punishment may be traced as far back as the Magna Carta, and the principle it represents has been incorporated into every significant declaration of rights in modern history.[160] Despite its ancient lineage, however, the precise limits of the clause have never been determined. *See, e. g.,* Wilkerson v. Utah, 99 U.S. (9 Otto) 130, 135–136, 25 L.Ed. 345 (1878); In re Kemmler, 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890); Weems v. United States, 217 U.S. 349, 368, 30 S.Ct. 544, 54 L.Ed. 793 (1910); Trop v. Dulles, 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). But this judicial silence is the result, not of oversight, but of foresight, for the Supreme Court has long recognized that "[t]ime works changes, brings into existence new conditions and purposes * * * [and] a principle to be vital must [therefore] be capable of wider application than the mischief which gave it birth." Weems v. United States, *supra,* 217 U.S. at 373, 30 S.Ct. at 551. Indeed, "[t]he basic concept underlying the Eighth Amendment," wrote Chief Justice Warren, "is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards. * * * The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing

---

ally getting, and he has no protection from the adulterants, which may sometimes be even more dangerous than the drug itself. *See, e. g.,* I. Chein *et al., supra* note 124, at 15; Task Force, *supra* note 25, at 3; Hearings Before the House Select Committee on Crime, entitled "Crime in America—The Heroin Paraphernalia Trade", 91st Cong., 2d Sess., 2 (1970) (statement of Congressman Pepper, Oct. 5, 1970). In addition, the rate of suicide among addicts appears to be extremely high. *See, e. g.,* Bell, *supra* note 16, at 14; Vaillant, *supra* note 153, at 1282–1288. Indeed, according to a recent report of the Center for Studies of Suicide Prevention, young heroin and cocaine addicts in the District of Columbia attempt suicide at least 15 times more often than non-addicts in the same age group. The Washington Post, April 1, 1972, at B3, col. 1–5 ("Addict Suicide Attempt Rate High").

160. The path by which the phrase "cruel and unusual punishment" has come into our law is well known. The principle it represents can be traced to the Magna Carta, and the phrase was first used in the English Declaration of Rights of 1688. In 1776 the phrase formed a part of the Virginia Declaration of Rights, and James Madison included it in the constitutional amendments he drafted in 1789. It was incorporated into the Constitution in 1791 as part of the Eighth Amendment with little debate. *See, e. g.,* Note, Cruel and Unusual Punishment—Conviction of Chronic Alcoholic for Public Intoxication Violates the Eighth Amendment, 11 Vill. L.Rev. 861 (1966); Note, The Effectiveness of the Eighth Amendment: An Appraisal of Cruel and Unusual Punishment, 36 N.Y.U.L.Rev. 846 (1961); Note, The Constitutional Prohibition Against Cruel and Unusual Punishment—Its Present Significance, 4 Vand.L.Rev. 680 (1951).

society." Trop v. Dulles, *supra*, 356 U. S. at 100–101, 78 S.Ct. at 597–598.[161]

These "evolving standards of decency," the Eighth Amendment, and the problem of narcotic addiction met head on in Robinson v. California, *supra*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758, in which the Court held that a California statute which made it a criminal offense to "be addicted to the use of narcotics" inflicted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.[162] Unfortunately, however, the precise basis of the decision was somewhat unclear. At one level of interpretation, the Court was clearly concerned over the fact that Robinson had been convicted simply for "being an addict," "even though he has never touched any narcotic drug within the State or been guilty of any irregular behavior there." [163] If primary significance is attached to this aspect of the opinion, *Robinson* might be viewed quite narrowly as prohibiting only prosecution of those "criminals" who have committed no *actus reus* within the jurisdiction.

The Court's extensive discussion of the disease concept of addiction, however, suggests a far broader rationale:

"It is unlikely that any State at this moment in history would attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease. * * * [I]n the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. * * *

"We cannot but consider the statute before us as of the same category. In this Court counsel for the State recognized that narcotic addiction is an illness. Indeed, it is apparently an illness which may be contracted innocently or involuntarily. We hold that a state law which imprisons a person thus afflicted as a criminal, even though he has never touched any narcotic drug within the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment. * * * Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." [164]

161. Initially, the cruel and unusual punishment clause was viewed as prohibiting only brutal and inhumane methods of physical punishment. *See, e. g.*, Wilkerson v. Utah, 99 U.S. (9 Otto) 130, 135–136, 25 L.Ed. 345 (1878) ; In re Kemmler, 136 U.S. 436, 446–447, 10 S.Ct. 930, 34 L.Ed. 519 (1890) ; Weems v. United States, 217 U.S. 349, 390, 30 S.Ct. 544, 54 L.Ed 793 (1910) (White, J., dissenting). Its scope has been gradually expanded, however, to keep pace with contemporary values. Thus in Weems v. United States, *supra*, for example, the Court declared that the Eighth Amendment "was directed, not only against punishments which inflict torture, 'but against all punishments which, by their excessive length or severity, are greatly disproportioned to the offense charged.'" 217 U.S. at 371, 30 S.Ct. at 551, quoting O'Neil v. Vermont, 144 U.S. 323, 339–340, 12 S.Ct. 693, 36 L.Ed. 450 (1892) (Field, J., dissenting). Although the Court has not had occasion to follow it, *Weems* "has generally been accepted by both federal and state courts as establishing the rule that excessiveness as well as mode of punishment may be unconstitutionally cruel." Note, The Cruel and Unusual Punishment Clause and the Substantive Criminal Law, 79 Harv.L.Rev. 635, 640 (1966). *See, e. g.*, Workman v. Commonwealth, Ky., 429 S.W.2d 374 (1968) ; State v. Evans, 73 Idaho 50, 245 P.2d 788 (1952). The Court has also held that non-physical, as well as physical, punishment may be cruel and unusual. *See* Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958).

162. It is worth noting that *Robinson* represented the first instance in which the Court relied upon the cruel and unusual punishment clause in order to limit the states' power to define crime. *See, e. g.*, Note, *supra* note 161, at 646; Note, The Supreme Court, 1961 Term, 76 Harv.L. Rev. 54, 143 (1962).

163. 370 U.S. at 667, 82 S.Ct. at 1420.

164. *Id.* at 666–667, 82 S.Ct. at 1420–1421.

In light of this language, then, the opinion might also be interpreted as holding that narcotics addiction, like mental illness, leprosy and venereal disease, is an illness and as such cannot constitutionally be punished as a crime.[165] The implications of this interpretation are far-reaching, for if punishment for having a common cold (to use the Court's example) is constitutionally prohibited, it would make little sense to permit a legislature to punish one who has a cold for sneezing or taking medicine. Similarly, this interpretation would seem logically to prohibit not only the criminalization of the status of "being addicted," but also punishment of an addict for those acts, such as possession or use of narcotics, which are symptomatic of the disease and therefore beyond his power to avoid.[166] *Cf.* Driver v. Hinnant, 4 Cir., 356 F.2d 761 (1966); Morales v. United States, 9 Cir., 344 F.2d 846 (1965).

Thus two separate yet related "standards of decency" were reflected in the Court's analysis—one involving the disease concept of addiction and the other, somewhat more subdued, concerning the absence of any *actus reus*. Needless to say, this ambiguity caused considerable confusion and disagreement among the lower courts upon whom fell the difficult task of interpreting the decision.[167]

Indeed, the need for Supreme Court clarification soon became apparent, and in Powell v. Texas, 293 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968), the Court offered its guidance.

In late December 1966 Leroy Powell was arrested and charged with violation of a Texas statute declaring it unlawful to "get drunk or be found in a state of intoxication in any public place." [168] At the trial evidence was introduced that Powell was afflicted with the disease of chronic alcoholism, that his appearance in public while drunk was not of his own volition, and that he had been convicted of public intoxication approximately 100 times since 1949. The trial judge, sitting without a jury, entered the following findings of fact:

> "(1) That chronic alcoholism is a disease which destroys the afflicted person's will power to resist the constant, excessive consumption of alcohol.
> "(2) That a chronic alcoholic does not appear in public by his own volition but under a compulsion symptomatic of the disease of chronic alcoholism.

165. Despite 2 dissenting opinions, there was no articulated division within the Court on the basic principle that imposition of criminal sanctions on an addict who has lost the power of self-control constitutes cruel and unusual punishment. Thus Mr. Justice Clark, dissenting, construed the statute as imposing punishment only on the addict who had not yet lost his self-control as to the use of drugs. And since he was convinced that Robinson was such an addict, he felt the statute imposed a proper punishment. 370 U.S. at 679–685, 82 S.Ct. 1417. Similarly, Mr. Justice White clearly stated that he would "have other thoughts about this case" if Robinson had lost the power of self-control. 370 U.S. at 685, 82 S.Ct. at 1430.

166. It is true, of course, that the Court suggested in *dicta* that a state might constitutionally "impose criminal sanctions * * * against the unauthorized manufacture, prescription, sale, purchase, or possession of narcotics within its borders."

370 U.S. at 664, 82 S.Ct. at 1419. But as Justice White points out in dissent, the Court's failure to include in this listing the states' power to punish the "use" of narcotics could hardly have been inadvertent. *Id.* at 688, 82 S.Ct. 1417. Moreover, since an addict cannot possibly use narcotics without also purchasing, receiving or possessing them, it is only logical to assume that this dictum in *Robinson* was not intended to include possession by addicts not engaged in trafficking.

167. *Compare, e. g.*, Easter v. District of Columbia, 124 U.S.App.D.C. 33, 361 F. 2d 50 (1966) (*en banc*); Driver v. Hinnant, 4 Cir., 356 F.2d 761 (1966); Morales v. United States, 9 Cir., 344 F.2d 846 (1965); *with* Bailey v. United States, 5 Cir., 386 F.2d 1 (1967); United States v. Reincke, 2 Cir., 344 F.2d 260 (1965); State v. Margo, 40 N.J. 188, 191 A.2d 43 (1963); Salas v. State, Tex.Cr.App., 365 S.W.2d 174 (1963).

168. 392 U.S. at 517, 88 S.Ct. at 2146.

"(3) That Leroy Powell, defendant herein, is a chronic alcoholic who is afflicted with the disease of chronic alcoholism." [169]

Despite these findings, the judge ruled that chronic alcoholism was not a defense to the charge, and Powell was therefore convicted. On appeal, the Supreme Court affirmed the conviction. There was, however, no majority opinion. Mr. Justice Marshall, writing for four members of the Court, adopted a restrictive interpretation of *Robinson*. In his view, "[t]he entire thrust of *Robinson's* interpretation of the Cruel and Unusual Punishment Clause is that criminal penalties may be inflicted only if the accused * * * has committed some *actus reus*. It thus does not deal with the question of whether certain conduct cannot constitutionally be punished because it is, in some sense, 'involuntary' or 'occasioned by a compulsion.' " [170] Thus, since Powell had been convicted for commission of certain proscribed acts (*i. e.*, getting drunk in public), rather than for the mere "status" of being a chronic alcoholic, his conviction did not fall within the principle espoused. Finally, noting the disagreement among members of the medical profession as to the precise nature of the disease, Justice Marshall concluded that "[i]t is simply not yet the time to write into the Constitution formulas cast in terms whose meaning, let alone relevance, is not yet clear either to doctors or to lawyers." [171]

Mr. Justice Fortas, on the other hand, also speaking for four members of the Court, eschewed this narrow interpretation of *Robinson* and construed it as holding that "criminal penalties may not be inflicted upon a person for being in a position he is powerless to change." [172] As a corollary to this proposition, Justice Fortas declared that "a person may not [constitutionally] be punished if the condition essential to constitute the defined crime is part of the pattern of his disease and is occasioned by a compulsion symptomatic of the disease." [173] Admitting that "many aspects of the disease remain obscure," he noted that "[w]e are similarly woefully deficient in our medical, diagnostic, and therapeutic knowledge of mental disease and the problem of insanity; but few would urge that, because of this, we should totally reject the legal significance of what we do know about these phenomena." [174] Thus, accepting the trial judge's findings that Powell was powerless to avoid drinking and that, once intoxicated, he could not prevent himself from appearing in public places, Justice Fortas concluded that infliction of a criminal penalty upon the defendant for being publicly intoxicated would be cruel and unusual punishment within the prohibition of the Eighth Amendment.

The deciding opinion, then, was that of Mr. Justice White. Although concurring in the result reached by Justice Marshall, Justice White's analysis of the

169. *Id.* at 521, 88 S.Ct. at 2148.

170. *Id.* at 533, 88 S.Ct. at 2154.

171. *Id.* at 537, 88 S.Ct. at 2156. Moreover, Justice Marshall did not find the characterization of alcoholism as a disease particularly helpful, since it apparently meant only that those with drinking problems should be treated medically. Adverting to the variety of the degrees of alcoholism, the opinion suggests that even if a defense is recognized it would be available only to those alcoholics showing both an inability to abstain from drinking and a loss of control over amount. And after examining the evidence supporting the trial judge's finding that Powell was compelled to drink, Justice Marshall concluded that

"the record in this case is utterly inadequate to permit the sort of informed and responsible adjudication which alone can support the announcement of an important and wide-ranging new constitutional principle." 392 U.S. at 521, 88 S. Ct. at 2149. Finally, because of the lack of available facilities for treatment of alcoholics and the lack of any assurance that treatment would be successful in most cases, he was not persuaded that society has any clearly preferable alternative to the criminal law in handling the disease.

172. 392 U.S. at 567, 88 S.Ct. at 2171.

173. *Id.* at 569, 88 S.Ct. at 2172.

174. *Id.* at 559–560, 88 S.Ct. at 2168.

criminal responsibility issue was more in line with that of Justice Fortas:

"If it cannot be a crime to have an irresistible compulsion to use narcotics, Robinson v. California, 370 U.S. 660, [82 S.Ct. 1417, 8 L.Ed.2d 758] rehearing denied, 371 U.S. 905, [83 S. Ct. 202, 9 L.Ed.2d 166] (1962), I do not see how it can constitutionally be a crime to yield to such a compulsion. *Punishing an addict for using drugs convicts for addiction under a different name.* Distinguishing between the two crimes is like forbidding criminal conviction for being sick with flu or epilepsy but permitting punishment for running a fever or having a convulsion. Unless *Robinson* is to be abandoned, *the use of narcotics by an addict must be beyond the reach of the criminal law.* Similarly, the chronic alcoholic should not be punished for drinking or for being drunk." [175]

Justice White voted to affirm the conviction, however, on the narrow ground that this *particular* alcoholic had failed

to prove that he was compelled by his disease to be drunk *in public.*[176]

Thus, as this court noted in *Watson,* because of the absence of a majority opinion, *"Powell* has left this matter of criminal responsibility, as affected by the Eighth Amendment, in a posture which is, at best, obscure." 141 U.S. App.D.C. at 344, 439 F.2d at 451. But insofar as five members of the Court accepted the Fortas-White position, *Powell* and *Robinson* would seem to stand for the proposition that an addict cannot constitutionally be subjected to criminal process for engaging in conduct which is itself inherent in the disease of addiction. Possession of heroin, of course, is just such conduct, for it is logically impossible for a person to be a heroin addict without also purchasing, possessing and using the drug in order to satisfy his addiction.[177] This being so, it is clear that an interpretation of the federal narcotics statutes which would permit prosecution and conviction of addicts who simply possess the drug for their own use would, at the very least, raise serious questions of constitutionality.[178]

175. *Id.* at 548–549, 88 S.Ct. at 2161. (Emphasis added.) This position, it should be noted, is by no means inconsistent with Justice White's dissent in *Robinson.* In voting to affirm the conviction in that case, he did not disagree with the basic proposition that infliction of punishment on an addict who has lost the power of self-control is violative of the Eighth Amendment. Rather, he was concerned primarily with the Court's failure to recognize different degrees of addiction. 370 U.S. at 688, 82 S.Ct. 1417. In his view, Robinson was simply an habitual user who had not lost the power of self-control. Thus, although noting that the Court's application of the cruel and unusual punishment clause was novel, he specifically stated that "if [Robinson] was convicted for being an addict who had lost the power of self-control, I would have other thoughts about this case." *Id.* at 685, 82 S.Ct. at 1413.

176. Justice White made it quite clear, however, that for those alcoholics who could show "that resisting drunkenness is impossible and that avoiding public places when drunk is also impossible * * * this statute is in effect a law which bans

a single act for which they may not be convicted under the Eighth Amendment —the act of getting drunk." 392 U.S. at 551, 88 S.Ct. at 2164.

177. *See, e. g.,* Task Force, *supra* note 25, at 10; Ausubel, *supra* note 116, at 59; Niebel, Implications of Robinson v. California, 1 Houston L.Rev. 1, 5–7 (1963); Note, *supra* note 84, at 578.

178. Indeed, there exists a sharp split of opinion throughout the legal profession concerning the meaning of *Powell* and its effect upon laws penalizing the "symptoms" of alcoholism and narcotic addiction. *Compare, e. g.,* Smith v. Follette, 2 Cir., 445 F.2d 955 (1971); Nutter v. State, 8 Md.App. 635, 262 A.2d 80 (1970); People v. Jones, 43 Ill.2d 113, 251 N.E.2d 195 (1969); McKevitt, The "Untouchable" Acts of Addiction, 55 A.B. A.J. 454 (1969); Note, Criminal Law: Demise of "Status"—"Act" Distinction in Symptomatic Crimes of Narcotics Addiction, 1970 Duke L.J. 1053; *with* State v. Fearon, 283 Minn. 90, 166 N.W.2d 720 (1969); In re Jones, 432 Pa. 44, 246 A.2d 356 (1968); Greenawalt, "Uncontrollable" Actions and the Eighth Amendment: Implications of Powell v. Texas,

It has long been settled, however, that "[a] statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." United States v. Jin Fuey Moy, *supra*, 241 U.S. at 401, 36 S.Ct. at 659; *see, e. g.*, United States v. Rumely, 345 U.S. 41, 45, 73 S.Ct. 543, 97 L.Ed. 770 (1953); Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932); Lucas v. Alexander, 279 U.S. 573, 577, 49 S.Ct. 426, 73 L.Ed. 851 (1929); United States v. Delaware & Hudson Co., 213 U.S. 366, 408, 29 S.Ct. 527, 53 L.Ed. 836 (1909). Thus, unless there is a specific indication in either the statutes themselves or the legislative history that Congress intended these statutes to apply to non-trafficking addict possessors, we should reject such an interpretation in order to fulfill "our duty in the interpretation of federal statutes to reach a conclusion which will avoid serious doubts of their constitutionality." Richmond Co. v. United States, 275 U.S. 331, 346, 48 S. Ct. 194, 198, 72 L.Ed. 303 (1928).

### B

Although *Powell* left unsettled the precise relationship between criminal responsibility and the Constitution, no member of the Court expressed even the slightest disagreement with the basic proposition that the Eighth Amendment provides only the floor and not the ceiling for development of common law no-

tions of criminal responsibility. Indeed, Mr. Justice Marshall, adopting a restrictive view of the constitutional issue, emphasized that the

> "doctrines of *actus reus, mens rea,* insanity, mistake, justification, and duress have historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man. * * * "

392 U.S. at 536, 88 S.Ct. at 2156. Thus, no matter what interpretation of *Powell* eventually is adopted, the decision must "be read not as a bar, but as an exhortation toward further experiment with common-law doctrines of criminal responsibility." Watson v. United States, *supra,* 141 U.S.App.D.C. at 352, 439 F.2d at 459 (Chief Judge Bazelon, concurring in part and dissenting in part).

The concept of criminal responsibility is, by its very nature, "an expression of the moral sense of the community." United States v. Freeman, 2 Cir., 357 F.2d 606, 615 (1966). In western society, the concept has been shaped by two dominant value judgments—that punishment must be morally legitimate,[179] and that it must not unduly threaten the liberties and dignity of the individual in his relationship to society.[180] As a result, there has historically [181] been a strong conviction in our jurisprudence

---

69 Colum.L.Rev. 927 (1969); Bason, Chronic Alcoholism and Public Drunkenness—Quo Vadimus Post Powell, 19 Am. U.L.Rev. 48 (1969); Comment, Emerging Recognition of Pharmacological Duress as a Defense to Possession of Narcotics: Watson v. United States, 59 Geo.L.J. 761 (1971); S.Rep.No.91–1069, 91st Cong., 2d Sess., 3 (1970); address by Attorney General John N. Mitchell, testimonial dinner honoring R. Brinkley Smithers, New York City, Dec. 9, 1971, at 5.

179. *See, e. g.*, J. Hall, General Principles of Criminal Law 70–75, 163–170 (2d ed. 1960); H. L. A. Hart, Legal Responsibility and Excuse, in S. Hook (ed.), Deter-

minism and Freedom 95, 102–103 (1961); H. M. Hart, The Aims of the Criminal Law, 23 Law & Contemp.Prob. 401, 423–424 (1958).

180. Dubin, Mens Rea Reconsidered: A Plea for a Due Process Concept of Criminal Responsibility, 18 Stan.L.Rev. 322, 343 (1966); Frankel, *supra* note 125, at 591; H. L. A. Hart, *supra* note 179, at 109–112.

181. For a discussion of the historical development of this conviction, *see generally* 2 F. Pollack & F. Maitland, The History of English Law 470–471, 479–480, 490–491, 499 (2d ed. 1923); Sayre, Mens Rea, 45 Harv.L.Rev. 974, 975–1016 (1932).

that to hold a man criminally responsible his actions must have been the product of a "free will." *See, e. g.,* 4 W. Blackstone, Commentaries 20–21, 27 (1854); 2 J. Stephen, History of the Criminal Law of England 99, 183 (1883). And this conviction "is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." Morissette v. United States, 342 U.S. 246, 250, 72 S. Ct. 240, 243, 96 L.Ed. 288 (1952). Thus criminal responsibility is assessed only when through "free will" a man elects to do evil, and if he is not a free agent, or is unable to choose or to act voluntarily, or to avoid the conduct which constitutes the crime, he is outside the postulate of the law of punishment.[182]

Despite this general principle, however, it is clear that our legal system does not exculpate all persons whose capacity for control is impaired, for whatever cause or reason. Rather, in determining responsibility for crime, the law assumes "free will" and then recognizes known deviations "where there is a broad consensus that free will does not exist" with respect to the particular condition at issue. Salzman v. United States, 131 U.S.App.D.C. 393, 399, 405 F.2d 358, 364 (1969) (Wright, J., concurring); *see also* United States v. Brawner, 153 U.S.App.D.C. 1, 27, 471 F. 2d 969, 995 (1972) (*en banc*). The evolving nature of this process is amply demonstrated in the gradual develop-

---

182. Whether premised on the common law concept of *mens rea, actus reus,* or a combination of the two, the requirement of voluntary action is fundamental to our system of criminal justice. *See, e. g.,* Easter v. District of Columbia, *supra* note 167, 124 U.S.App.D.C. at 35, 361 F.2d at 52; Carter v. United States, 102 U.S. App.D.C. 227, 235, 252 F.2d 606, 616 (1957); State v. Pike, 49 N.H. 399, 441–442 (1869); H. L. A. Hart, The Morality of the Criminal Law 8, 27 (1965); J. Hall, *supra* note 179, at 296; R. Perkins, Criminal Law 749–750 (2d ed. 1969); W. Burdick, The Law of Crime § 110 (1946); H. M. Hart, *supra* note 179, at 412, 414; Dubin, *supra,* note 180, at 296; Sayre, *supra* note 181, at 1004; Pound, Introduction to F. Sayre, Cases on Criminal Law (1927).

It should be noted that the Supreme Court's decisions in such cases as United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943); United States v. Balint, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (9122); and Shevlin-Carpenter Co. v. Minnesota, 218 U.S. 57, 30 S.Ct. 663, 54 L.Ed. 930 (1910); are by no means inconsistent with the principle set forth. In those cases, the Court refused to interpret statutes creating "regulatory" crimes as requiring "intent" as an element of the offense where the legislature had seen fit not to write such a requirement into the statute. These regulatory offenses are intended to serve an instructive purpose with regard to the general class of persons to which they are addressed. Thus the courts are willing to allow strict liability insofar as mistake of fact is concerned for the accused under such statutes ordinarily is capable of preventing the violation "with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who has assumed his responsibility." Morissette v. United States, 342 U.S. 246, 256, 72 S.Ct. 240, 246, 96 L.Ed. 288 (1952). *See generally* J. Hall, *supra* note 179, at 327–331; G. Williams, Criminal Law 215–238 (2d ed. 1961 The General Part); Wasserstrom, Strict Liability in the Criminal Law, 12 Stan.L.Rev. 730 (1960).

The situation is quite different, however, where the defendant's ability to control his behavior is impaired by some legally recognized disability such as duress, insanity, chronic alcoholism or addiction. Since these persons are *incapable* of conforming to the law no matter what standard of care is required, they cannot be held responsible for violations of even "regulatory" statutes. *See, e. g.,* Easter v. District of Columbia, *supra* note 167, 124 U.S.App.D.C. at 37, 361 F.2d at 54; Driver v. Hinnant, *supra* note 167, 356 F.2d at 764; J. Hall, *supra* note 179, at 342; R. Perkins, *supra,* at 806; G. Williams, *supra,* at 215; Lowenstein, Addiction, Insanity, and Due Process of Law: An Examination of the Capacity Defense, 3 Harv.Civ.Rights-Civ.Lib.L. Rev. 125, 128–129 (1967); Binavince, The Ethical Foundation of Criminal Liability, 33 Fordham L.Rev. 1, 32 (1964).

ment of such defenses as infancy,[183] duress,[184] insanity,[185] somnambulism and other forms of automatism,[186] epilepsy and unconsciousness,[187] involuntary intoxication,[188] delirim tremens,[189] and chronic alcoholism.[190]

A similar consensus exists today in the area of narcotics addiction.[191] In *Easter v. District of Columbia,* 124 U.S. App.D.C. 33, 36, 361 F.2d 50, 53 (1966) (*en banc*), this court held that a "chronic alcoholic cannot have the *mens rea* necessary to be held responsible criminally for being drunk in public" since such an individual "is in fact a sick person who has *lost control* over his use of alcoholic beverages." (Emphasis added.) *See also Driver v. Hinnant, supra,* 356 F.2d at 764. The World Health Organization has ranked heroin addiction as the most intensive form of drug dependence, far more severe than alcoholism.[192] Indeed, the primary element of the most widely accepted definition of opiate addiction is "an overpow-

*ering* desire or need to continue taking the drug," [193] and Congress has repeatedly defined as an addict any individual who is "so far addicted to the use of narcotic drugs as to have *lost the power of self-control* with reference to his addiction." [194] Thus it can no longer seriously be questioned that for at least some addicts the "overpowering" psychological and physiological need to possess and inject narcotics cannot be overcome by mere exercise of "free will."

Moreover, recognition of a defense of "addiction" for crimes such as possession of narcotics is consistent not only with our historic common law notions of criminal responsibility and moral accountability, but also with the traditional goals of penology—retribution, deterrence, isolation and rehabilitation.

Unlike other goals of penology, the retributive theory of criminal justice looks solely to the past for justification, without regard to considerations of prevention or reformation. Although the pri-

183. *See, e. g.,* Allen v. United States, 150 U.S. 551, 14 S.Ct. 196, 37 L.Ed. 1179 (1893); Heilman v. Commonwealth, 84 Ky. 457, 1 S.W. 731 (1886).

184. *See, e. g.,* 4 W. Blackstone, Commentaries 27–32 (1854); Gillars v. United States, 87 U.S.App.D.C. 16, 30, 182 F.2d 962, 976 (1950); Martin v. State, 31 Ala.App. 334, 17 So.2d 427 (1944).

185. *See, e. g.,* Regina v. Oxford, 173 Eng. Rep. 941, 950 (1840) (Lord Denman); M'Naghten's Case, 10 Clark & F. 200, 2 Eng.Rep. 718 (H.L. 1843); Smith v. United States, 59 App.D.C. 144, 36 F.2d 548 (1929); Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954); McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962) (*en banc*); United States v. Brawner, 153 U.S.App.D.C. 1, 471 F.2d 969 (1972) (*en banc*).

186. *See, e. g.,* Fain v. Commonwealth, 78 Ky. 183 (1879); G. Williams, *supra* note 182, at 482–490.

187. *See, e. g.,* Carter v. State, Okl.Cr., 376 P.2d 351 (1962); Smith v. Commonwealth, Ky., 268 S.W.2d 937 (1954); People v. Freeman, 61 Cal.App.2d 110, 142 P.2d 435 (1943).

188. *See, e. g.,* State v. Rippy, 104 N.C. 752, 10 S.E. 259 (1889); Pribble v.

People, 49 Colo. 210, 112 P. 220 (1910); J. Hall, *supra* note 179, at 538–544; G. Williams, *supra* note 182, at 562–563.

189. *See, e. g.,* United States v. McGlue, C.C.D.Mass., 26 Fed.Cas.No.15,679 (1851); United States v. Drew, C.C.D. Mass., 25 Fed.Cas.No.14,993 (1828).

190. *See, e. g.,* State v. Fearon, *supra* note 178; Easter v. District of Columbia, *supra* note 167.

191. *See, e. g.,* M. Nyswander, *supra* note 35, at 1; Cantor, *supra* note 67, at 523; Frankel, *supra* note 125, at 587; Winick, *supra* note 141, at 9, 24. *See generally* text and notes at notes 129–159 *supra.*

192. *See* World Health Organization Expert Committee on Alcohol, First Report, WHO Tech.Rep.Ser.No.84, at 10–11 (1954).

193. World Health Organization Expert Committee on Addiction-Producing Drugs, Thirteenth Report, WHO Tech.Rep.Ser. No. 273, at 13 (1964) (emphasis added).

194. 21 U.S.C. § 802(1) (emphasis added). *See also* 18 U.S.C. § 4251; 28 U.S.C. § 2901; 42 U.S.C. § 3411; 24 D.C. Code § 602(a)(1967). In an alternative formulation, Congress has characterized addiction as a "strong compulsion." 42 U.S.C. § 201(q).

mordial desire for vengeance is an understandable emotion, it is a testament to the constantly evolving nature of our social and moral consciousness that the law has, in recent decades, come to regard this "eye-for-an-eye" philosophy as an improper basis for punishment.[195] But even if this barbaric notion of justice retained its validity, it clearly would be inapplicable to those persons who act under a compulsion. Revenge, if it is ever to be legitimate, must be premised on moral blameworthiness, and what segment of our society would feel its need for retribution satisfied when it wreaks vengeance upon those who are diseased because of their disease?

It is of course true that there may have been a time in the past before the addict lost control when he made a conscious decision to use drugs.[196] But imposition of punishment on this basis would violate the long-standing rule that "[t]he law looks to the immediate, and not to the remote cause; to the actual state of the party, and not to the causes, which remotely produced it." United States v. Drew, C.C.D.Mass., 25 Fed. Cas. No. 14,993 at 914 (1828). *See also* Perkins v. United States, 4 Cir., 228 F. 408 (1915); Cochran v. State, 65 Fla. 91, 61 So. 187 (1913); State v. Kidwell, 62 W.Va. 466, 59 S.E. 494 (1907);

Beasley v. State, 50 Ala. 149 (1873). In answer to a similar argument in *Easter, supra,* this court declared that

> "chronic alcoholism resulting in public intoxication cannot be held to be criminal on the theory that before the sickness became chronic there was at some earlier period a voluntary act or series of acts which led to the chronic condition. A sick person is a sick person though he exposed himself to contagion. * * * "

124 U.S.App.D.C. at 36, 361 F.2d at 53. I would adhere to that view today, for no matter how the addict came to be addicted, once he has reached that stage he clearly is sick, and a bare desire for vengeance cannot justify his treatment as a criminal. Indeed, the need for retribution "can never be permitted in a civilized society to degenerate into a sadistic form of revenge." United States v. Freeman, *supra,* 357 F.2d at 615.

The most widely employed argument in favor of punishing addicts for crimes such as possession of narcotics is that such punishment or threat of punishment has a substantial deterrent effect. Given our present knowledge, however, the merits of this argument appear doubtful. Deterrence presupposes rationality—it proceeds on the assumption that the detriments which would inure to

---

195. *See, e. g.,* Morissette v. United States, *supra* note 182, 342 U.S. at 251, 72 S.Ct. 240; Williams v. New York, 337 U.S. 241, 248, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); In re Estrada, 63 Cal.2d 740, 745, 48 Cal.Rptr. 172, 175, 408 P.2d 948, 951 (1965); People v. Oliver, 1 N.Y.2d 152, 160, 151 N.Y.S.2d 367, 373, 134 N.E. 2d 197, 201–202 (1956). *See also* J. Michael & H. Wechsler, Criminal Law and Its Administration 9–10 (1940); A. Koestler, Reflections on Hanging 105–106 (1957); Camus, Reflections on the Guillotine, in E. London, The Law As Literature 528 (1960); Wechsler & Michael, A Rationale of the Law of Homicide, 37 Colum.L.Rev. 701, 752–761 (1937).

196. For some addicts, however, even the initial exposure to the drug and the subsequent addiction may be wholly involuntary. This may occur either through the use of medically prescribed narcotics or, in some cases, at birth because of ma-

ternal addiction. *See, e. g.,* Robinson v. California, 370 U.S. 660, 667, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); *see also* text at notes 114–115 *supra.* Any distinction which might be drawn between those addicts who became addicted innocently and those who began voluntarily would, of course, create virtually insuperable problems of proof. A second difficulty which might arise if such a distinction were adopted concerns the statute of limitations. If the initial voluntariness is viewed as the basis of liability, would addiction then be characterized as a continuing offense on which the statute of limitations does not run? And if the addict, now 40, first used the drug at age 15, would he have to be tried according to juvenile court standards? All of these problems, of course, need not and indeed should not arise, for regardless of how he came to be addicted, the addict is sick, and must be treated as such.

the prospective criminal upon apprehension can be made so severe that he will be dissuaded from undertaking the criminal act. In the case of the narcotic addict, however, the normal sense of reason, which is so essential to effective functioning of deterrence, is overcome by the psychological and physiological compulsions of the disease. As a result, it is widely agreed that the threat of even harsh prison sentences cannot deter the addict from using and possessing the drug.[197]

A similar situation prevails insofar as deterrence of *potential* addicts is concerned. At the outset, it must be noted that nothing in this opinion would in any way affect the criminal responsibility of non-addict users for crimes they may commit—including illegal possession of narcotics. Such persons are not compelled by the disease of addiction to use and possess the drug, and they are therefore proper subjects for punishment. Thus the concept of deterrence in this context is relevant only insofar as punishment of addict possessors might inhibit non-addicts, who are themselves subject to punishment, from using narcotics. Simply to state the problem is, of course, to answer it. Since the non-addict may still be punished for his possession of narcotics, the only consolation he might find in exculpation of addict possessors is that if he eventually attains the status of "addict" he must be treated rather than punished. But given what we now know about the pitiable life of an addict, this somewhat dubious consolation is hardly likely to "encourage" persons to use narcotics. *Cf.* Greenawalt, "Uncontrollable" Actions and the Eighth Amendment: Implications of Powell v. Texas, 69 Colum.L. Rev. 927, 954 (1969).

There is another side to the question of deterrence, however, which should not be ignored. The criminal law may serve as a deterrent not only through the fear of apprehension and prosecution, but also through the more general educative or moralizing effect the law may have upon society. Viewed in this manner, punishment as a concrete expression of society's disapproval of particular conduct helps to instill a desired moral code in the citizenry against commission of the proscribed acts. *See, e. g.,* Hawkins, Punishment and Deterrence: The Educative, Moralizing, and Habituative Effects, 1969 Wis.L.Rev. 550; Andenaes, The General Preventive Effects of Punishment, 114 U.Pa.L.Rev. 949 (1966); Andenaes, General Prevention—Illusion or Reality?, 43 J.Crim.L., C. & P.S. 176 (1952). Indeed, the history of public attitudes in this nation toward addiction exemplifies the potential impact this moralizing effect can achieve. But in an effort to shape these attitudes, the architects of our policies swept too broadly, perpetrating such myths as the "dope-crazed sex fiend" and condemning not only the volitional drug abuser but the confirmed addict as well. And although society may and indeed should voice its disapproval of non-medical use of narcotics, it is highly questionable whether it should also condemn as "moral degenerates" those pathetic individuals who, because of the disease of addiction, can no longer control their use of the drug. *See, e. g.,* Rosenthal, Proposals for Dangerous Drug Legislation, in President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Narcotics and Drug Abuse 80, 104 (1967).

Moreover, in any discussion of deterrence we must recognize that when an

197. *See, e. g.,* Special Committee, *supra* note 56, at 25–26; Advisory Commission, *supra* note 79, at 3, 40; New York Academy of Medicine, Report on Drug Addiction 10 (1955); Rosenthal, Proposals for Dangerous Drug Legislation, in Task Force, *supra* note 25, at 80, 103;

Ploscowe, *supra* note 51, at 19–20; Cantor, *supra* note 67, at 523; Chambliss, Types of Deviance and the Effectiveness of Legal Sanctions, 1967 Wis.L.Rev. 703, 707; Frankel, *supra* note 125, at 587–588; S.Rep.No.1667, 89th Cong., 2d Sess., 15 (1966).

individual is punished, not for his own good, but to set an example for others, he "suffers not for what he has done but on account of other people's tendency to do likewise." Bittner & Platt, The Meaning of Punishment, 2 Issues in Criminology 79, 93 (1966). In such situations, the offender serves simply as a tool in the hands of society, and if punishment premised on considerations of deterrence is to be morally legitimate, the punishment meted out must be justifiable in light of the gravity of the offense and the culpability of the offender. *See, e. g.,* Andenaes, The Morality of Deterrence, 37 U.Chi.L.Rev. 649 (1970). Since the addict's possession of narcotics is simply a symptom of his disease and not an act of "free will," however, this conduct cannot properly be deemed "culpable," and, it would therefore seem inappropriate for society to utilize him as a mere vehicle through which to deter others.

This is not to suggest, of course, that society has no legitimate interest in deterring drug abuse. Narcotic addiction presents a danger to both the addict and society generally, and society therefore has a right and indeed a duty to institute those measures which are reasonably necessary to curtail its incidence. But punishment of addict possessors is neither a reasonable nor a necessary means to achieve this goal.[198] Indeed, in enacting the Narcotic Addict Rehabilitation Act of 1966,[199] Congress itself recognized that the need to rehabilitate addicts generally outweighs any deterrent impact their imprisonment might achieve. Moreover, it should be noted that in some sense the entire question of deterrence in this context may in reality be meaningless. For after nearly two decades of experience with the harsh

penalty provisions adopted in the 1950's,[200] Congress concluded that "the severity of penalties * * * does not affect the extent of drug abuse." S.Rep. No. 91-613, 91st Cong., 1st Sess. at 2 (1969); *see also* Report of the President's Commission on Crime in the District of Columbia 572-573 (1967). And acting upon this conclusion, Congress enacted the Comprehensive Drug Abuse Prevention and Control Act of 1970,[201] in which the penalties for crimes of possession were decreased dramatically.

Shifting our focus now to the goal of isolating the offender, we arrive here at not only a justifiable basis for action but one which, in some cases at least, may be vital to the interests of society. Under our system of law, it must be remembered, criminal sanctions are withheld in cases of incompetence out of a moral sense of compassion and understanding. It would be obviously intolerable, however, if those suffering from a disease of such a nature as to relieve them of criminal responsibility were to be set free to continue to pose a danger to society. Thus, as with any individual who is afflicted with a dangerous or contagious disease, when the addict's freedom may seriously jeopardize the safety and security of the community, society has a legitimate interest in restraining him in order to protect its citizens. *See, e. g.,* Robinson v. California, *supra,* 370 U.S. at 664-665, *id.* at 676, 82 S.Ct. 1417 (Mr. Justice Douglas, concurring); Easter v. District of Columbia, *supra,* 124 U.S.App.D.C. at 37, 38, 361 F.2d at 54, 55; Driver v. Hinnant, *supra,* 356 F.2d at 764, 765.

This does not mean, however, that the goal of isolation justifies infliction of criminal punishment upon the addict.

---

198. Other means are, of course, available to achieve deterrence, including increased prosecution of non-addict users and traffickers, and more intensive efforts to provide accurate information to the public concerning the dangers of drug abuse and the nature of addiction. *See, e. g.,* 21 U.S.C. § 1001 *et seq.* (1970); Rosenthal, *supra* note 197, at 104-105. In addition,

the mere threat of civil commitment may serve a deterrent function. *See, e. g.,* Greenawalt, *supra* note 178, at 958.

199. 28 U.S.C. § 2901 *et seq.*; 18 U.S.C. § 4251 *et seq.*; 42 U.S.C. § 3411 *et seq.*

200. *See* text and notes at notes 94-97 *supra.*

201. 21 U.S.C. § 801 *et seq.*

On the contrary, this interest may be fully vindicated through a program of civil commitment with treatment as well as by criminal incarceration. And since the addict is not a culpable offender, treatment is clearly a preferable alternative to mere imprisonment. Moreover, the community's security may be even better protected under civil commitment for, as we shall see, although incarceration may restrain the addict for the period of his sentence, it does nothing to reduce the likelihood that upon his return to the streets he will again resort to the use of drugs.[202] Finally, we should make certain that, in the words of the President's Commission on Law Enforcement and Administration of Justice, when civil commitment is utilized as a means to isolate the addict, it "must not become the civil equivalent of imprisonment. The programs must offer the best possible treatment, including new techniques as they become available, and the duration of the commitment, either within or outside an institution, must be no longer than is reasonably necessary." [203]

This, then, brings us to the final and most important goal of modern penology —to rehabilitate the offender. In this age of enlightened correctional philosophy, we now recognize that society has a responsibility to both the individual and the community to treat the offender so that upon his release he may function as a productive, law-abiding citizen. And this is all the more true where, as with the non-trafficking addict possessor, the offender has acted under the compulsion of a disease. The task of rehabilitating the narcotic addict is not, as once was thought, a hopeless task. Great strides have been made in recent years toward development of effective and humane treatment techniques at both community-based and institutional levels, and the cure rate for addiction is now far higher than that of many other illnesses.[204] Thus, with the possible exception of those addicts who remain incurable,[205]

202. *Cf.* Williams v. United States, 102 U.S.App.D.C. 51, 58, 250 F.2d 19, 26 (1957) ; Douglas v. United States, 99 U.S.App.D.C. 232, 240 n. 12, 239 F.2d 52, 60 n. 12 (1956) ; Hearings Before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary on Bills Relating to Crime Syndicates, Obstruction of Investigation, Wiretapping, Immunity, Narcotic Drug Addiction, and Admissibility in Evidence of Confessions, 89th Cong., 2d Sess., 160 (1966) (statement of Leo J. Gehrig, Acting Surgeon General, U.S. Public Health Service, *et al.*). *See also* text and notes at notes 206–207 *infra*.

203. Task Force, *supra* note 25, at 17 ; *see also* Rouse v. Cameron, 125 U.S.App.D.C. 366, 373 F.2d 451 (1967) ; Wyatt v. Stickney, M.D.Ala., 325 F.Supp. 781 (1971).

204. For a discussion of these modern techniques and a comparison with more traditional methods of treatment, *see, e. g.*, Special Committee, *supra* note 56, at 52–61 ; Institute on New Developments in the Rehabilitation of the Narcotic Addict, Rehabilitating the Narcotic Addict (1968) ; D. Willner & G. Kassembaum (eds.), Narcotics chs. 10–17 (1965) ; D. Casriel, So Fair a House—The Story of Synanon (1963) ; DuPont & Katon, Development of a Heroin-Addiction Treatment Program : Effect on Urban Crime, 216 J.A.M.A. 1320 (May 1971) ; Eddy, Current Trends in the Treatment of Drug Dependence and Drug Abuse, 1971 Drug Abuse L.Rev. 308 ; Dole, Nyswander & Warner, Successful Treatment of 750 Criminal Addicts, 206 J.A.M.A. 2708 (June 1968) ; Fisher, The Rehabilitative Effectiveness of a Community Correctional Residence for Narcotic Users, 56 J.Crim.L., C. & P.S. 203 (1965) ; Winick, *supra* note 141 ; Lowry, *supra* note 142 ; Note, Methadone Maintenance for Heroin Addicts, 78 Yale L.J. 1175 (1969) ; H. Rep.No.92–678, 92nd Cong., 1st Sess., 5–35 (1971) ; H.Rep.No.91–1808, 91st Cong., 2d Sess., 31–45 (1970).

205. Although we have made great progress in our efforts to discover new and more effective techniques to rehabilitate the addict, we have not yet, and indeed may never, reach the point where all addicts can be cured. Nevertheless, it should be clear that non-trafficking addict possessors—even if incurable—may not be subjected to criminal punishment under existing legislation. We would, of course, hope that Congress will continue to explore all possible avenues of cure in order to provide effective rehabilitation for as

society clearly cannot meet its responsibilities simply by confining the addict without treatment. Such an approach does nothing to cure the chronic relapsing aspects of the disease,[206] and where confinement takes the form of imprisonment the addict is thrust inevitably into a "revolving door" of arrest, conviction, imprisonment, release and arrest, with the period of incarceration serving as but a temporary and futile stopping point in an otherwise interminable cycle.[207]

Under existing law, of course, at least some addicts may escape this cycle through the involuntary civil commitment procedures of Title II of the Narcotic Addict Rehabilitation Act, 18 U.S. C. § 4251 *et seq.* In enacting this legislation, however, Congress specifically limited its applicability to only those addicts who have been charged, prosecuted and convicted of a criminal offense.[208] Thus, with the recognition of the defense of addiction, these procedures presumably would no longer be available to non-trafficking addict possessors.[209] But this does not mean, as some may fear, that these addicts would be deprived of treatment or released without

---

many addicts as possible. One such avenue may be expanded use of methadone, which has proven moderately successful even with "old" addicts such as Raymond Moore. *See* Tr. 289–290. In the last analysis, however, there will inevitably be some addicts who cannot be treated. If there is in fact no prospect of rehabilitation, it is possible that we may have either (a) some limited program of heroin maintenance for otherwise incurable addicts, similar to the system in effect in England; (b) civil commitment without rehabilitative treatment; or (c) on *explicit* direction of Congress, and depending of course upon what interpretation of *Robinson* and *Powell* eventually is adopted, criminal liability without fault.

206. Mere incarceration may, of course, force the addict to undergo withdrawal, but this does not end the addiction, for the underlying psychological components of the addiction remain intact. *See, e. g.,* W. Eldridge, *supra* note 22, at 2; Advisory Commission, *supra* note 79, at 55; American Medical Association and National Academy of Sciences—National Research Council, *supra* note 153, at 87; Jaffe, *supra* note 125, at 277; Cantor, *supra* note 67, at 524; Rosenthal, *supra* note 197, at 104; S.Rep.No.1667, 89th Cong., 2d Sess., 15 (1966).

207. According to the President's Commission on Crime in the District of Columbia, for example, "[j]ust as the threat of long prison terms does not seem .to deter the addict, neither does the reality of prison life cure him. Lorton Reformatory does little to rehabilitate the addict, who re-enters the community after release with no help in confronting the basic problems underlying his addiction or preventing his readdiction. It is not surprising that most addicts rejoin the illegal drug traffic and resume their prior habit." Report of the President's Commission, *supra* note 104, at 573.

These observations are corroborated by a Maryland study, which revealed that only one year after release there were virtually no paroled addicts who had been continuously drug free, and that more than 80% had been returned to prison. *See* Jaffe, Whatever Turns You Off, 3 Psychology Today 43, 61 (May 1970). Indeed, appellant Moore's life provides a classic example of the failure of this punitive approach. In the 25 years since Moore first became addicted, at age 16, he has been arrested 23 times, convicted 14 times, and spent over 13 years in prison. On each occasion appellant went through withdrawal, yet returned to using heroin within weeks of his release. *See* Brief for Appellant at 28–36; Brief for the Washington Area Council on Alcoholism and Drug Abuse as *Amicus Curiae* at 2–3.

208. Under Title II of NARA, an addict may be involuntarily committed for treatment only if he has been "convicted of an offense against the United States." 18 U.S.C. § 4251(f); *see also* 18 U.S.C. § 4251(e). In the original Senate version of Title III, providing for civil commitment of addicts *not* charged with a criminal offense, it was proposed that such addicts may be involuntarily committed upon petition of "any individual." S.Rep. No.1667, 89th Cong., 2d Sess., 2 (1966). If this proposal had been adopted, "a friend of an alleged addict, a member of his family *or a law enforcement official*" could initiate the commitment proceedings. *Id.* at 23. (Emphasis added.) This version of the bill clearly was rejected, however, and as enacted Title III provides that only "a related individual" may file a petition for involuntary commitment. 42 U.S.C. § 3412(a) (1970).

209. At least some, and perhaps many, non-trafficking addict possessors may not receive treatment under Title II of NARA. The initial decision to commit for exam-

care or confinement to "prey on society." United States v. Lindsey, D.D.C., 324 F.Supp. 55, 57 (1971).

For the addict who may affirmatively desire treatment, there are, of course, many options available, including the possibility of voluntary civil commitment.[210] Moreover, there exist in the District of Columbia established procedures for involuntary commitment of known addicts even though they have not been charged, prosecuted or convicted of a criminal offense. See Hospital Treatment for Drug Addicts Act for the District of Columbia, 24 D.C.Code § 601 et seq. (1967). Under this Act, the Commissioner of the District of Columbia must conduct a preliminary examination whenever he has probable cause to believe that any person[211] within the District is an addict.[212] If evidence of addiction is found at the preliminary ex-amination, the patient is committed to a hospital for examination by two physicians, at least one of whom must be a psychiatrist.[213] Within five days these physicians must report their conclusions to the United States Attorney, who may, in his discretion, present a commitment petition to the Superior Court of the District of Columbia.[214] If, after a hearing,[215] the court finds the patient to be an addict, he is committed to a hospital until confinement for treatment is no longer necessary or until he has received "maximum benefits."[216] After his release, the patient is supervised in the community for a period of two years to insure that he does not return to the use of drugs.[217] Finally, the patient in these proceedings "shall not be deemed a criminal and the commitment of any such patient shall not be deemed a conviction."[218]

ination is in the discretion of the trial judge, and many otherwise eligible addicts may be excluded from treatment either because they are not "likely to be rehabilitated" or because "adequate facilities or personnel for treatment are unavailable." 18 U.S.C. § 4251(a).

210. See, e. g., 42 U.S.C. § 3411 et seq.; 42 U.S.C. § 260; 24 D.C.Code § 601 et seq. (1967).

211. The Act is not available to those addicts who are charged with a criminal offense, serving a sentence, on probation or parole, or on bond pending appeal. 24 D.C.Code § 603(b). If non-trafficking addict possessors were no longer subject to conviction of mere possession, however, these exclusions would pose no obstacle to involuntary civil commitment of such addicts unless some offense other than possession is involved. In addition, under principles similar to those announced in Bolton v. Harris, 130 U.S.App.D.C. 1, 10–11, 395 F.2d 642, 651–652 (1968), a defendant found not guilty of possession of drugs for his own use by reason of addiction may be retained in custody or continued on bond under appropriate conditions pending civil commitment proceedings for treatment.

212. 24 D.C.Code § 603(a); see note following 24 D.C.Code § 602 (Supp. IV 1971). The Act itself uses the term "drug user" rather than addict, but "drug user" is defined as "any person * * * who uses any habit-forming narcotic drugs so as to endanger the public morals, health, safety, or welfare or who is so far addicted to the use of such drugs as to have lost the power of self-control with reference to his addiction." 24 D.C.Code § 602(a) (Supp. IV 1971). This is, of course, the same definition most other statutes use to define "addict." See, e. g., 21 U.S.C. § 802(1); 18 U.S.C. § 4251; 28 U.S.C. § 2901; 42 U.S.C. § 3411.

213. 24 D.C.Code §§ 603(a), 605(a).

214. 24 D.C.Code § 605(a); 24 D.C.Code § 605(b) (Supp. IV 1971).

215. The patient has a right to a full evidentiary hearing, at which he may introduce evidence and subpoena and cross-examine witnesses. He also may demand trial by jury and has a right to counsel. 24 D.C.Code §§ 604–607.

216. 24 D.C.Code §§ 608, 609. The hospital must submit reports at 6-month intervals to explain the patient's continued confinement, and the patient may petition for release after one year. 24 D.C.Code §§ 608, 609(b).

217. 24 D.C.Code § 610(a). The patient may be recommitted if he again becomes a drug user, and failure to report as scheduled to the Commissioner may also result in confinement for examination. 24 D.C.Code § 610(b).

218. 24 D.C.Code § 611. Treatment in a purely civil context, it might be noted, is in

Despite the existence of these provisions, however, the Government contends that, since the Act has rarely been utilized,[219] the facilities presently available are inadequate to make the statute effective. Confronted with a similar argument in *Easter, supra,* this court held unequivocally that "[o]ne who has committed no crime cannot be validly sentenced as a criminal because of a lack of rehabilitative and caretaking facilities." 124 U.S.App.D.C. at 36, 361 F.2d at 53. Like the chronic alcoholic who is drunk in public, the non-trafficking addict possessor has committed no crime. The absence of treatment facilities is the responsibility, not of the addict, but of society generally, and the addict should not be treated as a criminal simply because society has failed to meet its responsibility. Had Congress acted to implement this statute with the necessary appropriations and facilities, this problem would not exist today. The statute is already on the books, and indeed has been for almost 20 years. Only the implementation is missing.[220]

The genius of the common law has long been its responsiveness to changing times, its ability to reflect new knowledge and developing social and moral values. What the law cannot do, if it is to remain true to its tradition, is to stand still while the world is in flux. *See, e.g.,* Holmes, The Path of the Law, 10 Harv.L.Rev. 457, 469 (1897). Drawing upon the past, the law must serve —as it always has served—the needs of the present. Thus on the basis of the considerations discussed above, I conclude that imposition of criminal liability on the non-trafficking addict possessor is contrary to our historic common law traditions of criminal responsibility. This being so, it is clear that a defense of "addiction" must exist for these individuals unless Congress has expressly and unequivocally manifested its intent to preclude such a defense. *See, e.g.,* Morissette v. United States, *supra,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288; Easter v. District of Columbia, *supra,* 124 U.S.App.D.C. at 43, 361 F.2d at 60 (McGowan, J., concurring); *cf.* United States v. International Minerals & Chemicals Corp., 402 U.S. 558, 563, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971); Durham v. United States, 94 U.S.App.D.C. 228, 240 & n.45, 214 F.2d 862, 874 & n. 45 (1954); 3 J. Sutherland, Statutory

---

some respects likely to be more effective than that provided in NARA, where the addict is involuntarily committed only after he has survived the degrading and dehumanizing process of a criminal prosecution. Given what we know about the insecure and unstable nature of the addict's personality, *see* text at notes 141–143 *supra,* such an experience can hardly be thought to be conducive to rehabilitation. *See, e. g.,* Ausubel, *supra* note 116, at 59.

219. As of 1966, the number of commitments under the Act ranged from a high of 35 in 1964 to a low of only 6 in 1961. *See* Report of the President's Commission, *supra* note 104, at 571.

220. There are, of course, certain gaps in the existing involuntary commitment procedures. *See* note 211 *supra.* I am confident, however, that these gaps will quickly be filled, and I am encouraged in this regard by the events following our decision in *Easter, supra* note 167. It is now clear that that decision gave added impetus toward causing new facilities and increased staffs to be made available in an effort to deal more effectively with the problem of alcoholism. Since *Easter,* Congress has enacted comprehensive legislation aimed at rehabilitating the chronic alcoholic in a non-criminal context. *See, e. g.,* 42 U.S.C. § 2688e *et seq.*; 42 U.S.C. § 4551 *et seq.* (1970); 24 D.C.Code § 521 *et seq.* (Supp. IV 1971). A number of bills presently before Congress would, if adopted, greatly expand the availability of involuntary civil commitment of narcotics addicts. *See, e. g.,* H.R. 1540, 92nd Cong., 1st Sess. (1971); H.R. 5714, 92nd Cong., 1st Sess. (1971). Moreover, it seems clear that rehabilitation of these addicts does not always require institutional care, as the success of outpatient methadone treatment demonstrates. *See* authorities cited in note 204 *supra.* Finally, my discussion of the D.C. commitment statute is not meant to suggest that any addict may be committed whether or not he is dangerous to society. Involuntary commitment of any individual whose freedom does not present such a danger might raise serious questions of constitutionality.

Construction §§ 6201–6203 (3d ed. 1943); E. Crawford, The Construction of Statutes 486–492 (1940).

C

It is apparent, then, that two separate interpretative presumptions—one based on constitutional and the other upon common law considerations—combine in this case to strongly suggest, if not compel, a construction of the federal narcotics statutes which would avoid infliction of criminal liability upon the non-trafficking addict possessor. And although these presumptions may, of course, be rebutted by a clear demonstration of a specific congressional intent to the contrary, the Government itself admits that evidence of such an intent is, at best, inconclusive. Indeed, after an exhaustive examination of almost 70 years of narcotics legislation, I must agree with the Government's own conclusion that "Congress has not expressly provided that addiction shall *not* be an affirmative defense to a charge of possessing illicit narcotics * * * ."[221]

The first significant legislation in this field was the Jones-Miller Act of 1909.[222] In enacting this statute, Congress hoped to curtail the constant flow of narcotic substances into the country. To achieve this goal, the Act prohibited importation of any narcotic drug contrary to law; receipt, concealment, purchase or sale of any such drug; or facilitation of any of these acts. Possession appears in the statute only as being "sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury." No effort was made to delineate which "explanations" would be acceptable, however, and Congress apparently left this question to the courts to resolve on the basis of common law principles of

criminal responsibility. Moreover, in neither the language of the statute nor the legislative history is there any indication that Congress intended to preclude recognition of "addiction" as a permissible defense for the non-trafficking addict possessor.[223] Indeed, such an intent would have been wholly incompatible with the prevailing mores of the time, for in the early years of this century the addict was viewed, not as a criminal, but as the victim of an unfortunate illness.[224]

Unlike the Jones-Miller Act, which was predicated on the Commerce Clause, the Harrison Act of 1914 [225] was cast in the form of a taxing measure and was designed to control domestic distribution of legally imported narcotics. As discussed previously, prior to 1914 such drugs could be obtained legally and at minimal cost over the counters of pharmacies, grocery stores, and even confectioneries.[226] In an effort to check these sloppy dispensing practices, a strict regulatory scheme was devised in the Harrison Act to ensure that such legally imported drugs did not stray into unauthorized hands. With certain exceptions, the Act made it unlawful for any person to produce, import, manufacture, compound, deal in, dispense, sell, distribute or give away any derivative of opium or cocaine unless he had registered, paid the required taxes, and maintained careful records of his transactions. Mere possession was not itself made criminal but was to be viewed simply as *prima facie* evidence of the proscribed acts. Thus, as with the Jones-Miller Act, this statute was designed solely as a regulatory measure, and in neither the statute nor the legislative history is there even the slightest suggestion that Congress intended, contrary to public opinion, to punish the addict

---

221. Brief for Appellee at 45 (emphasis in original).

222. Act of Feb. 9, 1909, c. 100, § 2, 35 Stat. 614 (repealed 1970).

223. *See, e. g.*, H.Rep.No.2003, 60th Cong., 2d Sess. (1909).

224. *See* text and notes at notes 53–56 *supra.*

225. Act of Dec. 17, 1914, c. 1, § 1, 38 Stat. 785 (repealed 1970).

226. *See* text and notes at notes 51–52 *supra.*

whose sole "crime" is to possess a sufficient quantity of the drug to satisfy the demands of his disease.[227] Indeed, only two years after the Act was adopted the Supreme Court, recognizing the limited purpose of the statute, held that Congress had not intended mere possession of a small amount of narcotics for personal use to trigger the statutory presumption of illegality. *See* United States v. Jin Fuey Moy, *supra*, 241 U.S. 394, 36 S.Ct. 658, 60 L.Ed. 1061.

After an extended hiatus of some 35 years, Congress again turned its attention to the problem of drug abuse in response to the sudden increase in illicit narcotics traffic following World War II.[228] In 1951, and again in 1956, Congress markedly enhanced the severity of punishments to be meted out for violations of the Jones-Miller and Harrison Acts.[229] In so doing, however, Congress focused its concern primarily upon the trafficker. As one House Report noted:

"Because contact with a drug is an essential prerequisite to addiction, the elimination of drug servility on the part of addicted persons can best be accomplished by the removal from society of the illicit trafficker. It is to this end that your committee has taken favorable action on [these amendments]." [230]

Thus, although these amendments did not alter the substantive provisions of the existing laws,[231] Congress expressly distinguished—in terms of penalties—between "actual traffickers" and those persons who were convicted simply on the basis of unexplained possession.[232] And this distinction apparently was carried over to the treatment of addicts, for although Congress made clear that addict *traffickers* were to be punished,[233] there is no indication whatever that Congress also intended to punish *non-trafficking* addict possessors.[234] On the contrary, Congress recognized that addicts are sick persons,[235] and seemed generally sympathetic to the plight of non-trafficking addicts.[236]

In 1953 [237] Congress enacted the Hospital Treatment for Drug Addicts Act

---

227. *See* text and notes at notes 57–60 *supra.* Indeed, in Nigro v. United States, 8 Cir., 117 F.2d 624, 629 (1941), the court noted that "the omission of Congress to make the act of an addict in purchasing narcotics to satisfy his cravings an offense is evidence of an affirmative legislative policy to leave the purchaser unpunished * * *."

228. *See* text and notes at notes 93–97 *supra.*

229. Act of Nov. 2, 1951, c. 666, § 1, 65 Stat. 767 (repealed 1970); Act of July 18, 1956, c. 629, § 103, 70 Stat. 568 (repealed 1970).

230. H.Rep.No.2388, 84th Cong., 2d Sess., 8 (1956), U.S.Code Cong. & Admin.News 1956, p. 3281; *see also* S.Rep.No.1997, 84th Cong., 2d Sess., 5–6 (1956); S.Rep. No. 1051, 82nd Cong., 1st Sess., 3–4 (1951); H.Rep.No.635, 82nd Cong., 1st Sess., 4–5 (1951). Judge Tamm continues to be of the firm view that a mandatory life sentence should be enacted for and enforced against all drug traffickers.

231. In enacting these amendments, Congress did not seek to make mere possession a crime in itself. Rather, it retained the statutory presumption that unexplained possession may be viewed as *prima facie* evidence of the proscribed acts. *See* 70 Stat. 568 (1956); 65 Stat. 767 (1951).

232. In 1951, Congress raised the penalties for all offenses without distinguishing between actual traffickers and unexplained possessors. *See* 65 Stat. 767 (1951). In 1956, however, the penalties for actual sale, barter, exchange or giving away of narcotic drugs were increased dramatically, while penalties for mere unexplained possession remained unchanged. *See* 70 Stat. 568 (1956).

233. *See, e. g.,* H.Rep.No.2388, 84th Cong., 2d Sess., 64 (1956).

234. *See, e. g.,* S.Rep.No.1997, 84th Cong., 2d Sess. (1956); H.Rep.No.2388, 84th Cong., 2d Sess. (1956).

235. Although not going so far as to label addiction a "disease," Congress recognized that it "is a symptom of mental or psychiatric disorder." H.Rep.No.2388, 84th Cong., 2d Sess., 8 (1956), U.S.Code Cong. & Admin.News 1956, p. 3281.

236. *See, e. g.,* H.Rep.No.2388, 84th Cong., 2d Sess. 7 (1956).

237. This Act is discussed in text and notes at notes 211–218 *supra.*

for the District of Columbia.[238] The preamble of this Act provides:

> "The Congress intends that Federal criminal laws shall be enforced against drug users as well as other persons, and [this statute] shall not be used to substitute treatment for punishment in cases of crime committed by drug users."[239]

Based on this one sentence, the Government argues that Congress specifically intended to punish all addicts for all "crimes" they may commit and, further, that Congress intended absolutely to forbid the continuing development of common law doctrines of criminal responsibility with reference to the disease of addiction. I cannot agree.[240] The underlying purposes of this legislation were set forth by Congressman Miller, the author and floor manager of the bill, during the House debate:

> " * * * [T]hese narcotic addicts are sick people. They ought not to be prosecuted and punished. The dope peddler is the one who needs to be punished, and there are criminal laws to take care of him. Many of these addicts need a helping hand, not a punishing whip, if they are to be cured of this vicious habit. The addict should not be forced to go through a criminal procedure as they do now in many States and suffer this stigma in order to get adequate treatment for their addiction." [241]

At the time this Act was adopted, possession of narcotic drugs [242] and posses-

sion of implements used to administer such drugs [243] were criminal offenses in the District of Columbia. And in 1956, when Congress drastically amended the Treatment Act to enhance the effectiveness of its provisions, it also enacted the Narcotics Vagrancy Act [244] which, among other things, made it unlawful for any addict to (a) mingle with others in public or "loiter" in any public place if he has no lawful means of support and is unable to give a good account of himself; (b) be found in any place where narcotic drugs are kept, used or dispensed; or (c) "wander about" in public places late at night if he cannot give a good account of himself. As a result, the addict became by necessity and, indeed, by definition, a walking criminal enterprise.[245] Yet under the Government's interpretation of the Treatment Act, the rehabilitative provisions of the statute would never be available to any addict who engaged in "criminal" activity.[246] Thus, in practical effect, the Government would have us assume that Congress enacted a complex statutory scheme for treatment of narcotic addicts which it never intended to be utilized. Such an assumption is, of course, contrary not only to logic but to the basic spirit of the Act. Moreover, it ignores the obvious import of its language.

The Treatment Act defines as an "addict" any person

> "who uses any habit-forming narcotic drugs so as to endanger the public

---

238. 24 D.C.Code § 601 et seq.

239. 24 D.C.Code § 601.

240. Initially it should be noted that this is an act of only local application. It is therefore questionable whether it is even relevant to our interpretation of national legislation.

241. 99 Cong.Rec. 2240–2241 (1953).

242. See 33 D.C.Code § 402 (1967).

243. See 22 D.C.Code § 3601 (1967).

244. 33 D.C.Code § 416a (1967). This statute has since been declared unconstitutional. See Ricks v. United States, 134 U.S.App.D.C. 215, 414 F.2d 1111 (1968).

245. See, e. g., Task Force, supra note 25, at 10; Joint Committee, supra note 51, at 64; Ausubel, supra note 116, at 59; Note, supra note 84, at 578.

246. This interpretation, I might add, represents a sudden and direct reversal of the Government's prior utilization of the Act, for in minor drug cases the United States Attorney has frequently agreed to drop prosecution if the addict defendant consents to civil commitment under the treatment statute. See Report of the President's Commission, supra note 104, at 571.

morals, health, safety, or welfare, or who is so far addicted to the use of such habit-forming drugs as to have *lost the power of self-control with reference to his addiction.*"[247]

When read with the preamble to the Act, this definition clearly indicates that Congress, while intending to punish addicts for their crimes, intended treatment rather than punishment for those addicts whose only "crime" is the use or possession of narcotics to satisfy their addiction.

Further, this express declaration that addicts are unable to control their use of narcotics is virtually identical with the congressional finding [248] this court relied on in *Easter, supra,* to recognize the defense of alcoholism:

"An essential element of criminal responsibility is the ability to avoid the conduct specified in the definition of the crime. * * * In case of a chronic alcoholic Congress has dealt with his condition so that in this jurisdiction he * * * cannot be held to be guilty of the crime of being intoxicated because, as the [Alcoholic Rehabilitation] Act recognizes, he has lost the power of self-control in the use of intoxicating beverages. In his case an essential element of criminal responsibility * * * is lacking.

This element is referred to in the law as the criminal mind. * * * "[249]

It is true, of course, that, unlike the Narcotics Treatment Act, the alcoholic statute contained an express authorization to the courts "to take judicial notice of the fact that a chronic alcoholic is a sick person and in need of proper medical, institutional, advisory, and rehabilitative treatment * * * ."[250] But this may indeed be a distinction without a difference. The entire structure of the Treatment Act is geared toward rehabilitating the addict "patient" [251] through medical care and treatment. And the legislative history of the Act makes clear that the foremost "purpose of this legislation is to establish and provide for the compulsory treatment of drug users in a manner *similar to the treatment of alcoholics* in the District of Columbia."[252] Thus, with all things considered, the Treatment Act is certainly not a bar; indeed, it is an invitation to use a civil approach rather than criminal stigmatization of addict possessors.

As we entered the decade of the 1960's, our knowledge and understanding of addiction continued to grow, and it soon became apparent that a penal solution to the problem of drug abuse is, in fact, no solution at all.[253] Thus in 1966 Congress enacted the Narcotic Addict

247. 24 D.C.Code § 602(a) (emphasis added). Technically, the statute uses this formulation to define the term "drug user," but it is clear that that phrase is being used interchangeably with the term "addict." *See* note 212 *supra.*

248. In the 1947 Alcoholic Rehabilitation Act Congress defined as a "chronic alcoholic" any person "who chronically and habitually uses alcoholic beverages to the extent that he has *lost the power of self-control with respect to the use of such beverages,* or while under the influence of alcohol endangers the public morals, health, safety, or welfare." 24 D.C.Code § 502 (1967) (emphasis added).

249. 124 U.S.App.D.C. at 35, 361 F.2d at 52.

250. 24 D.C.Code § 501 (1967).

251. The term "patient" is used throughout the Act. *See, e. g.,* 24 D.C.Code §§ 602 (c), 604–610.

252. S.Rep.No.365, 83rd Cong., 1st Sess., 3 (1953) (emphasis added) ; *accord* H.Rep. No.196, 83rd Cong., 1st Sess., 1 (1953).

253. As President Lyndon Johnson recognized, "[O]ur continued insistence on treating drug addicts * * * as criminals, is neither humane nor effective. It has neither curtailed addiction nor prevented crime." H.Rep.No.1486, 89th Cong., 2d Sess., 8 (1966). Similarly, Attorney General Katzenbach stated that the enactment of NARA "represents a fundamental reorientation toward the problem of addiction. * * * We have too long stressed punitive solutions and neglected medical and rehabilitative measures." Hearings Before Subcommittee No. 2 of the House Committee on the Judiciary, entitled "Civil Commitment and Treatment of Narcotic Addicts", 89th Cong., 1st & 2nd Sess., 79 (1965 & 1966).

Rehabilitation Act which, as noted in the Senate Report, was

"based upon the recognition that drug addiction cannot be cured by treating addicts as ordinary criminals, to be imprisoned and eventually released to return compulsively to a life of addiction and crime. Instead, the addict must be treated whenever possible as a medical problem, as a potentially productive citizen entitled to whatever assistance he can reasonably be given to enable him to end his dependence upon drugs and return to lead a normal, useful life."[254]

Throughout the legislative history it is repeatedly recognized that addiction is a disease,[255] and the Act itself emphasizes that, by definition, the addict has lost the power of self-control with reference to his continued use of narcotics.[256]

In practical effect, the Act is divided into three separate titles. Title I contemplates civil commitment in lieu of criminal prosecution for selected addicts charged with non-violent and non-trafficking offenses under federal law.[257] Title II provides for treatment in lieu of sentencing for certain addicts prosecuted and convicted of specified federal crimes.[258] And Title III is a purely civil commitment provision under which either the addict himself or a related individual may commence the commitment proceedings.[259] It is apparent, then, that under the first two titles Congress at least assumed that addicts *generally* might be prosecuted for crimes they may commit. But nothing in the Act, or in the legislative history, even remotely suggests that Congress intended to deny a *particular* class of addicts—those who are guilty of nothing more than mere purchase and possession of a sufficient quantity of narcotics to satisfy their disease—the right to present a defense of "addiction" based upon traditional common law principles of criminal responsibility. Indeed, the underlying spirit of the Act lends itself more readily to just the opposite conclusion.

This, then, brings us to the Comprehensive Drug Abuse Prevention and Control Act of 1970, which provided increased grants for and emphasis on drug treatment and rehabilitation programs,[260] replaced virtually all prior narcotic and dangerous drug laws—including the Jones-Miller and Harrison Acts—and drastically reduced the penalties to be imposed for all federal narcotics offenses.[261] In addition, the Act

254. S.Rep.No.1667, 89th Cong., 2d Sess., 37 (1966). The substantive provisions of NARA are preceded by a declaration of congressional policy to the effect that addicts convicted of or charged with certain criminal offenses should be civilly committed for rehabilitation rather than criminally punished. Pub.L. 89–793, § 2, 80 Stat. 1438 (1966).

255. The House Report, for example, characterizes addiction as an "acute illness." H.Rep.No.1486, 89th Cong., 2d Sess., 13 (1966). Testifying on the legislation that was eventually to become NARA, representatives of the Department of Health, Education and Welfare stated:
"(1) We recognize that addicts are sick persons;
"(2) We believe that addicts should come under medical supervision for treatment;
"(3) We believe that with treatment, including adequate aftercare, increasing numbers of addicts will be returned to useful lives in the community * * *."

Hearings, *supra* note 253, at 131. Attorney General Katzenbach testified that:
"Strong public support has enabled science to conquer many of the terrible diseases which afflicted man in the past. We are continuing an all-out effort against heart disease, cancer, and other maladies as yet undefeated.
"Drug addiction is a fearful disease of the mind and body no less damaging and no less deserving of our attention." *Id.* at 83.

256. *See, e. g.,* 18 U.S.C. § 4251(a); 28 U.S.C. § 2901(a); 42 U.S.C. § 3411(a).

257. *See* 28 U.S.C. § 2901 *et seq.*

258. *See* 18 U.S.C. § 4251 *et seq.*

259. *See* 42 U.S.C. § 3411 *et seq.*

260. *See, e. g.,* 42 U.S.C. § 260; 42 U.S.C. § 2688k(a); 42 U.S.C. § 2688n–1(a); 42 U.S.C. § 2809.

261. 21 U.S.C. § 801 *et seq.*

eliminated the pre-existing "presumption of guilt based on possession" construct, and enacted in its stead a separate offense of possession for use.[262] As we have already seen, however, use of narcotic drugs is by no means restricted solely to addicts,[263] and there is no indication whatever that Congress intended to punish mere *addict* possessors under the terms of this provision. Moreover, at the time this Act was adopted, Congress was well aware [264] of this court's suggestion in Watson v. United States, *supra*, that the federal narcotics statutes might never have been intended to apply to non-trafficking addict possessors. Thus, had Congress wished to preclude an addiction defense, it had ample warning and opportunity to do so. Instead, it chose to remain silent, stating simply that the question whether such addicts " 'can be held criminally responsible can only be decided in the courts, case by case.' " [265]

Thus the most that can reasonably be said about these statutes is that Congress has taken no position whatever on the precise issue confronting this court today. I therefore conclude, on the basis of considerations discussed throughout this opinion, that a narcotics addict may properly assert a defense of "addiction" in any prosecution charging him with mere purchase, receipt or possession of a quantity of narcotics which he intends to use himself in order to satisfy the demands of his disease. The hallmark of our legal system is, and always has been, its remarkable ability to adapt to new ideas and new situations. It is

simply too late in the day for us to shut our eyes in ignorance and to allow injustice to persist in blind imitation of the past. As medical knowledge continues to advance and standards of decency continue to evolve, our legal concepts of crime and punishment must change as well. Yet this is not a cause for alarm, as some may fear, but a reason for hope that as our civilization progresses our treatment of unsocial conduct will consistently become both more humane and more effective.

## V. THE NATURE OF THE DEFENSE

Perhaps the most troublesome question arising out of recognition of the addiction defense I suggest is whether it should be limited only to those acts—such as mere possession for use—which are inherent in the disease itself. It can hardly be doubted that, in at least some instances, an addict may in fact be "compelled" to engage in other types of criminal activity in order to obtain sufficient funds to purchase his necessary supply of narcotics. In such cases, common law principles of criminal responsibility would clearly be applicable. Indeed, it would seem intolerable that such addicts, who are "already crippled by an almost hopeless cycle of poverty, ignorance and drugs, should be further burdened by the moral stigma of guilt, *not* because they are morally blameworthy, but merely because we cannot afford to treat them as if they are not." United States v. Carter, 141 U.S.App.D.C. 46, 56, 436 F.2d 200, 210 (1970) (Chief

---

262. *See* 21 U.S.C. § 844 (1970). Crimes of trafficking were placed in a separate section, which authorized more severe penalties. *See* 21 U.S.C. § 841(a)(1) (1970).

263. *See* text and notes at notes 138–140 *supra.*

264. *See, e. g.,* Hearings Before the House Committee on Ways and Means on Legislation to Regulate Controlled Dangerous Substances and Amend Narcotics and Drug Laws, 91st Cong., 2d Sess., 328, 377 (1970).

265. H.Rep.No.1444, 91st Cong., 2d Sess., pt. 1, at 9 (1970), U.S.Code Cong. & Admin.News 1970, p. 4574, *quoting* Advisory Commission, *supra* note 79, at 3. The Government also argues that, since Congress consistently re-enacted these statutes with knowledge that they had been interpreted as applying to non-trafficking addict possessors, it must have intended such a result. It is equally, if not more, likely, however, that Congress intended to remain neutral on this question and to leave its resolution to the courts. *See ibid.*

Judge Bazelon, concurring) (emphasis in original). Nevertheless, I am convinced that Congress has manifested a clear intent to preclude common law extension of the defense beyond those crimes which, like the act of possession, cause direct harm only to the addict himself.

In the 1956 amendments to the Jones-Miller and Harrison Acts,[266] for example, Congress stated unequivocally that addict traffickers should be treated no differently than nonaddict traffickers:

> "Some testimony was received by the subcommittee to the effect that in determining the degree of punishment a distinction should be made between the nonaddict trafficker and the addict trafficker with the latter group being dealt with less severely. It is the view of your subcommittee that the addict trafficker is just as vicious a person as the nonaddict trafficker, that his deeds are no less heinous by virtue of his addiction, and any attempt to place such individuals in a separate category with a view to dealing less severely with them would only serve to encourage the addict trafficker to the detriment of society." [267]

The rationale underlying this congressional judgment must, of course, extend logically not only to acts of trafficking, but to all crimes which directly threaten the life, limb, health or property of others.

Moreover, in enacting Titles I and II of NARA, Congress expressly intended that addicts charged with specified crimes of violence or certain types of trafficking should be held criminally liable despite their addiction.[268] For lesser crimes, such as shoplifting or fraud, civil commitment was made available *in lieu of prosecution or sentencing* and only *after* the addict offender had been brought into the criminal process.[269] Indeed, the entire structure of NARA reflects a specific congressional determination that addicts generally should not be exempt from criminal prosecution. Of course, as indicated earlier,[270] there is room for flexibility in interpreting the general provisions of NARA. But the Act is not so flexible that it might reasonably be interpreted as permitting this court, under common law principles of criminal responsibility, to require non-criminal treatment of virtually all addict offenders.[271] Such an interpretation would, of necessity,[272] render the commitment provisions of Titles I and II practically meaningless, and Congress could hardly have intended such a result.

When viewed from the constitutional perspective, however, this "line-drawing" question is somewhat less settled. Mr. Justice Fortas, writing for four members of the Court in Powell v. Texas, *supra*, noted that, although the Eighth Amendment would, in his view, forbid infliction of criminal liability upon the chronic alcoholic who is "guilty" of no more than mere public intoxication,

> compelled by their disease to engage in the particular criminal activity at issue. In practical effect, however, it seems clear that most addict crime is in fact inseparable from the disease. Moreover, it would be extremely difficult to differentiate between crimes which derive from the addiction and crimes which may be viewed as the product of some independent antisocial tendencies. And since the burden of proof on this issue would presumably lie with the Government, the defense would in all likelihood serve to acquit at least most, if not all, addicts of their otherwise criminal acts.

266. Act of July 18, 1956, c. 629, § 103, 70 Stat. 568 (repealed 1970).

267. H.Rep.No.2388, 84th Cong., 2d Sess., 64 (1956), U.S.Code Cong. & Admin. News 1956, p. 3304.

268. *See* 18 U.S.C. § 4251(b), (f)(1), (f)(3); 28 U.S.C. § 2901(c), (g)(1), (g)(2).

269. *See* 18 U.S.C. § 4251 *et seq.*; 28 U.S.C. § 2901 *et seq.*

270. *See* text and notes at notes 253–260 *supra*.

271. Extension of the addiction defense to other crimes would, of course, exculpate only those addict offenders who were

272. *See* text and notes at notes 208–209 *supra*.

"[i]t is not foreseeable that findings such as those which are decisive here —namely that the appellant's being intoxicated in public was a part of the pattern of his disease and due to a compulsion symptomatic of that disease—could or would be made in the case of offenses such as driving a car while intoxicated, assault, theft, or robbery. Such offenses require independent acts or conduct and do not typically flow from and are not part of the syndrome of the disease of chronic alcoholism. If an alcoholic should be convicted for criminal conduct which is not a characteristic and involuntary part of the pattern of the disease as it afflicts him, nothing herein would prevent his punishment." [273]

Similarly, Mr. Justice White, who apparently agreed in principle with much of Justice Fortas' discussion of the public intoxication issue,[274] stated that the Eighth Amendment might not bar conviction of a chronic alcoholic for "crimes involving much greater risk to society." [275] With reference to narcotics addiction,

"such a construction of the Eighth Amendment would bar conviction only * * * for acts which are a necessary part of addiction, such as simple use. Beyond that it would preclude punishment only when the addiction to or the use of drugs caused sufficient loss of physical and mental faculties. This doctrine would not bar conviction of a heroin addict * * * for committing other criminal acts." [276]

While these comments in *Powell* were offered simply as dicta, they do indicate the position of the Court. Consequently I would limit the availability of the addiction defense to only those acts which, like mere purchase, receipt or possession of narcotics for personal use,[277] are inseparable from the disease itself and, at the same time, inflict no direct harm upon other members of society.[278]

273. 392 U.S. at 559 n. 2, 88 S.Ct. at 2167. *See also* Driver v. Hinnant, *supra* note 167, 356 F.2d at 764. Mr. Justice Marshall, also writing for 4 members of the Court, declared that this limiting principle was simply "limitation by fiat." 392 U.S. at 534, 88 S.Ct. 2145.

274. *See* text at notes 175–176 *supra*.

275. 392 U.S. at 552 n. 4, 88 S.Ct. at 2164.

276. *Id.* at 552–553 n. 4, 88 S.Ct. at 2164.

277. The defense would also be available for such acts as mere presence in an "illegal establishment" where narcotic drugs are used or stored, and purchase, receipt, possession or use of implements necessary for administration of narcotics.

278. This does not mean, however, that the question of addiction is irrelevant in prosecutions involving those crimes for which the addiction defense is unavailable. On the contrary, in at least three respects the presence of addiction may be highly relevant. First, it remains clear that narcotics addiction may be symptomatic of some underlying mental illness which will relieve the addict of criminal responsibility for the crime charged. In Gaskins v. United States, 133 U.S.App.D.C. 288, 290, 410 F.2d 987, 989 (1967), this court summarized the relationship between addiction and insanity:

"The fact of addiction standing alone, does not permit a finding of mental disease or defect. Evidence of that fact, however, has probative value in conjunction with evidence of mental illness, and the effect of a deprivation of narcotics on behavioral controls is a relevant circumstance. We have recognized, too, that extensive and protracted addiction may so deteriorate such controls as to produce irresponsibility within our insanity test. * * *"
(Footnotes omitted.) *See also* Green v. United States, 127 U.S.App.D.C. 272, 383 F.2d 199 (1967); Greene v. United States, 122 U.S.App.D.C. 150, 352 F.2d 366 (1965); Heard v. United States, 121 U.S.App.D.C. 37, 348 F.2d 43 (1965); Castle v. United States, 120 U.S.App.D.C. 398, 347 F.2d 492 (1964), cert. denied, 381 U.S. 929, 85 S.Ct. 1568, 14 L.Ed.2d 687 (1965); Brown v. United States, 118 U.S.App.D.C. 76, 331 F.2d 822 (1964). Second, there exists the possibility, as yet undecided, that this court might recognize a defense of narcosis, similar to the intoxication defense, which would require acquittal of a defendant whose use of drugs at the time of the offense negatives his ability to form the specific intent necessary for conviction of certain crimes. *See* United States v. Richardson, 148 U.S. App.D.C. 109, 459 F.2d 1133 (1972).

Perhaps the most difficult problem associated with the limited applicability of the addiction defense concerns the distinction between the trafficking and non-trafficking addict possessor. Fortunately, the Comprehensive Drug Abuse Prevention and Control Act of 1970, which is of course applicable in all future prosecutions, provides a convenient construct within which the issue may be litigated. The Act creates two entirely separate possession-related offenses, which may be termed (a) "mere possession," [279] and (b) possession "with intent to manufacture, distribute, or dispense." [280] Thus whenever any individual is found in possession of illicit narcotics, he may be charged under any one of three possible indictments. First, and least likely, the accused might be charged only with possession with intent to distribute. In such a situation, evidence of addiction would be clearly irrelevant, since under the addiction defense even an addict may be convicted of trafficking. Second, the individual might be charged simply with "mere possession." In this case, the availability of the defense would be dependent solely upon the question of addiction. Since the defendant is not accused of possession with intent to distribute, evidence of trafficking (i. e., in the past) would be inadmissible and could not be used to defeat the defense.[281] Finally, the offender might be charged with both possession with intent to distribute and, as a lesser included offense, "mere possession." Here, evidence as to both addiction and trafficking would be relevant. If the defendant is convicted of possession with intent to distribute, the question of addiction becomes moot and the lesser included offense should, of course, be dismissed. If, on the other hand, the individual is acquitted on the trafficking count, the jury should then determine (a) whether he was in fact in possession, and (b) if so, whether he was an addict at the time of the offense.

The basic question of criminal responsibility under the addiction defense is a legal, and not a purely medical, determination. Not all drug users are "addicts" and, as with any compulsion, the degree of dependence may vary among different individuals and, indeed, even in a given individual at different stages of his addiction. Thus what we are concerned with here is not an abstract medical or psychiatric definition of addiction which sets forth a clinical checklist of relevant symptoms but, rather, a behavioral model, based upon traditional legal and moral principles, which tests the ability of the defendant to control his behavior. The essential inquiry, then, is simply whether, at the time of the offense, the defendant, as a result of his repeated use of narcotics, lacked substantial capacity to conform his conduct to the requirements of the law.[282]

Cf. United States v. Brawner, supra note 185, 153 U.S.App.D.C. at 30–35, 471 F.2d at 998–1003. Finally, for those addict offenders who are eligible there is always the possibility of civil commitment for rehabilitative treatment under NARA. As to the constitutionality of the various exclusionary provisions presently operable under NARA, I note only that "[i]f society demands that individuals * * * must be held criminally responsible for their actions despite the fact that they are products of addiction, then the burden is on society to make every effort to rehabilitate [such persons]." United States v. Turner, D.D.C., 337 F.Supp. 1045, 1050 (1972).

279. 21 U.S.C. § 844(a).

280. 21 U.S.C. § 841(a)(1). This section also prohibits actual manufacture, distribution or dispensing of illicit narcotics.

281. In this respect, prior acts of trafficking should be viewed in the same manner as any other crimes the defendant might previously have committed. Clearly the addiction defense would not be made unavailable simply because the defendant had previously been convicted of theft or, indeed, even murder. Similarly, although evidence of trafficking is of course admissible to prove that the accused intended to distribute the narcotics found in his possession, if the Government fails to allege or to prove such an intent the question of trafficking becomes irrelevant.

282. This test of addiction is adapted from the standard for the insanity defense recently announced by this court in United States v. Brawner, supra note 185. In pertinent part, that decision declares that a defendant must be acquitted on the ground of insanity

As noted in *Watson, supra,* a defendant who seeks to raise this issue as an affirmative defense at trial[283] should bear the burden of going forward with some evidence of addiction.[284] If the prosecution disputes this evidence, it should then bear the burden of persuasion beyond a reasonable doubt.[285] A proper adjudication of the addiction defense would require that the jury be fully informed as to both the nature of the disease and the manner in which it affects the particular defendant. The extent to which the defendant's ability to avoid the use of narcotics has been overcome by his physical and/or psychologi-

---

"if, at the time of the criminal conduct, the defendant, as a result of mental disease or defect, either lacked substantial capacity to conform his conduct to the requirements of the law, or lacked substantial capacity to appreciate the wrongfulness of his conduct." 153 U.S.App.D.C. at 40, 471 F.2d at 1008. The reasons for the technical modifications of this standard, such as substitution of "his repeated use of narcotics" in place of "mental disease or defect," are obvious in light of the differences between addiction and insanity. The one major change is the deletion of the phrase "or lacked substantial capacity to appreciate the wrongfulness of his conduct." This alteration is due to the fact that the addiction defense focuses, as it should, on the volitional rather than the cognitive aspect of incapacity. If an addict has suffered a substantial impairment of his cognitive faculties, this would invariably be reflected in a recognized "mental disease or defect." *See* note 278 *supra.*

283. Any defense "which is capable of determination without the trial of the general issue may be raised before trial by motion." Rule 12(b)(1), Fed.R.Crim.P. Thus if the defendant is charged only with mere possession, the addiction defense could be raised either as an affirmative defense at trial or as a pretrial motion to dismiss. This is so because the availability of the defense, which in this situation would be dependent solely upon the addiction issue, could be conclusively determined before trial without requiring any evidence on the "general issue" of possession. When such a motion is made, the judge should determine whether the Government has presented sufficient evidence to go to the jury on the question of addiction. If not, the motion should of course be granted. If the motion is denied, the defense could then be raised as an affirmative defense at trial. Hearings on such a motion could, in the trial court's discretion, "be deferred for determination at the trial of the general issue." Rule 12(b)(4), Fed.R.Crim.P. If possession with intent to distribute is alleged, on the other hand, the defense could be raised only at trial, since even a pretrial find-

ing of addiction could not in itself establish the defense.

284. "[T]here can be no sharp quantitative or qualitative definition of 'some evidence.' Certainly it means more than a scintilla, yet, of course, the amount need not be so substantial as to require, if uncontroverted, a directed verdict of acquittal." McDonald v. United States, *supra* note 185, 114 U.S.App.D.C. at 122, 312 F.2d at 849. As a guiding principle, however, competent evidence of physical dependence should be sufficient to raise the issue of addiction. This does *not* mean that such a showing would be *necessary* to satisfy the "some evidence" requirement, nor does it mean that the existence of physical dependence would in itself be conclusive on the ultimate issue of criminal responsibility. *See* note 286 *infra.*

285. *Watson* premised this allocation of the burden of proof upon an analogy to the insanity defense. *See* 141 U.S.App.D.C. at 347, 439 F.2d at 454; *see also* Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895). Soon after *Watson* was decided, however, Congress amended the District of Columbia Code so as to provide that: "No person accused of an offense shall be acquitted on the ground that he was insane at the time of its commission unless his insanity, regardless of who raises the issue, is affirmatively established by a preponderance of the evidence." 24 D.C.Code § 301 (Supp. IV 1971). Questions have been raised as to the constitutionality of this provision, *see, e. g.,* United States v. Eichberg, 142 U.S.App.D.C. 110, 114, 439 F.2d 620, 624 (1971). (Chief Judge Bazelon, concurring), and as to its applicability to offenses committed in the District of Columbia which are not violations of the D.C.Code but are violations of the United States Code, *see, e. g.,* United States v. Thompson, 147 U.S.App. D.C. 1, 452 F.2d 1333 (1971). It would of course be inappropriate for us to decide these questions at this time. As a general matter, however, the burden of proof on the addiction issue should be allocated in a manner similar to that in the area of insanity.

cal dependence should be explored in the broad context of evidence concerning his mental and emotional processes, his family, educational and cultural background, the length of time he has used narcotics and the type of drug used, and any other evidence which might be relevant to the ultimate question of criminal responsibility. It must be emphasized that, as in the area of insanity, this ultimate question should be one for the triers of fact, and its resolution should not be controlled simply by expert opinion as to whether or not the accused is an "addict." See, e. g., United States v. Brawner, supra; Washington v. United States, 129 U.S.App.D.C. 29, 390 F.2d 444 (1967); McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962) (en banc). Finally, it should be clear that neither presence nor absence of any specific symptom of "addiction," as defined in a purely clinical sense, should be conclusive on this question.[286] Rather, the jury should decide, on the basis of all the evidence presented, whether the defendant, as a result of his repeated use of narcotics, lacked substantial capacity to conform his conduct to the requirements of the law.

## VI. CONCLUSION

These then are the principles I suggest should be applied where the defense of addiction is raised. Acceptance of these principles is but a short step past the principles announced in the Supreme Court's opinions in *Robinson* and *Powell* and in our opinions in *Easter* and *Watson*. In a dynamic, developing concept of the common law of *mens rea* these cases point the way. These principles demonstrate the humanism as well as the pragmatism of the common law. They address themselves to the solution of a grave social problem with characteristic sensitivity. And they offer hope that treatment of addicts, rather than criminal stigmatization, will bring peace to our cities.

I respectfully dissent.

BAZELON, Chief Judge (concurring in part and dissenting in part):

The views on which I would resolve the issues in this case are set forth in my separate opinions in United States v. Brawner, 153 U.S.App.D.C. 1, 471 F.2d 969, at 1022–1034 (1972) (en banc) and United States v. Alexander & Murdock, 152 U.S.App.D.C. 371, 471 F.2d 923, at 948–951 (1972). On the issue of guilt or innocence, Judge Wright's views are closest to my own. I cannot, however, accept his view that the addiction/responsibility defense should be limited to the offense of possession. I would also permit a jury to consider addiction as a defense to a charge of, for example, armed robbery or trafficking in drugs, to determine whether the defendant was under such duress or compulsion, because of his addiction, that he was unable to conform his conduct to the requirements of the law.

Although I disagree with the Court's decision on the underlying responsibility issue, given that decision, the views on NARA and on sentencing expressed in Part V of Judge Leventhal's opinion do seem useful. For the purpose of decision, therefore, I join in Part V of that opinion.

286. Thus the defense might be available even though the defendant is not physically dependent on narcotics. As we have seen, the psychological component of addiction may in some cases be even more severe than the physical. I see no reason why, if an individual's use of drugs has led to a substantial impairment of his ability to avoid the use of narcotics, the defense should be inapplicable simply because his dependence is psychological in nature. In effect, then, the defense could be asserted by any individual regardless of whether the drug he uses is physically addicting. See note 129 *supra*. As a practical matter, however, depending upon the drug involved, it might be considerably more difficult for the defendant to raise the defense and correspondingly easier for the Government to defeat it where physical dependence is absent.